**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**DRAGON JADE INTERNATIONAL,**
**LTD., a British Virgin Island limited**
**company,**                                     **CASE NO:  8:17-cv-2422-T-27TBM**

        **Plaintiff,**

**vs.**

**ULTROID, LLC, a Nevada corporation;**
**ULTROID MARKETING DEVELOPMENT**
**CORP., a Florida corporation; ULTROID**
**TECHNOLOGIES, INC., a Florida corporation,**

        **Defendants,**

**and**

**ULTROID, LLC, a Nevada corporation;**
**ULTROID MARKETING DEVELOPMENT**
**CORP., a Florida corporation,**

        **Counter-Plaintiffs,**

**vs.**

**DRAGON JADE INTERNATIONAL, LTD.,**
**a British Virgin Island limited company,**

        **Counter-Defendant.**
_____/

## SECOND AMENDED COUNTERCLAIMS

        Defendants/Counter-Plaintiffs ULTROID, LLC ("ULLC"), ULTROID MARKETING

DEVELOPMENT CORPORATION ("UMDC"), and ULTROID TECHNOLOGIES, INC.

("UT") (collectively referred to as the "Ultroid Companies"), by and through undersigned

counsel, hereby sue the Counter-Defendant DRAGON JADE INTERNATIONAL, LTD. ("Dragon Jade") and state as follows:

## JURSIDCTION AND VENUE

1.      As alleged in Paragraphs 13 and 15 of the Complaint (Doc. 1), the Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because one of the Counterclaims are brought under federal law, which provides the Court with supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

## GENERAL FACTUAL ALLEGATIONS

### The Ultroid Companies and their Product

2.      In the early 2000s, an electrical engineer and gastroenterologist designed what is now known as the Ultroid Hemorrhoid Management System ("Product"), an innovative device that provides a pain-free, non-invasive, and effective treatment of hemorrhoids through the use of a low voltage electrical charge. They applied for and received approval from the FDA to manufacture the Product.

3.      The Product was approved by the Federal Drug Administration in or around 2003.

4.      Sometime thereafter, UT purchased the Product and obtained its related intellectual property. At the time, UT was a subsidiary of Vascular Technologies, Inc., and both companies were owned by Michael Cao.

5.      Michael Knox was hired as the CFO for UT in 2007. This was when he first became involved with the Ultroid Companies.

6.     ULLC and UMDC were established in 2011 and 2012, respectively. Mr. Knox assumed the role of manager and CEO, respectively, for those companies at their inception. Additionally, he was the Secretary, Treasurer, and a Director of UMDC. He was also the Registered Agent for UT.

7.     ULLC was established as a holding company to hold the intellectual property associated with the Product; UT was responsible for manufacturing the Product; and UMDC was responsible for the distribution and sales of the Product.

8.     UT was administratively dissolved in late 2015.

9.     In early 2016, UMDC spun-off from UT and Vascular Technologies In., and ULLC became a wholly owned subsidiary of UMDC.

10.     ULLC is the current holder of the following intellectual property rights pertaining to the Product, among others:

     a.     The 510(k) premarketing authorization;

     b.     US Patent No. 8131380l;

     c.     CA Patent No. 2597892;

     d.     US Registered Trademark No. 3526435; and,

     e.     US Registered Trademark No. 1485175

(collectively referred to as the "Assets").

11.     In February 2016, Michael Knox fell critically ill. Later that year, around July of 2016, Mr. Knox resigned from his role of CEO, leaving Michael Cao in charge.

12.     Michael Cao resigned in or around October 2016. At that time, Michael Knox was a Director and an officer of UMDC.

13.     Michael Goeree is the current CEO, chairman, and President of UMDC. He assumed these roles on or about September 22, 2017.

14.     Mr. Knox was terminated from his remaining positions with the Ultroid Companies.

***Dragon Jade's involvement with the Ultroid Companies***

15.     In or around June of 2015, after learning of the Product, Dragon Jade's CEO, Dr. Steve Lai, became interested in the Product and the Ultroid Companies and requested to meet with a representative of the Ultroid Companies.

16.     In June of 2015, Michael Cao visited Hong Kong to meet with Dr. Lai and Dragon Jade's representatives.

17.     During the June 2015 visit, it was agreed that a representative of the Ultroid Companies would demonstrate the Product to Dragon Jade by performing a procedure on the chairman of Dragon Jade.

18.     Dragon Jade's interest in the Product and the Ultroid Companies increased after this demonstration.

19.     Mr. Cao entered into an Exclusive Distribution Agreement with Dragon Jade on behalf of the Ultroid Companies, whereby Dragon Jade would be the exclusive distributor of the Product throughout China.

20.     Soon after, upon recognizing the success of the companies and their Product, Dragon Jade expressed an interest in acquiring the Ultroid Companies.

21.     In February 2016, the Ultroid Companies were appraised at approximately $84,000.000.

22.     However, Dragon Jade and Dr. Lai were determined to obtain the Product for far less.

23.     Through 2016, Dragon Jade, Dr. Lai, and a Dragon Jade consultant, Glenn Henricksen, finagled ways to reduce the purchase price of the Ultroid Companies.

24.     They identified an ideal opportunity to swoop in on the Ultroid Companies after the companies voluntarily recalled the Product in September 2016, as a result of their quality management system ("QMS") falling below FDA standards.

25.     This was not an issue with the Product itself, and Dragon Jade's interest in the companies did not diminish.

26.     Dragon Jade and its representatives, including Glenn Henricksen and Dr. Lai, proposed that the parties enter into an agreement whereby Dragon Jade would assist in funding certain aspects of and completing certain tasks associated with the remediation in exchange for an exclusive right to purchase the Ultroid Companies' Assets.

