UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DRAGON JADE INTERNATIONAL,           CASE NO:  8:17-cv-2422-T-27TBM
LTD., a British Virgin Island limited
company,

       Plaintiff,

vs.

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT
CORP., a Florida corporation; ULTROID
TECHNOLOGIES, INC., a Florida corporation,

       Defendants,

and

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT
CORP., a Florida corporation,

       Counter-Plaintiffs,

vs.

DRAGON JADE INTERNATIONAL, LTD.,
a British Virgin Island limited company,

       Counter-Defendant.
_____/

DEFENDANTS/COUNTER-PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants/Counter-Plaintiffs   ULTROID,   LLC;   ULTROID   MARKETING

DEVELOPMENT CORP.; and ULTROID TECHNOLOGIES, INC. (collectively "Ultroid"), by

and through undersigned counsel and pursuant to Fed. R. Civ. P. 56, move for partial summary

judgment as to Counts I and II of Dragon Jade International, LTD's ("Dragon Jade") Complaint

(Doc. 1) and Counterclaim IV of the Second Amended Counterclaims (Doc. 126). As grounds in support of this Motion, Ultroid states as follows:

## INTRODUCTION

This case involves a publicly-traded foreign conglomerate's efforts to commandeer the assets of a privately-owned American company by *inter alia* bypassing the legal protections afforded to the company's shareholders. Specifically, it involves Dragon Jade's efforts to purchase the intellectual property rights associated with Ultroid's innovative hemorrhoid treatment device ("Assets") for next-to-nothing by ensuring Ultroid's sole decision-maker at the time, Michael Knox, executed an agreement granting Dragon Jade the exclusive option to purchase the Assets substantially under value ("Option Agreement"), without presenting the proposed transaction to the shareholders, much less having it approved by them.

When Ultroid came under new leadership in September 2017, its new CEO, Michael Goeree, recognized ambiguities in the Option Agreement, questionable circumstances surrounding the parties' negotiations and execution of the Agreement, and possible defrauding of Ultroid's shareholders. As a result, Ultroid terminated the parties' professional relationship, including the Option Agreement. In turn, Dragon Jade initiated this action, claiming in part that Ultroid breached the Option Agreement. By way of the Affirmative Defenses (Doc. 40) and Second Amended Counterclaims (Doc. 126), Ultroid challenges the validity of the Option Agreement.

Extensive discovery, including the testimony of Dragon Jade's corporate representatives, Glenn Henricksen and Dr. Steve Lai, has supported Ultroid's suspicion that the Option Agreement was entered into under fraudulent and illegal circumstances. Nevertheless, Ultroid recognizes that many facts remain in dispute in that regard. However, one significant fact has

proven true and undisputed: Ultroid's shareholders did not know of, much less approve, the sale of the Assets to Dragon Jade as required by Florida law. This alone suffices to render the Option Agreement null and void. At a minimum, it renders the Option Agreement voidable and because Ultroid's shareholders have not ratified it, it is not enforceable and should be rescinded. Accordingly, Dragon Jade's claims for breach and anticipatory breach of the Option Agreement fail as a matter of law and Ultroid is entitled to summary judgment on Counts I and II of the Complaint and possibly Counterclaim IV of the Second Amended Counterclaims.

## STATEMENT OF MATERIAL FACTS

### I.    The Ultroid entities and the Assets.

The Assets which are the heart of this matter include the intellectual property rights including trademarks, patents, and the 510k, related to the Hemorrhoid Management System, a highly innovative device that provides a pain-free, non-invasive treatment of hemorrhoids through the use of a low voltage electrical charge ("Device"). (Doc. 1-1, p. 9; Doc. 20-1, ¶ 3; Knox Depo., 26:4–13.)[1] An electrical engineer and a gastroenterologist designed, applied for, and obtained the 510k – a form issued by the FDA permitting a medical device to be manufactured and go to market – for the Device in the early 2000s. (Knox Depo., 25:21–24, 26:14–20, 28:11–29:12; Lewis Depo., 37:25–38:19; Doc. 12-1, ¶ 3.)[2] The Device was later purchased by Ultroid Technologies, Inc. ("UT") when it was offered on the open market, and the designers assigned the 510k to the UT company. (Knox Depo., 27:2–7, 29:8–12.)

As the Device sparked worldwide interest and hit the international markets, Ultroid underwent a corporate restructuring. In 2011, Ultroid LLC ("ULLC") was established as the holding company for the Assets (*id.* 28:8–10, 30:12–18), and in 2012, Ultroid Marketing

---

[1] Cited portions of Michael Knox's deposition transcript are attached at Exhibit 1.
[2] Cited portions of Cedric Lewis's deposition transcript are attached at Exhibit 2.

