Cedric Lewis  30(b)(6), Confidential
December 03, 2018

```
 1            UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF FLORIDA
 2                  TAMPA DIVISION

 3                          CASE NO: 8:17-cv-02422-JDW-CPT

 4   DRAGON JADE INTERNATIONAL,
     LTD., a British Virgin
 5   Islands limited company,
          Plaintiff/Counter-Defendant,
 6
     vs.
 7
     ULTROID, LLC, a Nevada corporation;
 8   ULTROID MARKETING DEVELOPMENT CORP.,
     a Florida corporation; ULTROID
 9   TECHNOLOGIES, INC., a Florida
     corporation,
10        Defendants/Counter-Plaintiffs
                                          /
11

12           DEPOSITION OF CEDRIC E. LEWIS

13       **** NON ATTORNEYS' EYES ONLY PORTIONS ****

14   Corporate Representative of Defendants/Counter-Plaintiffs,

15   Ultroid Marketing Development Corp., Ultroid LLC and Ultroid

16   Technologies, Inc., pursuant to Fed.R.Civ.P. 30(b)(6)

17              Pages 1 through 173

18            Monday, December 3, 2018

19           From 9:00 a.m. to 3:03 p.m.

20        Dean, Ringers, Morgan & Lawton, P.A.

21          201 East Pine Street, Suite 1200

22              Orlando, Florida  32801

23

24         Stenographically Reported By:

25             Mary Ann Schumacher, FPR
```

U.S. LEGAL SUPPORT
(813) 876-4722



EXHIBIT 2

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                                    2

APPEARANCES


On Behalf of the Plaintiff/Counter-Defendant

K&L GATES, LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 3900
Miami, Florida  33131
305-539-3300
elisa.damico@klgates.com

BY:   ELISA J. D'AMICO, Esquire


On Behalf of the Defendants/Counter-Plaintiffs

DEAN, RINGERS, MORGAN & LAWTON, P.A.
201 East Pine Street, Suite 1200
Orlando, Florida  32801
407-422-4310
wlawton@drml-law.com
JWinchester@drml-law.com

BY:    WILLIAM E. LAWTON, Esquire
       JENNA MARIE WINCHESTER, Esquire

1  nonsurgical, I guess we've always loosely called it a cure,
2  but it's a treatment for hemorrhoids, all four categories of
3  hemorrhoids.
4      Q.  And is the Ultroid device considered a medical
5  device?
6      A.  Yes.
7      Q.  I'm going to show you what we're going to mark as
8  Exhibit 3.  And you'll see this has a sticker from Mr. Knox's
9  deposition too, but --
10         MR. LAWTON:  But it's 3 for this one?
11         MS. D'AMICO:  Correct.  It's Exhibit 3.
12         (Plaintiff's Exhibit 3 was identified.)
13 BY MS. D'AMICO:
14     Q.  Have you seen Exhibit 3 before; can you tell me what
15 it is?
16     A.  Yes, I've seen it.  It is a -- it's a letter
17 from, it states, Nancy Brogdan, Director of -- Division of
18 Reproductive Abdominal and Radiological Devices.  It looks
19 like this is a determination from the original 510K that was
20 filed on the device, saying that it purports with, I guess
21 the basic standards or definitions -- I'm trying to think of
22 the exact language they use in this.  This is marketed for
23 interstate commerce, but I'm not sure what else you want me
24 to tell you about it.
25     Q.  Okay.  Well, let's unpack it a little bit.  When was

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                                           38

```
 1   Ultroid approved by the FDA for use on the market?
 2        A.   Okay.  So my understanding, from conversations and
 3   reviewing old documents, I believe around 2002.  I don't
 4   have -- that's roughly what I believe.
 5        Q.   Okay.  So this was perhaps shortly thereafter?
 6        A.   Yeah, I think shortly thereafter, yeah.
 7        Q.   Okay.
 8        A.   The 510K may have been filed in 2001, but I would
 9   have to look the exact date up.
10        Q.   The first line says, and this is a letter to the
11   company that says, We've reviewed your Section 510K
12   pre-market notification of intent to market the device.  Can
13   you explain what a Section 510K is?
14        A.   The 510K is part of the filing with the FDA, stating
15   that they're going -- it's part of the filing that says
16   they're going on the market, they're going to manufacture
17   and produce this device.  It's part of the regulatory process
18   to get an item approved to be used and sold in the commerce
19   market.  It's like a general description.
20        Q.   And what else is needed, in order to be able to
21   market a medical device such as Ultroid?
22        A.   I couldn't tell you every, exact step.  At the
23   time this was done, I think there was outside counsel, I
24   think Mr. Knox was involved in some of it.  After the
25   purchase, Dr. Cao, I know Mr. Knox came on at some point --
```

