UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:17-cv-2422-T-27TBM

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

       Plaintiff,

vs.

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation; ULTROID TECHNOLOGIES,
INC., a Florida corporation,

       Defendants.

and

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation,

       Counter-Plaintiffs,

vs.

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

       Counter-Defendant.

_____/

DEPOSITION OF
GLENN HENRICKSEN, JR.

Volume 1
Pages 1 through 169

Thursday, September 27, 2018

Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131

Stenographically Reported By:
Ninette Butler
RPR, CRR, CRC, RSA, FPR



EXHIBIT
4

```
 1    APPEARANCES:

 2

      On behalf of Plaintiff and Counter-Defendant:
 3
           PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
 4         600 Brickell Avenue
           Suite 3100
 5         Miami, Florida 33131
           (786) 913-4900
 6         BY:  JENNIFER G. ALTMAN, ESQ.
           jennifer.altman@pillsburylaw.com
 7
           and
 8
           PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
 9         12255 El Camino Real
           Suite 300
10         San Diego, California 92130
           (858) 509-4000
11         BY:  RICHARD L. BLAYLOCK, ESQ.
           richard.blaylock@pillsburylaw.com
12

13    On behalf of Defendants and Counter-Plaintiffs:

14         DEAN, RINGERS, MORGAN & LAWTON, P.A.
           201 East Pine Street
15         Suite 1200
           Orlando, Florida  32801
16         (407) 422-4310
           BY:  JOSHUA B. WALKER, ESQ.
17         jwalker@drml-law.com

18

19    ALSO PRESENT:  CEDRIC LEWIS

20

21

22

23

24

25
```

Page 73

 1    that happening?

 2              MS. ALTMAN:  Object to the form.

 3        A.    So I believe the date of my consultancy

 4    started in early December 2015.  Prior to that,

 5    Michael Cao and Michael Knox came to Hong Kong, and

 6    both Michael Cao and Dr. Lai asked me to attend

 7    those meetings.

 8    BY MR. WALKER:

 9        Q.    What was being discussed during those

10    meetings?

11              MS. ALTMAN:  Object to the form.

12        A.    What was going to be discussed or what was

13    discussed?

14    BY MR. WALKER:

15        Q.    Well, if there's a distinction there, I

16    would like to know it.

17              What was -- to your knowledge, what was

18    supposed to be discussed during those meetings?

19        A.    So, originally, I was under the impression

20    that Ultroid wanted to raise capital, so I attended

21    those meetings in that format.

22        Q.    And then when you attended the meetings,

23    what was actually discussed there?

24        A.    What was actually discussed at that

25    meeting was expansion of Dragon Jade's footprint in

 1    Asia and distribution of the product.

 2        Q.   Did you come to learn that Ultroid and

 3    Dragon Jade had a distribution agreement between

 4    them which allowed Dragon Jade to distribute

 5    Ultroid's product in a specific geographic area?

 6        A.   Yes.

 7        Q.   Okay.  By the way, what was your skill

 8    set, your ability, if any, to raise capital that you

 9    believe resulted in you being, you know, introduced

10    to these people for that purpose?

11            MS. ALTMAN:  Object to the form.

12        A.   I have been in those circles for a number

13    of years.

14    BY MR. WALKER:

15        Q.   Okay.  Have you assisted other companies

16    in raising capital before your endeavors here?

17            MS. ALTMAN:  Object to the form.

18        A.   Yes.

19    BY MR. WALKER:

20        Q.   So you're in a conversation now.  You're

21    in a meeting with Steven Lai and Michael Cao and

22    yourself in which conversations are being had about

23    Dragon Jade wanting to expand its footprint; is that

24    right?

25        A.   Correct.

1      Q.   Do you recall the scope of the expansion

2    that Dragon Jade wanted?

3      A.   Yes.

4      Q.   What were they trying to do?

5      A.   They were interested in Taiwan, Korea,

6    Japan, and China.

7      Q.   At that time, were you aware of any

8    problems that Ultroid was having with respect to its

9    manufacture of the device?

