```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3      - - - - - - - - - - - - - - - - - - -

        DRAGON JADE INTERNATIONAL, LTD.,  ) CASE NO:
 4      a British Virgin Islands limited  ) 8:17-cv-2422-T-27TBM
        company,                          )
 5                          Plaintiff,    )
        vs.                               )
 6                                        )
        ULTROID, LLC, a Nevada            )
 7      corporation; ULTROID MARKETING    )
        DEVELOPMENT CORP., a Florida      )
 8      corporation; ULTROID TECHNOLOGIES,)
        INC., a Florida corporation,      )
 9                                        )
                            Defendants.   )
10      and                               )
                                          )
11      ULTROID, LLC, a Nevada            )
        corporation; ULTROID MARKETING    )
12      DEVELOPMENT CORP., a Florida      )
        corporation,                      )
13                   Counter-Plaintiffs, )
        vs.                               )
14                                        )
        DRAGON JADE INTERNATIONAL, LTD.,  )
15      a British Virgin Islands limited  )
        company,                          )
16                   Counter-Defendant.   )
        - - - - - - - - - - - - - - - - - - -

17

18              VIDEOTAPED DEPOSITION OF STEVEN LAI

19                  Wednesday, January 9, 2019

20                      AT:  9:07 p.m.

21                      Taken at:
                        K&L Gates
22              44th Floor, Edinburgh Tower
            The Landmark, 15 Queen's Road Central
23                      Hong Kong
        Court Reporter:
        Jenny Buck
24      Accredited Real-time Reporter

25
```



EXHIBIT
5

```
 1                    A P P E A R A N C E S

 2      Appearing for the Plaintiff and Counter-Defendant:

 3              ELISA D'AMICO
                JAVIER ROLDAN CORA
 4              K&L GATES
                Southeast Financial Center, Suite 3900
 5              200 South Biscayne Boulevard
                Miami, Florida 33131-2399, USA
 6              Telephone:  +1.305.539.3315
                Email: elisa.damico@klgates.com
 7                     javier.roldancora@klgates.com

 8              CHRISTOPHER TUNG
                KATIE LI
 9              K&L GATES
                44th Floor, Edinburgh Tower
10              The Landmark, 15 Queen's Road Central
                Hong Kong
11              Telephone:  +852.2230.3511
                Email: christopher.tung@klgates.com
12                     katie.li@klgates.com

13
        Appearing for the Defendants and Counter-Plaintiffs:
14
                JOSHUA B. WALKER
15              JENNA M. WINCHESTER
                DEAN, RINGERS, MORGAN & LAWTON, P.A.
16              Post Office Box 2928
                Orlando, Florida 32802-2928, USA
17              Telephone:  +1.407.422.4310
                Email: jwalker@drml-law.com
18                     jwinchester@drml-law.com

19      Also present:

20              Margaret Tham -- Videographer
                Helena Li -- Interpreter
21

22

23

24

25
```

Page 8

1      Q.  When did you first meet Michael Cao?

2      A.  June 2015.

3      Q.  When was the last time that you have spoken with

4  Michael Cao?

5      A.  Around August of 2016.

6      Q.  Do you know where Michael Cao currently lives?

7      A.  I don't know.

8      Q.  There have been allegations in this case related to

9  some money that you gave to Michael Cao when he came to

10  visit you in Hong Kong, so I'm going to ask you a few

11  questions about that, to make sure that we understand your

12  testimony on that issue.

13      A.  I understand.

14          MS. D'AMICO:  Object to form.  I don't believe

15  that's a question, but I'll still object to it.

16          MR. WALKER:  Okay.

17  BY MR. WALKER:

18      Q.  Now, earlier on in the relationship you had with

19  Michael Cao, you were negotiating with Michael Cao for

20  Dragon Jade to purchase the Ultroid companies; correct?

21      A.  What time are you talking about?

22      Q.  Let's say 2015 until the early parts of 2016.

23      A.  No in 2015, but yes in 2016.

24      Q.  Okay.  So in 2016 is when you were talking about

25  acquiring the Ultroid companies then?

Page 9

1       A.  Yes.

2          Q.  **And at some point in time in 2016, there was**

3   **a purchase price of $84 million that was agreed upon between**

4   **Dragon Jade and Ultroid; is that right?**

5       A.  I did not agree to that.  That was a proposal only,

6   a recommendation.

7          Q.  **A recommendation made by who?**

8       A.  By Michael Cao.

9          Q.  **Did Dragon Jade make an offer to purchase the**

10  **Ultroid companies during 2016?   (Question not interpreted.)**

11          MS. D'AMICO:  I'm going to make an objection here,

12  and, Josh, I believe we're on the same page, but this

13  deposition is limited to two topics and I'll give you

14  a little leeway to go outside of that to set that up, but

15  I want to make sure that we're not wandering into territory

16  that's not appropriate here.

17          MR. WALKER:  Yeah, I appreciate that.  I think

18  you'll see -- you probably already know exactly where I'm

19  going with this.  I'm not going to wander down this road

20  really far at all.  It's just for context.

