UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DRAGON JADE INTERNATIONAL, LTD.,       CASE NO 8:17-cv-02422-JDW-CPT

    Plaintiff/Counter-Defendant,       **DISPOSITIVE MOTION**

v.

ULTROID, LLC, *et al.*,

    Defendants/Counter-Plaintiffs.
_____/

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ULTROID'S COUNTERCLAIMS, AND INCORPORATED MEMORANDUM OF LAW**

    Plaintiff/Counter-Defendant, Dragon Jade, Ltd. ("Dragon Jade") Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, hereby moves for summary judgment against Defendants/Counter-Plaintiffs (collectively "Ultroid") on Counterclaims I through VII, and states moves for summary judgment on Counterclaims I through VII, and states:

**I.      INTRODUCTION**

    Ultroid is the manufacturer of a Hemorrhoid Management System ("Product"), and for years, Dragon Jade was its Hong Kong distributor. Despite their business relationship, Ultroid kept Dragon Jade in the dark about Ultroid's mismanagement and the extent of the deficiencies in Ultroid's Product quality management system. Following FDA warnings and Ultroid's failure to correct these critical problems, in 2016, Ultroid was forced to recall the Product from the market. Ultroid has not sold a single Product since the recall.

    In January 2017, the parties signed an Exclusive Option and Remediation Agreement and a Security Agreement (collectively "Agreements"), whereby Dragon Jade committed to

1

fund and manage Ultroid's remediation of the Product to meet FDA requirements; in exchange, Dragon Jade received an option to purchase Ultroid's assets.

Ultroid was failing: the company had no money, no Product on the market, and no future. Instead of taking responsibility for the company's missteps and mistakes, Ultroid blamed Dragon Jade, alleging that Dragon Jade defrauded and conspired against Ultroid and bribed and threatened Ultroid's former CEO.

In September 2017, Ultroid attempted to terminate the Agreements, claiming that the option period expired. Dragon Jade filed this lawsuit in response. As detailed below, the undisputed facts and uncontroverted evidence completely debunk Ultroid's conspiracy theories. Because Ultroid has failed to meet its burden of proof, its Counterclaims I through VII fail as a matter of law and the Court should enter summary judgment in favor of Dragon Jade and against Ultroid.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     The Parties Attempted to Negotiate Dragon Jade's Acquisition of Ultroid

1. Michael Cao was Ultroid's founder, major shareholder, and chairman of its board of directors (the "Board") from 2012 to October 2016. MK Dep. 34:2–35:3, 36:22–37:22; **Ex. 8**. Michael Knox was CEO and a shareholder of Ultroid Technologies, Inc. and Ultroid Marketing Technologies, Inc., and the Manager of Ultroid LLC from 2010 until August 2016. From August 2016 until February 2018, Knox remained as Secretary, CFO, Director, and advisor for the Ultroid Companies. DE 126, ¶¶ 54, 202; MK Dep. 27:22–28:7.

2. Beginning in 2015, Glenn Henricksen became a consultant for Dragon Jade, when he was hired to advise Dragon Jade on the potential Ultroid acquisition and he was

Dragon Jade's primary point of contact during the negotiation of the Agreements. MK Dep. 109:8–15; **Ex. 13**; GH Dep. 39:8–13, 39:22–40:6, 104:11–105:18; DE 12-1 at 10; SL Dep. 21:7–16.

3.   In the early 2000s, Ultroid developed the Product, which received FDA approval in 2003. DE 126, ¶¶ 2–3. Dragon Jade was the exclusive Hong Kong distributor of the Product. DE 12-1 at 17–32. Sometime before November 2015, the Parties began discussing the possibility of Dragon Jade acquiring Ultroid. DE 20-1, ¶ 4, SL Dep. 8:18–9:1.[1]

4.   On August 27, 2015, the FDA issued a warning letter to Ultroid, identifying weaknesses within Ultroid's quality control management and internal control structure for the Product, and threatening regulatory action including seizure, injunction, and civil monetary penalties. **Ex. 2 at 5**. Despite the acquisition negotiations, Ultroid did not tell Dragon Jade about the FDA warning letter. GH Dep. 293:2–7;[2] SL Dep. 10:16–11:2.

5.   In February 2016, Ultroid suggested an acquisition price of $84,000,000, and later presented a valuation report ("Appraisal") to Dragon Jade to support that valuation. SL Dep. 9:2–8; GH Dep. 115:24–116:22; **Ex. 4**. The calculation was based on Ultroid's past Product revenue and a three-year projection of future sales. MK Dep. 85:9–87:5;[3] CL Dep. 80:5–23, 84:5–19, 87:10–89:6.[4]

6.   Dragon Jade rejected the Appraisal, and in April 2016, proposed a $40M acquisition price, comprised of cash and Dragon Jade stock. DE 29, ¶ 3–7; GH Dep. 118:1–120:5, 120:12–121:15; SL Dep. 10:4–7; CL Dep. 95:3–9, 96:15–97:13; **Ex. 7, 13 at 334**.

---

[1] "SL Dep. __" refers Steven Lai's deposition testimony, the cited pages of which are attached as **Ex. 1.**
[2] "GH Dep. __" refers to Glenn Henricksen's deposition testimony. The cited pages are attached as **Ex. 3.**
[3] "MK Dep. __" refers to Michael Knox's deposition testimony. The cited pages are attached as **Ex. 5.**
[4] "CL Dep. __" refers to Cedric Lewis's deposition testimony. The cited pages are attached as **Ex. 6.**

**B.     Dragon Jade Paid for Cao and Knox to Travel to Hong Kong_____**

7.     In April 2016, Cao and Knox traveled to Hong Kong to meet with Dragon Jade, including its CEO Dr. Steven Lai, to negotiate the acquisition. SL Dep. 13:1–5; 14:5–7.

8.     Dragon Jade reimbursed Knox and Cao for their flights based on invoices provided to Dragon Jade, and in cash per their request. SL Dep. 13:6–23, 14:2–7, 14:15–15:4; **Ex**. **9.** Cao's reimbursement was approximately $2,000.00. SL Dep. 13:15–18, **Ex. 9**.

