# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3      - - - - - - - - - - - - - - - - - -
        DRAGON JADE INTERNATIONAL, LTD.,   ) CASE NO:
 4      a British Virgin Islands limited   ) 8:17-cv-2422-T-27TBM
        company,                           )
 5                            Plaintiff,   )
        vs.                                )
 6                                         )
        ULTROID, LLC, a Nevada             )
 7      corporation; ULTROID MARKETING     )
        DEVELOPMENT CORP., a Florida       )
 8      corporation; ULTROID TECHNOLOGIES,)
        INC., a Florida corporation,       )
 9                                         )
                             Defendants.   )
10      and                                )
                                           )
11      ULTROID, LLC, a Nevada             )
        corporation; ULTROID MARKETING     )
12      DEVELOPMENT CORP., a Florida       )
        corporation,                       )
13                 Counter-Plaintiffs,     )
        vs.                                )
14                                         )
        DRAGON JADE INTERNATIONAL, LTD.,   )
15      a British Virgin Islands limited   )
        company,                           )
16                 Counter-Defendant. )
        - - - - - - - - - - - - - - - - - -
17
                    VIDEOTAPED DEPOSITION OF STEVEN LAI
18
                        Wednesday, January 9, 2019
19
                            AT:  9:07 p.m.
20
                              Taken at:
21                            K&L Gates
                       44th Floor, Edinburgh Tower
22           The Landmark, 15 Queen's Road Central
                              Hong Kong
23      Court Reporter:
        Jenny Buck
24      Accredited Real-time Reporter

25
```

1      Q.  When did you first meet Michael Cao?

2      A.  June 2015.

3      Q.  When was the last time that you have spoken with

4  Michael Cao?

5      A.  Around August of 2016.

6      Q.  Do you know where Michael Cao currently lives?

7      A.  I don't know.

8      Q.  There have been allegations in this case related to

9  some money that you gave to Michael Cao when he came to

10  visit you in Hong Kong, so I'm going to ask you a few

11  questions about that, to make sure that we understand your

12  testimony on that issue.

13      A.  I understand.

14      MS. D'AMICO:  Object to form.  I don't believe

15  that's a question, but I'll still object to it.

16      MR. WALKER:  Okay.

17  BY MR. WALKER:

18      Q.  Now, earlier on in the relationship you had with

19  Michael Cao, you were negotiating with Michael Cao for

20  Dragon Jade to purchase the Ultroid companies; correct?

21      A.  What time are you talking about?

22      Q.  Let's say 2015 until the early parts of 2016.

23      A.  No in 2015, but yes in 2016.

24      Q.  Okay.  So in 2016 is when you were talking about

25  acquiring the Ultroid companies then?

Page 9

1          A.  Yes.

2          Q.  And at some point in time in 2016, there was

3     a purchase price of $84 million that was agreed upon between

4     Dragon Jade and Ultroid; is that right?

5          A.  I did not agree to that.  That was a proposal only,

6     a recommendation.

7          Q.  A recommendation made by who?

8          A.  By Michael Cao.

9          Q.  Did Dragon Jade make an offer to purchase the

10    Ultroid companies during 2016?  (Question not interpreted.)

11          MS. D'AMICO:  I'm going to make an objection here,

12    and, Josh, I believe we're on the same page, but this

13    deposition is limited to two topics and I'll give you

14    a little leeway to go outside of that to set that up, but

15    I want to make sure that we're not wandering into territory

16    that's not appropriate here.

17          MR. WALKER:  Yeah, I appreciate that.  I think

18    you'll see -- you probably already know exactly where I'm

19    going with this.  I'm not going to wander down this road

20    really far at all.  It's just for context.

21          MS. D'AMICO:  Understood.

22          THE INTERPRETER:  Sorry, can you repeat your

23    question?

24    BY MR. WALKER:

25          Q.  Did Dragon Jade ever make an offer, a monetary

1   offer, to purchase the Ultroid companies?

2       A.  Yes.

3       Q.  When was that and what was the amount?

4       A.  That was in around April 2016.  We proposed a total

5   amount of US$40 million, and within this 40 million,

6   US$10 million would be cash and US$30 million will be in

7   stocks.

8       Q.  During the time of those negotiations, Michael Cao

9   came to visit you in Hong Kong; is that correct?

10      A.  Yes, in April 2016.

11      Q.  How would you describe your relationship with

12  Michael Cao around that time of April 2016?

13          MS. D'AMICO:  Object to form.

14      A.  Business relationship.

15  BY MR. WALKER:

16      Q.  Okay.  Were you on friendly terms with Mr. Cao?

17      A.  Definitely not.

18      Q.  Why do you say "definitely not"?

19      A.  That is because after we placed order in 2015, they

20  delivered the equipment to us, they actually knew that the

21  equipment was medical or healthcare devices equipment, and

22  they have been warned by FDA of the US about that as well.

23  However, they did not tell us that that was medical

24  equipment.  And then, in January 2016, we were told by

25  hospitals in Hong Kong, in fact the hospitals in Hong Kong

1  put the questions to us, about those products.  So I have

2  the feeling that I was actually deceived by Michael Cao.

3       Q.  When did you come to that conclusion, that you had

4  been deceived by Michael Cao?

5       A.  Right from the beginning, I had the feeling that he

6  was not really very good, and later on a lot more

7  irregularities or anomalies were discovered, but then that

8  had to go a long way back into history, so I want to ask my

9  counsel whether I should go into all those details because

10  it seems that those details are not related to today's

11  deposition.

12       Q.  Yeah, well, I'm not trying to get too deep into

13  that, other than I'm just trying to understand the nature of

14  the relationship that you had with Michael Cao during the

15  time that you were negotiating to acquire the Ultroid

16  companies.

17            MS. D'AMICO:  Object to form.

18  BY MR. WALKER:

19       Q.  Is it your testimony, Dr. Lai, that during April

20  2016, when Dragon Jade made an offer of $40 million to

21  purchase the Ultroid companies, that as of that time you had

22  serious concerns about Michael Cao and the Ultroid

23  companies' veracity or truthfulness when they were providing

24  you information?

25            MS. D'AMICO:  Object to form.

Page 12

1      A.  Yes.

2   BY MR. WALKER:

3      Q.  During that same time period of April 2016, had you

4   already met Michael Knox?

5      A.  Yes.

6      Q.  Did you have similar concerns about Michael Knox's

7   truthfulness at that time?

8      A.  Of course.

9      Q.  As of April 2016, did you feel that both Michael

10  Knox and Michael Cao had been misleading you about the

11  Ultroid companies and its product?

12      MS. D'AMICO:  Object to form.

13      A.  Correct.

14  BY MR. WALKER:

15      Q.  Did you ever come to the United States to visit

16  either Michael Cao or Michael Knox?

17      MS. D'AMICO:  Object to form.

18      Josh, I appreciate the set-up, but I think we need

19  to get to the two topics.  You haven't asked any questions

20  about that yet.  So I would --

21      MR. WALKER:  This is leading direct -- this is

22  leading directly to it.

23      A.  I did not go deliberately to visit them, but

24  Michael Knox had been to New York once to meet with me.

25  BY MR. WALKER:

