# EXHIBIT 3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:17-cv-2422-T-27TBM

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

        Plaintiff,

vs.

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation; ULTROID TECHNOLOGIES,
INC., a Florida corporation,

        Defendants.

and

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation,

        Counter-Plaintiffs,

vs.

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

        Counter-Defendant.

_____/

DEPOSITION OF
GLENN HENRICKSEN, JR.

Volume 1
Pages 1 through 169

Thursday, September 27, 2018

Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131

Stenographically Reported By:
Ninette Butler
RPR, CRR, CRC, RSA, FPR

Page 39

1       Q.   Have you ever been an employee of Dragon

2    Jade?

3       A.   No.

4       Q.   Are you a consultant?

5            MS. ALTMAN:  Object to the form.

6       A.   Yes.

7    BY MR. WALKER:

8       Q.   Do you have a consultant agreement with

9    Dragon Jade?

10      A.   Yes.

11      Q.   How long have you had a consultant

12   agreement with Dragon Jade?

13      A.   Since the end of 2015.

14      Q.   Have the terms of that agreement ever been

15   changed or amended?

16           MS. ALTMAN:  Object to the form.

17      A.   Not the agreement.

18   BY MR. WALKER:

19      Q.   Do you mean not the written document

20   itself?

21      A.   Yes.

22      Q.   Have the terms of your relationship with

23   Dragon Jade changed since you first entered into

24   that consultant agreement?

25           MS. ALTMAN:  Object to the form.

1        A.    Yes.

2    BY MR. WALKER:

3        Q.    In what ways?

4        A.    The original intent was an acquisition of

5    the asset, and then I became -- managed the

6    litigation.

7        Q.    When you first entered into the

8    consultancy agreement with Dragon Jade, what were

9    the compensation terms of the agreement?

10            MS. ALTMAN:  Object to the form.

11       A.    There were two compensation terms:  a

12   monthly stipend and share payment.

13   BY MR. WALKER:

14       Q.    What was the amount of the monthly

15   stipend?

16       A.    It was 20,000 Hong Kong dollars a month.

17       Q.    Has that ever changed?

18       A.    Yes.

19       Q.    When did it change?

20       A.    I don't recall.

21       Q.    How did it change?

22       A.    It was increased.

23       Q.    To what amount?

24       A.    To 40,000 Hong Kong dollars a month.

25       Q.    Why was it increased from 20,000 to 40,000

Page 104

1          Q.    What was your understanding of his

2    position with Ultroid?

3          A.    Prior to him showing up, I had no idea.

4          Q.    Once you met him, though, did you come to

5    understand, generally at least, what his position

6    was?

7          A.    Yes.

8          Q.    What was your understanding?

9          A.    He -- he was the CEO, operating officer or

10   something to that effect.

11         Q.    During the time that Dragon Jade was

12   attempting to acquire the Ultroid companies, who was

13   the primary point of contact on Dragon Jade's side

14   as far as communicating with Ultroid?  So when

15   Ultroid was communicating to Dragon Jade during that

16   acquisition period, who was Dragon Jade's primary

17   point of contact?

18              MS. ALTMAN:  Object to the form.

19         A.    Dragon Jade did not have a primary point

20   of contact.  I was the primary point of contact.

21   BY MR. WALKER:

22         Q.    So you were the primary point of contact

23   during that time.

24         A.    Correct.

25         Q.    And during that time where the parties

Page 105

1    were attempting to negotiate an acquisition, who did

2    you report to?

3         A.   I reported to Dr. Steven Lai.

4         Q.   Is Dr. Lai still the person that you

5    report to, in your current role with the company?

6         A.   Yes.

7         Q.   I understand that you were produced as the

8    representative for Dragon Jade at the mediation we

9    held yesterday; is that correct?

10        A.   Correct.

11        Q.   Did you have full authority to settle the

12   case on behalf of Dragon Jade?

13        A.   Yes.

14        Q.   Who gave you that authority?

15        A.   The company did.

16        Q.   Who communicated to you that you had that

17   authority?