27.     Dragon Jade's attorney, Richard Blaylock, assisted Dragon Jade, Dr. Lai, and Mr. Henricksen in formulating the terms of an Exclusive Option and Remediation Agreement ("Option Agreement") that was to memorialize Dragon Jade's purported right to purchase the Assets.

28.     Despite prior appraisals of the Ultroid Companies and the value of the Product, Dragon Jade has suggested that the purchase price of the Assets under the Option Agreement was to be only $1,000,000.00.

29.     Mr. Henricksen presented verbal terms of the Option Agreement to the Ultroid Companies' only two Board members, Michael Knox and Kevin McAdams, during a January

2017 Board meeting. However, the terms were never presented to the Ultroid Companies' shareholders.

30.     Mr. Knox and Mr. McAdams approved the verbal terms, but requested that they be reduced to writing.

31.     Thereafter, Dragon Jade and its attorney, Mr. Blaylock, only communicated with Mr. Knox.

32.     Mr. Blaylock then drafted the Option Agreement and a corresponding Security Agreement, which are attached to the Complaint at Docs. 1-1 and 1-2, respectively and incorporated hereto by reference.

33.     Mr. Blaylock reduced the terms to be most favorable to Dragon Jade and drafted the Agreements in such a vague and ambiguous manner as to give Dragon Jade the ability to interpret the Agreements in any way that met its desires.

34.     The drafted Agreements were never presented to the Ultroid Companies' Board or shareholders.

35.     Michael Knox executed the Option and Security Agreements on January 19, 2017, and January 20, 2017, respectively.

36.     He signed the Agreements on behalf of the Ultroid Companies, including the administratively dissolved UT, despite lacking the legal authority to do so.

*Current status*

37.     When Michael Goeree came on board in September 2017, he learned of some suspicious circumstances regarding the execution of the Agreements.

38.     He also learned of Dragon Jade's shortcomings under the Agreements.

39.     On September 22, 2017, the Ultroid Companies terminated the Option Agreement and the parties' relationship.

40.     Since Mr. Goeree's employment in September 2017, the Ultroid Companies have secured funding and continued their efforts to remediate the QMS. They have entered into agreements to ensure the successful remediation of the QMS and have secured manufacturing of the Product.

41.     The Ultroid Companies have been able to remediate the QMS and get the Product prepared for market for a price significantly less than what has been claimed by Dragon Jade.

## COUNTERCLAIM I

### VIOLATION OF FDUTPA
### (The Ultroid Companies against Dragon Jade)

42.     The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41 as if fully set forth herein.

43.     When Michael Cao visited Dr. Lai and Dragon Jade in Hong Kong in June of 2015, Dragon Jade paid for all of his expenses, including but not limited his entertainment, travel, hotel, and food.

44.     During the Fall of 2015, Dragon Jade requested that Mr. Cao and Mr. Knox return to Hong Kong to discuss Dragon Jade's interest in purchasing the Ultroid Companies and the Product.

45.     Mr. Cao had contacted Glenn Henricksen to represent the Ultroid Companies in the potential sale of the companies. This was before Dragon Jade and its representatives had known of or met Mr. Henricksen.

46.     In November 2015, Mr. Cao and Mr. Knox returned to Hong Kong. Dragon Jade again paid for entertainment and expenses for Mr. Cao and Mr. Knox during their visit.

47.     While in Hong Kong, Mr. Cao and Mr. Knox met with Dr. Lai, who was adamant about buying the Ultroid Companies, particularly because Dragon Jade wanted to acquire the Product.

48.     Dr. Lai suggested a purchase price of $80,000,000.00 and requested that Mr. Cao and Mr. Knox get an appraisal of the Ultroid Companies that would substantiate this price.

49.     On their last evening in Hong Kong, Mr. Cao introduced Mr. Henricksen to Dragon Jade's representatives.

50.     In February 2016, the Ultroid Companies were appraised by a certified valuation analyst group at $84,000,000.00.

51.     Also in February 2016, Mr. Knox fell critically ill, requiring extensive hospitalization and treatment. He was in a coma for nearly a week and hospitalized for nearly a month.

52.     During this time, Mr. Cao assumed the role of acting CEO for the Ultroid Companies.

53.     Mr. Knox was released from the hospital on or around March 17, 2016. Following his release, he remained extremely vulnerable and ill.

54.     Mr. Knox never reassumed his full duties. He resigned as CEO and manager of UMDC and ULLC in July 2016, but he stayed on as Secretary, Treasurer, Director, and advisor for UMDC.

55.     In April 2016, Mr. Cao re-visited Hong Kong to meet with Dr. Lai to continue the discussions regarding Dragon Jade's acquisition of the Ultroid Companies for $80,000,000.00.

56.     Dragon Jade requested that Michael Knox attend this meeting as well, recognizing that his knowledge of the Product and Assets and connections made him an asset to the Ultroid

Companies. To facilitate a smooth transaction, Mr. Knox went, despite his ongoing health concerns.

57.     Again, all expenses and entertainment were paid for by Dragon Jade.

58.     Mr. Cao traveled to Hong Kong one day prior to Mr. Knox. When Mr. Knox arrived, he observed Mr. Cao and Dr. Lai refer to one another as "brothers" and Dr. Lai hand Mr. Cao an envelope that contained a significant amount of cash.

59.     While in Hong Kong, Dr. Lai advised that Dragon Jade had reduced the purchase price of the Ultroid Companies to $40,000,000.00. This purchase price was to be paid $10,000,000.00 in cash and $30,000,000.00 in Dragon Jade stock.

60.     Mr. Cao knew of Dragon Jade's intention to reduce the purchase price, and he was paid under the table in exchange for his acquiescence.

61.     In October 2016, Mr. Cao resigned from the Ultroid Companies, leaving the recovering and vulnerable Michael Knox as the only one to handle day-to-day operations and decision-making for the Ultroid Companies.