Development Corp. ("UMDC") was created to market and distribute the Device (*id.* 29:22–30:11). To summarize, ULLC held the intellectual property associated with the Device; UT was responsible for manufacturing the Device; and, UMDC was responsible for the distribution and sales of the Device. (*Id.* 30:2–8; *see also* Goeree Depo., 27:1-14.)[3] This was until UT transferred the remaining intellectual property rights into ULLC and was administratively dissolved in late 2015. (Goeree Depo., 26:14–22.) Then, UMDC spun-off from UT and ULLC became a wholly owned subsidiary of UMDC in early 2016. (Doc. 20-1, ¶ 3; Doc. 12-1, p. 40; Goeree Depo., 24:24–25:22, 28:5–12.)

UT and its parent company, Vascular Technologies, Inc., were founded by Michael Cao. (Knox Depo., 37:9–16.) In 2007, Michael Knox assumed the role of CFO and officer of UT (*id.* 23:1–25:7), and in mid-2010, he was appointed the company's CEO (*id.* 25:8–10, 27:20–24.) When ULLC and UMCD were established, Mr. Knox assumed the roles of manager and CEO, respectively. (*Id.* 27:25–28:7, 33:11–13.) He also held officer positions with the entities and was a Board member of UMDC since its inception. (*Id.* 31:10–21, 48:6–17.) Despite his managerial titles, Mr. Knox answered to Mr. Cao, who was the chairman of the Board of all three Ultroid entities from 2012-2016 and had the final say in all aspects of the business, including all contracts that were signed. (*Id.* 34:1–8, 37:17–22, 38:8–20, 40:17–25.)

Mr. Knox held his managerial and C-level roles until February 2016, when he fell critically ill with pneumonia and acute respiratory failure, resulting in him being placed in a medically induced coma for six days, hospitalized for three weeks, and rehabilitated to re-learn how to walk. (*Id.* 35:9–36:21; Doc. 21-1, ¶ 6.) During this time, Mr. Cao assumed the role of acting CEO and took complete charge of the Ultroid entities. (Knox Depo., 35:14–15, 36:22–37:3; Doc. 21-1, ¶ 6.) Mr. Knox returned to work around summertime of that year, but he never

---

[3] Cited portions of Michael Goeree's deposition transcript are attached at Exhibit 3.

resumed his full duties. (Knox Depo., 35:17, 89:3–15; Doc. 21-1, ¶ 6.) In fact, he formally resigned from his C-level and managerial positions in July of 2016 and maintained only his officer roles as secretary and treasurer. (*Id.* 39:8–24, 47:5–48:1, 89:16–90:3.) To this day, Mr. Knox has lingering effects from his 2016 medical scare. (*Id.* 35:18.)

Mr. Cao remained the acting CEO of the Ultroid entities until he unexpectedly resigned in October of 2016. (*Id.* 98:4–20.) This left Mr. Knox as the only person acting with any leadership authority as 2016 ended and 2017 began. (Lewis Depo., 125:17–22.) In September 2017, Michael Goeree came on board as UMDC and ULLC's new CEO. (Doc. 20-2, ¶ 2; Doc. 31-1, ¶ 1; Goeree Depo., 23:1–24:7.)

## II.     Undisputed material facts.

In June 2015, Dragon Jade and Mr. Cao entered into an International Distribution Agreement, whereby Dragon Jade would be the exclusive distributor of the Device throughout various Asian countries ("Distribution Agreement"). (Knox Depo., 80:1–5, 81:21–82:2; Doc. 12-1, pp. 18–32; Doc. 20-1, ¶ 4; Doc. 12-1, ¶ 3.) Later that year, the FDA issued a warning to Ultroid regarding deficiencies with its quality management system ("QMS"), signifying the FDA's determination that Ultroid's internal management system and processes did not meet the protocol requirements. (Knox Depo., 64:20–65:25; Doc. 20-1, ¶ 5.) The FDA's concerns were not specifically related to the Device itself (*see id.* 66:25–67:6, 77:20–78:14), and Dragon Jade's interest in the Device appeared to be unscathed. In fact, Dragon Jade was looking to "expand its footprint" and develop more ties to Ultroid and the Device. (*See* Henricksen Depo., 73:3–74:6, 74:20–75:6.)[4] In November 2015, Dragon Jade's CEO, Dr. Steve Lai, met with Mr. Cao and

---

[4] Cited portions of Glenn Henricksen's deposition transcript are attached at Exhibit 4.