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                                            115

1    Q.   Please.  It's 10 and 11.
2    A.   Thank you.  Exhibit 11 is the letter to the
3  shareholders telling them that they have entered into an MOU
4  and they will enter into a definitive agreement, so yes.
5    Q.   Okay.  So is your testimony then that the MOU that
6  you're looking at -- is this Exhibit 10 or 11?
7    A.   This is Exhibit 11 that I'm looking at.  That's
8  the letter to the shareholders.  And Exhibit B is an MOU.
9  And then the cover letter references a letter definitive
10 agreement.
11   Q.   So did the parties enter into that agreement for the
12 40 million dollars?
13   A.   The definitive end agreement.
14   Q.   Right.
15   A.   Okay.  I don't want to guess.  I don't think I've
16 seen a definitive agreement.
17   Q.   And so what's an MOU, just to be clear?
18   A.   Memorandum Of Understanding.  Now, do I get --
19        MR. LAWTON:  Go ahead.  She's going to ask you
20     anyway so go ahead.
21        THE DEPONENT:  Sure.  You're asking me in general
22     what an MOU is, a Memorandum Of Understanding?
23 BY MS. D'AMICO:
24   Q.   What does it mean?
25   A.   It's a summary of initial terms and conditions that

```
 1   the parties have agreed to.  Depending on who you ask in the
 2   circumstances and conditions surrounding that execution of
 3   the document and the information in it, it may, in itself,
 4   be binding or it may need a definitive agreement after the
 5   fact.
 6       Q.   Was this MOU binding?
 7            MR. LAWTON:  Hold on.  Objection to the form of
 8        the question.  He's not been produced to give legal
 9        opinions.  With regard to that, I think that's
10        well beyond the scope of the notice that you've given.
11   BY MS. D'AMICO:
12       Q.   Was the MOU intended to be binding?
13            MR. LAWTON:  Same objection.  You can answer it if
14        you can.
15       A.   I don't know, I wasn't there.  I mean, I can -- I
16   don't know.  It does reference a definitive agreement, but
17   without -- I can't answer that, I can't give you a legal
18   answer.
19   BY MS. D'AMICO:
20       Q.   I don't want a legal answer, I want your answer as
21   the corporate representative for Ultroid.
22            MR. LAWTON:  And again --
23            MS. D'AMICO:  May I finish my question, please?
24            MS. LAWTON:  You may.
25            MS. D'AMICO:  Thank you.
```

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                                    125

1   Michael Knox before this was drafted.
2       A.   I only have -- the only thing I can tell you, from
3   what is sitting in front of me, this is a letter from SEI,
4   dated to Mr. Knox, that uses those terms.  It's dated October
5   17, 2016.  This contract -- this exhibit seems to use similar
6   terminology.  It's dated January 1st.  Whether this was
7   provided, although SEI is mentioned in this, so I can infer
8   at least, that some of it came, those two things happened.
9       Knox got this later on this date, this information is
10  in this document.  They seem to match up.  I don't know who
11  provided where.  I know there was discussion, communication,
12  between Dragon Jade and SEI at some point, but past that,
13  that's what I can tell you
14      Q.   Do you know when Dragon Jade's first communication
15  with SEI was?
16      A.   That I do not know.
17      Q.   I believe your testimony was earlier, and correct
18  me if I'm wrong, but at the time this option agreement was
19  signed, you said that Knox was pretty much the only one at
20  the company?
21      A.   In terms of operating day-to-day, that was my
22  understanding, yes.  In terms of officers, yeah.
23      Q.   After Mr. Knox signed this agreement, did anyone at
24  Ultroid have any discussion about whether he was allowed to
25  sign the agreement or not?