10     A.   No.

11     Q.   Who else was present during that first

12   meeting that you attended with Michael Cao and

13   Steven Lai?

14     A.   I don't recall.

15     Q.   Had you already met Michael Knox by that

16   point in time?

17     A.   No.  I believe that was the first time I

18   met him.

19     Q.   After that meeting concluded, what was

20   your next interaction with either Ultroid or Dragon

21   Jade, whichever came first?

22          MS. ALTMAN:  Object to the form.

23     A.   I don't recall the things we did after

24   that.

25

```
 1   BY MR. WALKER:

 2       Q.    Before you entered into the consultancy

 3   agreement with Dragon Jade, had you been having any

 4   types of conversations with the Ultroid companies

 5   about you performing some type of work for them?

 6       A.    I had begun to talk to them about it, yes.

 7       Q.    What type of work was being discussed?

 8       A.    At that point, they were talking about

 9   investing in or acquiring the Ultroid companies.

10       Q.    Dragon Jade was.

11       A.    Correct.

12       Q.    And perhaps I misspoke.

13             Before you entered into the Dragon Jade

14   consultant agreement, had you been having any

15   conversations with Ultroid about you performing

16   services for Ultroid?

17       A.    No.

18       Q.    Okay.  After that meeting that you had

19   with Steven Lai and Michael Cao, then you at some

20   point came to learn that Dragon Jade was interested

21   in acquiring Ultroid; is that right?

22             MS. ALTMAN:  Object to the form.

23       A.    I wouldn't say that Dragon Jade was

24   interested in acquiring Ultroid.

25
```

Page 82

1        A.    No.

2              MS. ALTMAN:   Objection.   Form.

3    BY MR. WALKER:

4        Q.    Did you have any experience dealing with

5    international distribution agreements?

6              MS. ALTMAN:   Object to the form.

7        A.    No.

8    BY MR. WALKER:

9        Q.    Is it fair to say that your expertise was

10   raising capital?

11       A.    No.

12       Q.    How would you characterize your expertise

13   at that time?

14       A.    My expertise was just general business

15   knowledge.

16       Q.    In what sense?

17       A.    How business is conducted.

18       Q.    But you agree with me that how businesses

19   are conducted can vary depending upon the type and

20   nature of the business?

21       A.    Yes.

22       Q.    An ice cream shop might conduct its

23   business differently than a medical device

24   manufacturer?

25       A.    Yes.

1        Q.   So what was it generally about your

2   business knowledge that you thought would lend

3   itself towards advising the Dragon Jade company?

4           MS. ALTMAN:  Object to the form.

5        A.   I think you would have to ask them.

6   BY MR. WALKER:

7        Q.   Did you have any conversations with Dragon

8   Jade where you explained to them why you could

9   provide a value service to their company?

10       A.   Yes.

11       Q.   What did you tell them?

12       A.   I told them that I could assist them in

13   handling their dealings with Ultroid.

14       Q.   At some point in time, I understand there

15   was a disagreement between Dragon Jade and Ultroid

16   about some product issues that ultimately led to an

17   arbitration proceeding.  Were you involved with

18   Dragon Jade during that time?

19           MS. ALTMAN:  Object to the form.

20       A.   Yes.

21   BY MR. WALKER:

22       Q.   What is your knowledge of the issues that

23   led to that arbitration proceeding?

24       A.   That's a pretty broad question.  Can

25   you --

Page 84

1        Q.    Sure.

2        A.    -- sharpen the pencil a little bit?

3        Q.    And I certainly will so we can get through

4    it, but can you tell me in a general sense what the

5    disagreement was between the parties at that time?

6        A.    In a general sense, Dragon Jade had signed

7    an international distribution agreement with

8    Ultroid.  And Ultroid, through -- had problems.

9    They couldn't deliver product.  They couldn't -- and

10   timing these things is a little bit fuzzy to me.

11   They couldn't deliver product.  They had a recall.

12   They just -- they -- we bought product -- or they

13   bought product from them.