21          MS. D'AMICO:  Understood.

22          THE INTERPRETER:  Sorry, can you repeat your

23  question?

24  BY MR. WALKER:

25          Q.  **Did Dragon Jade ever make an offer, a monetary**

1    offer, to purchase the Ultroid companies?

2        A.  Yes.

3        Q.  **When was that and what was the amount?**

4        A.  That was in around April 2016.  We proposed a total

5    amount of US$40 million, and within this 40 million,

6    US$10 million would be cash and US$30 million will be in

7    stocks.

8        Q.  **During the time of those negotiations, Michael Cao**

9    **came to visit you in Hong Kong; is that correct?**

10       A.  Yes, in April 2016.

11       Q.  **How would you describe your relationship with**

12   **Michael Cao around that time of April 2016?**

13           MS. D'AMICO:  Object to form.

14       A.  Business relationship.

15   BY MR. WALKER:

16       Q.  **Okay.  Were you on friendly terms with Mr. Cao?**

17       A.  Definitely not.

18       Q.  **Why do you say "definitely not"?**

19       A.  That is because after we placed order in 2015, they

20   delivered the equipment to us, they actually knew that the

21   equipment was medical or healthcare devices equipment, and

22   they have been warned by FDA of the US about that as well.

23   However, they did not tell us that that was medical

24   equipment.  And then, in January 2016, we were told by

25   hospitals in Hong Kong, in fact the hospitals in Hong Kong

1   put the questions to us, about those products.  So I have

2   the feeling that I was actually deceived by Michael Cao.

3       **Q.  When did you come to that conclusion, that you had**

4   **been deceived by Michael Cao?**

5       A.  Right from the beginning, I had the feeling that he

6   was not really very good, and later on a lot more

7   irregularities or anomalies were discovered, but then that

8   had to go a long way back into history, so I want to ask my

9   counsel whether I should go into all those details because

10  it seems that those details are not related to today's

11  deposition.

12      **Q.  Yeah, well, I'm not trying to get too deep into**

13  **that, other than I'm just trying to understand the nature of**

14  **the relationship that you had with Michael Cao during the**

15  **time that you were negotiating to acquire the Ultroid**

16  **companies.**

17          MS. D'AMICO:  Object to form.

18  BY MR. WALKER:

19      **Q.  Is it your testimony, Dr. Lai, that during April**

20  **2016, when Dragon Jade made an offer of $40 million to**

21  **purchase the Ultroid companies, that as of that time you had**

22  **serious concerns about Michael Cao and the Ultroid**

23  **companies' veracity or truthfulness when they were providing**

24  **you information?**

25          MS. D'AMICO:  Object to form.

Page 16

1   abandoned its efforts to acquire the Ultroid company and

2   instead moved towards the purchase option that would allow

3   it to purchase the Ultroid assets?  It was during that time

4   period; correct?

5           MS. D'AMICO:  Object to form, and to the extent

6   that that's also outside the scope of the deposition.

7       A.  At that time, we decided to abandon the idea of

8   acquisition, and we did not have the intention to buy their

9   assets.  These are actually two different things.  But we

10  have not got this idea about buying their assets.

11  BY MR. WALKER:

12      Q.  Well, you were certainly aware by January of 2017

13  that Dragon Jade was entering into the asset purchase

14  agreement with the Ultroid companies?

15          MS. D'AMICO:  Object to form again.  This is

16  outside the scope.  I'm not sure where you're going this

17  time.

18      A.  Yes.

19  BY MR. WALKER:

20      Q.  And it was during that same time period that you

21  were presented with a request from Michael Knox that he be

22  given some additional money personally from Dragon Jade; is

23  that right?

24      A.  First of all, the time was different from what you

25  say it just now.  Secondly, Michael Knox did not directly

1   contact me.

2        Q.  Well, let's address those in turn.  First of all,

3   you say the time is different.  Tell me what you mean by

4   that.

5        A.  First of all, Michael Knox needed money at that

6   time to pay for his rent, and also for some kind of loan

7   maybe or pledge, and he did not have enough money so he

8   wanted to borrow money.  And then the other thing is about

9   the contract that was signed on the 19th of January.  When

10  Michael Knox wanted to borrow money, he did not contact me.

11  He approached Glenn Henricksen in mid-January.

12        So these were actually two separate issues.  One

13  thing is about the CEO having not enough money, wanting to

14  borrow money.  The other thing is about the signing of the

15  contract.  These are two different, separate issues.  So

16  that's why these two things took place at different times.

17        Q.  Okay.  Well, let's talk about the timing first,

18  just to go back to my question.  My question was about

19  Michael Knox asking for money, that he wanted money from

20  Dragon Jade, and that was around the time that the contracts

21  were signed.  I think you had said they were at different

22  times.

23        So let me ask it this way:  When did you first

24  learn that Michael Knox was asking for money to be given to

25  him personally?