**C.     Acquisition Negotiations Collapsed After the Product is Recalled_____**

9.     In August 2016, Knox resigned as CEO of Ultroid Technologies and Ultroid Marketing Technologies. **Ex. 10**. But, Knox remained employed by Ultroid and continued to serve as director, secretary, and treasurer (and manager of Ultroid LLC) until February 2018. MK Dep. 48:14–49:2, 87:6–90:3; MG Dep. 110:3–6.[5]

10. In July 2016, a follow-up FDA inspection revealed that Ultroid had failed to resolve numerous issues the FDA identified in its August 2015 warning letter. CL Dep. 65:19–66:7, 67:7–71:10; MK Dep. 94:8–95:2; **Exs. 2, 12**. Consequently, in September 2016 Ultroid issued a worldwide Product recall. **Ex. 12**. Shortly after the recall, acquisition negotiations stalled and were eventually abandoned because of it. SL Dep. 15:19–16:10; **Exs. 7, 12**.

11. Since the recall, Ultroid has neither sold any Product, received any revenue, nor met the financial projections in the appraisal. MK Dep. 102:19–103:1; **Ex. 13 at 341.** In October 2016, Cao resigned as Board Chairman. MK Dep. 98:4–17.

**D.     Parties Attempt an Asset Sale Negotiation, Leading to the Agreements**

12. After the recall, Ultroid proposed that Dragon Jade purchase its assets to ensure

---

[5] "MG Dep. __" refers to Michael Goeree's deposition testimony. The cited pages are attached as **Ex. 11.**

Dragon Jade did not assume Ultroid's liabilities. **Ex. 13 at 337**. In November 2016, Dragon Jade offered $3M for the assets, which Ultroid rejected, claiming to have a better third-party offer. **Ex. 7**; GH Dep. 113:18–114:21.

13. In December 2016, asset sale negotiations resumed, and on December 28, 2018, Knox advised the Board that Dragon Jade was still interested in the "Ultroid Brand." MK Dep. 104:19–25; **Ex. 13 at 339**. By unanimous vote and memorialized in writing, the Board authorized Knox to conduct "formal discussions with [Dragon Jade] for the purpose to sell the assets of [Ultroid]." **Ex. 13 at 339**. During this time, Knox was Dragon Jade's only point of contact with Ultroid. CL Dep. 95:17–96:2, 125:17–22; GH Dep. 106:17–24.

14. By January 11, 2017, Ultroid had no funds and was unable to pay its obligations as they became due. **Ex. 13 at 341**. Ultroid had no money to remediate the Product, which was the Company's only potential source of revenue. CL Dep. 44:4–45:4. That same day, at a Board meeting, Dragon Jade made a presentation to the Board and provided a written proposal. MK Dep. 109:8–15; **Ex. 13 at 341**; DE 12-1 at 10.

15. The Board found the proposed terms acceptable and asked Dragon Jade to prepare a final document for Ultroid's corporate counsel to review. **Ex. 13 at 341**. The Board also entered resolutions authorizing the Agreements. **Ex. 14.** Dragon Jade's corporate counsel, Richard Blaylock, drafted the Agreements based on those terms, and Ultroid's corporate counsel reviewed these drafts before execution. GH Dep. 135:5–136:12; MK Dep. 109:21–110:11. During negotiations, Knox repeatedly represented to Dragon Jade that he had the requisite authority to bind Ultroid, and to execute the Agreements on its behalf. **Exs. 8, 16–18.** Indeed, the Agreements set forth that all necessary authorizations were obtained for execution.

**Ex. 15**. Knox also represented to Dragon Jade that he was knowledgeable about the required Product remediation and that the process would be simple. **Ex. 19**; SL Dep. 32:14–19. The parties executed the Agreements effective January 19, 2017, with Knox executing on behalf of Ultroid. **Ex. 15**. Ultroid operated under the Agreements terms until September 2017.

      **E.**      <u>**Knox was in Financial Distress, So He Asked Dragon Jade for Help**</u>

16. Around mid-January 2017, but prior to the execution of the Agreements, Knox first informed Dragon Jade that he was having serious financial trouble, and he requested financial assistance from Dragon Jade. SL Dep. 17:5–11, 17:23–19:1. Although Lai took pity on Knox, initially he refused to help; but, once Knox executed the Agreements, Lai realized that Knox was integral to a successful Product remediation. SL Dep. 20:5–12. Lai agreed to loan Knox the funds himself on January 22 or 23, 2017, and arranged for a $10,000 loan to be made for Knox's benefit. SL Dep. 20:19–20.

17. Despite feeling sorry for Knox, Lai did not trust him. SL Dep. 20:7–12, 36:5. Lai asked Knox to find someone willing to execute the loans on his behalf to ensure that Knox had a loan guarantor. SL Dep. 28:11–16, 35:22–36:21. Knox designated his sister-in-law, and Ultroid shareholder, Dale Rose. SL Dep. 36:13–37:4; **Ex. 21.**

18. Lai enlisted the help of a Dragon Jade clerk, Tam Siu Man, whose job duties included bookkeeping and handling errands such as paying Lai's bills. SL Dep. 22:16–24:16, 27:1–22; **Ex. 20**. The $10,000 loan was memorialized in a written agreement, and was made from Man's personal funds, by wire transfer, to Rose on Knox's behalf. SL Dep. 27:1–22; **Ex. 20**. Man agreed to use her own money so she could earn interest; Lai believed this was a good solution. SL Dep. 27:1–22.

19. Around July 2017, Knox continued to struggle financially and once again asked Henricksen for money. **Ex. 22**. Lai arranged for a second personal loan of $5,400, to be made by wire transfer, from Man to Rose for Knox's benefit; the loan was ultimately wired to Rose from the personal funds of Dragon Jade's CFO, William Fung with Man's permission. SL Dep. 48:16–20, 49:10–51:5; **Exs. 23–24**.