```
 1         Q.  How many times did Michael Knox come to Hong Kong
 2    to visit with you?
 3         A.  Two times.
 4         Q.  When were those times?
 5         A.  November 2015 and April 2016.
 6         Q.  There has been testimony in this case stating that
 7    around the April 2016 trip when Michael Cao came to visit
 8    you, that you handed him some cash for some purposes.  Do
 9    you recall doing that?
10         A.  Yes.
11         Q.  The testimony, I believe, was that you handed
12    Michael Cao an envelope with cash in it.  Is that also what
13    you recall?
14         A.  Yes.
15         Q.  How much cash did you give to Michael Cao in April
16    2016?
17         A.  I think it should be around US$2,000, but I do not
18    have the exact figure.
19         Q.  Why did you give him that cash?
20         A.  That was to pay for his air ticket for him to fly
21    to Hong Kong.
22         Q.  Where did that cash come from?
23         A.  The company made that conversion into US dollars.
24         Q.  When Michael Cao came to visit you in November
25    2015, did you reimburse his travel expenses then?
```

1      A.  No.

2          Q.  Later, when Michael Knox came on some additional

3    trips to visit Dragon Jade, was he reimbursed for those

4    travel expenses?

5          A.  Michael Knox and Michael Cao together came in 20 --

6    in April 2016.  So both of them received the envelope with

7    the reimbursement of air ticket expenses.

8          Q.  I'm talking about after April 2016, when Michael

9    Knox came to visit.  Do you know if his travel expenses were

10   reimbursed in the same way that Michael Cao's were in April

11   2016?

12         MS. D'AMICO:  Object to form.

13    A.  He did not come after April 2016.

14   BY MR. WALKER:

15         Q.  Why did you decide to give Michael Cao an envelope

16   with cash to reimburse his travel expenses instead of

17   a check to the Ultroid company or any other form of payment?

18         A.  In fact, I had asked them whether we should send by

19   TT the amount of money involved, because they showed us the

20   invoice from their travel agency, and in fact the other

21   option is for us to pay them in cash here in Hong Kong when

22   they arrived.  A check was not really possible because they

23   are in the US and we are in Hong Kong here, so they bought

24   air tickets through their travel agency and then they

25   received an invoice from their travel agency, and they

Page 15

1  presented -- they sent the invoice to us, and then we asked

2  our accounting department to pay in accordance with that

3  invoice in the cash, in cash, for that amount directly to

4  those two persons.  That is the option that they chose.

5      Q.  Do Dragon Jade keep any type of accounting records

6  demonstrating that cash envelope that was handed to Michael

7  Cao?

8      A.  This is for sure because we are a listed company.

9      Q.  Did Dragon Jade also pay for Michael Cao and

10  Michael Knox's expenses while they were visiting you in

11  Hong Kong?

12      A.  No, no other expenses, apart from the airfares.

13      Q.  Now, I believe you said the last time you spoke to

14  Michael Cao was around August 2016; is that correct?

15      A.  Yes.

16      Q.  Did you learn at some point that Michael Cao

17  resigned from the Ultroid companies?

18      A.  I knew that sometime later.

19      Q.  Did you also learn, in the fall of 2016, that

20  Michael Knox had taken over as the president and CEO of the

21  of Ultroid companies?

22      A.  I knew about Michael Cao's resignation and Michael

23  Knox's taking over of the company as president and CEO at

24  the same time.

25      Q.  And it was during that time period that Dragon Jade

Page 16

1   abandoned its efforts to acquire the Ultroid company and

2   instead moved towards the purchase option that would allow

3   it to purchase the Ultroid assets?  It was during that time

4   period; correct?

5         MS. D'AMICO:  Object to form, and to the extent

6   that that's also outside the scope of the deposition.

7         A.  At that time, we decided to abandon the idea of

8   acquisition, and we did not have the intention to buy their

9   assets.  These are actually two different things.  But we

10  have not got this idea about buying their assets.

11  BY MR. WALKER:

12        Q.  Well, you were certainly aware by January of 2017

13  that Dragon Jade was entering into the asset purchase

14  agreement with the Ultroid companies?

15        MS. D'AMICO:  Object to form again.  This is

16  outside the scope.  I'm not sure where you're going this

17  time.

18        A.  Yes.

19  BY MR. WALKER:

20        Q.  And it was during that same time period that you

21  were presented with a request from Michael Knox that he be

22  given some additional money personally from Dragon Jade; is

23  that right?

24        A.  First of all, the time was different from what you

25  say it just now.  Secondly, Michael Knox did not directly

1    contact me.

2        Q.  Well, let's address those in turn.  First of all,

3    you say the time is different.  Tell me what you mean by

4    that.

5        A.  First of all, Michael Knox needed money at that

6    time to pay for his rent, and also for some kind of loan

7    maybe or pledge, and he did not have enough money so he

8    wanted to borrow money.  And then the other thing is about

9    the contract that was signed on the 19th of January.  When

10   Michael Knox wanted to borrow money, he did not contact me.

11   He approached Glenn Henricksen in mid-January.

12        So these were actually two separate issues.  One

13   thing is about the CEO having not enough money, wanting to

14   borrow money.  The other thing is about the signing of the

15   contract.  These are two different, separate issues.  So

16   that's why these two things took place at different times.

17        Q.  Okay.  Well, let's talk about the timing first,

18   just to go back to my question.  My question was about

19   Michael Knox asking for money, that he wanted money from

20   Dragon Jade, and that was around the time that the contracts

21   were signed.  I think you had said they were at different