18        A.   Dr. Steven Lai.

19        Q.   Okay.  During the time that there was this

20   attempt for Dragon Jade to acquire Ultroid, I

21   understand that there were numerous conversations

22   and discussions that took place over a period of

23   months between you and Michael Knox; is that right?

24        A.   You said "attempt."  I wouldn't

25   characterize it as an attempt.  I would characterize

Page 106

1   it as a normal acquisition discussion.

2        Q.   There were a period of negotiations

3   regarding efforts for the acquisition of the Ultroid

4   company by Dragon Jade.

5             MS. ALTMAN:   Object to the form.

6        A.   The -- I'm sorry.  Can you repeat that?

7   BY MR. WALKER:

8        Q.   Hopefully better than I stated it the

9   first time.

10            I'm not trying to be tricky with words

11  here or parse words or run an attempt or something

12  else but, certainly, there were efforts by both

13  companies to see if Dragon Jade would acquire

14  Ultroid.

15       A.   There were discussions, ongoing

16  discussions, during a long period of time, yes.

17       Q.   Who were you primarily speaking with at

18  Ultroid during that time?

19       A.   Primarily I was speaking with Mr. Michael

20  Knox.

21       Q.   Did you consider him to be your main point

22  of contract -- or point of contact, rather, with

23  Ultroid?

24       A.   Yes.

25       Q.   And I understand that period of

1    Dragon Jade would acquire the Ultroid assets for

2    approximately $3 million.

3         A.   Yes.

4         Q.   At the time that offer was made, did you

5    understand that what Dragon Jade was requiring was

6    all or substantially all of the Ultroid assets?

7         A.   We were not particularly -- we didn't

8    particularly know everything that was going on, so

9    we wanted to find out more.

10        Q.   But at the time that you made the offer, a

11   $3 million to purchase the assets of Ultroid, did

12   you know which assets you were offering to purchase?

13        A.   Yes.

14        Q.   And was it your understanding that those

15   assets were all or substantially all of the assets

16   of the Ultroid companies?

17        A.   Yes.

18        Q.   So in November of 2016, there's an offer

19   by Dragon Jade to purchase the Ultroid assets for

20   3 million, and then I understand --

21        A.   I don't remember the exact numbers.

22        Q.   Approximately 3 million.

23             And then Ultroid withdrew from those talks

24   in November 2016.

25        A.   No.

Page 114

1        Q.    I misunderstood.

2        A.    Yes.   Ultroid rejected it.

3        Q.    Okay.

4        A.    The board rejected it.   They withdrew in

5    November, saying that they had a much higher offer.

6        Q.    So the Ultroid board rejected that offer,

7    is your understanding.

8        A.    Yes.

9        Q.    And how did you come to that

10   understanding?

11       A.    By communication with Michael Knox.

12       Q.    Michael Knox said the Ultroid board

13   rejected that offer.

14       A.    Correct.

15       Q.    Did he tell you the process that the

16   Ultroid companies went through in rejecting that

17   offer?  Meaning, was it a board decision?  Was it

18   put to the shareholders to vote?  Did they give you

19   any information about that?

20            MS. ALTMAN:   Object to the form.

21       A.    Yes.   He told me the board rejected it.

22   BY MR. WALKER:

23       Q.    Okay.   Now, you understand that before the

24   parties were negotiating an asset purchase,

25   obviously the first was -- there was a negotiation

Page 115

1    for the purchase of the companies.  Do you

2    understand that the monetary amounts that were being

3    discussed were substantially higher when the

4    companies were talking about an acquisition of the

5    Ultroid companies?

6                MS. ALTMAN:  Object to the form.

7         A.    I'm sorry.  What is the -- the numbers

8    were sub --

9    BY MR. WALKER:

10        Q.    I'm sorry.  Let me rephrase that.  My

11   words often come out awkwardly and I don't mean for

12   them to.

13        A.    Same me -- same as me.

14        Q.    I don't know if that was intentional or

15   not, but I appreciate it.

16               When Dragon Jade and Ultroid were

17   negotiating the purchase of Ultroid, there's been

18   some allegation in the Complaint that there was

19   first at least a suggestion that Dragon Jade would

20   purchase Ultroid for about $84 million.  I'm

21   assuming you've heard that allegation.