62.     At some point in time leading up to October 2016, Glenn Henricksen jumped ship and assumed a consulting role with Dragon Jade.

63.     As a result of the September 2016 voluntary recall, the Ultroid Companies had to temporarily suspend manufacturing of the Product.

64.     Nonetheless, in the late part of Fall 2016, Mr. Henricksen communicated to Mr. Knox that Dragon Jade was still interested in the Ultroid Companies' Product and in acquiring the Assets.

65.     To put the Ultroid Companies in a bind and further tie their hands after the voluntary recall and temporary manufacturing suspension, Dragon Jade initiated arbitration

proceedings against the Ultroid Companies because it could not fulfill an order of the Product supply under the Exclusive Distribution Agreement.

66.    Shortly thereafter, Dragon Jade proposed the terms of the Option Agreement.

67.    The terms were never presented to the Ultroid Companies' shareholders.

68.    Rather, it was only discussed with the recovering and vulnerable Michael Knox.

69.    In the months leading up to the execution of the Agreements, Michael Knox continued to suffer from health complications and side effects from his 2016 hospitalization.

70.    Additionally, Mr. Knox's wife was having severe health complications.

71.    As 2016 came to an end, Michael Knox was financially, emotionally, and physically vulnerable.

72.    Michael Knox conveyed his financial vulnerabilities to Glenn Henricksen on at least one occasion, advising that he was not being suitably compensated and was struggling to make ends meet for his family.

73.    Michael Knox expressed a need for $20,000.00.

74.    Mr. Henricksen conveyed Mr. Knox's financial vulnerabilities and request for money to Dr. Lai.

75.    Dr. Lai did not like or trust Mr. Knox, but knew he needed to keep him on friendly terms in order to have him execute the Agreements to consummate the sale of the Assets to Dragon Jade.

76.    Dr. Lai's need for Mr. Knox's participation was particularly important given the fact that the Ultroid Companies' shareholders had not been made aware of, let alone approved of, the terms of the Agreements. Dr. Lai knew this, and he further knew that without exploiting Michael Knox's vulnerabilities, Dragon Jade would never be able to acquire the Assets.

77.     Dr. Lai took matters into his own hands and ensured Michael Knox that he would receive money after the Agreements were executed.

78.     Prior to the January 19, 2017, Dr. Lai agreed to pay Mr. Knox under the table for his execution of the Agreement.

79.     Dr. Lai and Mr. Henricksen also offered Mr. Knox a full-time operations position with Dragon Jade, contingent on the sale of the Assets to Dragon Jade.

80.     Dragon Jade would not put its offer in writing or finalize the terms of the position until after the Agreements were consummated.

81.     Dragon Jade also threatened to release embarrassing photographs of Mr. Knox in compromising and inappropriate positions that had been taken during his visits to Hong Kong if he would not execute the Agreements.

82.     Even though Dragon Jade was represented by counsel, Mr. Blaylock, who is licensed to practice Florida law and knew that the Ultroid Companies needed shareholder approval to sell their corporate Assets, neither Dr. Lai, Mr. Henricksen, Mr. Blaylock nor any other Dragon Jade representative communicated this requirement to Mr. Knox or otherwise ensured that he had shareholder approval before entering into the Agreements.

83.     Mr. Knox did not have the legal authority to enter into these Agreements, and Dragon Jade knew or should have known he lacked the authority to do so.

84.     After the Agreements were executed, Dr. Lai arranged for the first payment to be made to Mr. Knox.

85.     Although Mr. Knox conveyed at need for $20,000.00, Dr. Lai decided he was only worthy of $10,000.00.

86.     Dragon Jade, with the assistance of Dr. Lai and other representatives and employees, all of whom operated individually and in their representative capacities at different times, orchestrated for Mr. Knox to receive the under-the-table payments.

87.     Dr. Lai made the determination to structure payments to Mr. Knox in a manner that would avoid scrutiny by the SEC and auditors and carry out this scheme.

88.     The transaction was designed for the specific purpose of concealing or disguising the nature, location, source, ownership and control of the proceeds, and further to avoid the transaction reporting requirements under state and federal law.

89.     It was determined that a low-level Dragon Jade employee, Tam Sui Man, would wire the $10,000.00 from her personal finances to an account in the name of Michael Knox's sister-in-law, Dale Rose.

90.     Dr. Lai instructed William Fung, Dragon Jade's CEO, to assist in facilitating the transaction.

91.     Dragon Jade's accounting department prepared a fake loan document to masquerade the wire transfer as a loan agreement between Tam Sui Man and Dale Rose.

92.     Dragon Jade worked with Michael Knox to obtain a forged signature for the loan document.

93.     Glenn Henricksen coordinated with Michael Knox to obtain account numbers and other information to facilitate the transaction, and he provided that information to Mr. Fung.

94.     Although the loan document purports to be signed by Dale Rose, she never knew of or signed the loan document.

95.     On January 23, 2017, $10,000.00 was wired into Dale Rose's account.

96. Michael Knox, whose wife is a co-signor on Dale Rose's account, ultimately retrieved the funds.

97. Dr. Lai reimbursed Tam Sui Man the $10,000.00, plus interest, from his personal account.

98. Neither Michael Knox nor Dale Rose was ever asked to reimburse Dragon Jade, Dr. Lai, William Fung, or Tam Sui Man.

99. Dragon Jade, Dr. Lai, and Mr. Henricksen knew that Michael Knox was still struggling financially.

100. When the sale of the Assets did not occur as quickly as anticipated, Dragon Jade and Dr. Lai knew they needed to string Michael Knox along further.