Mr. Knox in Hong Kong to discuss a potential acquisition of Ultroid[5] by Dragon Jade.[6] (Doc. 21-1, ¶ 4; Doc. 12-1, ¶ 9.)

Through the remainder of 2015 and into 2016, Ultroid worked to remediate its QMS to satisfy the FDA's concerns. Ultroid had completed approximately 80-85% of the necessary corrections to install a new QMS when Mr. Knox fell critically ill in February 2016. (Knox Depo., 65:18–66:17, 67:17–68:7.) It is unclear what exactly happened with the remediation efforts during Mr. Cao's interim leadership, but when the FDA conducted its annual report later that year, it remained unsatisfied with Ultroid's QMS, prompting Ultroid to issue a voluntary recall of the Device in September 2016. (*Id.* 94:8–95:12.)

In the meantime, following the November 2015 meeting in Hong Kong, Ultroid engaged the Business Valuation Center to conduct an appraisal for Dragon Jade, and in February 2016, Ultroid was appraised at $84,000,000.00.[7] (*Id.* 76:17–77:1, 79:10–21, 121:15–23; Doc. 20-1, ¶ 6.) In April 2016, Mr. Knox and Mr. Cao visited China again to further discuss Dragon Jade's purchase of the Ultroid companies, despite Mr. Knox's ongoing health concerns. (*Id.* 122:18–123:13; Doc. 20-1, ¶ 7.) During this meeting, Dr. Lai reduced his purchase price offer to $40,000,000.00. (Lai Depo., 9:25–10:7.)[8]

As a result of the voluntary recall that occurred in September 2016, Ultroid was required to suspend manufacturing of the Device until the FDA's concerns had been addressed. (Doc. 20-1, ¶ 8.) This resulted in Ultroid's inability to fulfill Dragon Jade's purchase order in connection with the Distribution Agreement. Consequently, Dragon Jade initiated arbitration

---

[5] At this time, UT was dissolved and "Ultroid" became UMDC and ULLC.  (Doc. 20-1, ¶ 3.)

[6] Ultroid contends that Dr. Lai proposed the idea of Dragon Jade purchasing the Ultroid companies, but this fact is disputed. (*Compare* Doc. 21-1, ¶ 4; Knox Depo., 79:10–25, *with* Henricksen Depo., 76:18–77:5.)

[7] Ultroid contends that Dr. Lai requested Ultroid obtain an appraisal to substantiate a proposed purchase price of approximately $80,000,000.00. (Knox Depo., 79:22–25.) This, too, is contested by Dragon Jade, who contends that Mr. Cao recommended an $84,000,000.00 purchase price. (Lai Depo., 9:2–8.)

[8] Cited portions of Dr. Steve Lai's deposition transcript are attached at Exhibit 5.

proceedings against Ultroid. (Henricksen Depo., 83:14–84:23; Doc. 12-1, ¶ 25.) This all occurred around the time that Mr. Cao resigned, leaving the recovering Michael Knox as the only one left to handle the day-to-day operations and decision-making for Ultroid. (Lewis Depo., 125:17–22; Lai Depo., 15:13–24.) Also around this time, Dragon Jade's interest shifted from acquiring the Ultroid entities to instead purchasing only the Ultroid Assets.[9] (Knox Depo., 113:4–9; Lai Depo., 15:25–16:18.)

Not long thereafter, Dragon Jade's consultant, Glenn Henricksen, presented the verbal terms of the proposed Asset sale to Ultroid's Board members during a January 11, 2017 Board meeting. (Knox Depo., 106:21–23, 108:14–109:15.) The terms included a purchase price of $1,000,000.00 in cash plus 500,00 shares of Dragon Jade stock. (Doc. 12-1, ¶ 26.) Dragon Jade's purchase option was to be memorialized in the Option Agreement, which would call in part for Dragon Jade to fund some costs and complete certain tasks associated with the remediation of the Device in exchange for an exclusive option to purchase the Assets for potentially as little as $1,000,000.00. (Doc. 20-1, ¶¶ 10, 14, 15; *see also* Doc. 1-1.) At that time, Mr. Knox and Kevin McAdams were Ultroid's only two Board members. They approved the verbal terms and requested that they be reduced to writing for approval. (Knox Depo., 109:16–24.) Dragon Jade's attorney, Richard Blaylock, drafted the Option Agreement and played a role in negotiating the terms of the Agreement leading up to its execution.[10] (Henricksen Depo., 136:5–137:13.)