14       Q.    Dragon Jade bought product from Ultroid?

15       A.    Right.  And it was never delivered.

16       Q.    At the time that that dispute arose, had

17   you already been working with Dragon Jade as a

18   consultant for a period of time?

19       A.    Yes.

20       Q.    About how long?

21       A.    The -- my consulting agreement was

22   December 2015.  And I believe that the arbitration

23   was delivered to them in January of 2017.

24       Q.    So you had been working there for a little

25   bit over a year at the time that that issue was

Page 112

1        A.    Probably around October of 2016.

2        Q.    By January of 2017, I see that we have a

3    signed contract for a purchase option, correct?

4        A.    That is correct.

5        Q.    Describe for me your role from

6    October 2016 to January 2017 with respect to

7    conducting due diligence regarding that asset

8    purchase.

9        A.    In October of 2016, I reviewed, through

10   various different processes, what it meant to be an

11   asset sale, including speaking to people that were

12   experts in the field.

13            In November of 2016 -- well, I made an

14   offer just to see if there was something that could

15   be done there, and it was rejected by the board.  In

16   November, the -- they withdrew.

17       Q.    Who withdrew?

18       A.    Ultroid withdrew.

19       Q.    In November of 2016?

20       A.    Correct.

21       Q.    What was the offer that you had made?

22       A.    I don't remember the exact numbers, but

23   it's in WeChats and e-mails.  And I believe it was

24   anywhere in the neighborhood of 3 million.

25       Q.    So an offer was made in November of 2016.

Page 134

1    with respect to whether or not the Ultroid

2    shareholders had agreed to the terms of that

3    purchase option?

4         A.   The purchase option.  Okay.

5              So this is not talking about a purchase

6    option here, is it?  So I don't recall what -- these

7    are two different -- these are different things,

8    right?  So I don't recall if I heard anything more

9    or I heard anything less.

10        Q.   Just so I'm clear on your response, at the

11   time that the purchase option was entered into in

12   January 2017, had you been told anything else with

13   respect to whether or not the Ultroid shareholders

14   had voted to approve an asset sale of the companies?

15        A.   I don't recall.

16        Q.   Did Michael Knox ever tell you anything

17   else after this October 2016 e-mail with respect to

18   whether or not the Ultroid shareholders had voted on

19   an asset sale?

20             MS. ALTMAN:  Object to the form.

21        A.   I don't recall.

22   BY MR. WALKER:

23        Q.   Okay.  Who -- let me do this:  The Option

24   Agreement has been marked as Exhibit B and I handed

25   that to you at the beginning of the deposition.

1    Could you pull that, please?

2             Have you had the opportunity to review

3    that document?

4        A.    Yes, I have.

5        Q.    Do you recognize that to be the Exclusive

6    Option and Remediation Agreement that was entered

7    into between Dragon Jade and the Ultroid companies?

8        A.    Yes, I do.

9        Q.    The -- if you turn to page 8 of 12.  And

10   the page numbers might actually be off.  In the top

11   right corner, it will say 8 of 12.

12       A.    Eight of 12 is the signature page?

13       Q.    Yes, sir.

14             Is that William Fung's signature?

15       A.    I believe so, yes.

16       Q.    Who drafted this agreement?

17       A.    I believe it was the attorneys who drafted

18   this agreement.

19       Q.    Which attorneys?

20       A.    Pillsbury.

21       Q.    How long has Dragon Jade been a client of

22   the Pillsbury law firm?

23       A.    At this point in time?

24       Q.    Yes.

25       A.    I don't know exactly, but I believe it had

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:17-cv-2422-T-27TBM

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

        Plaintiff,

vs.

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation; ULTROID TECHNOLOGIES,
INC., a Florida corporation,

        Defendants.

and

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation,

        Counter-Plaintiffs,

vs.

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

        Counter-Defendant.

_____/

DEPOSITION OF
GLENN HENRICKSEN, JR.