1    A.  Around mid-January.

2    Q.  **And that was before the asset purchase agreement**

3  **was signed between the parties; correct?**

4    A.  Yes.

5    Q.  **Now, I understand that Michael Knox made that**

6  **request to Glenn Henricksen; is that right?**

7    A.  Yes.

8    Q.  **Did you ever communicate with Michael Knox about**

9  **his request for money?**

10    A.  No.

11    Q.  **So, in January of 2017, what did Glenn Henricksen**

12  **tell you about Michael Knox's request?**

13    A.  So he told me that he had difficulties in his

14  living, he had no money to spend, and he made ...

15  (Chinese spoken).

16      THE INTERPRETER:  Okay.

17    A.  Michael Knox told Glenn Henricksen that he had

18  difficulties in living and he did not have money to spend,

19  and he made a number of requests to Glenn, but then I did

20  not have all the details of his actual request.  So, through

21  WeChat and telephone calls, he made continuous requests to

22  Glenn.

23  BY MR. WALKER:

24    Q.  **Did you ever communicate directly with Michael Knox**

25  **about his requests for money?**

Page 19

1        A.  No.

2        Q.  **What did you tell Glenn Henricksen when he**

3  **presented this request to you?**

4        A.  I just said that this was a trouble, this is very

5  troublesome.

6             (Chinese spoken).

7             THE INTERPRETER:  So the supplement was that, "He

8  was annoying."

9  BY MR. WALKER:

10       Q.  **Okay.  So you thought Michael Knox was being**

11  **annoying in his request, and you also had some concerns**

12  **about his requests for money; is that right?**

13       A.  I did not have any concern.

14       Q.  **I believe your testimony just now, Dr. Lai, was**

15  **that it was "troublesome."  What do you mean by that?**

16       A.  Can I give some examples?

17       Q.  **Please.**

18       A.  If the colleague next to you always borrows money

19  from you and always tells lies, will you think that this is

20  very troublesome?

21       Q.  **So the reason why you were troubled about Michael**

22  **Knox's request was because you thought he was always asking**

23  **for money and also because you felt that he was lying to**

24  **you?**

25       A.  Yes.

Page 20

1      Q.  Well, Dr. Lai, if that was your concern, why then

2  did you agree to give Michael Knox $10,000 at the same time

3  that you were negotiating the asset purchase agreement?

4          MS. D'AMICO:  Object to form.

5      A.  During the negotiation of the agreement, I would

6  not give him the money, but after the -- well, because I do

7  not like him.  But after the agreement was signed, Glenn

8  told me that if we did not give him money, if we did not

9  save him, then he would become a beggar, and there was only

10  one person left in his company at that time, so I was

11  actually forced to give him money to rescue him, and at the

12  same time I took pity on him as well.

13  BY MR. WALKER:

14      Q.  Dr. Lai, we have the option agreement that was

15  signed dated January 19, 2017.  Does that match your

16  recollection about when Dragon Jade formally entered into

17  that agreement with the Ultroid companies?

18      A.  I think so.

19      Q.  When did you first give $10,000 to Michael Knox?

20      A.  23rd of January 2017.

21      Q.  So four days after the agreement was signed is when

22  the wire transfer was made to Michael Knox or, as we'll get

23  to, to Michael Knox's sister-in-law; is that right?

24          MS. D'AMICO:  Object to form.

25      A.  The dates mentioned were correct, that is contract

1   was signed on the 19th and money was sent to him to rescue

2   him on the 23rd.  But these two matters were not related.

3   However, if he did not -- if he had not signed the contract,

4   I would not have sent him the money, because then he would

5   not be my friend, so I would not have saved him.

6   BY MR. WALKER:

7       **Q.  Let me make sure I understand you correctly,**

8   **Dr. Lai.  Your testimony was that you did not trust Michael**

9   **Knox, you thought he was obnoxious, you thought that he was**

10  **lying to you during the time that you were negotiating the**

11  **purchase option; correct?**

12      A.  I did not like Michael Knox.  I did not like

13  Michael Cao.  I did not like things that the Ultroid company

14  had done in deceiving us.  So I would not and I did not

15  negotiate with him.  The negotiation was handled by Glenn

16  and our lawyer.

17      **Q.  That lawyer was Richard Blaylock?**

18      A.  Yes.

19      **Q.  So those were your feelings before Dragon Jade**

20  **signed the agreement, but yet, within days after the**

21  **agreement being signed, you took pity on Michael Knox,**

22  **according to your testimony, and I think you said that now**

23  **he was your friend now that the agreement was signed.  Was**

24  **that your feeling at the time?**

25      A.  Even after the contract was signed, he still was

Page 22

```
 1    not my friend.  He was just a party, the other party of the

 2    agreement, and he is the one to execute the agreement, so

 3    without him it's not possible.

 4         Q.  Now, it took several days to get the information

 5    that you needed to send the $10,000 to Michael Knox; isn't

 6    that true?

 7         A.  I can't remember because that was not handled by

 8    me.

 9         Q.  Who handled that part of the transaction?

10         A.  At that time, I asked a clerk to do it.

11         Q.  What was the name of the clerk?

12         A.  Tam Siu Man.

13         Q.  How long had Tam Siu Man been with Dragon Jade as

14    of January 2017?

15         A.  Around 14 to 15 months.

16         Q.  What was her job responsibilities as a clerk for

17    Dragon Jade?

18         A.  She is taking up miscellaneous duties.

19         Q.  Was this mostly a secretarial type of job function?

20         A.  On top of her, there are secretaries.

21         Q.  So she worked underneath some secretaries then; is

22    that right?

23         A.  Yes, you may put it that way.

24         Q.  Would you agree that Tam Siu Man held a very

25    low-level, entry-type position with Dragon Jade?
```

Page 33

1            (Chinese spoken).