20. A total of $15,400 was loaned to Knox via Rose. Despite Knox's representations that he would repay the loans, neither he nor Rose has done so. **Ex. 25;** SL Dep. 44:2–11. Lai repaid Man and Fung from his personal funds. SL Dep. 44:6–18, 56:9–23.

**F.    Remediation was not as Simple as Ultroid Represented, but It Still Blamed Dragon Jade for Delays**

21. On January 23, 2017, upon Knox's suggestion, Dragon Jade contracted with Superior Electronics, Inc. ("SEI"), an engineering firm, to begin the Product remediation. DE 12-1 at 8, 10–11; DE 30, ¶ 3; **Ex. 19**; GH Dep. 190:4–20. Dragon Jade soon learned that remediation would not be as simple as Knox had represented, but instead would take significantly more time and money. DE 30, ¶¶ 7, 9–10, 14, 17; **Exs. 26–30**. Dragon Jade continued to fulfill its contractual obligations by facilitating the Product remediation, ultimately hiring a second engineering firm to help with the remediation. DE 30, ¶ 12. Dragon Jade's efforts continued through January 2018. GH Dep. 288:19–289:3.

22. On September 22, 2017, Ultroid sent Dragon Jade a letter claiming that the purchase option period expired and purported to terminate the Agreements. **Ex. 31.** Dragon Jade responded on September 28, 2017, advised that the period had not expired and the alleged termination was invalid. **Ex. 32**. On October 13, 2017, Dragon Jade filed the instant action. DE 1.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is mandated if Ultroid cannot "make a showing sufficient to establish the existence of an element essential to [Ultroid's] case, and on which [Ultroid] will bear the burden of proof at trial."[6] For such issues, Dragon Jade may simply "point [] out to the district court–that there is an absence of evidence to support [Ultroid]'s case."[7] Once Dragon Jade has met this burden, Ultroid cannot defeat summary judgment by relying on the pleadings or mere denials of the allegations.[8] Ultroid "must come forward with 'specific facts showing that there is a genuine issue for trial."[9] Indeed, Ultroid must show more than "some metaphysical doubt as to the material facts," and "the mere existence of a scintilla of evidence in support of the position will be insufficient."[10] Although the evidence is viewed in the light most favorable to Ultroid, only probative, admissible evidence may be considered in determining whether there is a genuine issue of material fact.[11]

### IV.    ARGUMENT

#### A.    COUNTERCLAIMS II & III: Summary Judgment is Proper Because the RICO Claims Fail as a Matter of Law[12]

Ultroid cannot establish the substantive elements of its federal and state RICO claims. Even if Ultroid could do so, its claims still fail on causation.

The Federal RICO Act, 18 U.S.C. § 1961 *et seq.* makes it "unlawful for any person

---

[6] *Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1243 (11th Cir. 2001); Fed. R. Civ. P. 56.
[7] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[8] *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).
[9] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citations omitted).
[10] *Id.* at 586; *Johnson*, 263 F.3d at 1243.
[11] *See* Fed. R. Civ. P. 56(e); *First Union Nat'l Bank of Fla. v. Hall*, 123 F.3d 1374, 1378 (11th Cir. 1997).
[12] The Florida RICO statute is patterned after the federal RICO statute and Florida courts look to federal authority for guidance regarding interpretation. Fla. Stat. § 895; 18 U.S.C. § 1961 *et seq.*; *see Acosta v. Campbell*, 2006 WL 146208, *5 n.7 (M.D. Fla. Jan. 18, 2006); *State v. Gross*, 765 So.2d 39, 42 (Fla. 2000).

employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[13] "[A] civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts."[14] A plaintiff must also establish that the pattern of racketeering activity is the but-for and proximate cause of injury.[15]

### 1.   Ultroid Cannot Establish the Existence of a RICO "Enterprise"

To recover under RICO, Ultroid must first establish the existence of an "enterprise," which "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact."[16] It must prove the enterprise's existence with evidence of an ongoing formal or informal organization, and of the various associates functioning as a continuing unit.[17] "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[18]

Ultroid alleges that the RICO "enterprise actors" were: Lai, Fung, Man, Henricksen, and Blaylock. DE 126 ¶¶ 128–29, 130–35. Ultroid alleges that Dragon Jade and its CEO, along

---

[13] 18 U.S.C. § 1962(c).

[14] *See* FLA. STAT. § 895.03; *Lugo v. State*, 845 So.2d 74, 97 (Fla. 2003); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016); *Delta Air Lines, Inc. v. Network Consult. Assocs.*, 2014 WL 4347839, *7 (M.D. Fla. Sep. 2, 2014) (citations omitted).

[15] *See Fla. Evergreen Foliage v. E.I. DuPont de Nemours & Co.*, 165 F. Supp. 2d 1345, 1351 (S.D. Fla. 2001).

[16] 18 U.S.C. § 1961(4).

[17] *See Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1209 (M.D. Fla. 2004); *U.S. v. Turkette*, 452 U.S. 576, 583 (1981).

[18] *Boyle v. U.S.*, 556 U.S. 938, 946 (2009).

with its "other representatives and employees" were working "individually and in their representative capacities at different times" and that they "orchestrated for Mr. Knox to receive the under-the-table payments." DE 126 ¶¶ 86, 129, 131, 134 [official], ¶¶ 128, 133 [individual], ¶¶ 130, 132 [individual and/or official], ¶¶ 131, 135 [individual or official]. "[A] defendant corporation cannot be distinct for RICO purposes from its own officers, agents, and employees when those individuals are operating in their official capacities . . . ."[19] To prevail, Ultroid must establish a distinction between Dragon Jade—the defendant 'person'— and the enterprise itself because "the racketeering enterprise and the defendant must be two separate entities."[20] Ultroid has not met that burden and the RICO claims fail as a matter of law.