22   times.

23        So let me ask it this way:  When did you first

24   learn that Michael Knox was asking for money to be given to

25   him personally?

Page 18

1        A.  Around mid-January.

2        Q.  And that was before the asset purchase agreement

3   was signed between the parties; correct?

4        A.  Yes.

5        Q.  Now, I understand that Michael Knox made that

6   request to Glenn Henricksen; is that right?

7        A.  Yes.

8        Q.  Did you ever communicate with Michael Knox about

9   his request for money?

10       A.  No.

11       Q.  So, in January of 2017, what did Glenn Henricksen

12   tell you about Michael Knox's request?

13       A.  So he told me that he had difficulties in his

14   living, he had no money to spend, and he made ...

15   (Chinese spoken).

16            THE INTERPRETER:  Okay.

17       A.  Michael Knox told Glenn Henricksen that he had

18   difficulties in living and he did not have money to spend,

19   and he made a number of requests to Glenn, but then I did

20   not have all the details of his actual request.  So, through

21   WeChat and telephone calls, he made continuous requests to

22   Glenn.

23   BY MR. WALKER:

24       Q.  Did you ever communicate directly with Michael Knox

25   about his requests for money?

1        A.  No.

2        Q.  What did you tell Glenn Henricksen when he

3   presented this request to you?

4        A.  I just said that this was a trouble, this is very

5   troublesome.

6            (Chinese spoken).

7            THE INTERPRETER:  So the supplement was that, "He

8   was annoying."

9   BY MR. WALKER:

10       Q.  Okay.  So you thought Michael Knox was being

11   annoying in his request, and you also had some concerns

12   about his requests for money; is that right?

13       A.  I did not have any concern.

14       Q.  I believe your testimony just now, Dr. Lai, was

15   that it was "troublesome."  What do you mean by that?

16       A.  Can I give some examples?

17       Q.  Please.

18       A.  If the colleague next to you always borrows money

19   from you and always tells lies, will you think that this is

20   very troublesome?

21       Q.  So the reason why you were troubled about Michael

22   Knox's request was because you thought he was always asking

23   for money and also because you felt that he was lying to

24   you?

25       A.  Yes.

1      Q.  Well, Dr. Lai, if that was your concern, why then

2  did you agree to give Michael Knox $10,000 at the same time

3  that you were negotiating the asset purchase agreement?

4          MS. D'AMICO:  Object to form.

5      A.  During the negotiation of the agreement, I would

6  not give him the money, but after the -- well, because I do

7  not like him.  But after the agreement was signed, Glenn

8  told me that if we did not give him money, if we did not

9  save him, then he would become a beggar, and there was only

10  one person left in his company at that time, so I was

11  actually forced to give him money to rescue him, and at the

12  same time I took pity on him as well.

13  BY MR. WALKER:

14      Q.  Dr. Lai, we have the option agreement that was

15  signed dated January 19, 2017.  Does that match your

16  recollection about when Dragon Jade formally entered into

17  that agreement with the Ultroid companies?

18      A.  I think so.

19      Q.  When did you first give $10,000 to Michael Knox?

20      A.  23rd of January 2017.

21      Q.  So four days after the agreement was signed is when

22  the wire transfer was made to Michael Knox or, as we'll get

23  to, to Michael Knox's sister-in-law; is that right?

24          MS. D'AMICO:  Object to form.

25      A.  The dates mentioned were correct, that is contract

1  was signed on the 19th and money was sent to him to rescue

2  him on the 23rd.  But these two matters were not related.

3  However, if he did not -- if he had not signed the contract,

4  I would not have sent him the money, because then he would

5  not be my friend, so I would not have saved him.

6  BY MR. WALKER:

7      Q.  Let me make sure I understand you correctly,

8  Dr. Lai.  Your testimony was that you did not trust Michael

9  Knox, you thought he was obnoxious, you thought that he was

10  lying to you during the time that you were negotiating the

11  purchase option; correct?

12      A.  I did not like Michael Knox.  I did not like

13  Michael Cao.  I did not like things that the Ultroid company

14  had done in deceiving us.  So I would not and I did not

15  negotiate with him.  The negotiation was handled by Glenn

16  and our lawyer.

17      Q.  That lawyer was Richard Blaylock?

18      A.  Yes.

19      Q.  So those were your feelings before Dragon Jade

20  signed the agreement, but yet, within days after the

21  agreement being signed, you took pity on Michael Knox,

22  according to your testimony, and I think you said that now

23  he was your friend now that the agreement was signed.  Was

24  that your feeling at the time?

25      A.  Even after the contract was signed, he still was

Page 22

1    not my friend.  He was just a party, the other party of the

2    agreement, and he is the one to execute the agreement, so

3    without him it's not possible.

4         Q.  Now, it took several days to get the information

5    that you needed to send the $10,000 to Michael Knox; isn't

6    that true?

7         A.  I can't remember because that was not handled by

8    me.

9         Q.  Who handled that part of the transaction?

10        A.  At that time, I asked a clerk to do it.

11        Q.  What was the name of the clerk?

12        A.  Tam Siu Man.

13        Q.  How long had Tam Siu Man been with Dragon Jade as

14   of January 2017?

15        A.  Around 14 to 15 months.

16        Q.  What was her job responsibilities as a clerk for

17   Dragon Jade?

18        A.  She is taking up miscellaneous duties.

19        Q.  Was this mostly a secretarial type of job function?

20        A.  On top of her, there are secretaries.

21        Q.  So she worked underneath some secretaries then; is

22   that right?

23        A.  Yes, you may put it that way.

24        Q.  Would you agree that Tam Siu Man held a very