22               MS. ALTMAN:  Object to the form.

23   BY MR. WALKER:

24        Q.    Have you heard the allegation -- are you

25   aware of the allegation made in this Complaint that

Page 116

1    earlier on in this process, Dragon Jade and the

2    Ultroid companies were discussing a purchase price

3    of $84 million?

4              MS. ALTMAN:  Object to the form.

5         A.   We had been discussing a price.  And you

6    say purchase price.  We were discussing a price of

7    $84 million.

8              There's something called price discovery.

9    BY MR. WALKER:

10        Q.   Can you explain that to me?

11        A.   Yes.  So when, for example, you want to

12   buy a car and somebody is saying, I want $5,000 for

13   this car.  And then you go and say, oh, the car's

14   not worth 5,000.  I'll pay you 3,000.  And then so

15   there's -- that's a price discovery process.

16   $84 million was an offer price.  It was not a

17   purchase price.

18        Q.   An offer made by who?

19        A.   An offer made by Ultroid.

20        Q.   So Ultroid offered to sell its companies

21   to Dragon Jade for $84 million.

22        A.   That is correct.

23        Q.   Who was involved in those settlement

24   discussions at that time -- I'm sorry -- those sale

25   discussions at that time?

Page 118

```
 1        Q.   There's been a suggestion from your
 2    counsel in this case that that $84 million appraisal
 3    was illegitimate.  At the time that you were
 4    involved in those negotiations, did you believe that
 5    $84 million was -- appraisal was illegitimate?
 6              MS. ALTMAN:  Object to the form.
 7        A.   Yes.
 8    BY MR. WALKER:
 9        Q.   Based on what?
10        A.   The appraisal had three calculation
11    methods.  The first method is -- my brain is, like,
12    slowing down.  The first method is income statement
13    and balance sheet.  And they looked at the financial
14    of the company, the financials of the company, and
15    said the company is worth a certain amount of money
16    using a standard formula.
17              The second is what is known as discounted
18    cash flow.  The company provides revenues going
19    forward for a period of time.  The valuation company
20    creates a risk adjusted discount rate, and those
21    cash flows are discounted back to create a present
22    value.
23              The third methodology is known as
24    comparables.  And what they do is they look at other
25    companies in the market, and these are generally
```

Page 119

1    publicly traded entities.  And those publicly traded
2    entities have valuation metrics, and they apply the
3    average valuation metrics of these public companies
4    to the valuation -- or to the metrics of the company
5    they're evaluating.
6              Method 1 and method 3 had zero valuation.
7    Method 2 had an $84 million valuation.
8              And you will see my e-mail to the company
9    asking many questions about that.
10         Q.   Do you believe Ultroid acted
11   inappropriately in getting that valuation?
12             MS. ALTMAN:  Object to the form.
13         A.   As a fact, I can't say yes or no.  All
14   right?  "Inappropriate" is probably not the proper
15   word.
16             Let's take one example in that.  They
17   assumed that they were going to get a license fee
18   from India in the amount of $5 million within a very
19   short period of time.  $5 million discounted back
20   at -- I forget the number -- 22 percent or whatever
21   creates a present value of about 3 and a half
22   million dollars.  All right?  There were dozens and
23   dozens of examples like that.
24             In that whole matrix of cash flows that
25   they were projecting, not one single one of those

Page 120

1   cash flows ever materialized.  So if you were to

2   actually take the actual cash flows that were

3   generated from that particular matrix, you would

4   have gotten a valuation that they call $84 million

5   as a zero.

6       Q.   Is Dragon Jade taking the position that

7   Ultroid acted fraudulently in getting that

8   $84 million valuation?

9            MS. ALTMAN:  Object to the form.

10      A.   No.

11  BY MR. WALKER:

12      Q.   I have seen in the documents that the

13  conversation of purchase price of $84 million was

14  subsequently reduced to a conversation of

15  $40 million.  I'm not saying at this time any party

16  agreed to that, but are you aware of a conversation,

17  however, where the price being discussed was

18  $40 million for a purchase of the Ultroid companies?