101. A second wire transfer was made on July 31, 2017, in the amount of $5,400.00.

102. This time, Dr. Lai instructed William Fung to front the money from his personal account.

103. Dr. Lai and Mr. Fung continued to engage in this scheme in their individual and/or official capacities.

104. Even though the money was provided by Mr. Fung, the wire transfer was again masqueraded as a purported loan agreement between Dale Rose and Tam Sui Man.

105. A second fake loan document was prepared by Dragon Jade's accounting department.

106. Tam Sui Man agreed to her name being used on the fake loan document although she did not provide the money.

107. Dragon Jade again worked with Mr. Knox to obtain a forged signature on the loan document.

108.    Glen Henricksen worked with Michael Knox to sort out details of the transfer, including account names and numbers, and provided this information to Dragon Jade, Dr. Lai, and Mr. Fung.

109.    Dr. Lai reimbursed Mr. Fung from his personal account, without interest.

110.    Michael Knox ultimately received the $5,400.00 on or around August 1, 2017.

111.    Once again, this transaction was designed for the specific purpose of concealing or disguising the nature, location, source, ownership and control of the proceeds, and further to avoid the transaction reporting requirements under state and federal law.

112.    Throughout this process, Dr. Lai had a strong distaste for the Ultroid Companies and Mr. Knox personally.

113.    But, he knew he needed, and felt forced to keep, Mr. Knox on his side to obtain the Product and Assets. With Mr. Cao gone, Mr. Knox was the only person willing and vulnerable enough to execute the Agreements without the required shareholder approval.

114.    Through 2016 and early 2017, Mr. Knox's health was still poor as he recovered from his February 2016 hospitalization.

115.    To date he still suffers and is recovering from weakness and other repercussions from the severe health issues he suffered in early 2016.

116.    Dragon Jade and Dr. Lai knew about Mr. Knox's vulnerabilities – financially, emotionally, and health-wise – throughout their negotiations and the execution of the Agreements.

117.    Dragon Jade is engaged in commerce as defined by § 501.203(8), Florida Statutes, and is therefore subject to the provisions of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

118.    The Ultroid Companies are "consumer(s)" as defined by § 501.203(7), Florida Statutes, and are therefore entitled to the protection of FDUTPA.

119.    Dragon Jade engaged in a deceptive or unfair practice prohibited by FDUTPA by, among other things, using threat, intimidation, manipulation, coercion, and/or fraud to get Michael Knox to execute the Agreements on behalf of the Ultroid Companies.

120.    Indeed, Dragon Jade blackmailed, threatened, and extorted Mr. Knox in the days and weeks leading up to his execution of the Agreement.

121.    Dragon Jade also paid Mr. Knox under the table to make him sign the Agreements on behalf of the Ultroid Companies, which were lacking in legal authority and were against the interest of the Ultroid Companies' shareholders.

122.    Dragon Jade's deceptive and/or unfair conduct was material because it was the driving force behind Mr. Knox's execution of the Agreements, which he otherwise would not have executed on behalf of the Ultroid Companies.

123.    As a direct and proximate result of Dragon Jade's conduct, the Ultroid Companies have been aggrieved and damaged in that they did not end up with the remediated product that they expected to have and their shareholders have been robbed of their investment. Specific damages include but are not limited to the delay in the remediation of the Product and getting it back on the market, an associated loss in revenues and profits, and additional costs since having to find others to complete the work Dragon Jade was supposed to but failed to do, not to mention the possible loss of the Ultroid Companies' Product and Assets for tens of millions of dollars below their worth.

124.    The Ultroid Defendants are therefore entitled to damages under FDUTPA.

WHEREFORE, the Ultroid Companies pray that this Honorable Court award the Ultroid Companies damages pursuant to § 501.211(2), Florida Statutes, the reasonable attorneys' fees and costs incident to the bringing of this action pursuant to §§ 501.2105 and 501.211, Florida Statutes, punitive damages, and for all such other relief as the Court deems just and proper.

## COUNTERCLAIM II

### VIOLATION OF FEDERAL CIVIL RICO
### (The Ultroid Companies against Dragon Jade)

125.   The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41 and 43 through 116 as if fully set forth herein.

126.   18 U.S.C. §1964 provides for civil remedies upon a violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

127.   Dragon Jade operated or managed an enterprise so that it could illegally acquire the Ultroid Companies' Assets.

128.   Dragon Jade schemed with Dr. Steve Lai, who acted at times in his individual capacity outside the scope of his employment with Dragon Jade, such as when he paid off the Dragon Jade employees who wired money to Dale Rose's account for Michael Knox, namely Tam Sui Man and William Fung, from his own personal finances.

129.   At other times, Dr. Lai was acting in his official capacity as CEO of Dragon Jade, such as when he directed certain employees to engage in the wire transfer scheme and prepare loan documents using the company's resources.

130.   Dragon Jade employed its CFO and other employees to carry of this scheme, including but not limited to William Fung and Tam Sui Man, all of whom were operating in their individual and/or official capacities.

131.    At a minimum, Mr. Fung was acting in his official capacity when he worked with Dragon Jade's accounting department to prepare the fraudulent loan documents. And he was working in either his individual capacity or official capacity when he agreed to use his personal finances to pay Michael Knox, via Dale Rose's account, at the direction of Dr. Lai.

132.    Mr. Fung and Ms. Man were acting in their official and/or individual capacities when they fronted the money to wire to Dale Rose for Michael Knox at the request and/or direction of Dr. Lai.

133.    Dragon Jade also acted in conjunction with its consultant, Glenn Henricksen. At times, Glenn Henricksen was working in his individual capacity for personal gain in the form of cash and Dragon Jade stock should the sale of the Assets go through, dating back to when he first started formulating the terms of the Option Agreement to deprive the Ultroid Companies' of their Assets.

134.    At other times, Mr. Henricksen was acting on behalf of Dragon Jade when specifically engaging in certain acts at the direction of Dr. Lai.