Throughout this process, Dr. Lai had a strong distaste for the Ultroid companies, but he wanted their Assets. And although he did not like or trust Michael Knox, he knew he needed

---

[9] It is unclear exactly when Dragon Jade's intentions shifted from a purchase of the Ultroid companies to an Asset purchase. (*Compare* Knox Depo., 113:4–9 (indicating the shift occurred in December 2016/January 2017), *with* Henricksen Depo., 85:5–23 (stating the shift occurred in Fall 2016).)

[10] Richard Blaylock is an attorney with the law firm of Pillsbury, Winthrop, Shaw Pittman, LLP, which was the original firm that represented Dragon Jade in connection with this matter. On October 5, 2018, shortly after the deposition of Glenn Henricksen, the K&L Gates law firm substituted as counsel in place of Pillsbury, without explanation. (Doc. 69.)

Mr. Knox to obtain those Assets.[11] (*See* Lai Depo., 11:19–12:13, 19:10–25 (discussing his concerns about the Ultroid entities, Michael Knox, and Michael Cao).) Dr. Lai felt "forced" to help Mr. Knox because he was the only person left with Ultroid that was capable of executing the sale of the corporate Assets; without him, the sale would not be possible. (*Id.* 20:1–12, 54:19–25, 55:25–56:7.) Dragon Jade was aware of Mr. Knox's ongoing financial, emotional, and physical concerns during this time period. (*See* Lai Depo., 17:23–18:22, 37:19–38:2.)

Dr. Lai agreed to assist Mr. Knox with his financial struggles, but would only do so once the Option Agreement was executed. On January 19, 2017, Mr. Knox executed the Option Agreement. (*See* Doc. 1-1, p. 2.) This was done without the knowledge of or approval from the Ultroid shareholders. (Goeree Aff., ¶ 3.)[12] Mr. Knox also executed a Security Agreement, which granted Dragon Jade an interest in specified collateral as security for Ultroid's reimbursement of costs paid by and due to Dragon Jade under the Option Agreement. (Doc. 1-2.) Dragon Jade executed corresponding UCC Financing Statements to memorialize the security interests over the collateral. (Doc. 1-7.)

Thereafter, Dr. Lai had Dragon Jade employees make two under-the-table wire transfers to the account of Michael Knox's sister-in-law for the benefit of Mr. Knox – one on January 23, 2017, for $10,000.00 and one on July 31, 2017, for $5,400.00 – which were memorialized by purported loan agreements between a Dragon Jade clerk and Mr. Knox's sister-in-law. (*See* Lai Depo., 20:14–33:22, 35:16–37:23, 43:25–47:20, 48:16–52:18, 56:10–57:12 (discussing the circumstances of the wire transfers from a Dragon Jade clerk to the account of Michal Knox's

---

[11] During his deposition, Dr. Lai likened Michael Knox to his "disgusting driver," whom he could not fire because of his ability to navigate the roads. Dr. Lai placed his driver and Mr. Knox in the category of people who are essentially indispensable because their "good points outweigh [their] bad points." (Lai Depo., 52:19–54:12.) Dr. Lai subsequently provided an errata sheet, which is attached at Exhibit 6, whereby he claims to have meant "irritating" rather than "disgusting" driver.

[12] Michael Goeree's supporting Affidavit is attached at Exhibit 7.

sister-in-law and the corresponding loan agreement documents); *see also* Wire Transfer and Loan Documents attached as exhibits to Dr. Lai's deposition, attached hereto as Composite Exhibit 8.) These transfers were done without any due diligence and designed to evade the eye of the SEC and auditors. (Lai Depo., 34:11–35:15, 36:5–21, 37:19–23; *see also id.* 47:22–48:6, 57:13–58:7.) Dr. Lai and Mr. Henricksen also dangled a job opportunity with Dragon Jade in front of Mr. Knox, but they would not discuss specifics or finalize the terms of any such employment until the after the Asset sale had gone through.[13] (Doc. 20-1, ¶ 16; Henricksen Depo., 220:2–224:13.)

The extent to which Dragon Jade satisfied its obligations under the Option Agreement in the months after it was executed is hotly contested by the parties. Nevertheless, in the second half of 2017, Mr. Knox strongly believed that Dragon Jade would be unable to make the payments or complete the tasks required of it. (Doc. 20-1, ¶¶ 13–17; *see also* Knox Depo., 130:9–133:24.) Thus, Mr. Knox sought new leadership to fill the void in management and move Ultroid forward. In September 2017, Michael Goeree was hired as Ultroid's new CEO to manage capitulation, raise funds, and bring the Device back to the market (Goeree Depo., 23:1–24:7.)