Volume 2
Pages 170 through 314

Thursday, September 27, 2018

Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131

Stenographically Reported By:
Ninette Butler
RPR, CRR, CRC, RSA, FPR

Page 171

1    APPEARANCES:

2

     On behalf of Plaintiff and Counter-Defendant:
3
            PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
4           600 Brickell Avenue
            Suite 3100
5           Miami, Florida 33131
            (786) 913-4900
6           BY:  JENNIFER G. ALTMAN, ESQ.
            jennifer.altman@pillsburylaw.com
7
            and
8
            PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
9           12255 El Camino Real
            Suite 300
10          San Diego, California 92130
            (858) 509-4000
11          BY:  RICHARD L. BLAYLOCK, ESQ.
            richard.blaylock@pillsburylaw.com
12

13   On behalf of Defendants and Counter-Plaintiffs:

14          DEAN, RINGERS, MORGAN & LAWTON, P.A.
            201 East Pine Street
15          Suite 1200
            Orlando, Florida  32801
16          (407) 422-4310
            BY:  JOSHUA B. WALKER, ESQ.
17          jwalker@drml-law.com

18

19   ALSO PRESENT:  CEDRIC LEWIS

20

21

22

23

24

25

Page 216

1    based on information, I have a question to ask.

2              Did you and Michael Knox ever engage in

3    any type of romantic relationship?

4         A.    Umm, no.

5         Q.    Did you ever see Michael Knox engage in

6    any type of romantic relationships with anyone?

7         A.    In what context?

8         Q.    Well, let's start with during any of his

9    visits to Hong Kong.

10        A.    Okay.  No, I did not see him in a romantic

11   relationship.

12        Q.    Did you engage -- that was a misspeak.

13             Did you ever see Michael Knox engage in

14   any type of sexual behavior with anyone while he was

15   in Hong Kong?

16        A.    No.

17        Q.    There has been an allegation in this case,

18   which I presume you are aware of, that during some

19   visits to Hong Kong, Mr. Knox may have been engaged

20   in some inappropriate relationships with some people

21   while there.  Did you ever see any activity such as

22   that?

23        A.    No, I have not.

24        Q.    An allegation has also been raised that

25   around the time that these agreements were being

Page 217

1   entered into, specifically the Option Agreement and

2   the Security Agreement, that Michael Knox was told

3   that there were some embarrassing photographs of him

4   engaged in inappropriate behaviors that could be

5   shown to his family.  Did you ever hear that those

6   threats had been made?

7        A.   The only threats that I heard were the

8   ones that were in your filings.

9        Q.   Prior to seeing those, had you ever heard

10  any indication from Mr. Knox or otherwise that

11  someone was threatening him, threatening to release

12  embarrassing photographs of him if he did not enter

13  into these agreements?

14       A.   I did not.

15                    * * * * * *

16     (Excerpt of this transcript has been declared

17      confidential and is sealed under separate cover.)

18                    * * * * * *

19

20

21

22

23

24

25

Page 220

1   BY MR. WALKER:

2        Q.   After the Option Agreement was entered

3   into, was Michael Knox trying to secure for himself

4   a position with Dragon Jade?

5             MS. ALTMAN:  Object to the form.

6        A.   In various different communications,

7   during the course of -- of communicating with

8   Michael Knox, he had intimated to us that he had a

9   financial problem, which is not answering your

10  question and I apologize.  But he had numerous times

11  asked to be employed.

12  BY MR. WALKER:

13       Q.   What was Dragon Jade's response?

14            MS. ALTMAN:  Object to the form.

15            Sorry.  You can go ahead.

16       A.   I think I've been very clear in my

17  responses to him that it was not an appropriate time

18  to discuss such things, since we hadn't reached a

19  point in which it made sense to talk about it.

20  BY MR. WALKER:

21       Q.   Did Michael Knox ever make a presentation

22  to Dragon Jade in which he suggested what his

23  position should be and what his compensation package

24  should look like?

25       A.   Michael Knox made several presentations to

Page 221

1    me and one presentation to Dragon Jade.