2            MR. WALKER:  You told us a moment ago that --

3            THE INTERPRETER:  Sorry, I haven't finished.

4    Sorry.

5       A.  Dragon Jade did not routinely lend money to others,

6    but I did, I am.

7    BY MR. WALKER:

8       **Q.  You told us a moment ago in your testimony that**

9    **Dragon Jade does loan people money from time to time, which**

10   **is why you have this template in your accounting department.**

11   **Is that accurate?**

12           MS. D'AMICO:  Object to form.

13      A.  Well, Dragon Jade did not routinely lend money to

14   others.  Dragon Jade from time to time lends money to other

15   companies and other people, but not on a routine basis.

16   However, I am the person who actually routinely lend money

17   to others, because my friends often ask me to lend money to

18   them because I am a very nice person, so that's why I often

19   get requests from my friends for money.

20   BY MR. WALKER:

21      **Q.  Ultimately, in this case, it was your decision to**

22   **loan money to Michael Knox; correct?**

23      A.  Only I had the right to make this decision.

24      **Q.  That being the case, Dr. Lai, why then, instead of**

25   **you personally loaning the money or Dragon Jade itself**

Page 34

1    loaning the money, why would you go to a clerk at Dragon

2    Jade and ask her to make a loan out of her own personal

3    funds?

4              MS. D'AMICO:  Object to form.

5       A.  I am both a professional as well as a businessman.

6    So, based on my professional instinct, I am of the view that

7    there would be problems if the company or I personally

8    directly sent the money to Michael Knox.  And now this case

9    proved me right, that there really are problems.

10   BY MR. WALKER:

11      Q.  What concerns did you have if in fact it was shown

12   that either you personally or Dragon Jade lent the money to

13   Michael Knox?

14      A.  In doing business, very often we rely on our

15   experience and our feelings.  I do not like Michael Knox, so

16   I'm forced to lend money to him, and I am the CEO of

17   a listed company, so our company is under the regulation of

18   the US SEC, so I don't want any trouble with US SEC rules

19   and regulations.  Besides, there is the independent auditor

20   who would put questions to us if there's problem, because

21   there is annual audit.

22           So that's why, in case when there is conflict of

23   interest, definitely I would decline any request that may

24   lead to conflict of interest.  But I cannot refuse to help

25   Michael Knox.  So that's why I decided to use another

Page 35

1   person's capacity to send the money.

2       Q.  Can you think of any other time, in your role as

3   the CEO for Dragon Jade, where you had asked a Dragon Jade

4   employee to issue a personal loan such as you did here in

5   this case?

6       A.  Yes, definitely.

7       Q.  On how many occasions?

8       A.  I can't remember.  I think slightly more than

9   a dozen, 10-odd times.

10      Q.  And were those other occasions -- in those other

11  occasions, did you make that request for similar concerns,

12  that you wanted to avoid any issues with SEC oversight or

13  internal audits?

14      A.  No.  This was the only case in -- under that --

15  under those circumstances.

16      Q.  When you decided to make this transaction and to

17  ask Tam Siu Man to do that, did you seek any advice to see

18  if that was permissible?

19          MS. D'AMICO:  Object to form.

20      A.  No.

21  BY MR. WALKER:

22      Q.  I haven't got to the next glaring question that we

23  have regarding this, but this whole time we've been talking

24  about Michael Knox requesting the money, you making the

25  decision that he was worth $10,000, and deciding that that

1   money would be lent to him by your employee.  Given that,

2   why was this set up to make it look like it was a loan to

3   Dale Rose instead of to Michael Knox?

4           MS. D'AMICO:  Object to form.

5       A.  First of all, I had no trust in Michael Knox.  In

6   front of me, he had no credibility at all, but at that time

7   he was in a very anxious situation.  He needed money

8   desperately.  So I did not have time to do all the due

9   diligence, I did not have time to go through all his bank

10  statements or ask for credit card statements to check, I did

11  not have time to check whether his property really was in

12  his name, and so on and so forth.

13          We wanted to help him, so we had to find

14  a solution.  We had to find a method to help him.  So as

15  long as he can find somebody who is willing to sign the loan

16  agreement, then that will be -- that will suffice.  In that

17  case, we are indirectly getting somebody like a guarantor

18  for the loan.  If Michael Knox could not repay the loan,

19  then he would be putting Dale Rose in trouble.