During the relevant time, Man was a Dragon Jade clerk whose responsibilities included bookkeeping, paying bills, and answering telephone calls. SL Dep. 22:9–24:4. Henricksen was, and has been since 2015, Dragon Jade's consultant. Henricksen was the primary point of contact for negotiations with Ultroid, and her remains involved in the instant litigation. SL Dep. 21:7–16; GH Dep. 39:8–13, 104:11–105:18, 106:2–24. CL Dep. 125:17–22. Fung was, and remains, Dragon Jade's CFO; his job duties include overseeing financial transactions and preparing loan documents. SL Dep. 25:3–8, 49:17–50:1. Blaylock was engaged as outside counsel for Dragon Jade at least six months prior to the drafting and execution of the Agreements. In that capacity, he performed due diligence and legal drafting for Dragon Jade. GH Dep. 135:5–136:12.

As Man, Henricksen, Fung, and Blaylock were all working for Dragon Jade and

---

[19] *Ray*, 836 F.3d at 1355.

[20] *See id.* (*citing Cedric Kushner Promo.Ltd. v. King*, 533 U.S. 158, 161–62 (2001)); *accord U.S. v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000).

carrying out their job duties, Ultroid cannot establish a distinction between the defendant "person" (i.e., Dragon Jade") and the "enterprise" itself.[21] To establish a RICO enterprise along with defendant Dragon Jade, Ultroid must then look to third parties. DE 126 ¶143

Ultroid has implicated Ultroid's former chairman, Cao, as collaborating improperly with Dragon Jade. DE 126 ¶¶ 143, 145; MG Dep. 81:1–3, 102:8–11, 108:17–21. But the record evidence does not support this theory and there is no evidence that Dragon Jade collaborated or associated in an improper manner with Cao. Dragon Jade's CEO, Lai, testified that he never liked or trusted Cao. SL Dep. 10:16–12:1. In fact, Lai refused to negotiate with Cao and had Henricksen handle negotiations instead. SL Dep. 21:12–16. Lai never spoke with Cao after August 2016—more than four months before the Agreements' execution. SL Dep. 15:13–15.

There is also no evidence that Dragon Jade improperly collaborated or associated with Knox, whom Lai did not like or trust. SL Dep. 12:6–8, 21:12–13, 38:25–39:3.

Without evidence of any RICO enterprise, Ultroid's RICO claims fail.[22]

## 2.    Ultroid Cannot Established "Racketeering Activity"

Ultroid cannot establish that Dragon Jade engaged in the requisite racketeering activity, defined as including anything indictable under an exhaustive list of criminal offenses.[23] Because the racketeering activity under RICO involves predicate acts that are criminal violations, Ultroid must establish that Dragon Jade committed such acts willfully or with actual

---

[21] *Id.*

[22] As no RICO enterprise exists, Dragon Jade neither operated nor managed any RICO enterprise. *See Ray*, 836 F.3d at 1348; *U.S. v. Starrett*, 55 F.3d 1525, 1542 (11th Cir.1995) (citations omitted); *See Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583.

[23] 18 U.S.C. § 1961(1); FLA. STAT. § 895.02, including, at § 895.02(1)(b), "Any conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)."

knowledge of the illegal activities, which Ultroid cannot do.[24]

Ultroid claims Dragon Jade engaged in a pattern of racketeering activity through certain of the company's actions, including coercing Knox into executing the Agreements by making illegal wire payments, bribing him by offering him a job; extorting, threatening, intimidating, and blackmailing him; and engaging in other deceitful and fraudulent conduct. DE 126 ¶¶ 141, 152. But the record evidence does not support any of these allegations.

**a.**     ***The Wire Transfers Were Not Improper and Do Not Constitute Predicate Acts***

There is no evidence that the wire transfers Ultroid complains of were improper or illicit. "A violation of the mail or wire fraud statutes occurs 'when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. . . .' [I]n the Eleventh Circuit '[a] scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts . . . reasonably calculated to deceive persons of ordinary prudence.'"[25] Based on the record evidence, Ultroid cannot establish that Dragon Jade committed mail fraud and/or wire fraud, or any other predicate act.[26]

The wire transfers at issue,[27] made on or about January 23, 2017 and July 31, 2017, were loans arranged by Lai for the benefit of Knox. **Exs. 20, 23–24**. The January 2017 wire

---

[24] *See Ray*, 836 F.3d at 1346.

[25] *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1373 (M.D. Fla. 2005); *U.S. v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995) (elements of wire fraud under Sec. 1343 directly parallel mail fraud under Sec. 1341, but require use of electronic communication in furtherance of the scheme); 18 U.S.C. § 1961(1); FLA. STAT. §§ 836.05, 836.05.

[26] *See* 18 U.S.C. 1961(1); FLA. STAT. § 895.02(1)(b).

[27] Dragon Jade did make several wire transfers to Ultroid when it loaned funds to the insolvent company to help it continue operations: $10,000 on or about January 26, 2017; $10,000 on or about March 17, 2017; and $20,000 on or about May 8, 2017, but these payments are not at issue. These loans were paid by wire transfer by Dragon Jade to Ultroid and each was memorialized in written loan agreements. **Ex. 33.**

transfer of $10,000 was made pursuant to a loan agreement between Dragon Jade clerk Man, and Knox's sister-in-law and Ultroid shareholder Rose. *Id*; *see also* SL Dep. 22:4–12. The January 23, 2017 wire transfer was made with the intention that the funds were a loan for Knox. SL Dep. 26:17–24, 28:11–16, 29:18–25; **Ex. 24**.

The July 2017 wire transfer to Knox of $5,400 was made pursuant to a second loan agreement between Man and Rose. SL Dep. 30:16–20, 48:16–20, 49:10–15; **Ex. 23**. On July 31, 2017, the wire transfer was made by Fung (with Man's approval) with the intention that the funds were again a loan intended for Knox. SL Dep. 48:16–20, 49:10–51:5; **Exs. 23–24**. Knox acknowledged his intention to repay the loans, but he has not yet done so. **Ex. 25**; SL Dep. 59:21–60:5. Lai repaid Man and Fung in July 2017 and October 2017, respectively. SL Dep. 28:2–5; 44:6–14; 56:10–57:12.