25   low-level, entry-type position with Dragon Jade?

Page 23

1        A.  I would say she was in a medium level.  In fact she

2   works very close to me because my electricity, water tariff,

3   my credit card bills, my daughter's school fees and tuition

4   fees are all paid through her.  So she's like my family

5   member, so I would not say whether she is a very junior or

6   a medium-level person.  I would not put her to a certain

7   grade.

8        Q.  Okay.  I'm not trying to denigrate her or be

9   offensive regarding her position.  I'm just trying to

10  understand what her position was with the company.  You said

11  she was like family.  Was she actually -- is she actually

12  your family member?

13       A.  Definitely not my family member.

14       Q.  To your knowledge, is she related to anyone in the

15  Dragon Jade company?

16       A.  No.

17       Q.  Did she serve as your personal assistant?

18       A.  Part of her responsibilities were described by me

19  just now.  For example, paying my water and electricity

20  bills, credit card bills, and so on.  And then, at the same

21  time, she also assists the secretaries in daily bookkeeping

22  and answering telephone calls.  So she is not really

23  anybody's personal assistant.

24       Q.  Just so I understand -- so she would handle some of

25  your personal finances, paying for your children's school

Page 24

1   expenses, and she would also assist some of the secretaries

2   within Dragon Jade doing functions like bookkeeping and

3   answering the telephones; is that right?

4        A.  Yes.

5        Q.  How long have you known Tam Siu Man?

6        A.  You mean from -- at this point in time, that is the

7   length of --

8        Q.  Yes.

9        A.  I knew her when she joined our company at the end

10  of 2015.

11       Q.  Was that when you first met her?

12       A.  Yes.  Yes.

13       Q.  Is Tam Siu Man still employed by Dragon Jade?

14       A.  No.

15       Q.  When did she leave the company?

16       A.  She resigned in April last year.

17       Q.  Why did she resign?

18       A.  I had asked her.  She had found another job, paying

19  her higher salary, so that's why she left.

20       Q.  When was Michael Knox told that he would be

21  receiving that first wire transfer of $10,000?

22            MS. D'AMICO:  Object to form.

23       A.  I do not know when Michael Knox was told, because

24  it was Glenn who contacted him.  I just gave consent to the

25  sending of money to him on around 22nd/23rd.  But I don't

1   know when Michael Knox was told about this.

2   BY MR. WALKER:

3       Q.  Now, in January 2017, the chief financial officer

4   for Dragon Jade was William Fung; is that correct?

5       A.  Yes.

6       Q.  Is Mr. Fung still the chief financial officer for

7   Dragon Jade?

8       A.  Yes.

9       Q.  Did you have any conversations with Mr. Fung about

10  Michael Knox's request for money in January 2017?

11      A.  Yes.

12      Q.  Tell me about those conversations you had with

13  William Fung.

14      A.  I said to William Fung -- I told him that Michael

15  Knox once again was asking us for money, and then Michael

16  Knox -- and then William Fung said nothing.  He only gave me

17  a facial expression like this, "Huh?", and he did not give

18  any opinion.  The decision was made by me.

19      Q.  Did you instruct William Fung to take any actions

20  with respect to this request?

21          THE WITNESS:  Do you mean January?

22          MR. WALKER:  I did not hear you; can you say that

23  again?

24          THE INTERPRETER:  "Do you mean in January?"

25          MR. WALKER:  Yes, in January 2017.

1      A.  No.

2   BY MR. WALKER:

3      Q.  Did William Fung have any involvement in sending

4   $10,000 in January 2017 to Michael Knox?

5      A.  No.

6      Q.  We have seen, and you may have noted this when you

7   reviewed Mr. Henricksen's testimony, that in fact Michael

8   Knox took the bank information of his sister-in-law, Dale

9   Rose, and sent that to Glenn Henricksen, and Glenn

10  Henricksen sent that information to William Fung.  Were you

11  aware that occurred?

12     A.  I read that later.

13     Q.  Do you deny that William Fung worked with Tam

14  Siu Man in order to send that wire transfer?

15          MS. D'AMICO:  Object to form.  Misstates his

16  testimony.

17     A.  I have to put this in a very precise manner.

18  William Fung should be aware of the situation because a loan

19  agreement had to be signed, so William Fung should be aware

20  of that.  But then for the arrangement of the wire transfer,

21  it was I who asked Tam Siu Man to do it, and this did not go

22  through William Fung.  So I'm not too sure how to

23  differentiate which part is under which person.  So I don't

24  know what really is the meaning of your question.

25  BY MR. WALKER:

Page 27

1      Q.  Tell me about your conversation with Tam Siu Man
2   where you told her to send money to Michael Knox.
3      A.  Number one, I asked her whether she had US$10,000
4   in her account, and number two, I asked her whether she
5   wanted to earn 5 percent annual interest.
6      Q.  How did you decide that the amount you were going
7   to send to Michael Knox was $10,000?
8      A.  In my mind, every person has a value; even enemies
9   have value.  So, to me, the value of Michael Knox would not
10  be bigger than 10,000.  10,000 is a maximum already.  At
11  that time, he actually wanted to borrow 20,000, but both
12  Glenn and I did not agree to that, so I believe that 10,000
13  was the maximum that could be given to him.
14      Q.  So, once you made that decision, that $10,000 would
15  be given to Michael Knox, you then went to Tam Siu Man and
16  asked her if she had $10,000 in her own account?
17      A.  She was the first person whom I asked whether she
18  wanted to earn 5 percent annual interest.
19      Q.  Did she already have US$10,000 in her account at
20  that time?
21      A.  She certainly had the amount, otherwise she would
22  not have said yes to me.
23      Q.  Did you send any money to Tam Siu Man to put in her
24  account that would allow her to send that money to Michael
25  Knox?

Page 28

1     A.  Not at that time.