19      A.   Yes.

20      Q.   Did you see any business valuations that

21  would have arguably supported a $40 million purchase

22  price?

23      A.   No.

24      Q.   Did Dragon Jade ever make a monetary offer

25  to purchase the Ultroid companies?

Page 121

1          A.   I can't recall if we made a monetary

2    offer.  I believe that the 40 million was what is

3    known as MOU.  And it was subject to due diligence

4    and other, you know, discovery.

5          Q.   What is MOU?  MOU is an acronym you used.

6    What does that stand for?

7          A.   Memorandum of understanding.

8          Q.   So, then, do I understand correctly, there

9    was a memorandum of understanding that was written

10   up that stated that the purchase price was

11   $40 million for the companies subject to a number of

12   terms; is that right?

13              MS. ALTMAN:  Object to the form.

14         A.   There was a memorandum of understanding

15   that was drawn up at $40 million, yes.

16   BY MR. WALKER:

17         Q.   Was that memorandum of understanding

18   signed?

19         A.   I don't recall.

20         Q.   During the time of that period of

21   negotiation, where there was a $40 million purchase

22   price being discussed, did you have any

23   conversations with anyone at Ultroid to determine

24   whether a shareholder vote would be required on that

25   issue?

Page 135

1    Could you pull that, please?

2              Have you had the opportunity to review

3    that document?

4         A.   Yes, I have.

5         Q.   Do you recognize that to be the Exclusive

6    Option and Remediation Agreement that was entered

7    into between Dragon Jade and the Ultroid companies?

8         A.   Yes, I do.

9         Q.   The -- if you turn to page 8 of 12.  And

10   the page numbers might actually be off.  In the top

11   right corner, it will say 8 of 12.

12        A.   Eight of 12 is the signature page?

13        Q.   Yes, sir.

14              Is that William Fung's signature?

15        A.   I believe so, yes.

16        Q.   Who drafted this agreement?

17        A.   I believe it was the attorneys who drafted

18   this agreement.

19        Q.   Which attorneys?

20        A.   Pillsbury.

21        Q.   How long has Dragon Jade been a client of

22   the Pillsbury law firm?

23        A.   At this point in time?

24        Q.   Yes.

25        A.   I don't know exactly, but I believe it had

Page 136

1    been -- you're going to give me the over/under

2    stuff?

3         Q.    Sure.  Approximately.

4         A.    Six months, maybe.

5         Q.    At the time of this agreement, Dragon Jade

6    had been working with the Pillsbury law firm for

7    about six months?

8         A.    Yeah.  I don't recall the exact dates.

9         Q.    And was Mr. Blaylock the attorney that was

10   primarily, as far as you know, primarily involved in

11   drafting this agreement?

12        A.    Yes.

13        Q.    Was Mr. Blaylock your primary point of

14   contact in communicating regarding these issues?

15             MS. ALTMAN:  Object to the form.

16        A.    Regarding what issues?

17   BY MR. WALKER:

18        Q.    The drafting of the agreements that have

19   been signed and made at issue in this case.

20        A.    The -- signed?

21        Q.    I'm sorry.  Let me back up.

22        A.    Okay.

23        Q.    When Dragon Jade decided to retain counsel

24   and when that counsel started drafting the Option

25   Agreement, were you the one that was primarily

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:17-cv-2422-T-27TBM

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

               Plaintiff,

vs.

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation; ULTROID TECHNOLOGIES,
INC., a Florida corporation,

               Defendants.

and

ULTROID, LLC, a Nevada corporation;
ULTROID MARKETING DEVELOPMENT CORP., a
Florida corporation,

               Counter-Plaintiffs,

vs.

DRAGON JADE INTERNATIONAL, LTD., a British
Virgin Island limited company,

               Counter-Defendant.
_____/

DEPOSITION OF
GLENN HENRICKSEN, JR.