135.    Mr. Henricksen was acting in either his individual or official capacity when he worked with Dr. Lai and Michael Knox to craft the wire transfers and corresponding fictitious loan documents.

136.    Further, Dragon Jade worked with, used, and relied upon Richard Blaylock, who assisted in formulating and crafting the terms of the Agreements, drafted the same, and withheld legal requisites despite his knowledge of Florida law, to carry out its scheme.

137.    All of these enterprise actors shared a common purpose of defrauding the Ultroid Companies' shareholders and American investors and ensuring that Dragon Jade would be able to purchase the Product and Assets for substantially less than what they are worth.

138.    Each member of the enterprise stood to gain large economic and financial benefit from the acts described herein.

139.    Together, this enterprise operated as a continuing unit and vehicle that carried out predicate acts with a common goal over the course of at least 6 months and up to over two years.

140.    The enterprise engaged in or affected interstate and foreign commerce because it operated to purchase assets from an American company that it would sell overseas and, in doing so, it was defrauding American investors.

141.    As part of the enterprise described herein, Dragon Jade engaged in a pattern of racketeering activity under RICO, demonstrated by the fact that, within the last ten years, Dragon Jade:

      a.    Facilitated illegal, under the table wire payments designed to evade the SEC and auditors on at least two occasions by preparing fraudulent loan documents to coerce Mr. Knox into executing illegal Agreements and to defraud the Ultroid Companies' shareholders;

      b.    Facilitated at least two illegal wire transfers designed for the specific purpose of concealing or disguising the nature, location, source, ownership and control of the proceeds, and further to avoid the transaction reporting requirements under state and federal law.

      c.    Bribed and paid off Mr. Cao and Mr. Knox with cash in exchange for their agreement to reduce the purchase price of the Assets;

      d.    Bribed Mr. Knox to execute the Agreements by offering him a job that it never intended to follow through with and paying him under the table;

      e.    Extorted Mr. Knox's financial, emotional, and physical vulnerabilities through threats, intimidation, and blackmail, including with threats to release photographs and by stringing him along financially; and,

      f.    Engaged in other deceitful and fraudulent conduct to secure execution of the illegal Agreements.

142.    Dragon Jade has engaged in similar activity in the past, and such conduct reflects a pattern and practice employed by Dragon Jade.

143.     Additionally, or in the alternative, the enterprise included Michael Knox and/or Michael Cao.

144.     Dragon Jade stood to gain the Product and Assets and corresponding economic benefits, and Mr. Knox and Mr. Cao stood to gain personal employment and financial benefits, including cash and under-the-table payments, if the sale of the Product and Assets went through for Dragon Jade.

145.     Through this enterprise, Dragon Jade defrauded the Ultroid Companies' shareholders by paying Mr. Cao off in cash to accept a reduced purchase price and crafting illegal wire payments to Mr. Knox to execute the Option Agreement.

146.     Dragon Jade intentionally participated in a scheme with Michael Knox to defraud the Ultroid Companies' shareholders when it wired him money and offered him a job in exchange for his execution of the Option Agreement.

147.     Dragon Jade was the mastermind behind these enterprises, carrying out illegal acts to ensure that it would obtain the Assets for substantially under value.

148.     Through its pattern of racketeering, Dragon Jade has defrauded the Ultroid Companies' shareholders and deprived the Ultroid Companies of its Assets.

149.     As a direct and proximate result of Dragon Jade's racketeering scheme, the Ultroid Companies have suffered damages in that its shareholders have been defrauded and it is subjected to the loss of its Assets. Additional or alternative damages include but are not limited to a substantial loss of profits and revenue due to delayed remediation of the Product, incurred additional expense in securing other companies and methods to perform the work that Dragon Jade did not do, and suffered reputational harm with past and future customers and investors.

WHEREFORE, the Ultroid Defendants pray that this Honorable Court, pursuant to 18 U.S.C. § 1964: (a) impose reasonable restrictions to prevent and restrain Dragon Jade from furthering violating the RICO statute; (b) order Dragon Jade to divest itself of any interest, direct or indirect, it has obtained arising out of its actions and the subject Agreements; (c) order dissolution of Dragon Jade; (d) award the Ultroid Companies compensatory and trebled damages; (e) award the Ultroid Companies the cost incurred in bringing this suit, including reasonable attorneys' fees; (f) award the Ultroid Companies punitive damages; and (g) for all such other relief as the Court deems just and proper.

## COUNTERCLAIM III

### VIOLATION OF FLORIDA'S CIVIL RICO ACT
### (The Ultroid Companies against Dragon Jade)

150.    The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41, 43 through 116, 127 through 140, and 143 through 147 as if fully set forth herein.

151.    Section 772.104, Florida Statutes provides for civil remedies upon a violation of the Florida's Civil Remedies for Criminal Practices Act ("Florida's RICO Act"), Fla. Stat. § 772.101.

152.    Dragon Jade has operated as part of an enterprise for the common purpose of defrauding the Ultroid Companies' shareholders and obtaining the Assets for economic benefit, as alleged in greater detail in Paragraphs 127 through 133 and 136 through 140. Dragon Jade has engaged in a pattern of criminal activity under Florida's RICO Act, Fla. Stat. § 772.102, as demonstrated by the fact that, within the last five years, Dragon Jade:

        a.      Facilitated illegal, under the table wire payments designed to evade the SEC and auditors on at least two occasions by preparing fraudulent loan documents to coerce Mr. Knox into executing illegal Agreements and to defraud the Ultroid Companies' shareholders;

b.     Facilitated at least two illegal wire transfers designed for the specific purpose of concealing or disguising the nature, location, source, ownership and control of the proceeds, and further to avoid the transaction reporting requirements under state and federal law.

c.     Bribed and paid off Mr. Cao and Mr. Knox with cash in exchange for their agreement to reduce the purchase price of the Assets;

d.     Bribed Mr. Knox to execute the Agreements by offering him a job that it never intended to follow through with and paying him under the table;

e.     Extorted Mr. Knox's financial, emotional, and physical vulnerabilities through threats, intimidation, and blackmail, including with threats to release photographs and by stringing him along financially; and,

f.     Engaged in other deceitful and fraudulent conduct to secure execution of the illegal Agreements.