Mr. Goeree quickly recognized what he considered suspicious circumstances and ambiguities associated with the Option Agreement, prompting him to terminate the relationship between the parties. (*See* Goeree Depo., 77:5–83:14.) He also discovered that the shareholders never knew or approved of the Option Agreement or the sale of the Assets to Dragon Jade. (*See* Goeree Aff., ¶ 3; Goeree Depo., 82:13–19.)

After Ultroid terminated the relationship between the parties, Dragon Jade initiated this

---

[13] There remain issues of fact regarding other circumstances surrounding the execution of the Option Agreement, such as whether Dragon Jade did in fact threaten to release photographs of Michael Knox taken of him while he was in Hong Kong if he did not execute the Agreement. (*Compare* Goeree Depo., 99:21–101:7, *with* Henricksen Depo., 216:24–217:14.) Ultroid is not abandoning those disputed issues by not addressing them in the facts of this Motion.

diversity action for breach of both the Option and Security Agreements and to close on the UCC Filing Statements. (Doc. 1.) In light of the illegal tactics employed by Dragon Jade in securing its right to purchase the Assets, Ultroid filed its Affirmative Defenses and Second Amended Counterclaims challenging Dragon Jade's conduct and the validity of the Option Agreement.[14] (Docs. 39, 40.) For purposes of this Motion, Ultroid directs the Court's attention to the lack of shareholder approval that was required to authorize the sale of the Assets to Dragon Jade in support of its request for partial summary judgment as to Counts I and II of Dragon Jade's Complaint.

## MEMORANDUM OF LAW

### I.      Standard of review on summary judgment.

Ultroid is entitled to summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits on file demonstrate that there are no genuine issues of material fact and that he is entitled to a judgment as a matter of law. Fla. R. Civ. P. 1.510(c); *see also Richmond v. Fla. Power & Light Co.,* 58 So. 2d 687 (Fla. 1952) (explaining that judges have the power to decide a case on a motion for summary judgment where the "basic facts were so clear and undisputed"). Once Ultroid proffers competent evidence in support of its motion or demonstrates a lack of evidence supporting Dragon Jade's claim, Dragon Jade incurs the burden of proffering counter-evidence revealing disputed issues of material fact. *Landers v. Milton,* 370 So. 2d 368, 370 (Fla. 1979). Dragon Jade cannot satisfy this burden merely by asserting that issues exist. *Landers*, 370 So. 2d at 370; *The Florida Bar v. Mogil*, 763 So. 2d 303, 307 (Fla. 2000).

---

[14] On November 18, 2018, Ultroid moved to amend its Counterclaims to add a claim for Recission, specifically predicated in part on the lack of shareholder approval. (Doc. 80.) This Motion remains pending.

**II.    Ultroid is entitled to summary judgment on the breach of contract claims in Counts I and II because the Option Agreement is void *ab initio* and invalid as a matter of law.**

To prevail on a breach of contract claim, Dragon Jade must establish: (a) the existence of a valid contract; (2) a material breach of the contract; and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)). If Dragon Jade cannot establish that the Option Agreement constitutes a valid contract, its claims for breach and anticipatory breach of the Option Agreement (Counts I and II, respectively) fail. That is precisely the case here.

An agreement that violates a provision of a valid statute is illegal and void. *In re Voltarel*, 236 B.R. 464, 466 (M.D. Fla. 1999) (citing *Local No. 234 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Ind. of U.S. & Canada v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 821 (Fla. 1953)). Florida courts have "consistently applied this rule to invalidate contracts that violate the law." *Gables Ins. Recovery, Inc. v. Citizens Prop. Ins. Co.*, 2018 WL 4495365, *8–*10 (Fla. 3d DCA 2018) (discussing cases in which contracts and agreements were declared void and invalid when they violated a statute); *see, e.g.*, *Griffin v. ARX Holding Corp.*, 208 So. 3d 164, 170–71 (Fla. 2d DCA 2016) (holding an employment contract was illegal, void *ab initio*, and unenforceable when it violated 18 U.S.C. § 1033).