2         Q.   The presentations that he made to you, did

3    you relay those to the other individuals at Dragon

4    Jade?

5         A.   No.  Just -- wait.  No.  I told them about

6    it.

7         Q.   For those earlier presentations that were

8    relayed first to you that you then told to Dragon

9    Jade representatives, what was the response from

10   Dragon Jade at that time?

11        A.   There was no response from Dragon Jade.

12   They left it to me to handle that situation.

13        Q.   Who at Dragon Jade were you discussing

14   this with?

15        A.   Dr. Steven Lai.

16        Q.   Anyone else?

17        A.   No.

18        Q.   Did you have any concerns about Michael

19   Knox coming on board with Dragon Jade?

20             MS. ALTMAN:  Object to the form.

21        A.   I think "concerns" isn't necessarily a --

22   that's an opinion and not a fact.

23   BY MR. WALKER:

24        Q.   You stated that you felt that it was not

25   an appropriate time.  What do you mean by that?

Page 222

1      A.    One of the -- one of the natural things

2    when you're transitioning from one company to

3    another, either acquiring a company or acquiring

4    their assets, is to move intellectual property as

5    well as intellectual knowledge from one entity to

6    the other.  So there is a natural need -- and this

7    happens in many different situations to effect that.

8    So it's not unusual for a company to either hire or

9    contract to that -- to people that know the product,

10   the knowledge, you know, the markets or a host of

11   other things in those kind of situations.

12      Q.    And I appreciate that response.  I was

13   following up on your earlier statement that you did

14   not believe that it was an appropriate time for

15   Michael Knox to come on board.  What do you mean by

16   that?

17      A.    I didn't say an appropriate time to come

18   on board.  I said an appropriate time to discuss it.

19      Q.    Why did you not believe it was an

20   appropriate time to discuss that topic?

21      A.    Because we had not reached a point in

22   which it was clear to -- that what we needed, how we

23   need to do it, and when it was going to be done.

24      Q.    Did Michael Knox come to Hong Kong in

25   August of 2017 and make a presentation to Dragon

Page 223

1   Jade?

2       A.   In August of 2017, no, he did not come to

3   Hong Kong.

4       Q.   Did Michael Knox make a presentation to

5   Dragon Jade in August of 2017?

6       A.   Yes.

7       Q.   Where was that presentation made?

8       A.   That presentation was made in the Oyster

9   Bar in Grand Central Station in New York City.

10      Q.   Who was present?

11      A.   Dr. Lai and myself.

12      Q.   What was Michael Knox asking for?

13      A.   I don't remember the exact details, but he

14   was asking for a position.

15      Q.   And this had been an ongoing topic with

16   Michael Knox from January 2017 to August 2017; is

17   that right?

18      A.   That is correct.

19      Q.   And he had been coming to you and saying,

20   "I feel like I need to be coming to work with Dragon

21   Jade."  And he was making monetary demands

22   associated with that, correct?

23      A.   That is correct.

24      Q.   At the conclusion of that presentation at

25   Oyster Bar in August 2017, was Michael Knox told

Page 224

1      anything with respect to his request to begin

2      working with Dragon Jade?

3              MS. ALTMAN:  Object to the form.

4         A.   Yes.

5    BY MR. WALKER:

6         Q.   What was he told?

7         A.   Michael Knox had desired to work for the

8    company, and he had expressed that many, many times.

9    And Dr. Lai had said that we would be willing to

10   hire you in the transition as a part-time

11   consultant.

12        Q.   What terms were discussed?

13        A.   Specific terms weren't discussed.

14        Q.   What general compensation terms were

15   discussed?

16        A.   The general compensation terms was a

17   monthly -- a monthly payment of $5,000 and some

18   potential to earn additional moneys to be -- in the

19   sales and distribution process.

20        Q.   And at some point in time, you sent

21   Michael Knox a copy of your consultant agreement,

22   correct?

23        A.   That is correct.

24        Q.   Why did you do that?

25        A.   Michael Knox, after the -- after that