20          I am a person who focus on problem-solving instead

21  of creating too many problems and troubles.

22  BY MR. WALKER:

23      Q.  Do you have any idea who Dale Rose is?

24      A.  I did not know at that time but I know now.

25  (Chinese spoken) --

1     Q.  What is your current understanding?

2     A.  I only know that Dale Rose is his sister-in-law,

3 but not too clear about the exact relationship by this

4 reference of "sister-in-law."

5     Q.  Did you know anything about Dale Rose's finances at

6 the time that this loan agreement was structured?

7     A.  I do not need to know that.

8     Q.  Did you know if Dale Rose even had a job at the

9 time that this loan agreement was entered into?

10    A.  I don't need to know that.

11    Q.  Did you know if Dale Rose owned any property at the

12 time this agreement was entered into?

13    A.  I don't know.

14    Q.  Do you know --

15    A.  (Chinese spoken).

16    Q.  -- if Dale Rose is even a real person?

17    A.  (In English) Oh, okay.

18       (Via interpreter) No.

19    Q.  Did you conduct any due diligence whatsoever before

20 deciding that this loan agreement would be structured

21 between Tam Siu Man and Dale Rose?

22    A.  I did not have time to do the due diligence,

23 otherwise Michael Knox would have died out of starvation.

24    Q.  Now, you knew in January of 2017 that Michael Knox

25 was in a desperate financial situation; is that right?

Page 42

1    Five minutes.

2              MR. WALKER:  Okay.  Let's take a break.  Thank you.

3              MS. D'AMICO:  Thank you.  I appreciate it.

4              THE VIDEOGRAPHER:  There is a request to go off the

5    record.  Hearing no objection, we are going off the record

6    at 22:46.

7                          (Break taken.)

8              THE VIDEOGRAPHER:  Going back on the record at

9    22:56.

10   BY MR. WALKER:

11       Q.  Dr. Lai, after the option agreement was entered

12   into between Dragon Jade and the Ultroid companies in

13   January of 2017, we have seen records indicating that Dragon

14   Jade lent money to the Ultroid companies during that year,

15   2017, approximately $3,000 or so.  Were you aware of that?

16       A.  40,000.  It should be 40,000.

17       Q.  Yes, sir, and were you aware that at least a part

18   of that $40,000 was being used to pay for Michael Knox's

19   salary?

20       A.  Yes, I know.

21       Q.  And were you also aware that as part of that

22   $40,000 or those series of loans totaling $40,000, that

23   Dragon Jade entered into loan agreements directly between

24   Dragon Jade and the Ultroid companies?

25       A.  Correct.

Page 43

1      Q.  And you're aware that in January 2017, that if

2  Dragon Jade wanted to lend money to the Ultroid companies to

3  pay for Michael Knox's salary or expenses, it could have

4  done that directly as a loan from Dragon Jade to the Ultroid

5  companies, instead of from Tam Siu Man to Dale Rose?

6        MS. D'AMICO:  Object to form.

7     A.  At that time, Michael Knox said that if money was

8  sent to his company's account, then it was very possible,

9  very likely, that Michael Cao would take out the money from

10  the account, and as a result Michael Knox would not be able

11  to get the money.  So that's why the whole thing had to go

12  through Dale Rose.

13  BY MR. WALKER:

14     Q.  And this was as of January 2017; is that right?

15     A.  Yes.

16     Q.  But between January 2017 to July 2017, Dragon Jade

17  did in fact lend money directly to Ultroid; correct?

18     A.  Yes, but through a different bank account, and for

19  that bank account only Michael Knox can sign a check.

20     Q.  Do you know when that Ultroid bank account was

21  opened?

22     A.  I think it is between February to early March.

23     Q.  Of 2017?

24     A.  Yes, of course.

25     Q.  Has Michael Knox ever repaid that $10,000 loan?

Page 44

1      A.   It would be excellent if he had repaid it.

2      **Q.   Did he repay the $10,000 loan?**

3      A.   Of course not.

4      **Q.   Did Dale Rose repay the $10,000 loan?**

5      A.   No.

6      **Q.   Was Tam Siu Man reimbursed for the $10,000 that she**

7   **lent to Dale Rose?**

8           MS. D'AMICO:   Object to form.

9      A.   You asked me that question earlier.   Actually, in

10   July, I reimbursed the money to her.

11   BY MR. WALKER:

12      **Q.   Where did the money come from that was used to**

13   **reimburse Tam Siu Man?**

14      A.   From my personal account.

15      **Q.   Did you include any of the interest that was**

16   **supposed to be a part of that loan when you reimbursed Tam**

17   **Siu Man?**

18      A.   I paid her 2.5 percent.

19      **Q.   Why did you reimburse Tam Siu Man?**

20      A.   Because of the 180-day term.

21      **Q.   My question, though, is:   Why did you reimburse**

22   **her?**

23      A.   As I explained earlier, 90 days after the contract,

24   the contract should have been executed, and then Michael

25   Knox should have the money to repay the loan.   However, at

Page 45

1    that time, there was no document at all in his company, so

2    in July it was already 180 days after the signing of the

3    contract.  Still, remediation was not completed.  Because

4    I had asked -- and I had told Tam Siu Man that after 180

5    days, she would get repayment from Dale Rose, but that did

6    not happen.