These transfers were personal loans to Knox, who had repeatedly asked for financial assistance since at least mid-January 2017, representing that he "had difficulties in living" and had no money for his rent or other debts. SL Dep. 17:5–11, 17:23–18:22. Lai understood Knox was financially vulnerable but believed he was necessary to successfully remediate the Product; Lai felt compelled to loan Knox money to rescue him. SL Dep 20:7–12, 36:5–8.

Because the evidence demonstrates that Dragon Jade wired the funds at issue for a proper purpose and with the genuine, good faith belief that the information was true or valid, Ultroid cannot establish that Dragon Jade is guilty of wire or mail fraud. SL Dep. 66:9–12.[28]

### b.    *Dragon Jade Did Not Bribe or Extort Knox*

There is also no evidence that Dragon Jade bribed, extorted, threatened, intimidated, or

---

[28] *See, e.g., Perez v. Volvo Car Corp.*, 247 F.3d 303, 319–20 (1st Cir. 2001).

blackmailed Knox by "threaten[ing] to release embarrassing photographs of Mr. Knox in compromising and inappropriate positions that had been taken during his visits to Hong Kong if Knox would not execute the Agreements." DE 126, ¶ 81. In fact, there is no evidence whatsoever that compromising photographs of Knox exist, nor is there evidence of any credible threat or blackmail attempt by Dragon Jade concerning explicit photos or otherwise. MG Dep. 99:21–101:3, 101:19–20; CL Dep. 147:19–148:12, 166:25–168:12.

Ultroid's current CEO, Goeree, testified that Lai stated that they "have cameras" and that they "have pictures of [Knox]," which Knox interpreted as referring to photographs of him with "a woman that's not his wife." MG Dep. 100:1–101:1. But Goeree also testified that "in all fairness, [Lai] said it in a joking manner."[29] MG Dep. 100:1–13, 100:21–101:11. And, Goeree admitted that Lai only made this joke once without any quid pro quo. MG Dep. 99:21–101:20; CL Dep. 144:7–13, 147:12–148:12, 166:25–167:22. The record evidence not only fails to support Ultroid's sextortion claim, but actually contradicts it.

Ultroid's other allegations of coercion, bribery, extortion, threats, intimidation, blackmail, deceit, and fraud are equally unfounded. DE 126, ¶¶ 141, 152; CL Dep. 168:17–21;

---

[29] Ultroid is bound by the testimony of its corporate representatives even where that testimony defeats any claim of actual threat, coercion, or manipulation based on the alleged photographs. *See Peeler v. KVH Indus., Inc.*, 8:12-CV-1584-T-33MAP, 2014 WL 117101, at *8 (M.D. Fla. Jan. 13, 2014). Knox's deposition took place on 11/20/18, and was continued on 1/15/18. At his depositions, Knox invoked his Fifth Amendment right against self-incrimination. On December 3, 2018, Ultroid's corporate representatives, Goeree and Lewis, both testified that on 12/2/18, Knox prepared them on most of their designated topics. These topics correlate to questions Knox was asked at his depositions, and refused to answer invoking his Fifth Amendment right. Eleventh Circuit jurisprudence establishes that in situations like these, where a former officer of a party invokes the Fifth Amendment, is a key figure in a case, and with demonstrated loyalty for his former employer, it is proper for the Court to allow adverse inferences from the witness' assertion of his Fifth amendment right against that witnesses' former employer. *See generally Coquina Investments v. TD Bank, N.A.*, 760 F.3d 1300, 1309–12 (11th Cir. 2014). Furthermore, while a corporate representative can testify at a deposition based on knowledge of the corporation, even if acquired through a former employee, testimony at trial must be based on personal knowledge and the corporate representative may not provide hearsay testimony. *See Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, 8:12-CV-691-T-24-MAP, 2014 WL 4983912, at *2–4 (M.D. Fla. Oct. 6, 2014).

SL Dep. 64:20–65:19. Dragon Jade did not threaten Knox to sign the Agreements nor did it need to, as Knox was eager to do so. **Ex. 34**. At the time the Agreements were signed, Ultroid was insolvent, Knox had no income, and despite being the sole provider for his family, he was out of cash. CL Dep. 168:3–168:12; **Ex. 13 at 341**; SL Dep. 20:5–12. Entering into the Agreements with Dragon Jade was in the best interest of both Knox and Ultroid. CL Dep. 167:23–168:12; **Ex. 14**. Not only did Knox represent to Dragon Jade that he was authorized to execute the Agreements, but he executed them on his own accord; and, Ultroid subsequently ratified them by, *inter alia*, accepting funds and remediation aid from Dragon Jade. **Exs. 8, 16–18, 33**.

Ultroid has refuted its own claim that Dragon Jade bribed Knox to sign the Agreements by offering him a job, as Ultroid's corporate representative testified that under the circumstances, "offering somebody a job is not an issue." MG Dep. 98:13–18.

### c. *Dragon Jade Did Not Bribe Cao*

The record evidence does not support Ultroid's theory that in April 2016, Dragon Jade paid Cao approximately $100,000 cash for his agreement to lower the price of Ultroid from $80M to $40M.[30] MG Dep. 85:11–86:16, 89:10–90:1; SL Dep. 13:6–23, 14:2–7, 14:15–15:12. But the record evidence does not support this theory and instead only shows payments by Dragon Jade to Cao and Knox to reimburse their documented travel expenses. SL Dep. 13:6–23, 14:5–7, 14:15–15:12; **Ex. 9**. Dragon Jade reimbursed Cao approximately $2,000.00. SL Dep. 13:15–18. There is no evidence of any $100,000 payment to Cao and moreover, the

---

[30] In April 2016, Cao held a 29 percent interest in Ultroid, which Ultroid contends was valued at $84M. **Ex. 21**. The idea that Cao would accept $100,000 to give up around $12M that he stood to gain from a potential sale of Ultroid is both illogical and improbable.

proposed acquisition deal was never consummated at any price.

Because Ultroid cannot establish the requisite predicate acts, its RICO claims fail.