2         Q.  Did you at some other time reimburse Tam Siu Man

3    for any portion of that $10,000?

4         A.  Around July, because the duration of the agreement

5    was 180 days.

6         Q.  So around July of 2017?

7         A.  Yes.

8         Q.  What agreement are you referencing that had

9    a duration of 180 days?

10        A.  For Tam Siu Man to lend money to Dale Rose.

11        Q.  This whole time, we've been talking about Michael

12   Knox.  You mentioned Dale Rose.  In January 2017, had you

13   ever heard the name Dale Rose?

14        A.  Michael Knox provided this name as a person to sign

15   the loan agreement.  So that's the name he gave, but I did

16   not know who that person was.

17        Q.  When you decided that you were going to loan money

18   to Michael Knox in January 2017, had anyone discussed with

19   Michael Knox that this loan would also include a 5 percent

20   interest term?

21        A.  So he must have already read the loan agreement

22   containing that clause, so he would go ahead to borrow the

23   money, if he agreed to the terms.  If he disagreed, then he

24   should have already raised the point, but we had not heard

25   anything from him.

1      Q.  So, when you asked Tam Siu Man if she wanted to

2  make 5 percent interest on a $10,000 loan to Dale Rose, did

3  you know that Michael Knox was going to agree to a 5 percent

4  interest term on that loan?

5      A.  I definitely did not know.  If Michael Knox was not

6  willing to pay that interest, then he could choose not to

7  take up the loan.

8      Q.  We have sent over some documents, there's only five

9  pages, and you should have them in front of you.  I would

10  ask if someone could please assist with us.  I'm going to

11  ask you some questions about those documents.

12         Do you have those in front of you?

13      A.  I've got only three sheets.

14         MR. TUNG:  This looks from here that they're

15  double-sided.

16         THE WITNESS:  Yes, yes, I've got them.

17  BY MR. WALKER:

18      Q.  Okay.  What should be the first page shows

19  a $10,000 wire transfer from Tam Siu Man.  Do you see that

20  page?

21      A.  Are you asking for the date?

22      Q.  I'm just asking if you have in front of you the

23  document that shows the $10,000 wire transfer from Tam

24  Siu Man.

25      A.  Yes, I can see that.

1         MS. D'AMICO:  Are you talking about the first

2    document, Josh, just so I can understand, in the pack that

3    you sent over?

4         MR. WALKER:  It would be the first document in the

5    packet that I sent over, yes.

6         MS. D'AMICO:  Okay.

7    A.  Yes, I see that page.

8    BY MR. WALKER:

9    Q.  At the very top, it has information about the

10   sender of that $10,000.  There's an account number that

11   appears to come from Bank of New York City.  Are you

12   familiar with that bank?

13   A.  No.

14   Q.  Okay.

15        Turn with me to the next page, please.

16        We're going to get to this momentarily, but

17   I understand there was a second payment or wire transfer

18   that was made to Michael Knox later on in 2017.  This one

19   shows the amount of $5,375.  Are you looking at that page?

20   A.  Yes.

21   Q.  At the top, it has an account number there as well,

22   and it shows the bank being HSBC Bank USA; do you see that?

23   A.  Yes.

24   Q.  Are you familiar with that bank?

25   A.  This is the largest bank in Hong Kong.  What do you

Page 32

1    Whose idea was that?

2        A.  I.

3        Q.  How did you come up with that rate?

4        A.  He offered no collateral, so in Hong Kong and China

5    I don't think anybody would be willing to charge such a low

6    interest rate, so no one would be willing to treat him as

7    good as we did.

8            (Chinese spoken).

9        Q.  This also has a term of 180 days, indicating that

10   the loan shall be repaid in full within that time frame.

11   Who came up with that term?

12       A.  I did.

13       Q.  And how did you come up with that term?

14       A.  Because Michael Knox told me that remediation

15   should be completed within 90 days, so in that case our

16   contract could be executed after 90 days.  And then, by

17   then, his company would have money and then he would also

18   have money, so he should be able to repay this loan after 90

19   days.  But then, in order to play safe, I put down 180 days.

20       Q.  This loan agreement contains a social security

21   number of Dale Rose.  Where did that information come from?

22       A.  Michael Knox gave it to us.

23       Q.  Does Dragon Jade routinely loan people money?

24           MS. D'AMICO:  Object to form.

25       A.  No.

1    person's capacity to send the money.

2         Q.  Can you think of any other time, in your role as

3    the CEO for Dragon Jade, where you had asked a Dragon Jade

4    employee to issue a personal loan such as you did here in

5    this case?

6         A.  Yes, definitely.

7         Q.  On how many occasions?

8         A.  I can't remember.  I think slightly more than

9    a dozen, 10-odd times.

10        Q.  And were those other occasions -- in those other

11   occasions, did you make that request for similar concerns,

12   that you wanted to avoid any issues with SEC oversight or

13   internal audits?

14        A.  No.  This was the only case in -- under that --

15   under those circumstances.

16        Q.  When you decided to make this transaction and to

17   ask Tam Siu Man to do that, did you seek any advice to see

18   if that was permissible?

19             MS. D'AMICO:  Object to form.

20        A.  No.

21   BY MR. WALKER:

22        Q.  I haven't got to the next glaring question that we

23   have regarding this, but this whole time we've been talking

24   about Michael Knox requesting the money, you making the

25   decision that he was worth $10,000, and deciding that that

Page 36

1    money would be lent to him by your employee.  Given that,

2    why was this set up to make it look like it was a loan to

3    Dale Rose instead of to Michael Knox?

4              MS. D'AMICO:  Object to form.

5         A.  First of all, I had no trust in Michael Knox.  In