Volume 2
Pages 170 through 314

Thursday, September 27, 2018

Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131

Stenographically Reported By:
Ninette Butler
RPR, CRR, CRC, RSA, FPR

1    intervene in assisting SEI to bring their work

2    product up to FDA standards.

3    BY MR. WALKER:

4         Q.    How did Dragon Jade get introduced to SEI?

5         A.    SEI was introduced to Dragon Jade from

6    Michael Knox.

7         Q.    Did Dragon Jade do anything to look at any

8    other potential companies to perform the engineering

9    work that SEI eventually did, or did it only just go

10   to SEI?

11              MS. ALTMAN:  Object to the form.

12        A.    Dragon Jade looked at a number of

13   different companies for all its processes that it

14   contracted out.  So the company looked at SEI as

15   well as others.

16   BY MR. WALKER:

17        Q.    So SEI, at least for a period, did some

18   engineering work for the remediation process; is

19   that right?

20        A.    That is correct.

21        Q.    How much was SEI paid for its remediation

22   efforts?

23        A.    I don't recall without looking at the

24   numbers.

25        Q.    One of the topics that you were asked to

Page 288

1   protected assets is not being violated.

2   BY MR. WALKER:

3        Q.   Are you aware of any other illegal actions

4   undertaken by the Ultroid companies?

5             MS. ALTMAN:  Object to the form.

6        A.   It's not something that I'm prepared to

7   talk about.

8   BY MR. WALKER:

9        Q.   So then I assume your answer is no?  My

10  question is whether you are aware of something, and

11  either you are aware of something or you are not.

12       A.   Right.

13       Q.   So are you aware of any other illegal

14  actions undertaken by the Ultroid companies?

15       A.   I am not.

16            MS. ALTMAN:  Object to the form.

17       A.   I am not aware.

18  BY MR. WALKER:

19       Q.   Is Dragon Jade still attempting to

20  remediate the product?

21            MS. ALTMAN:  Object to the form.

22       A.   No.

23  BY MR. WALKER:

24       Q.   When did it discontinue those efforts?

25       A.   I believe we talked about that earlier

Page 289

1    today.  We stopped remeditating the product when the

2    $16,000 that we paid to AJW ran out in January of

3    2018.

4         Q.   What activity did Dragon Jade do to

5    remediate the product from September 2017, upon

6    receipt of the letter from Mr. Goeree -- and I

7    believe the day was September 27, 2017 -- until that

8    $16,000 paid to AJW ran out that following January?

9         A.   There was a contract with AJW for the

10   amount of $16,000 executed in, I believe, in August

11   of 2017.  There was -- SOW is scope of work.  That

12   scope of work was continued only under that

13   particular contract until that process was

14   completed.

15        Q.   What specifically was AJW doing from

16   September 27, 2017, until those moneys ran out the

17   following January?

18        A.   I don't remember the exact things they

19   were doing.  It was preparing DHF materials or

20   something to that effect, but I don't remember the

21   exact contract.  But whatever that contract was,

22   whatever that contract was, that's what was done by

23   AJW.

24        Q.   Was AJW able to complete the design

25   history file?

Page 293

1      A.    Never.

2      Q.    When did Dragon Jade first become aware of

3  the FDA warning letter that was sent to Ultroid?

4            MS. ALTMAN:   Object to the form.

5      A.    Dragon Jade became aware of the FDA

6  warning letter, I believe -- and I get my dates

7  mixed up -- in January 2016.

8  BY MR. WALKER:

9      Q.    Why did the remediation efforts take

10 longer than initially planned?

11           MS. ALTMAN:   Object to the form.

12     A.    That's a very broad question.   There

13 were -- there are various things that go into

14 remediation.   I think that Michael Knox had a very

15 rosy outlook on how quickly this could be done.

16 There were a lot of different things that happened.

17 We didn't know that they didn't have a -- the DHF

18 materials that we needed had to be re-created, so

19 that took much longer.

20 BY MR. WALKER:

21     Q.    You said Michael Knox had a rosy picture

22 about how long it would take to remediate the

23 product.   But you, as the Dragon Jade consultant

24 that was handling these issues, did you make any

25 independent effort other than what Michael Knox was