153.    Dragon Jade has engaged in similar activity in the past, and such conduct reflects a pattern and practice employed by Dragon Jade.

154.    Through its pattern of racketeering, Dragon Jade has defrauded the Ultroid Companies' shareholders and deprived the Ultroid Companies of its Assets.

155.    As a direct and proximate result of Dragon Jade's racketeering scheme, the Ultroid Companies have suffered damages in that its shareholders have been defrauded and it is subjected to the loss of its Assets. Additional or alternative damages include but are not limited to a substantial loss of profits and revenue due to delayed remediation of the Product, incurred additional expense in securing other companies and methods to perform the work that Dragon Jade did not do, and suffered reputational harm with past and future customers and investors.

WHEREFORE, the Ultroid Defendants pray that this Honorable Court, pursuant to Florida Statute § 772.104: (a) award the Ultroid Companies compensatory and trebled damages; (b) award the Ultroid Companies the cost incurred in bringing this suit, including reasonable attorneys' fees; and (c) for all such other relief as the Court deems just and proper.

## COUNTERCLAIM IV

### RESCISSION OF THE OPTION AGREEMENT –
### LACK OF SHAREHOLDER APPROVAL
### (The Ultroid Companies against Dragon Jade)

156.    The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41, 82, and 83 as if fully set forth herein.

157.    Under Florida law, a purchase of all or substantially all of a company's assets requires notice to and approval of the company's shareholders.

158.    The Option Agreement provides for Dragon Jade to purchase the Ultroid Companies' Assets and Product, which make up substantially all of the Ultroid Companies' assets.

159.    The sale contemplated by the Option Agreement would fundamentally alter the investment of the Ultroid Companies' shareholders and the nature of the Ultroid Companies' business.

160.    The sale of the Assets to Dragon Jade required approval of the Ultroid Companies' shareholders.

161.    At all times material hereto and leading up to the execution of the Option Agreement, Dragon Jade was represented by counsel, Mr. Blaylock, who is licensed to practice Florida law and knew that the Ultroid Companies needed shareholder approval to sell their corporate Assets.

162.    Dragon Jade, Steve Lai, Glenn Henricksen, and Attorney Richard Blaylock all knew that the Option Agreement required approval of the Ultroid Companies' shareholders.

163.    Dragon Jade and its shareholders failed to communicate this requirement to Mr. Knox or otherwise ensure that he had shareholder approval before entering into the Option Agreement.

164.    The Ultroid Companies' shareholders were never notified of the proposed sale of the Assets to Dragon Jade.

165.    The Ultroid Companies' shareholders were never afforded the opportunity to dissent to the propose sale and withdraw from the company.

166.    The Ultroid Companies' shareholders never approved of the proposed sale of the Assets to Dragon Jade.

167.    The Ultroid Companies' shareholders never approved of the Option Agreement.

168.    Mr. Knox did not have the legal authority to enter into the Option Agreement, and Dragon Jade knew or should have known this.

169.    Nonetheless, Michael Knox executed the Option Agreement on January 19, 2017, without the approval of the Ultroid Companies' shareholders.

170.    The Option Agreement is, therefore, illegal and void.

171.    Alternatively, the Option Agreement is voidable.

172.    The Ultroid Companies' shareholders were unaware of the proposed sale of the Assets to Dragon Jade until Michael Goeree came on board in September 2017. They have never ratified the Option Agreement or sale of Assets.

173.    Since then, the Ultroid Companies have requested that Dragon Jade provide an itemized list of expenses that Dragon Jade paid pursuant to the Option Agreement so that it can reimburse Dragon Jade for those costs. Dragon Jade has refused to provide such information.

174.    Therefore, the Option Agreement should be rescinded.

175.    Rescission of the Option Agreement is the only adequate remedy at law for the Ultroid Companies and their shareholders.

WHEREFORE, the Ultroid Companies pray for this Honorable Court to rescind the Option Agreement, award the Ultroid Companies the costs incurred in bringing this action, and for all such other relief as the Court deems just and proper.

## COUNTERCLAIM V

### RECISSION OF THE OPTION AND SECURITY AGREEMENTS – FRAUDULENT AND ILLEGAL CONDUCT
### (The Ultroid Companies against Dragon Jade)

176.    The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41 and 43 through 116, as if fully set forth herein.

177.    As alleged in greater detail in herein and in Affirmative Defenses 1 through 5 and 22, Michael Knox executed the Option and Security Agreements under duress, undue influence, extortion, coercion, bribery, fraudulent circumstances, and other illegal or deceitful conduct by Dragon Jade and/or its representatives, agents, and employees, including but not limited to:

a.    Financial manipulation, control and bribery by way of the wire transfers made to Mr. Knox on January 23 and July 31, 2017, which were made only after Mr. Knox agreed to and did in fact execute the Agreements, and job offers contingent on the sale of the Assets to Dragon Jade;

b.    Extortion of Michael Knox's financial, emotional, and physical vulnerabilities and health complications;

c.    Threats to release embarrassing and compromising photographs of Mr. Knox if he did not sign the Agreements on behalf of the Ultroid Companies;

d.  Concealment of legal requisites for the Agreements to be executed, including the fact that Mr. Knox needed approval from the Ultroid Companies' shareholders to enter into the Option Agreement.