Here, the Option Agreement is illegal and void because it violates Florida Statute § 607.1202. The statute provides that a corporation may sell "all, or substantially all, of its property" only if "the board of directors proposes and <u>its shareholders of record approve</u> the proposed transaction." Fla. Stat. § 607.1202(1) (emphasis added). The statute sets forth a mandatory procedure that must be followed in order for the proposed transaction to be deemed authorized, which includes notification to all shareholders of a shareholders meeting to discuss

the proposed transaction and of their dissenting rights; a recommendation regarding the proposed transaction by the board of directors to the shareholders; and a majority vote by the shareholders approving the proposed transaction. Fla. Stat. § 607.1202(2)–(5). The procedure is "intended to insure [sic] that directors do not fundamentally change the nature of the shareholders' investments without the check and balance of informed shareholder approval, and the opportunity for dissenters to withdraw from the corporation." *Boettcher v. IMC Mortg. Co.*, 871 So. 2d 1047, 1051 (Fla. 2d DCA 2004) (quoting *S. End Improvement Grp., Inc. v. Mulliken*, 602 So. 2d 1327, 1332 (Fla. 4th DCA 1992)); *see also Schwadel v. Uchitel*, 455 So. 2d 401, 403 (Fla. 3d DCA 1984) (explaining the purpose of requiring shareholder approval is to "protect the shareholders from fundamental change, or more specifically, . . . from the destruction of the means to accomplish the purposes or objects for which the corporation was incorporated and actually performs").

The Assets undisputedly constitute all or substantially all of Ultroid's property. (Goeree Aff., ¶ 4.) This fact is conceded by Dragon Jade. (Henricksen Depo., 113:4–17.) Thus, a sale of the Assets would be subject to § 607.1202 and require the procedural formalities, including shareholder approval, set forth in the statute.

The record evidence conclusively establishes that Ultroid's shareholders did not vote on, much less approve, the sale of the Assets to Dragon Jade as contemplated by the Option Agreement. (Goeree Aff., ¶ 3.) In fact, they were never even made aware of the proposed transaction.[15] (*Id.*) Instead, the Option Agreement was entered into without the requisite

---

[15] Michael Knox and Kevin McAdams were the two Board members who knew of and approved the proposed sale of the Assets. Although they were Ultroid shareholders, together they only held a minor percentage of the Ultroid shares. (Goeree Aff., ¶ 3.) Because they did not constitute a majority of the shareholders, their approval of the proposed transaction is insufficient to satisfy the requisite shareholder approval. *Cf. Beville v. Freeman*, 483 So. 2d 813, 815 (Fla. 2d DCA 1986) (finding the requisite notice to shareholders was satisfied since the president of the company who negotiated and authorized the sale of corporate assets owned 80% of the stock at the time of the sale).

shareholder approval, stripping Ultroid's shareholders of the statutory protections and rights afforded to them. As such, the Option Agreement, which provides for Dragon Jade to purchase the Assets despite the fact that such a sale was never approved by the Ultroid shareholders, violates § 607.1202(1) and is void as a matter of law. *See Local No.* 234, 66 So. 2d at 821 (stating that rights founded upon an agreement "tainted with the vice of [] illegality" are generally unenforceable).

Significantly, this illegal aspect of the Option Agreement is not severable from the remainder of the agreement. "As a general rule, contractual provisions are severable, where the illegal portion of the contract does not go to its essence, and, with the illegal portion eliminated, there remain valid legal obligations." *In re Colony Beach & Tennis Club Ass'n, Inc.*, 2010 WL 11629255, *6 (M.D. Fla. Nov. 19, 2010) (quoting *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA 2005)); *Local No. 234*, 66 So. 2d at 821–22. But, where the illegal provision "is a substantial part of the benefit to be gained by one of the parties," it is generally not divisible from the contract. *In re Voltarel*, 236 B.R. at 466.

Here, Dragon Jade cannot dispute that the purchase of the Assets is a substantial part of the benefit to be gained by Dragon Jade from the Option Agreement. Indeed, the Option Agreement was essentially created and is in fact titled to memorialize Dragon Jade's purported right to purchase the Assets. Dr. Lai's testimony that he was forced to help Michael Knox because he needed Mr. Knox to execute the Option Agreement further confirms the value Dragon Jade placed on its purported right to purchase the Assets. (*See, e.g.*, Lai Depo., 21:19– 22:3, 55:19–25.) Thus, the illegal sale provision is not severable and the entire Option

Agreement remains illegal and void.[16] This outcome – that is, the determination that the Option Agreement is invalid – is fatal to Dragon Jade's breach and anticipatory breach of contract claims arising out of the Option Agreement. Accordingly, Ultroid is entitled to summary judgment on Counts I and II.