7            And, as I said earlier, I am a person focusing on

8    solving problems.  To me, $10,000 was not a problem at all,

9    and I could not lose credit in front of my subordinate.  So

10   that's why I decided to pay her the money.  And then, after

11   paying the money to Tam Siu Man, I would then check when

12   remediation can be completed and when our company would pay

13   Ultroid and then when Michael Knox would get money from

14   Ultroid to repay the loan.

15       **Q.  Why did you only repay her 2.5 percent interest,**

16   **when the loan agreement would have allowed her to recover**

17   **5 percent interest?**

18       A.  Because, as stated in the loan agreement, the

19   interest rate of 5 percent is 5 percent per annum, that is

20   that's the annual interest rate, but 180 days is only half

21   of a year.

22       **Q.  And did you repay Tam Siu Man out of your own**

23   **personal funds?**

24       A.  Yes, I said that a moment ago already.

25       **Q.  You said that you repaid her in July 2017.  Do you**

1    remember when in July 2017?

2         A.  I can't remember.

3         Q.  Did Tam Siu Man ever complain to you about the fact

4    that she had never been repaid for the $10,000 loan?

5              MS. D'AMICO:  Object to form.

6         A.  No.

7    BY MR. WALKER:

8         Q.  Did she ever mention it to you at all?

9              MS. D'AMICO:  Object to form.

10        A.  No.  She respects me a lot.

11   BY MR. WALKER:

12        Q.  How did you know that she had never been repaid?

13        A.  Because I know that Michael Knox had no money.

14        Q.  Did you ask Tam Siu Man if she had been repaid for

15   that loan?

16        A.  I had not asked.  I did not need to ask.

17        Q.  So, without asking whether she had been repaid by

18   Dale Rose, you just assumed she had not, and took $10,000

19   plus 2.5 percent interest out of your own personal funds and

20   gave that to her in July 2017; is that right?

21        A.  Yes.

22        Q.  Did Dragon Jade ever reimburse you for that

23   $10,000?

24        A.  That is not necessary.

25        Q.  Did Dragon Jade ever reimburse you for that

Page 47

1    $10,000?

2         MS. D'AMICO:  Object to form.

3    A.  No.

4  BY MR. WALKER:

5    **Q.  Why do you feel that would not be necessary?**

6    A.  Because there is the loan agreement still in

7  existence.  If Michael Knox did not make repayment, then he

8  would be sued, and then, when he repays the money back to

9  Tam Siu Man, then Tam Siu Man can repay me and then that's

10 done.

11        So this is all on a personal level.  It does not

12 have to do with Dragon Jade.

13        MR. WALKER:  I'm afraid that the audio cut out

14 there.  Can you repeat the answer, please?

15        THE INTERPRETER:  I said that:  "The loan agreement

16 is still in existence, so even if Michael Knox does not

17 repay the loan, then he can be sued.  And then, after suing

18 him, if he repays the loan, if he repays Tam Siu Man, then

19 Tam Siu Man can repay me, and all this are on a personal

20 level and this has nothing to do with Dragon Jade."

21 BY MR. WALKER:

22   **Q.  Did Dragon Jade keep any type of accounting**

23 **documents demonstrating this loan payment between Tam**

24 **Siu Man and Dale Rose?**

25        MS. D'AMICO:  Object to form.

Page 48

1      A.  Definitely not.

2   BY MR. WALKER:

3      **Q.  Was this loan included in any of Dragon Jade's**

4   **filings with the SEC?**

5          MS. D'AMICO:  Object to form.

6      A.  No.

7   BY MR. WALKER:

8      **Q.  Is it fair to say that as of July 2017, Tam Siu Man**

9   **did not feel that she could trust Dale Rose or Michael Knox**

10  **repaid the loan that was made?**

11         MS. D'AMICO:  Object to form.

12     A.  Tam Siu Man did not make that point.  Tam Siu Man

13  has trust in me, not in Michael Knox or Dale Rose.  I am the

14  person facing her every day.

15  BY MR. WALKER:

16     **Q.  Now, we've been talking this whole time about the**

17  **$10,000 payment that was made in January of 2017, but,**

18  **Dr. Lai, you are aware that there was another payment of**

19  **$5,400 that was also made, in July of 2017; is that correct?**

20     A.  Yes.

21     **Q.  And isn't it true that during this time of July**

22  **2017, you learned from Glenn Henricksen that Michael Knox**

23  **was still asking for money?**

24     A.  Yes.

25     **Q.  And you also knew that for several months before**

Page 49

1   July of 2017, that Dragon Jade had been lending money to

2   Ultroid and wiring money from Dragon Jade's account to

3   Ultroid's account?

4          A.  Yes, I know.

5          Q.  And you also knew, in July of 2017, that the

6   $10,000 that was sent to Dale Rose had never been repaid,

7   which caused you to pay that money out of your personal

8   funds?