### 3. Even if Ultroid Could Establish the Requisite "Racketeering Activity," Ultroid Cannot Establish a Pattern

Ultroid must demonstrate the requisite "pattern" of racketeering activity through the presence of a RICO scheme, [that lasts] more than a few weeks or months."[31] The wire transfers at issue occurred a few months apart in January and July 2017, respectively and there is no evidence of a plan or threat of future transfers. **Exs. 20, 23**. Because "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."[32] Ultroid cannot meet its burden, and its RICO claims fail.

### 4. Even if Ultroid Could Establish the Substantive RICO elements, it Cannot Establish Causation and thus Lacks Standing

Ultroid is only entitled to recover under RICO to the extent it has been injured in its business or property by the conduct constituting the violation.[33] "The connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect."[34] To prevail, Ultroid must establish that "the alleged violation led directly to the plaintiff's injuries" and that there is "some direct relation" between the conduct and the injury to sustain a claim."[35] If it cannot establish its injuries were proximately caused by the RICO violation, Ultroid "lack[s] standing to bring a RICO claim."[36]

---

[31] *Opteum Fin. Servs., LLC. V. Kolbe*, No. 8:03-cv-355-T-17TBM, 2010 WL 3766470 (M.D. Fla. Sep. 22, 2010) (six months too short); *Aldridge v. Lily-Tulip, Inc.*, 953 F. 2d 587, 593 (11th Cir. 1992) (same); *Ray*, 767 F. 3d at 1224.

[32] *Lockheed Martin Corp.*, 314 F. Supp. 2d at 1219.

[33] *See Ray*, 836 F.3d 1349 (citations omitted).

[34] *Id.*; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006); *Williams*, 465 F.3d at 1287–88.

[35] *Anza*, 547 U.S. at 461; *Williams*, 465 F.3d at 1287–88.

[36] *Ray,* 836 F.3d at 1849.

Ultroid contends that it has "suffered damages including but not limited to a substantial loss of profits and revenue due to delayed remediation . . . additional expense in securing other [remediation] companies and methods," and "reputational harm." DE 126, ¶¶ 149, 155. But, the evidence shows that Ultroid is responsible for its own lack (and loss) of profits. Ultroid voluntarily recalled the Product in September 2016, long before Dragon Jade became financially responsible for the remediation. **Ex. 12**. Ultroid admitted that it has had no sales or revenues since the recall, it has also admitted that not having the Product on the market was problematic and affected the company's financial health. MK Dep. 102:19–103:1; CL Dep. 89:4–6; MG Dep. 47:12–17, 50:4–7; **Exs. 12–13**.

Ultroid, not Dragon Jade, was responsible for any remediation delays, as Dragon Jade relied on Knox for information and knowledge about the remediation process, requirements, and who to hire to conduct the remediation. SL Dep. 32:14–18; DE 30, ¶¶ 6-17; **Exs. 19, 26– 30.** Knox had not been forthcoming about Ultroid's remediation needs, and had misled Dragon Jade into believing remediation would be simple and would take only 90 days. *Id.* Dragon Jade relied on the remediation schedule Knox proposed. CL Dep. 122:5–125:8; **Ex. 37**. Only after SEI began working did SEI and Dragon Jade learn that the Product and Ultroid's documentation were both in worse than expected condition and were the source of the increase in time and funds required to remediate. DE 30, ¶¶ 7, 9, 10, 14, 17; **Exs. 19, 26–30, 36.**

Despite these misrepresentations, Dragon Jade continued to perform its duties under the Agreements, investing almost $200,000 and continuing to fund and manage the remediation until, and after, Ultroid improperly terminated and breached the Agreements in September 2017. **Exs. 19, 31–32**; DE 30, ¶ 3; DE 12–1 at 12–13; GH Dep. 288:19–289:3.

Ultroid has yet to repay Dragon Jade.

The record evidence contradicts Ultroid's contentions about Dragon Jade's purported responsibility for lost profits, additional expense and reputational harm. As of early December 2018, the Product was *still* not back on the market despite Ultroid having taken over the remediation itself in September 2017. MG Dep. AEO 34:17–37:3.

Because Ultroid cannot meet its requisite burdens to establish its RICO claims, Dragon Jade is entitled to summary judgment on Counts II and III of the Counterclaim.

**B.     COUNTERCLAIM I: Summary Judgment is Proper Because the FDUTPA Claim Fails as a Matter of Law**

To establish a claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. §§ 501.201–213, Ultroid must show 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages.[37] FDUTPA's purpose is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."[38] Since Ultroid cannot meet its burden, its FDUTPA claim fails.

**1.     Ultroid Cannot Establish any Deceptive Act or Unfair Practice**

Ultroid contends that Dragon Jade engaged in a deceptive act or unfair practice "by, among other things, using threat, intimidation, manipulation, coercion, and/or fraud to get Knox to execute the Agreements on behalf of the Ultroid Companies"; that it "paid Knox under the table to make him sign the Agreements"; and such actions were the "driving force behind" Knox's execution of the Agreements. DE 126, ¶¶ 119–22. For the reasons detailed above in

---

[37] *Id.* at § 501.204; *Hughes Supply, Inc. v. Cont'l Recovery Servs. Corp.*, 6:07-CV-1009-ORL31KR, 2007 WL 4206599, at *2 (M.D. Fla. Nov. 27, 2007).

[38] FLA. STAT. § 501.202.