6    front of me, he had no credibility at all, but at that time

7    he was in a very anxious situation.  He needed money

8    desperately.  So I did not have time to do all the due

9    diligence, I did not have time to go through all his bank

10   statements or ask for credit card statements to check, I did

11   not have time to check whether his property really was in

12   his name, and so on and so forth.

13             We wanted to help him, so we had to find

14   a solution.  We had to find a method to help him.  So as

15   long as he can find somebody who is willing to sign the loan

16   agreement, then that will be -- that will suffice.  In that

17   case, we are indirectly getting somebody like a guarantor

18   for the loan.  If Michael Knox could not repay the loan,

19   then he would be putting Dale Rose in trouble.

20             I am a person who focus on problem-solving instead

21   of creating too many problems and troubles.

22   BY MR. WALKER:

23        Q.  Do you have any idea who Dale Rose is?

24        A.  I did not know at that time but I know now.

25   (Chinese spoken) --

Page 37

1      Q.  What is your current understanding?

2      A.  I only know that Dale Rose is his sister-in-law,

3   but not too clear about the exact relationship by this

4   reference of "sister-in-law."

5      Q.  Did you know anything about Dale Rose's finances at

6   the time that this loan agreement was structured?

7      A.  I do not need to know that.

8      Q.  Did you know if Dale Rose even had a job at the

9   time that this loan agreement was entered into?

10      A.  I don't need to know that.

11      Q.  Did you know if Dale Rose owned any property at the

12   time this agreement was entered into?

13      A.  I don't know.

14      Q.  Do you know --

15      A.  (Chinese spoken).

16      Q.  -- if Dale Rose is even a real person?

17      A.  (In English) Oh, okay.

18         (Via interpreter) No.

19      Q.  Did you conduct any due diligence whatsoever before

20   deciding that this loan agreement would be structured

21   between Tam Siu Man and Dale Rose?

22      A.  I did not have time to do the due diligence,

23   otherwise Michael Knox would have died out of starvation.

24      Q.  Now, you knew in January of 2017 that Michael Knox

25   was in a desperate financial situation; is that right?

1      A.  That was told by him.  It was not my own

2  understanding.

3      Q.  **But certainly even before the option agreement was**

4  **signed between Dragon Jade and Ultroid, Michael Knox had**

5  **been asking Dragon Jade for money for months before that**

6  **time?**

7          MS. D'AMICO:  Object to form.

8      A.  First of all, I had no contact with Michael Knox,

9  so I did not know what his request was or what he said and

10  so on.  He did not have my telephone number.  I also did not

11  have his phone number.

12  BY MR. WALKER:

13      Q.  **My question, Dr. Lai, was whether --**

14      A.  (Chinese spoken).

15      Q.  **-- you were aware, before the option agreement was**

16  **signed in January 2017 --**

17          THE INTERPRETER:  The witness was actually --

18  BY MR. WALKER:

19      Q.  **-- that Michael Knox had been requesting money from**

20  **your company.**

21          THE INTERPRETER:  Excuse me.  Dr. Lai had not

22  finished his answer just now.

23  BY MR. WALKER:

24      Q.  **Please finish.**

25      A.  I did not like Ultroid company either, because

Page 39

1    Michael Cao and Michael Knox had cheated me.  Ultroid had

2    also cheated me.  Ultroid had borrowed money from us but had

3    not repaid.  In April 2016, Michael Knox said that Michael

4    Cao had left one day earlier, so he was the only person

5    remaining in Hong Kong, and that night I had dinner with him

6    in Regal Hotel in Sha Tin and Michael Knox said to me -- he

7    proposed to work for my company here in Hong Kong.

8           So I think you would be able to imagine what kind

9    of person he is in my mind.

10          Q.  My question, Dr. Lai, which you did not answer, is

11   whether you were aware, before the option agreement was

12   signed between the Ultroid companies and Dragon Jade, that

13   Michael Knox had been requesting money to be given to him

14   personally.  Did you know about that before the option

15   agreement was signed?

16          MS. D'AMICO:  Object to form.

17          A.  As I said just now, I would not differentiate among

18   Michael Knox, Michael Cao and Ultroid, because in my mind

19   these two persons and the company all belonged to one single

20   deceptive group or organization.

21          So my official answer is that I would not know when

22   and whom Michael Knox requested money from, because Michael

23   Knox and I had no contact between us.  I believe Michael

24   Knox requested money through Glenn but I'm not sure and

25   I did not know when that really happened.

1       Q.  And you're aware that in January 2017, that if

2  Dragon Jade wanted to lend money to the Ultroid companies to

3  pay for Michael Knox's salary or expenses, it could have

4  done that directly as a loan from Dragon Jade to the Ultroid

5  companies, instead of from Tam Siu Man to Dale Rose?

6       MS. D'AMICO:  Object to form.

7       A.  At that time, Michael Knox said that if money was

8  sent to his company's account, then it was very possible,

9  very likely, that Michael Cao would take out the money from

10  the account, and as a result Michael Knox would not be able

11  to get the money.  So that's why the whole thing had to go

12  through Dale Rose.

13  BY MR. WALKER:

14       Q.  And this was as of January 2017; is that right?

15       A.  Yes.

16       Q.  But between January 2017 to July 2017, Dragon Jade

17  did in fact lend money directly to Ultroid; correct?

18       A.  Yes, but through a different bank account, and for

19  that bank account only Michael Knox can sign a check.

20       Q.  Do you know when that Ultroid bank account was

21  opened?

22       A.  I think it is between February to early March.

23       Q.  Of 2017?

24       A.  Yes, of course.

25       Q.  Has Michael Knox ever repaid that $10,000 loan?

Page 44