178.  Since then, the Ultroid Companies have requested that Dragon Jade provide an itemized list of expenses that Dragon Jade paid pursuant to the Option Agreement so that it can reimburse Dragon Jade for those costs. Dragon Jade has refused to provide such information.

179.  Therefore, the Option and Security Agreements should be rescinded.

180.  Rescission of these Agreements is the only adequate remedy at law for the Ultroid Companies and their shareholders.

WHEREFORE, the Ultroid Companies pray for this Honorable Court to rescind the Option and Security Agreements, award the Ultroid Companies the costs incurred in bringing this action, and for all such other relief as the Court deems just and proper.

## COUNTERCLAIM VI

### FRAUD IN THE INDUCEMENT—RESCISSION
### (The Ultroid Companies against Dragon Jade)

181.  The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41, 51 through 54, 63 through 72, 75, 76, 82, and 83 as if fully set forth herein.

182.  The Option Agreement purported to provide Dragon Jade an option to purchase the Assets upon completion of certain payments issued to assist in the Ultroid Companies' remediation efforts. It also called for Dragon Jade to complete specified tasks to assist with the remediation of the Product, including but not limited to:

a.  Engage Underwriters' Laboratories for testing and certification of the Product;

b.  Timely establish a quality management system and/or retain a consulting firm to do so; and

c.      Provide sufficient funds required for remediation.

183.    Despite execution of the Option Agreement in January of 2017, Dragon Jade failed to remediate the QMS or otherwise fulfill its obligations under the Option Agreement as late as September 2017. These failures include, but are not limited to:

a.      Failure to timely exercise its purchase option during the option period after the completion of Milestone 2 on or around March 2017 as defined in the Agreement;

b.      Failure to engage Underwriters' Laboratories for testing and certification of the Product;

c.      Failure to timely establish quality management system or timely retain a consulting firm to do so; and,

d.      Failure to secure or retain sufficient funds required to remediate the Product or otherwise perform under the Agreement.

184.    Dragon Jade knew all along it would not be able to fulfill its monetary obligations or tasks under the Option Agreement, but also knew the Agreement was the only way it could secure its purchase of the Assets, particularly at such a low price.

185.    Dragon Jade knew of Mr. Knox's physical, emotional, and mental vulnerabilities since his severe hospitalization in 2016, and it preyed on those vulnerabilities to have Mr. Knox execute the Option Agreement.

186.    Dragon Jade also knew that the Ultroid Companies were vulnerable due to the arbitration proceeding it had initiated and offered the Option Agreement as a way out.

187.    Additionally, Dragon Jade and its representatives led Mr. Knox to believe that he did not need shareholder approval or otherwise had legal authority to enter into the Option Agreement on behalf of the Ultroid Companies, fully knowing that this was not the case.

188.    Nonetheless, in effort to have Michael Knox execute the Agreements on behalf of the Ultroid Companies, Dragon Jade, through its representatives, including Mr. Henricksen, misrepresented its intentions and obligations under the Agreements and engaged in other deceitful conduct leading up to the execution of the Agreements in January 2017, including but not limited to:

   a.    Materially misrepresenting that it would remediate the Product as part of the Option Agreement, knowing that it would not be able to do so;

   b.    Materially misrepresenting to Mr. Knox that he could enter into the Agreements although it knew or should have known that they lacked legal authority; and/or,

   c.    Suggesting the Option Agreement was in the best interest of Mr. Knox and the Ultroid Companies;

   d.    Engaging in other unfair, deceptive, and/or fraudulent conduct to ensure the sale of the Product and Assets to Dragon Jade for under $1,000,000.00 despite an appraisal of $84,000,000.00 without the Ultroid Companies' shareholder approval.

189.    By engaging in such conduct, Dragon Jade misled Michael Knox into believing that the Agreements were legal and beneficial to the Ultroid Companies.

190.    Mr. Knox relied on Dragon Jade's representations and they caused him to enter into the unlawful and detrimental Agreements on behalf of the Ultroid Companies, which Dragon Jade knew or should have known were lacking in legal authority and which defrauded the Ultroid Companies by subjecting their Product and Assets to purchase for little to no cost relative to their appraised value.

191.    Dragon Jade's conduct renders the Agreements voidable and permits for the Ultroid Companies to repudiate the Agreements.

192.    The Ultroid Companies have suffered damages as a result of the conduct of Dragon Jade, including but not limited to falling victim to these Agreements which could

potentially result in a devastating loss to the Ultroid Companies if the sale were to go through; defrauding of the shareholders of the Ultroid Companies; suffering a delay in the remediation of the Product due to the prolonged relationship with Dragon Jade resulting from these Agreements; and associated losses in revenue, profit, and other expenses.

WHEREFORE, the Ultroid Companies pray for this Honorable Court to rescind the Option and Security Agreements, award the Ultroid Companies the costs incurred in bringing this action, award punitive damages, and for all such other relief as the Court deems just and proper.

## COUNTERCLAIM VII

### CONSPIRACY TO DEFRAUD THE ULTROID COMPANIES
### (The Ultroid Companies against Dragon Jade)

193.    The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41, 46, 48, 64, 66 through 68, 71 through 74, 77 through 80, 84, and 86 through 111 as if fully set forth herein.

194.    This Counterclaim is pled in the alternative to Counterclaims I, II, III, IV, V, and/or VI.

195.    After Mr. Knox fell ill in February 2016, involving a week-long coma and requiring a month-long hospitalization, his wife too fell very that summer.

196.    Mr. Knox never fully recovered, and he remained physically, mentally, and emotionally vulnerable.

197.    This vulnerability was exasperated by the fact that he had to resign from his primary positions with the Ultroid Companies and was struggling financially.

198.    Dragon Jade and its representatives were aware that Mr. Knox was an asset to the Ultroid Companies based on his knowledge of the Product, and knew that the Product would not come with as much value without him.