### III.   Alternatively, assuming the Option Agreement is not void *ab initio*, it is voidable because the sale was not ratified by the Ultroid shareholders and it should be rescinded as a matter of law.

Assuming *arguendo* that the Option Agreement is not void for want of shareholder approval, it is voidable and should be rescinded as a matter of law. A voidable act is one "performed in the interest of the company, but beyond the authority of management." *Apple Computer, Inc. v. Exponential Tech., Inc.*, 1999 WL 39547, *6 (Del. Ch. Jan. 21, 1999).[17] Because the Ultroid shareholders did not approve the proposed sale of the Assets to Dragon Jade, Michael Knox lacked legal authority to enter into the Option Agreement granting Dragon Jade the right to purchase the Assets. *See* Fla. Stat. § 607.1202(1), (2)(b). Thus, his execution of the Option Agreement providing for the sale of the Assets constitutes a voidable act. *See Apple Computer*, 1999 WL 39547 at *7 (concluding the company's sale of its assets without shareholder approval was a voidable act). A voidable act is cause for legal relief and may be unenforceable. *See, e.g.*, *id.* at *7 (providing that, without shareholder ratification, the voidable act is subject to recission).

---

[16] Assuming *arguendo* that the illegal sale provision is severable, it should be severed from the remainder of the Option Agreement and the Option Agreement should not be construed to allow for the sale of the Assets by Dragon Jade.

[17] Florida courts have long turned to Delaware precedent for guidance on interpretations of corporate law. *See Williams v. Stanford*, 977 So. 2d 722, 727 (Fla. 1st DCA 2008) (seeking guidance from Delaware case law as to the construction of Florida corporate statute § 607.1302); *Boettcher*, 871 So. 2d at 1052 n.5 (acknowledging that Florida courts routinely consult Delaware case law for guidance when construing Florida corporate statutes); *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1459 n.22 (11th Cir. 1989) ("We rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines." (citations omitted)).

Unlike a void act, a voidable act is subject to cure. *Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979). If "the shareholders ratify the voidable act after the fact, the ratification cures the defect and relates back to moot all claims." *Id.* ("It is the law of Delaware, and general corporate law, that a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors. . . . If shareholders have approved an otherwise voidable act, their approval extinguishes any claim for losses based on prior lack of authority of the directors to undertake such action."). "Shareholder ratification is valid only where the stockholders so ratifying are adequately informed of the consequences of their acts and the reasons therefor." *Id.* at 220. Whether the shareholders are "adequately informed" turns on the "fairness and completeness" of the materials provided to them by corporate management in advance of a vote. *Id.*

The *Apple* court evaluated the issue of ratification in a similar context. Part of that case involved Exponential Technology, Inc.'s ("Exponential") sale of its patent portfolio for $10,000,000.00 to another company. 1999 WL 39547 at *2–*3. Apple Company, Inc. ("Apple"), a shareholder of Exponential, challenged Exponential's sale of the assets on the ground that it was done without a vote by or approval of the Exponential shareholders as required by Delaware law.[18] *Id.* at *3. This prompted Exponential to ask its shareholders to ratify the sale. *Id.* In response, a majority of the shareholders delivered written consent of the sale to Exponential. *Id.* The court noted that the shareholders' consent, if legally valid, would cure any injury caused by the sale and moot Apple's claim. *Id.* at *7 (noting that the shareholder ratification would moot Apple's claim, but denying summary judgment in favor of Exponential on this claim because

---

[18] Like in Florida, in Delaware, a sale of "all or substantially all" of a corporation's property and assets requires approval by a majority of the voting shareholders. *See* 8 Del. C. § 271(a).

there were disputed issues as to the legal sufficiency of many of the shareholders' consent forms).

Under the foregoing principles, if the Ultroid shareholders ratified the originally unauthorized sale of the Assets to Dragon Jade set forth in the Option Agreement, their ratification would cure the defect that renders the Option Agreement voidable. However, there is not a shred of evidence suggesting that the Ultroid shareholders did any such thing. In fact, the evidence affirmatively establishes just the opposite – that the shareholders <u>did not</u> ratify the sale. (Goeree Aff., ¶ 5.) Not only did they not vote to approve the sale after-the-fact, but they were not even provided materials or information regarding the sale such that they could have voted to ratify it. Dragon Jade cannot point to any evidence suggesting otherwise.