9          A.  I said I know already, just now.

10         Q.  However, despite all of that, at the very end of

11  July 2017, in fact July 31st, 2017, you facilitated another

12  transaction from Tam Siu Man to Dale Rose, wiring another

13  $5,400, didn't you?

14             MS. D'AMICO:  Object to form.

15         A.  Yes.

16  BY MR. WALKER:

17         Q.  This second loan transaction -- if you look in

18  front of you, there's a loan agreement dated July 31, 2017.

19  Just let me know when you have that in front of you.

20         A.  Yes.

21         Q.  Did Dragon Jade's accounting office also prepare

22  this loan agreement?

23         A.  It was prepared according to the original template

24  with some revised numbers and figures.

25         Q.  Who prepared that document?

Page 50

1      A.  William Fung prepared it.

2      Q.  **Where did the money come from for this payment in**

3  **July 2017?**

4      A.  From William Fung's own account.

5      Q.  **Turn with me back to the wire transfer document**

6  **that you looked at earlier, the one that includes "HSBC**

7  **Bank" at the top.**

8      A.  Yes, okay.

9      Q.  **In the middle of that page for this wire transfer**

10  **in July of 2017, under "Originator" it has the name "Mr Fung**

11  **Kwok Wing."  Is that William Fung?**

12      A.  Yes.

13      Q.  **And in that same section, at the bottom, it says,**

14  **"Originator to beneficiary information" -- it says, "From**

15  **Tam Siu Man"; do you see that?**

16      A.  Yes.

17      Q.  **And then the loan agreement that was prepared by**

18  **Dragon Jade shows that this loan came from Tam Siu Man and**

19  **again that it was paid to Dale Rose; is that right?**

20      A.  Yes, you may put it that way.

21      Q.  **Did Tam Siu Man have any involvement with this loan**

22  **in July 2017?**

23      A.  We had notified Tam Siu Man that under her name

24  there would be another loan agreement, but she did not have

25  to contribute money this time.  Because last time, at the

1   end of the day, I had to make the reimbursement to her, so

2   this time Tam Siu Man did not have to put in money, so let

3   William Fung handle it.  In fact, the contract -- the

4   agreement states the same person, and so we are making this

5   arrangement so that Michael Knox would not be too desperate.

6           MS. D'AMICO:  I'm sorry, can I ask the court

7   reporter to read that back?  We dropped the video

8   connection, so I couldn't hear what that answer was.  Thank

9   you.

10          THE COURT REPORTER:  Excuse me, I have a sore

11  throat, so I'll do my best.

12                      (Record read.)

13          MS. D'AMICO:  Thank you.

14  BY MR. WALKER:

15      **Q.  Who made the decision to authorize this payment in**

16  **July 2017?**

17      A.  I.  I did.

18      **Q.  Did Tam Siu Man ever sign this loan agreement in**

19  **July 2017?**

20      A.  No.

21      **Q.  What about the earlier loan agreement, in January**

22  **2017?  Did she sign that one?**

23      A.  I believe she had not signed it.

24      **Q.  Why did William Fung make this payment out of his**

25  **own personal funds?**

Page 52

1    A.  Because I'm his boss; he has trust in me.

2    (Chinese spoken).

3    **Q.  Did you direct him to make that payment out of his**

4    **own personal funds?  (Question not interpreted.)**

5    A.  I want to supplement:  Besides, William Fung is

6    very wealthy.

7    **Q.  Did you direct William Fung to make that payment**

8    **out of his own personal funds?**

9    A.  I only asked if he was willing to do that.  I did

10   not direct him to do it.

11   **Q.  Why did you not lend the money out of your own**

12   **personal funds?**

13   A.  In order to arrange a wire transfer, you have to

14   personally go to the bank, and first of all you must have

15   a bank account.  Secondly, you have to queue up to do that.

16   And thirdly, in the past 20 years in which I am a boss or

17   an employer, I have never been to the bank queueing up to

18   arrange this.

19   **Q.  You told me before in your deposition that**

20   **essentially you're a nice guy and people come to you for**

21   **loans every once in a while.  When other people outside of**

22   **Dragon Jade come to you for loans, do you lend them your own**

23   **personal money, or do you turn to your employees and ask**

24   **that those people lend money to your friends instead?**

25            MS. D'AMICO:  Object to form.

Page 53

1        A.  So I classify things in the following way.  If my

2    friends want to borrow money, then I will lend the money to

3    them personally.  If my company's clients want to borrow

4    money, then it will be the company to be the lender.  If the

5    company's employees want money, then the company will be

6    lending them the money.

7    BY MR. WALKER:

8        **Q.  Well, in this situation, none of those apply.**

9    **Michael Knox, from your testimony, is not your friend, nor**

10   **was he an employee of Dragon Jade.  Did you consider him to**

11   **be a client of Dragon Jade?**

12       A.  He is a person whom I really cannot predict or

13   anticipate.  He does not belong to all those three

14   categories.  He's neither my friend, my company's employees,

15   nor our company's clients.  He should be in the fourth

16   category.  So that's why I asked Tam Siu Man to lend him

17   money.