Part IV.A.2, Ultroid cannot demonstrate that Dragon Jade engaged in any act of "threat, intimidation, manipulation, coercion, and/or fraud," and the FDUTPA claim fails.[39]

### 2.        Dragon Jade Did Not Proximately Cause Ultroid's Damages.

Even if it could establish a deceptive act or unfair practice (which it has not), as described in detail above in Part IV.A.2, Ultroid has failed to establish the requisite causation.[40]

### 3.        Lost Revenues and Added Expenses are not FDUTPA Damages

It is well established that actual damages are required for a FDUTPA claim.[41] Actual damages must be direct damages, not consequential damages in the form of lost profits.[42] And while "actual damages" are not statutorily defined, courts have consistently defined them narrowly: "[g]enerally, the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."[43] FDUTPA damages are thus measured by: "(1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service."[44]

Ultroid alleges that it is entitled to damages under FDUTPA for "the delay in remediation of the Product and getting it back to the market, and associated loss in revenues and profits, and additional costs . . . ." DE 126, ¶ 123. But damages in the form of lost revenue and added expenses do not fall within the two established measures for FDUTPA damages.[45]

---

[39] *Supra.* pp. 11–16.
[40] *Supra.* pp. 16–18.
[41] *See Lustig v. Bear Stearns Residential Mortg. Corp.*, 411 Fed. Appx. 224, 225 (11th Cir. 2011).
[42] *See Hetrick v. Ideal Image Dev. Corp.*, 372 Fed. Appx. 985, 991 (11th Cir. 2010).
[43] *Democratic Rep. of the Congo v. Air Capital Group, LLC*, 614 Fed. Appx. 460, 472 (11th Cir. 2015) (internal citation omitted).
[44] *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1323 (M.D. Fla. 2016), *aff'd*, 703 Fed. Appx. 814 (11th Cir. 2017).
[45] *See id.* at 1324.

Moreover, and as described in detail above in Part IV.A.4, Ultroid has not established that Dragon Jade proximately caused any damages from a remediation delay.[46] Accordingly, summary judgment in Dragon Jade's favor is appropriate.

**C.    COUNTERCLAIM IV: Summary Judgment is Proper on this Rescission Claim Because the Agreements Did Not Require Shareholder Approval**

The plain language of the Agreements conveyed to Dragon Jade an exclusive option to purchase all of Ultroid's assets, but only subject to the post-option negotiation of a separate asset purchase agreement. If the Parties were unable to, in good faith, negotiate a mutually agreeable asset purchase agreement, Ultroid would have no further obligation to sell its assets to Dragon Jade. **Ex. 15**, §§2.1-2.4. The Agreements also conveyed to Dragon Jade a security interest in Ultroid's assets to secure payment of amounts owed to Dragon Jade under the Agreements for remediation costs and other debts. *Id.* § 4.1.

While Florida Statute § 607.1202 states that a corporation must have shareholder approval for the sale of all of its property, that statute is not applicable here. As described above, the Agreements do not convey or otherwise transfer Ultroid's assets to Dragon Jade but instead provide Dragon Jade with an option to purchase, subject to the later negotiation of a separate purchase agreement. **Ex. 15**. The plain language of the Agreements is the best evidence of the Parties' intent, which was *not* an asset sale.[47]

Presumably § 607.1202 would govern any later negotiated asset purchase agreement, but none exists at this time. Moreover, pursuant to § 607.1201, Ultroid, through its Board, was

---

[46] *Supra.* pp. 16-18.
[47] *Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*, 898 F.3d 1087, 1093 (11th Cir. 2018) (stating "that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls," and "[w]hen general propositions in a contract are qualified by the specific provisions, the rule of construction is that the specific provisions in the agreement control").

authorized to convey the security interests in its assets without shareholder approval.[48] For all of the above reasons, Dragon Jade is entitled to summary judgment on Counterclaim IV.

> **D.      COUNTERCLAIM V:  Summary Judgment is Proper on this Rescission Claim Because Ultroid Cannot Establish the Requisite Elements and Regardless, It Has an Adequate Remedy at Law**

"Rescission is an equitable remedy, which 'lies within the sound discretion of the court and is not available as a matter of right.' But, 'rescission and cancellation are harsh remedies and therefore not favored by the courts.'"[49] A party must have no adequate remedy at law, and a "party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for recession."[50]

Ultroid's Counterclaim V is an attempt to reframe the allegations Ultroid makes in Counterclaims I through III as grounds for rescission rather than damages. In Paragraph 177 of the Counterclaim, Ultroid makes the same unsupported allegations of "financial manipulation," "[e]xtortion, "[t]hreats to release embarrassing pictures," and "[c]oncealment of legal requirements," which Dragon Jade addresses in Part IV.A and B of this Motion.[51] For the same reasons described therein, summary judgment in Dragon Jade's favor is appropriate.

Counterclaim V also fails because rescission is not Ultroid's only remedy at law. Indeed, relying on the same allegations, Ultroid has brought various claims for damages, and it is undisputed that Ultroid continued to enjoy the benefits of the Agreements after the

---

[48] Under FLA. STAT. § 607.1201, a corporation may, without shareholder approval, "create a security interest in, or otherwise encumber any or all of its property whether or not in the usual and regular course of business" on the terms and conditions and for the consideration determined by the board of directors.
[49] *Allegheny Cas. Co. v. Archer-W./Demaria Joint Venture III*, 8:13-CV-128-SCB-TGW, 2014 WL 4162787, at *20 (M.D. Fla. Aug. 21, 2014).
[50] *Id.*
[51] *Supra.* pp. 8-20.

discovery of the alleged grounds for rescission, thereby waiving its claim.[52]

Dragon Jade is entitled to summary judgment on Counterclaim V.

**E.      COUNTERCLAIM VI: Summary Judgment is Proper Because the Fraud in the Inducement Claim Fails as a Matter of Law**

Fraud in the inducement requires proof of: "(1) a false statement of a material fact; (2) known by the defendant to be false; (3) made to induce the plaintiff to act in reliance; (4) the plaintiffs acts in reliance upon the representations; and (5) that proximately caused his injury."[53] None of these elements are present in this case. Additionally, as discussed above in Part IV.D, Counterclaim VI fails because Ultroid has an adequate remedy at law and has waived its right to rescission.

**1.      There is no Evidence of any False Statement by Dragon Jade that Induced Ultroid into Executing the Agreements**

Ultroid has not established that it was fraudulently induced into executing the Agreements. First, Ultroid alleges that Dragon Jade misrepresented that it would remediate the Product "knowing that it would not be able to do so." DE 126, ¶ 188. Ultroid bases this counterclaim on two theories: that Dragon Jade: 1) did not complete remediation post-execution; and 2) had not previously performed a similar remediation. MG Dep. 119:13–120:22. But Ultroid does not allege, nor is there evidence, that Dragon Jade made any representations about having prior similar remediation experience; and the plain language of the Agreements show that Dragon Jade's obligation was to engage SEI to remediate the Product—Dragon Jade was not obligated to perform remediation-related tasks itself. **Ex. 15** §3

---

[52] *See* Parts IV.A and B.
[53] *Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1410 (M.D. Fla. 1998).

and Exhibit C thereto. Without more, Ultroid has failed to meet its burden.