```
 1        A.  It would be excellent if he had repaid it.

 2        Q.  Did he repay the $10,000 loan?

 3        A.  Of course not.

 4        Q.  Did Dale Rose repay the $10,000 loan?

 5        A.  No.

 6        Q.  Was Tam Siu Man reimbursed for the $10,000 that she

 7   lent to Dale Rose?

 8             MS. D'AMICO:  Object to form.

 9        A.  You asked me that question earlier.  Actually, in

10   July, I reimbursed the money to her.

11   BY MR. WALKER:

12        Q.  Where did the money come from that was used to

13   reimburse Tam Siu Man?

14        A.  From my personal account.

15        Q.  Did you include any of the interest that was

16   supposed to be a part of that loan when you reimbursed Tam

17   Siu Man?

18        A.  I paid her 2.5 percent.

19        Q.  Why did you reimburse Tam Siu Man?

20        A.  Because of the 180-day term.

21        Q.  My question, though, is:  Why did you reimburse

22   her?

23        A.  As I explained earlier, 90 days after the contract,

24   the contract should have been executed, and then Michael

25   Knox should have the money to repay the loan.  However, at
```

Page 48

1        A.  Definitely not.

2    BY MR. WALKER:

3        Q.  Was this loan included in any of Dragon Jade's

4    filings with the SEC?

5            MS. D'AMICO:  Object to form.

6        A.  No.

7    BY MR. WALKER:

8        Q.  Is it fair to say that as of July 2017, Tam Siu Man

9    did not feel that she could trust Dale Rose or Michael Knox

10   repaid the loan that was made?

11           MS. D'AMICO:  Object to form.

12       A.  Tam Siu Man did not make that point.  Tam Siu Man

13   has trust in me, not in Michael Knox or Dale Rose.  I am the

14   person facing her every day.

15   BY MR. WALKER:

16       Q.  Now, we've been talking this whole time about the

17   $10,000 payment that was made in January of 2017, but,

18   Dr. Lai, you are aware that there was another payment of

19   $5,400 that was also made, in July of 2017; is that correct?

20       A.  Yes.

21       Q.  And isn't it true that during this time of July

22   2017, you learned from Glenn Henricksen that Michael Knox

23   was still asking for money?

24       A.  Yes.

25       Q.  And you also knew that for several months before

Page 49

1    July of 2017, that Dragon Jade had been lending money to

2    Ultroid and wiring money from Dragon Jade's account to

3    Ultroid's account?

4        A.  Yes, I know.

5        Q.  And you also knew, in July of 2017, that the

6    $10,000 that was sent to Dale Rose had never been repaid,

7    which caused you to pay that money out of your personal

8    funds?

9        A.  I said I know already, just now.

10       Q.  However, despite all of that, at the very end of

11   July 2017, in fact July 31st, 2017, you facilitated another

12   transaction from Tam Siu Man to Dale Rose, wiring another

13   $5,400, didn't you?

14           MS. D'AMICO:  Object to form.

15       A.  Yes.

16   BY MR. WALKER:

17       Q.  This second loan transaction -- if you look in

18   front of you, there's a loan agreement dated July 31, 2017.

19   Just let me know when you have that in front of you.

20       A.  Yes.

21       Q.  Did Dragon Jade's accounting office also prepare

22   this loan agreement?

23       A.  It was prepared according to the original template

24   with some revised numbers and figures.

25       Q.  Who prepared that document?

Page 50

1        A.  William Fung prepared it.

2        Q.  Where did the money come from for this payment in

3    July 2017?

4        A.  From William Fung's own account.

5        Q.  Turn with me back to the wire transfer document

6    that you looked at earlier, the one that includes "HSBC

7    Bank" at the top.

8        A.  Yes, okay.

9        Q.  In the middle of that page for this wire transfer

10    in July of 2017, under "Originator" it has the name "Mr Fung

11    Kwok Wing."  Is that William Fung?

12        A.  Yes.

13        Q.  And in that same section, at the bottom, it says,

14    "Originator to beneficiary information" -- it says, "From

15    Tam Siu Man"; do you see that?

16        A.  Yes.

17        Q.  And then the loan agreement that was prepared by

18    Dragon Jade shows that this loan came from Tam Siu Man and

19    again that it was paid to Dale Rose; is that right?

20        A.  Yes, you may put it that way.

21        Q.  Did Tam Siu Man have any involvement with this loan

22    in July 2017?

23        A.  We had notified Tam Siu Man that under her name

24    there would be another loan agreement, but she did not have

25    to contribute money this time.  Because last time, at the

Page 51

1   end of the day, I had to make the reimbursement to her, so

2   this time Tam Siu Man did not have to put in money, so let

3   William Fung handle it.  In fact, the contract -- the

4   agreement states the same person, and so we are making this

5   arrangement so that Michael Knox would not be too desperate.

6           MS. D'AMICO:  I'm sorry, can I ask the court

7   reporter to read that back?  We dropped the video

8   connection, so I couldn't hear what that answer was.  Thank

9   you.

10           THE COURT REPORTER:  Excuse me, I have a sore

11   throat, so I'll do my best.

12                   (Record read.)

13           MS. D'AMICO:  Thank you.

14   BY MR. WALKER:

15       Q.  Who made the decision to authorize this payment in

16   July 2017?

17       A.  I.  I did.

18       Q.  Did Tam Siu Man ever sign this loan agreement in

19   July 2017?

20       A.  No.

21       Q.  What about the earlier loan agreement, in January

22   2017?  Did she sign that one?

23       A.  I believe she had not signed it.

24       Q.  Why did William Fung make this payment out of his

25   own personal funds?

Page 56

1    suing the Ultroid company for money, you knew that if Dragon

2    Jade was going to acquire the Ultroid assets, you had to

3    have Michael Knox on board to sign the agreements?

4         MS. D'AMICO:  Object to form.

5    A.   Correct.  So if Michael Knox was no longer there,

6    then Ultroid would have to find another person and appoint

7    another person to sign the necessary agreement.

8    BY MR. WALKER:

9         Q.  A few more questions and then we'll be done here.

10             This loan agreement in July of 2017, where William

11   Fung advanced his own $5,400, was William Fung ever paid

12   back for that?

13        A.  Yes.

14        Q.  By who?

15        A.  By me.

16        Q.  When did you pay William Fung back for that loan?

17        A.  When we started this case about suing Ultroid.  In

18   around October 2017, we filed to sue Ultroid, and at that

19   time I knew William Fung would not be possible to get back

20   5,400, so that's why I decided to pay him back.

21        Q.  Did you pay William Fung out of your own personal

22   funds?

23        A.  Yes.

24        Q.  Did you also pay him the interest that was

25   indicated in the loan document?

Page 57

1        A.  He did not want it because the amount was so

2   little.