199.    Dragon Jade, its representatives, and Mr. Knox all knew that the Ultroid Companies had been appraised at $84,000,000.00, yet Mr. Knox nonetheless approved of a $1,000,000 purchase price of the Assets.

200.    Dragon Jade, Mr. Henricksen, Dr. Lai, Mr. Blaylock, and Mr. Knox were all aware that shareholder approval was required to execute such Agreements. Further, they all knew that the Ultroid Companies' shareholders were unaware of the Agreements, much less the execution of them.

201.    Despite knowing he did not have authority to execute the Option Agreement for the sale of the Ultroid Companies' corporate Assets, Mr. Knox did so in exchange for a full-time position with Dragon Jade following the sale and two under-the-table wire payments, as alleged in Paragraphs.

202.    Michael Knox was acting outside the scope of his authority as a Director, Secretary, Treasurer or CFO of the Ultroid Companies when he executed the Option and Security Agreements because he did not have authority to enter into such agreements without shareholder approval.

203.    Dragon Jade and Michael Knox conspired to defraud the Ultroid Companies in that they:

   a.    Engaged in unfair, deceptive, and/or fraudulent conduct to ensure the sale of the Product and Assets to Dragon Jade without the Ultroid Companies' shareholder approval;

   b.    Entered into the Option and Security Agreements which potentially provide for the sale of the Product and Assets for under $1,000,000.00

despite an appraisal of $84,000,000.00, thereby providing for Dragon Jade to be unjustly enriched and the Ultroid Companies' to be defrauded; and/or,

c.      Entered into the Agreements to achieve an illegal objective, i.e. to sell the Product and Assets to Dragon Jade without shareholder approval.

204.    Dragon Jade and Mr. Knox participated in overt acts in furtherance of their conspiracy objectives, including but not limited to:

a.      Agreeing to employ Mr. Knox after the sale went through;

b.      Illegally paying Mr. Knox for executing the Agreements, and Mr. Knox accepting payment of the same knowing the nature of the payment; and,

c.      Executing the Agreements that were knowingly lacking in legal authority.

205.    The Ultroid Companies have suffered damages as a result of the conduct of Dragon Jade and Mr. Knox, including but not limited to falling victim to these Agreements which could potentially result in a devastating loss to the Ultroid Companies if the sale were to go through; defrauding of the shareholders of the Ultroid Companies; suffering a delay in the remediation of the Product due to the prolonged relationship with Dragon Jade resulting from these Agreements; and associated losses in revenue, profit, and other expenses.

WHEREFORE, the Ultroid Companies pray for this Honorable Court to award the Ultroid Companies monetary damages, punitive damages, costs incurred in bringing this action, and all such other relief as the Court deems just and proper.

## COUNT VIII

### BREACH OF CONTRACT
### (The Ultroid Companies against Dragon Jade)

206.    The Ultroid Companies re-allege and incorporate by reference Paragraphs 1 through 41 as if fully set forth herein.

207.     The Ultroid Companies challenge the validity and enforceability of the Option and Security Agreements. Assuming, however, that the Agreements are valid and enforceable, Dragon Jade breached the Option Agreement.

208.     The Option Agreement purported to provide Dragon Jade an option to purchase the Assets upon completion of certain payments issued to assist in the Ultroid Companies' remediation efforts. It also called for Dragon Jade to complete specified tasks to assist with the remediation of the Product, including but not limited to:

   a.     Engage Underwriters' Laboratories for testing and certification of the Product;

   b.     Timely establish a quality management system and/or retain a consulting firm to do so; and

   c.     Provide sufficient funds required for remediation.

209.     Despite execution of the Option Agreement in January of 2017, Dragon Jade failed to remediate the QMS or otherwise fulfill its obligations under the Option Agreement as late as September 2017.

210.     Dragon Jade's breaches of the Option Agreement include but are not limited to:

   a.     Failing to engage Underwriters' Laboratories for testing and certification of the Product;

   b.     Failing to timely establish quality management system or timely retain a consulting firm to do so; and/or,

   c.     Failing to secure or retain sufficient funds required to remediate the Product or otherwise perform under the Agreement.

211.     Dragon Jade knew all along it would not be able to fulfill its monetary obligations or tasks under the Option Agreement.

212.     The Ultroid Companies have been damaged as a direct and proximate result of Dragon Jade's breaches of the Option Agreement by, among other things, suffering a loss of

revenue and profits for the delay in remediation of the Product, suffering harm to their reputation, and incurring expenses associated with hiring other companies and determining other methods to complete the work within the scope of the Option Agreement which Dragon Jade failed to do.

WHEREFORE, the Ultroid Companies pray for judgment against Dragon Jade for monetary damages, pre-judgement interest, injunctive relief, costs of this action, and such other relief as the Court deems just, necessary and proper.

## DEMAND FOR JURY TRIAL

The Ultroid Companies hereby demand a trial by jury as to all issues so triable.

**I HEREBY CERTIFY** that on March 5, 2019, the foregoing was electronically filed through the Florida Courts E-Filing Portal which will send a notice of electronic filing to Jennifer G. Altman, Esq. and Markenzy Lapointe, Esq., 600 Brickell Avenue, Suite 3100, Miami, FL 33131.

/s/ *Jenna M. Winchester*
WILLIAM E. LAWTON, ESQ.
Florida Bar No. 0163236
JOSHUA B. WALKER, ESQ.
Florida Bar No. 0047614
JENNA M. WINCHESTER, ESQ.
Florida Bar No. 0114280
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel: 407-422-4310  Fax: 407-648-0233
WLawton@drml-law.com
JWalker@drml-law.com
JWinchester@drml-law.com
Attorneys for Defendants/Counter-Plaintiffs