Clearly, Mr. Knox's unauthorized act of approving the sale of the Assets to Dragon Jade and executing the Option Agreement on those terms has not been cured by Ultroid shareholder ratification. Accordingly, the voidable Option Agreement should be rescinded, *see Dist. Bd. of Trustees v. Morgan*, 890 So. 2d 1155, 1160 (Fla. 5th DCA 2004) (discussing a party's entitlement to seek rescission of a voidable contract), thereby rendering it "abrogated and of no force and effect," *Leo v. MacLeod*, 752 So. 2d 627, 630 (Fla. 2d DCA 1999) (quoting *Borck v. Holewinski*, 459 So. 2d 405, 405 (Fla. 4th DCA 1984)). *See also Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. 2002) ("The recission of contract amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination." (citation omitted)). This outcome entitles Ultroid to summary judgment on Counts I and II, as it precludes Dragon Jade from establishing a valid contract in support of those claims.

Additionally, under this alternative, Ultroid would also be entitled to summary judgment on Counterclaim IV of the Second Amended Counterclaims, which affirmatively seeks rescission

of the Option Agreement based on the lack of shareholder approval. Such a claim would require the Ultroid Companies to allege: (1) the character or relationship of the parties; (2) the making of the contract; (3) the existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) that the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) lastly, that the moving party has no adequate remedy at law. *Barber v. Am.'s Wholesale Lender*, 542 F. App'x 832, 836 (11th Cir. 2013) (citing *Billian v. Mobil Corp.*, 710 So. 2d 984, 991 (Fla. 4th DCA 1998)).

Although Ultroid disputes the validity and enforceability of the Option Agreement, there is dispute as to the first and second elements based on business dealings between Dragon Jade and Ultroid and the fact that Mr. Knox executed the Option Agreement on behalf of Ultroid. Additionally, as discussed herein, the lack of shareholder approval constitutes grounds for rescission of the Option Agreement, satisfying the third element.

As for the fourth and fifth elements, Ultroid undisputedly notified of its termination of the Option Agreement when it came under new leadership in September 2017 (*see* Doc. 1-4) and has since requested the amounts that would be owed back to Dragon Jade for expenses it fronted in contemplation of the Option Agreement on numerous occasions, as evidenced by at least one documented effort attached at Exhibit 9. To date, Dragon Jade has not advised of the amounts owed, so Ultroid has been unable to restore the benefits to Dragon Jade. And as to the final element, Ultroid is without an adequate remedy at law as, assuming the Option Agreement and

enforceable, Ultroid could be robbed of its Assets and its shareholders stripped of their investment without the protections afforded to them under Florida law.

In light of the foregoing, assuming the Option Agreement is found to be a valid contract, it is voidable and should be rescinded, and Ultroid should be granted summary judgment as to Counts I and II and Counterclaim IV.

## IV.     Conclusion

It is no secret that the parties disagree as to the circumstances and impact of numerous issues in this case, and Ultroid concedes that a majority of those issues are genuinely disputed and not appropriate for resolution on summary judgment. Perhaps the most significant issue, however, is in fact one that is entirely indisputable: the sale of the Ultroid Assets to Dragon Jade was not approved by the Ultroid shareholders as required by Florida law. Thus, the Option Agreement memorializing Dragon Jade's right to purchase the Assets is void *ab initio*. Alternatively, assuming the Option Agreement is only voidable, it should be rescinded because the Ultroid shareholders have not ratified it. Under either scenario, the outcome remains the same: Dragon Jade cannot prevail on a claim arising out of the Option Agreement and Ultroid is entitled to summary judgment on Counts I and II and, dependent on the alternative, Counterclaim IV.

**WHEREFORE**, the Defendants/Counter-Plaintiffs Ultroid LLC, Ultroid Marketing Development Corp., and Ultroid Technologies, Inc., respectfully request that this Honorable Court grant this Motion and enter judgment in their favor and against Dragon Jade on at least Counts I and II or alternatively, Counts I and II and Counterclaim IV, and for all such further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that June 13, 2019, the foregoing was electronically served to William J. Simonitsch, Esq. and Javier Roldan Cora, Esq., K & L Gates LLP, Southeast Financial Center, 200 South Biscayne Boulevard, Suite 3900, Miami, FL 33131.

_____/s/ *Jenna M. Winchester*_____
WILLIAM E. LAWTON, ESQ.
Florida Bar No. 0163236
JOSHUA B. WALKER, ESQ.
Florida Bar No. 0047614
JENNA M. WINCHESTER, ESQ.
Florida Bar No. 0114280
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel: 407-422-4310  Fax: 407-648-0233
WLawton@drml-law.com
JWalker@drml-law.com
JWinchester@drml-law.com
Attorneys for the Ultroid Companies