18       **Q.  What would that fourth category be?  How would you**

19   **have classified Michael Knox in July of 2017?**

20           MS. D'AMICO:  Object to form.

21       A.  The fourth category is that when you have no way to

22   reject or decline to giving -- to give help to that person,

23   even though you hate him a lot, you still have to help him.

24   In life, you often encounter a lot of this kind of persons.

25           Let me give you an example.  My driver has been

1    serving me for 20 years and he is really a very disgusting

2    person.  My wife always asks me to fire him, but I cannot

3    fire him because I can't find somebody else who is better

4    than him.  He does not need to rely on Google Map to find

5    the right way.

6            So very often people have both strengths and

7    weaknesses, good points and bad points.  So as long as

8    a person's good points outweigh his bad points, then I will

9    still continue to get along with him.  So I think that

10   depends on how you value a person.

11           So the fourth category will be people with --

12   people whose good points outweigh his bad points.

13   BY MR. WALKER:

14       **Q.  If I understand your testimony, you have your own**

15   **personal driver that you've used for 20 years that you feel**

16   **is a disgusting person, but he does a good job so you keep**

17   **him around; is that right?**

18       A.  Yes.

19       **Q.  Is it your testimony that you felt that Michael**

20   **Knox, although you hated him, that in July of 2017, you felt**

21   **that you still needed him around?**

22       A.  The fact is, Michael Knox was the only person left

23   in his company who could execute the contract.  So this is

24   already not a matter of whether I like him or dislike him.

25   I have to help him.  I am forced to help him.

1      Q.  And in fact this was true in January of 2017.  You

2   felt that you had to have Michael Knox around, you had to

3   have a relationship, an ability to use him, because he was

4   the only person on behalf of Ultroid that could enter into

5   the agreements and you needed him in January of 2017;

6   wouldn't you agree with that?

7          MS. D'AMICO:  Object to form.

8      A.  To put it correctly, I do not need him.  It's

9   actually he who needs me.  Even though there might be nobody

10  except him to execute the contract -- well, I can just let

11  it go because anyway we are suing his company.  On the 3rd

12  of January, we started a litigation against his company,

13  asking for compensation of our loss.  So, with hindsight, we

14  should not have helped him.  Actually, we could just claim

15  compensation, instead of spending additional legal costs in

16  the past year.

17  BY MR. WALKER:

18     Q.  Even though you were going to be suing --

19         MR. TUNG:  Josh -- excuse me, Josh, sorry to

20  interject.  The reporter has just said she can only be here

21  for another few minutes.

22         MR. WALKER:  Okay.  We are going to be wrapping up

23  here shortly.

24  BY MR. WALKER:

25     Q.  Even though -- even though you were going to be

Page 56

1    suing the Ultroid company for money, you knew that if Dragon

2    Jade was going to acquire the Ultroid assets, you had to

3    have Michael Knox on board to sign the agreements?

4            MS. D'AMICO:  Object to form.

5        A.  Correct.  So if Michael Knox was no longer there,

6    then Ultroid would have to find another person and appoint

7    another person to sign the necessary agreement.

8    BY MR. WALKER:

9        Q.  A few more questions and then we'll be done here.

10           This loan agreement in July of 2017, where William

11   Fung advanced his own $5,400, was William Fung ever paid

12   back for that?

13       A.  Yes.

14       Q.  By who?

15       A.  By me.

16       Q.  When did you pay William Fung back for that loan?

17       A.  When we started this case about suing Ultroid.  In

18   around October 2017, we filed to sue Ultroid, and at that

19   time I knew William Fung would not be possible to get back

20   5,400, so that's why I decided to pay him back.

21       Q.  Did you pay William Fung out of your own personal

22   funds?

23       A.  Yes.

24       Q.  Did you also pay him the interest that was

25   indicated in the loan document?

Page 57

1      A.  He did not want it because the amount was so

2   little.

3      **Q.  Were you ever reimbursed --**

4      A.  (Chinese spoken).

5          Because --

6      Q.  Sorry, is your answer finished?  (Question not

7   interpreted.)

8      A.  -- I said just now that William Fung is very

9   wealthy.

10     **Q.  Thank you.  Were you ever reimbursed by Dragon Jade**

11  **for that amount?**

12     A.  No.

13     **Q.  Did Dragon Jade keep any documents, any financial**

14  **documents or accounting documents, evidencing this loan in**

15  **July 2017?**

16         MS. D'AMICO:  Object to form.

17     A.  Not in the accounting department's documents, but

18  in William Fung's and also in my email there would be this

19  record.

20  BY MR. WALKER:

21     **Q.  So you would have emails about it but, as far as**

22  **the Dragon Jade accounting department, would there be any**

23  **official Dragon Jade documents reflecting this loan that was**

24  **made in July 2017?**

25         MS. D'AMICO:  Object to form.