Ultroid also alleges that Dragon Jade made misrepresentations to Knox about Knox's ability to enter into the Agreements when Dragon Jade "knew or should have known that they lacked the legal authority." DE 126, ¶ 188. Dragon Jade owed no duty to Ultroid or Knox to provide them with legal advice. Knox repeatedly represented, in writing, to Dragon Jade that he had the authority to bind Ultroid by executing the Agreements. **Exs. 16–18.** Even Ultroid's corporate representative admitted that "[b]y virtue of his position, [Knox] had authority, apparent authority to sign documents . . . ." CL Dep. 126:9–10. Ultroid's conclusory allegation that Dragon Jade engaged in "other unfair, deceptive, and/or fraudulent conduct," DE 126, ¶ 188, lacks evidentiary support and the counterclaim for fraud in the inducement fails as a matter of law.[54]

### 2.    Without Evidence of Any Misrepresentation, Ultroid Cannot Establish Reliance

Because Ultroid cannot establish any misrepresentation, it cannot establish that it relied on any misrepresentation. Moreover, Knox testified that Ultroid's counsel reviewed the Agreements before he executed them, further invalidating any reliance argument. MK Dep. 110:4–11. Dragon Jade is therefore entitled to summary judgment on Counterclaim VI.

### F.    COUNTERCLAIM VII: Summary Judgment is Proper Because the Evidence Does Not Establish a Conspiracy Claim

The elements of a civil conspiracy are: (1) a conspiracy between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) some overt act in pursuit

---

[54] *See Guarantee Ins. Co. v. Brand Mgmt. Serv., Inc.*, 12-61670-CIV, 2013 WL 6768641, at *5 (S.D. Fla. Dec. 20, 2013) (summary judgment where conclusory assertions of coercion and fraud by misrepresentation to execute agreements unsupported and refuted by record).

of the conspiracy, and (4) damage to the plaintiff as a result of the acts performed in pursuit of the conspiracy.[55] To establish a civil conspiracy claim, there "must be an independent wrong or tort that would be a cause of action if by one person."[56]

> 1.   **Ultroid Cannot Establish an Independent Wrong or Tort that Would be a Cause of Action if Performed by One Person**

Ultroid's conspiracy counterclaim fails because there is no independent actionable wrong or tort.[57] Ultroid bases its conspiracy counterclaim on its claim for fraud in the inducement. DE 126, ¶ 202. For all the reasons described above in Part IV.C, Ultroid's conspiracy counterclaim necessarily fails as a matter of law.

> 2.   **Even if Ultroid Had Established and Independent Actionable Wrong, it Fails to Establish All Elements of a Civil Conspiracy**

Ultroid's civil conspiracy claim also fails because it cannot establish that two or more parties conspired to defraud it. Ultroid has alleged that Knox—acting outside of the scope of his authority as a Director, Secretary, Treasurer or CFO of the Ultroid Companies–conspired with Dragon Jade to defraud Ultroid. DE 126, ¶¶ 202–03. Ultroid claims that Knox and Dragon Jade agreed to achieve the illegal purpose of "[selling] the Product and Assets to Dragon Jade without the Ultroid Companies' shareholder approval." DE 126, ¶ 203.

But, the evidence establishes that Knox was acting within the scope of his authority. The Board authorized Knox in writing to negotiate the sale of Ultroid's assets to Dragon Jade

---

[55] *See RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 579 Fed. Appx. 779, 789 (11th Cir. 2014).

[56] *Sky Enterprises, LLC v. Offshore Design & Drilling Services, LLC*, 3:16-CV-916-J-32PDB, 2017 WL 7309871, at *10 (M.D. Fla. Dec. 21, 2017).

[57] *See generally id.*; *see also Kee v. National Reserve Life Insurance Co.*, 918 F.2d 1538 (11th Cir. 1990); *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1370 (M.D. Fla. 2007); *Liappas v. Augoustis*, 47 So. 2d 582, 582 (Fla. 1950).

and to execute the Agreements, which were reviewed by Ultroid's legal counsel.[58] **Exs. 13–14;** MK Dep. 110:4–11. In addition, as discussed at length above, shareholder approval was not required for the execution of the Agreements.[59]

Given the lack of evidence that Knox and Dragon Jade agreed to achieve any illegal purpose of "[selling] the Product and Assets to Dragon Jade without shareholder approval," and the evidence to the contrary, Dragon Jade is entitled to summary judgment on Counterclaim VII.[60] DE 126, ¶ 203

## V.   CONCLUSION

For all the foregoing reasons, the Court should grant Dragon Jade's motion for summary judgment as to Counterclaims I through VII.

**I HEREBY CERTIFY** that on **June 13, 2019** the foregoing was filed via CM-ECF and served by Notice of Electronic Filing on William Lawton, Joshua Walker, Jenna Winchester, Dean, Ringers, Morgan & Lawton, PA, PO Box 2928, Orlando, Florida, 32802.

Dated: June 13, 2019

*/s/ Elisa J. D'Amico*
ELISA J. D'AMICO, ESQ.
Fla. Bar No. 76936
Email: elisa.damico@klgates.com
WILLIAM J. SIMONITSCH, ESQ.
Fla. Bar No. 0422060
Email: bill.simonitsch@klgates.com
**K&L Gates LLP**
200 South Biscayne Blvd., Ste. 3900
Miami, Florida 33131
Tel. 305 539 3300
***Trial Counsel for Plaintiff***

---

[58] *Supra.* ¶¶ 12–15.
[59] *Supra.* pp. 20-21.
[60] *Bivens*, 140 F.3d at 912.