3        Q.  Were you ever reimbursed --

4        A.  (Chinese spoken).

5            Because --

6        Q.  Sorry, is your answer finished?  (Question not

7   interpreted.)

8        A.  -- I said just now that William Fung is very

9   wealthy.

10       Q.  Thank you.  Were you ever reimbursed by Dragon Jade

11   for that amount?

12       A.  No.

13       Q.  Did Dragon Jade keep any documents, any financial

14   documents or accounting documents, evidencing this loan in

15   July 2017?

16           MS. D'AMICO:  Object to form.

17       A.  Not in the accounting department's documents, but

18   in William Fung's and also in my email there would be this

19   record.

20   BY MR. WALKER:

21       Q.  So you would have emails about it but, as far as

22   the Dragon Jade accounting department, would there be any

23   official Dragon Jade documents reflecting this loan that was

24   made in July 2017?

25           MS. D'AMICO:  Object to form.

Page 59

1  was started, actually, in the conversation with Glenn, Glenn

2  asked me to also sue Dale Rose so that she would repay the

3  loan.  However, I said no because the American lawyers' fee

4  is very expensive.  Besides, it is stated in the agreement

5  that jurisdiction is in Hong Kong, and this will lead to

6  even higher legal cost because first of all I have to hire

7  a Hong Kong lawyer to get a court judgment in Hong Kong.

8  After that, I have to find a US law firm in Florida.  So the

9  legal cost would be very high.  But then we are only talking

10  about getting back an amount of US$15,400[sic].  With so big

11  legal costs, so I don't think that is justified, so I said

12  no.

13  BY MR. WALKER:

14      Q.  So when Glenn Henricksen recommended suing Dale

15  Rose on the loans, then, as part of that discussion, did he

16  indicate that he was aware of the circumstances of these

17  loans and the fact that they had not been repaid?

18          MS. D'AMICO:  Object to form.

19      A.  Of course he knew.

20  BY MR. WALKER:

21      Q.  This loan in July 2017 -- I don't know if I asked

22  it -- Michael Knox or Dale Rose never repaid that loan?

23          MS. D'AMICO:  Object to form.  Asked and answered.

24          THE WITNESS:  You mean who asked whom?

25          MR. WALKER:  Say that one more time?

Page 60

1          THE INTERPRETER:  "You mean who asked whom?"

2    BY MR. WALKER:

3        Q.  Did either Michael Knox or Dale Rose ever repay the

4    loan that was made in July 2017?

5        A.  I answered already just now.  No.

6          MR. WALKER:  Okay.  Thank you.  Dr. Lai, I don't

7    have any further questions.

8          MS. D'AMICO:  I actually -- and I know, Madam Court

9    Reporter, you need to go -- I have just a few, just a couple

10   of minutes of questions.

11         THE COURT REPORTER:  Sorry, but I've already stayed

12   40 minutes after I said I had to leave.  I'm writing

13   realtime for 100 people in the morning and I'm sick;

14   I really need -- I need to be in bed.  Sorry.

15         MS. D'AMICO:  Okay.  Well, we can suspend and I can

16   continue at another time then.

17         MR. WALKER:  Just to put on the record here, first

18   of all, I'm not agreeing -- Madam Court Reporter, I'm sorry

19   you have some limitations, but I'm not agreeing to

20   terminating or even suspending the deposition.

21         And just so we're clear, because I feel like based

22   on prior history -- so I need to put some record with you

23   guys -- we are not agreeing to continue anything past the

24   discovery deadline.  Just so that's clear.

25         MS. D'AMICO:  Okay.  I am entitled to ask for

Page 64

1    will just be a few minutes.

2         I want to look back for one moment at the loan

3    agreement that was dated July 2017.  I believe your

4    testimony was that Mr. Fung drafted this document.  Is that

5    correct?

6         MR. WALKER:  Object to the form.

7    A.  It was based on the original template with some

8    changes in wordings.

9    BY MS. D'AMICO:

10   Q.  Do you know who made the changes to those wordings?

11   A.  I don't know because this is not within my

12   responsibility to take care of.

13   Q.  Mr. Walker asked you about Tam Siu Man and her

14   salary.  Do you recall that exchange between you and

15   Mr. Walker?

16   A.  Yes, I remember that, around US$1,900.

17   Q.  Did you ever ask Ms. Man how much money she had in

18   her account before she began with Dragon Jade?

19   A.  No.

20   Q.  Mr. Walker asked you about the original -- the

21   first loan that you made to Mr. Knox for $10,000 in January

22   of 2017.  Do you recall discussing that?

23   A.  Yes.

24   Q.  Did you or anyone from Dragon Jade ever tell

25   Mr. Knox that the only way he would get the money from you

Page 65

1   is if he signed the agreement, the option agreement?

2            MR. WALKER:  Object to the form.

3        A.  No.

4   BY MS. D'AMICO:

5        Q.  Did you or anyone from Dragon Jade ever coerce

6   Mr. Knox monetarily to enter the option agreements?

7        A.  No.

8        Q.  Did you or anyone from Dragon Jade ever extort

9   Mr. Knox?

10        A.  Definitely not.

11        Q.  Did you or anyone from Dragon Jade ever intimidate

12   Mr. Knox to try to get him to sign the option agreements?

13            MR. WALKER:  Object to the form.

14        A.  No.

15   BY MS. D'AMICO:

16        Q.  Did you or anyone from Dragon Jade ever threaten

17   Mr. Knox in any way?

18            MR. WALKER:  Object to the form.

19        A.  Definitely no.

20            MR. WALKER:  Elisa, by this line of questioning,

21   are you opening up the door for me to ask Dr. Lai about the

22   threats, intimidation, pictures, extortion and everything

23   else?  Because I hadn't gotten into that based upon the

24   scope of the deposition.  Do you want to --

25            MS. D'AMICO:  No.  I'm limiting my questions to

1  what you asked about and to your questions about the

2  integration, or relationship rather, between him giving the

3  money and when he signed, and clarifying.  I'll make sure to

4  be more limited so that you understand we're not opening

5  this door.

6          MR. WALKER:  Okay.  We will let you.

7  BY MS. D'AMICO:

8      Q.  Did you ever -- strike that.

9          Dr. Lai, did you or anyone from Dragon Jade ever

10  make payments to Mr. Knox by wire to coerce him into

11  executing the agreement?

12      A.  No.

13      Q.  Mr. Walker asked you earlier about the timing of

14  you giving Mr. Knox money, the $10,000, in relation to the

15  signing of the option agreement.  Do you recall that

16  exchange?

17      A.  I remember and I said to Mr. Walker that these are

18  two separate issues.

19      Q.  Why did you make the decision not to pay Mr. Knox

20  before the agreement was executed?

21      A.  Because at that time I was suing his company, so

22  how could I lend money to him even though he was making

23  request?

24      Q.  And what -- in your opinion, what changed after

25  that agreement was signed?