EXHIBIT 6

Cedric Lewis  30(b)(6), Confidential
December 03, 2018

```
 1              UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF FLORIDA
 2                   TAMPA DIVISION

 3                           CASE NO: 8:17-cv-02422-JDW-CPT

 4   DRAGON JADE INTERNATIONAL,
     LTD., a British Virgin
 5   Islands limited company,
          Plaintiff/Counter-Defendant,
 6
     vs.
 7
     ULTROID, LLC, a Nevada corporation;
 8   ULTROID MARKETING DEVELOPMENT CORP.,
     a Florida corporation; ULTROID
 9   TECHNOLOGIES, INC., a Florida
     corporation,
10        Defendants/Counter-Plaintiffs
     _____/
11

12              DEPOSITION OF CEDRIC E. LEWIS

13         **** NON ATTORNEYS' EYES ONLY PORTIONS ****

14   Corporate Representative of Defendants/Counter-Plaintiffs,

15   Ultroid Marketing Development Corp., Ultroid LLC and Ultroid

16   Technologies, Inc., pursuant to Fed.R.Civ.P. 30(b)(6)

17              Pages 1 through 173

18              Monday, December 3, 2018

19              From 9:00 a.m. to 3:03 p.m.

20         Dean, Ringers, Morgan & Lawton, P.A.

21         201 East Pine Street, Suite 1200

22              Orlando, Florida  32801

23

24         Stenographically Reported By:

25              Mary Ann Schumacher, FPR
```

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          44

1      Q.   Okay.

2      A.   So with regards to some of the things that went on

3   during those inspections, yes.

4      Q.   Okay, great.  Did Ultroid have any other devices

5   that it manufactured, other than the device that you were

6   referencing when you say device?

7      A.   Not to my knowledge.

8      Q.   Is there any other product, physical product, that

9   the company manufactured?

10         MR. LAWTON:  Are you using the word, product, or

11      device?

12   BY MS. D'AMICO:

13      Q.   I want to know if there's any other physical product

14   that the company manufactured.

15      A.   Not to my knowledge.

16      Q.   And what other services or things did Ultroid do or

17   put out, that you would consider to be under a product, other

18   than the device?

19      A.   Well, some of those relate to the device, as I know

20   they sold them wholesale, sold them to doctors, they had

21   distributors throughout the world.

22      Q.   Okay.

23      A.   So that service of the product, it generates

24   revenue.

25      Q.   Distributors.  What else?

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          45

1       A.   I believe there was some direct sales directly to

2   doctors or clinics.

3       Q.   Anything else?

4       A.   I think that's it.

5       Q.   Did there come a time, in April of 2015, when there

6   was an FDA inspection --

7       A.   Yes.

8       Q.   -- of the Ultroid.

9            MR. LAWTON:  Let her finish the question, please.

10           MS. D'AMICO:  And part of it is that I'm trying to

11       speak slowly, so it sounds very jolted.

12           THE DEPONENT:  Okay.

13   BY MS. D'AMICO:

14       Q.   Was this at the Ultroid headquarters?

15           MR. LAWTON:  Is this 4?

16           MS. D'AMICO:  This is Exhibit 4.  I'm trying to

17       find a place for the sticker that does not cover

18       everything.  I'm going to note, for the record, because

19       I see it's not on your copy, that this is one of the

20       documents produced to us recently, on Friday.  And so

21       we didn't have the Bates stamp number that we could

22       print out.  So it's Ultroid 68844.  It's the first page.

23           MR. LAWTON:  6844?

24           MS. D'AMICO:  68844.

25           MR. LAWTON:  Okay.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          65

1      A.   In May of 2016?

2      Q.   Yes?

3      A.   The device was pulled off the market voluntarily.  I

4  don't recall the exact date of that voluntary, there would be

5  a record of it.  Up until that voluntary recall, it was still

6  on the market.

7      Q.   So it's permissible or it's okay, I suppose, to have

8  a company manufacture a device even with some deficiency in

9  the QMS?

10      A.   Yes, because the FDA allows you time to correct

11  it.

12      Q.   Do you know how long they allow?

13      A.   No, I don't think there was a specific time unless

14  within an agreement you've established an agreement within a

15  specific time frame.  As I said, they kind of just drop in

16  and they go okay, you need to fix these.  And at some point,

17  they show back up, unannounced, and say, okay, did you fix

18  these?

19      Q.   At some point in July 2016, the FDA shows up for

20  another inspection?

21      A.   Yes.

22      Q.   And who was present at that inspection?

23      A.   Present at the inspection was Mr. Knox and the

24  inspector.  My understanding is that Charity should have been

25  there, was supposed to have been there, and then she refused.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                    66

1    Apparently at that point, there was some argument about

2    $250,000.

3        Q.   Okay.  She didn't show up.

4        A.   And Mr. Cao was supposed to have been there.  I

5    think he had, he was back in charge still, at that time was

6    handling the day to day.  But my understanding from Mr. Knox

7    is he either refused to show up or could not be found.

8        Q.   Okay.  Let's just backtrack.  On August 27, 2015,

9    when Exhibit 5 comes into play and the company receives the

10   warning letter from the FDA, who is running the company at

11   that point?

12            MR. LAWTON:  August of '15?

13            MS. D'AMICO:  Correct.

14            MR. LAWTON:  Okay.

15       A.   So here's what my take on this has been.  That's a

16   good question.  Mr. Cao was the chairman of the company.

17   Mr. Knox was the CEO of the company.  Throughout the years

18   of operation, although Mr. Knox should have been in charge

19   of the day to day, I understand there was a period of time

20   when he was ill, and he was -- and it was not uncommon for

21   Mr. Cao to kind of come in and do what he wanted because he

22   was the chairman.

23       So I know Mr. Knox was sick for a period of time and was

24   not at the office.  So Mr. Cao had taken over and that's why

25   he did hire Charity.  I know Mr. Knox came to that meeting.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                    67

1   Mr. Cao said, Hey, I'm hiring this lady, come talk to her.

2   Mr. Knox appears to be the knowledge guy and Mr. Cao appears

3   to be the wild card.  That's the best I can tell you, from

4   what I've looked at and seen.  The official title CEO was

5   Mr. Knox.

6   BY MS. D'AMICO:

7        Q.   So fast forward a little bit to a couple months

8   later, July 2016.  There was an inspection.

9        A.   Yes.

10       Q.   Did Ultroid keep records of that inspection,

11  similarly to the April 2015 inspection that we saw in

12  Exhibit 4?

13       A.   Again, I have no knowledge of records that were

14  kept.  I would suspect, simply from what I've deduced of

15  Mr. Knox, that if there were records, he would have been the

16  one who would have had them and would have kept them.

17       Q.   Do you know if most of them or are all of them were

18  electronic or paper?

19       A.   I do not know.

20       Q.   Okay.  I'm going to mark this as Exhibit 7.

21       A.   Okay.

22            (Plaintiff's Exhibit 7 was identified.)

23       Q.   This is, you'll see it's Exhibit 9 from Knox, but

24  we're going to make it 7 here.  Have you seen this document

25  before.  Can you tell me what it is?

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                        68

1       A.   I can tell you what it is.  It's a press release.

2   Exhibit 7, I've not seen this specific document before, but

3   I have seen a similar release in some form.

4       Q.   Okay.  Is this the Ultroid press release, or do you

5   recognize it as an Ultroid press release?

6       A.   Yes.

7            MR. LAWTON:  Again, it's two pages, so there's some

8       on the back.

9            MS. D'AMICO:  Just trying to be environmentally

10      friendly.

11  BY MS. D'AMICO:

12      Q.   It's a little bit confusing because the title of it,

13  which is in italics at the top, mentions a date of February

14  27, 2003, but if you look at the first line of the actual

15  press release, you see that it's dated September 27, 2016.

16      A.   Uh-huh.

17      Q.   And is that the date that the company recalled the

18  device?

19      A.   I can't tell you that that's the exact date they

20  recalled the device.  I can tell you that's the exact date

21  that they issued this announcement, so it would have been

22  relatively plus, minus, a few days or weeks, I'm assuming.

23      Q.   So approximately September, late September 2016,

24  Ultroid announces its worldwide recall?

25      A.   Yes.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          69

1       Q.   And if you look at the title in italics, it says

2  that it's referring to system device kits, procedure packs

3  and individual replacement parts purchased on or after

4  February 27, 2003?

5       A.   Yes.

6       Q.   Is that the date that the Ultroid device was first

7  available for purchase?

8       A.   Roughly, I believe so.

9       Q.   And did the FDA require Ultroid to recall its

10  product or was it voluntary?

11       A.   My understanding, it was a voluntary recall.  I've

12  not seen anything directing them to recall.

13       Q.   Towards the bottom of the third paragraph --

14       A.   -- I'm sorry.

15       Q.   Please go ahead.

16       A.   My understanding is that for a non voluntary recall,

17  the company would not have issued the announcement, the FDA

18  would have.

19       Q.   At the end of the third paragraph, the last line

20  says, these events have led to an unacceptable risk,

21  requiring removal of the UHMS.  Do you see that?

22       A.   Yes.

23       Q.   And what is UHMS?

24       A.   That's the Ultroid Hemorrhoid Management System.

25       Q.   Is that the device that you're talking about, or is

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                        70

1   that something else?

2        A.   That's the device.

3        Q.   Okay.  And in part, in that paragraph, it talks

4   about the unacceptable risk, it talks about the ineffective

5   Quality Management System?

6        A.   Yes.

7        Q.   So is it fair to say then that part of the reason,

8   at least part of the reason why Ultroid recalled the product

9   was due to its QMS?

10       A.   Yes.  Can you restate that?

11       Q.   Sure.  In this recall, the company says there have

12  been no reports of adverse reactions, right?

13       A.   Right.

14       Q.   But it goes on to say, an effective Quality

15  Management System and poor supplier management practices

16  leads to the conclusion that the overall severity risk

17  associated with the use of the devices is serious, taken

18  into consideration that it cannot be verified by objective

19  evidence that the devices are manufactured in accordance with

20  the specifications cleared by the FDA?

21       A.   Yes.

22       Q.   So then, at least in part, the ineffective QMS --

23       A.   -- is what they're listing as one of their reasons,

24  yes.

25       Q.   Thank you.  On the second page, which is on the

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                              71

1      back of this sheet, you'll see contact information.  Is

2      someone named Jazz, J-A-Z-Z, Singh, S-I-N-G-H.  Who is that?

3           A.   Actually, I do not.  I would --

4                MR. LAWTON:  Don't guess.

5                THE DEPONENT:  I don't want to guess.  I can tell

6           you, from my knowledge of business in general, that

7           sometimes companies, especially where they may be

8           dealing with large volumes of questions, will hire a

9           firm for people to contact and deal with.  But I can't

10          tell you specifically who it is, no.

11               (A recess was taken.)

12     BY MS. D'AMICO:

13          Q.   I'm going to show you what I'm marking Exhibit 8 for

14     this deposition.  You'll notice that it's 6 from Mr. Knox's

15     deposition.

16          A.   Okay.

17               (Plaintiff's Exhibit 8 was identified.)

18     BY MS. D'AMICO:

19          Q.   And just to keep with, actually, the same markings

20     in Mr. Knox's, if I may, I'm going to mark -- it's a

21     compilation of two documents.  One is a cover letter and

22     then the main document in this case is Exhibit 9.  So it will

23     be 8 and 9.

24          A.   Okay.

25               (Plaintiff's Exhibit 9 was identified.)

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          80

1   due diligence, in doing the documentation.  I don't have

2   a specific list of anything else that would have been

3   provided to them.  I know those are the basics of what was

4   provided by the company.

5       Q.   And what was the methodology that they used to

6   appraise Ultroid?

7            MR. LAWTON:  Excuse me, can you read that back?

8            (Read back by the court reporter.)

9            MR. LAWTON:  You're talking about the business

10       valuation?

11           MS. D'AMICO:  Yes.  I can rephrase it.

12           MR. LAWTON:  No, that's fine.  My mind just

13       wandered.

14  BY MS. D'AMICO:

15      Q.   Go ahead.

16      A.   If I have this correct, it was a discounted,

17  projected cash flow approach.

18      Q.   And in doing that evaluation, did they look at the

19  financial projections then of Ultroid?

20      A.   That's part of it, yeah.

21      Q.   And at that time, was the Ultroid device on the

22  market?  This is February 17, 2016.

23      A.   I believe so.

24      Q.   Was Ultroid management satisfied with this

25  valuation?

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          84

1    to that, I don't have the knowledge of that.  If you're

2    asking if the valuation company knew, saw, looked at the

3    FDA information, I don't know because I didn't prepare the

4    valuation.

5        Q.   Page 40 of the valuation -- let's go to 38 for a

6    moment.  This is a financial projection, a summary of the

7    financial projections.

8        A.   Uh-huh.

9        Q.   And it talks about what the primary drivers of the

10   company's financial projections are and lists number of units

11   sold of each product.  This is page 38.

12       A.   I'm just looking at something real quick, I'm sorry.

13   Okay.

14       Q.   So number 1, primary driver of the company's

15   financial projection is the number of units sold of the

16   product?

17       A.   Yes.

18       Q.   Was that accurate?

19       A.   That's what's listed here, yes.

20       Q.   And number 2, cost per unit.  Number 3, sales price

21   per unit.  And 4 and 5, timing and amount of license fees and

22   then operating expenses that it breaks down.

23       A.   That's what is listed here, yes.

24       Q.   So if we look at page 40, the valuation company

25   calculates the financial projections for the Ultroid probes,

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          87

1       business plan that we have been discussing about.

2       You're talking about events that occurred after that.

3       But I'm going to let him answer, but I just want the

4       record clear that he was not produced as a corporate

5       rep for that.

6            MS. D'AMICO:  Understood.  We went through the

7       valuation report, which talks about financial

8       projections.  I'll ask him the questions now.

9  BY MS. D'AMICO:

10     Q.   We looked at, just a moment ago, about the financial

11  projections that Business Value Center, Inc., made as part of

12  this valuation; do you remember that?

13     A.   Right.

14     Q.   And the number 1 driver, they said, would be

15  products sold, the number of products sold.  This is page --

16          MR. LAWTON:  38.

17     A.   Right.

18  BY MS. D'AMICO:

19     Q.   So then as you sit here today, do you believe that

20  once the company stopped manufacturing and selling products,

21  that that valuation would not be accurate anymore?

22          MR. LAWTON:  My objection's noted.  You can

23       answer.

24     A.   I'm trying to answer, what I don't want to do is --

25  so -- and the reason I say from who, so the value of a

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                                    88

1  company, I can -- or we'll say anything.  I can say to you,

2  This ring is worth a million dollars.  You can say to me, I

3  wouldn't pay you a million dollars for it, I would only pay

4  you $10 for it.  So the reason I'm trying to clarify it, when

5  I say it depends on who you're asking is, in a broad sense,

6  the company's worth what someone is willing to pay for it.

7  BY MS. D'AMICO:

8      Q.    Right.  Fair market value; is that what it's

9  called?

10      A.    Yeah.  And that's why I'm trying to get to exactly

11  what you're asking me.  Now, in terms of how the FDA -- and

12  I'm not a business valuator, but I'm a business person.  If

13  you asked me, this recall letter goes out today, what's the

14  value of this company the day after that, or how that impacts

15  that projection, there are 37 questions that go with that.

16  Am I buying it today, am I buying it after those things are

17  fixed, what am I buying?

18      When the FDA warning letters are issued, the company

19  has the opportunity to correct those issues.  Even after a

20  voluntary recall, they can go back into production and comply

21  with all of those issues.

22      So if you're asking me, would it change the projected

23  number, it depends on -- the projected number of sales, it

24  would depend on when you looked at the projected number of

25  sales.  So would it change the value, I'm not sure I can

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                        89

1    give you an accurate answer, I can only tell you the things

2    that will be looked at.  Again, I'm not trying to be evasive.

3        Q.   No, I appreciate your help, we'll work through this

4    together.  How many products or how many devices has Ultroid

5    sold since the recall?

6        A.   Since the recall, none.

7        Q.   Okay.  We talked a little bit about a company

8    called Dragon Jade, that I understand you're familiar with.

9    When did Ultroid first come to know Dragon Jade?

10       A.   My understanding is that around April of 2015,

11   Mr. Knox, as the CEO, received an e-mail from Dr. Lai,

12   saying they knew about the company, they were impressed with

13   it, that they were -- I believe it was they wanted more

14   information, wanted to talk about getting involved as a

15   distributor or whatever the case may be.

16        Mr. Knox looked at the e-mail, recognized the

17   connection between a Chinese company and thought that Mr. Cao

18   would be the most appropriate person to deal with that, and

19   so he turned that over to Mr. Cao, and Mr. Cao began to have

20   a discussion with Dr. Lai and Dragon Jade.

21       Q.   What was the nature of their relationship initially,

22   their meaning Dragon Jade and Ultroid?

23       A.   In April of 2015, the initial e-mail was kind of a

24   blind reach out and it developed from there.

25       Q.   After that, what was the nature of the parties'

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                    95

1      A.   -- Mr. Knox.

2      Q.   Okay.

3      A.   That's really all I know about it.  So from that

4  point, Mr. Knox said, There's no way we can do 10 million

5  dollars, our shareholders won't approve it and they'll sue

6  us.  There was some continued negotiation and that price of

7  10 million cash changed from 10 million cash and 30 million

8  in stock, which is Dragon Jade stock, so it was a 40 million

9  dollar total price.

10     Q.   Uh-huh.

11     A.   And there was some, I believe there was some

12 agreement to that price.

13     Q.   Okay.  And at some point, did the conversation

14 switch then to not an acquisition, but a different type of

15 transaction between Dragon Jade and Ultroid?

16     A.   My understanding is not at that point.

17     Q.   Okay.  At what point did that happen?

18     A.   So at some point after the recall, after basically

19 several months of silence, pretty much, Mr. Cao was gone,

20 Mr. Knox had been ill, the company's not doing anything, at

21 some point Dragon Jade reached back out to Mr. Knox and said,

22 Hey, what can we do here, can we come to some agreement on

23 this.  And through that process, they discussed several ways

24 on how they would do this deal.  By that time, I think

25 Mr. Hendricksen, Mr. Knox and, to some extent, Mr. Blalock,

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          96

1   was then involved, his counsel, and they figured out how they

2   would do that.

3        Q.   You said Mr. Blalock.  Was he counsel for Ultroid or

4   Dragon Jade?

5        A.   He was counsel for Dragon Jade.

6        Q.   I'm showing you Exhibit 10.  It says, the Notice

7   to Shareholders of an Memorandum Of Understanding, MOU, dated

8   May 5, 2016, between Ultroid Marketing Development Corp. and

9   Dragon Jade.

10            (Plaintiff's Exhibit 10 was identified.)

11       A.   Yes.

12       Q.   And is this the transaction, or proposed transaction

13  that you were discussing a moment ago?

14       A.   This appears to be it, yes.

15       Q.   And you have said that originally the price offered

16  was 10 million, by Dragon Jade, and then that changed all of

17  a sudden, back up to 40 million?

18       A.   It changed to a cash and stock offer, yes.

19       Q.   And what was the reasoning that was given to the

20  company, by Dragon Jade, as to why the change from first it

21  was 80 million down to 10 and now back up to 40?

22       A.   Again, I don't know the conversation they had

23  between Mr. Cao and Dr. Lai, in between that.  When that

24  price was given to Mr. Knox, he told me those were some of

25  the reasons, they were concerned about his illness and

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          97

1  liability, going forward, without him.  But past that, I

2  don't have a specific reason.

3     Q.   So the only reason that was given for the changing

4  or dropping in value was liability as to Mr. Knox?

5     A.   Well, the liability in the company because, in

6  part, because of whether or not Mr. Knox would be able to

7  continue, going forth.  He had been very sick, his wife had

8  been having some issues, it was not clear how long he would

9  be gone.  And he's the brain, he knows everything there is

10  to know about the company, especially at this point in time.

11  So based on the limited information I have, it's a reasonable

12  concern, but that's what I'm told was the reason that was

13  given.

14     Q.   Okay.  Was Ultroid advised at all about Dragon

15  Jade's concern about the company, going forward, having

16  nothing to do with Mr. Knox?

17     A.   To my knowledge, at that time, no, from

18  conversations with Mr. Knox, but any concern would have been

19  communicated to Mr. Knox and Mr. Cao, so I can only go on

20  that information.

21     Q.   And does Mr. Cao work at the company anymore?

22     A.   No.

23     Q.   Does he have any role whatsoever?

24     A.   No.  As of today?

25     Q.   As of today.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          122

1    BY MS. D'AMICO:

2        Q.    And, in fact, at some point, Dragon Jade told

3    Ultroid that it didn't want to speak to Mr. Cao anymore?

4        A.    I don't know.

5        Q.    At the time of this October 17th letter from SEI,

6    if you look at the subject, it says, Proposal to Restart

7    Production of HMS Products.   What is HMS?

8        A.    I was going to ask you that question.

9        Q.    I don't want to testify.   I think it refers to

10   Hemorrhoid Management System.

11       A.    That's what I was trying to figure out, but it's

12   generally referred to as the Ultroid Management System, so

13   I can say I'm not sure what Mr. deSouza meant there.

14       Q.    That's fair enough.   And it says, reference, verbal

15   request by Michael Knox?

16       A.    Yes.

17       Q.    So at some point before October 17, 2016, Mr. Knox

18   put in a verbal request to SEI, to which SEI responded by

19   this letter?

20       A.    That's what this says.

21       Q.    And in fact, the e-mail says that our proposal,

22   first line, second sentence, Our proposal follows the

23   outline I sent you, the e-mail on October 14th.   I don't have

24   that October 14th e-mail if that's what you're looking for.

25       A.    Yeah, that's what I'm looking for.

U.S. LEGAL SUPPORT
(813) 876-4722

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                        123

1        Q.   So we're not sure what was in there.  But you see

2    that Mr. deSouza says, We are submitting a multi-phase

3    solution, due to the chronological dependencies of tasks.

4    And if you read through it, you see that there's phase 1, 2,

5    3 and 4, and he says, This is our pricing schedule by phase.

6    And if you look at this, as compared to Exhibit C of the

7    Option Agreement, it lines up with the phase 1, 2, 3 and 4

8    in Exhibit C.

9        A.   When you say it matches up, what do you mean?

10       Q.   That there's phase 1, phase 2, phase 3, phase 1

11   has the same titling.  The pricing is the same.  It's not a

12   perfect match, but I want you to compare the two of them.

13       A.   That's what I'm doing.  I was looking at the heading

14   here and I'm looking at other things here.  So the initial

15   headings didn't match up, that's why I wanted to make sure.

16           MR. LAWTON:  Is there a question?

17           MS. D'AMICO:  Not yet.

18           THE DEPONENT:  I see a phase 1, phase 2, in terms of

19        the terminology, yes.

20   BY MS. D'AMICO:

21       Q.   Okay.  You've testified earlier that Mr. Blalock

22   would be the one that would know best about this schedule in

23   Exhibit C?

24           MR. LAWTON:  Object to the form.

25       A.   He would be the one that knows best about what he

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                              124

1    meant by this, in terms of the drafting.

2    BY MS. D'AMICO:

3        Q.   And would it seem reasonable to you that this

4    scheduling of phase 1, 2, 3, 4, at least came from SEI's

5    schedule on this October 17, 2016 letter?

6             MR. LAWTON:  Objection to the form.  You can answer

7        if you understand it.

8        A.   Well, my answer is this, this Exhibit C has a

9    number of other details that weren't in there, so I can

10   assume there's at least some other communication.  But in

11   terms of them matching up, term wise, is that logical, that

12   at least some part of this was derived from discussion of

13   this, yeah, I guess I could say that seems plausible.

14   BY MS. D'AMICO:

15       Q.   In fact, the scheduling of it did come from SEI is

16   the question.

17       A.   It's a question?

18       Q.   Yeah.  Didn't it come from SEI?

19            MR. LAWTON:  Which scheduling are you talking about?

20   BY MS. D'AMICO:

21       Q.   On Exhibit C, the option agreement.  We're looking

22   at it and we're comparing it.

23       A.   Are you asking me if SEI provided this information

24   to Mr. Blalock to draft?

25       Q.   No, I'm not.  I'm asking you if they provided it to

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                              125

1    Michael Knox before this was drafted.

2        A.   I only have -- the only thing I can tell you, from

3    what is sitting in front of me, this is a letter from SEI,

4    dated to Mr. Knox, that uses those terms.  It's dated October

5    17, 2016.  This contract -- this exhibit seems to use similar

6    terminology.  It's dated January 1st.  Whether this was

7    provided, although SEI is mentioned in this, so I can infer

8    at least, that some of it came, those two things happened.

9        Knox got this later on this date, this information is

10   in this document.  They seem to match up.  I don't know who

11   provided where.  I know there was discussion, communication,

12   between Dragon Jade and SEI at some point, but past that,

13   that's what I can tell you

14       Q.   Do you know when Dragon Jade's first communication

15   with SEI was?

16       A.   That I do not know.

17       Q.   I believe your testimony was earlier, and correct

18   me if I'm wrong, but at the time this option agreement was

19   signed, you said that Knox was pretty much the only one at

20   the company?

21       A.   In terms of operating day-to-day, that was my

22   understanding, yes.  In terms of officers, yeah.

23       Q.   After Mr. Knox signed this agreement, did anyone at

24   Ultroid have any discussion about whether he was allowed to

25   sign the agreement or not?

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          126

1        A.    I'm not sure I understand the question.  Was there

2   anyone at Ultroid that discussed whether or not -- well,

3   again, at this time, my understanding is there was pretty

4   much Mr. Knox, so I'm not sure who else at the company, at

5   that time, there would have been to talk to.

6        Q.    Okay.  Who at the company at the time -- this was

7   signed in early '17.  Who at the company could authorize an

8   individual to sign an agreement?

9        A.    By virtue of his position, he had authority,

10  apparent authority to sign documents, statutorily to approve

11  anything of this nature, which is basically gutting the

12  company, selling its major asset, it would require a director

13  vote and shareholder vote.

14       Q.    Well, you said statutorily.  I want to be really

15  clear that I'm not asking for your legal opinion, I'm only

16  asking you questions as the corporate representative of

17  Ultroid.  So if there's any questions that I ask you where

18  you believe that you interpret it as a legal question,

19  it's --

20       A.    -- it's not that I'm interpreting it as a legal

21  question, those two things go a little bit hand in hand.

22  As the CEO, general duties allow him to negotiate and even

23  sign.  It stills requires the shareholders' agreement and

24  statutorily, which I think those two matched up, would still

25  require approval of the board and then the shareholders.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          144

1

2

3          (The non-confidential record resumed as follows:)

4

5    END OF ATTORNEYS' EYES ONLY

6    BY MS. D'AMICO:

7         Q.   Before we took a short break, you testified that

8    Dragon Jade, more specifically, Dr. Lai, threatened to

9    release embarrassing photos of Mr. Knox; is that right?

10        A.   Yes, he made a statement to that effect.

11        Q.   And you told me that happened during November 2015,

12   when Mr. Knox first went to Hong Kong?

13        A.   That's my recollection, yes.

14        Q.   And you said that with respect to the trips to Hong

15   Kong, sometimes Mr. Cao went alone and sometimes Mr. Knox

16   went with Mr. Cao, right?

17        A.   Yes.

18        Q.   Did Mr. Knox ever travel to Hong Kong without

19   Mr. Cao, so alone?

20        A.   Not to my knowledge.

21        Q.   And for these trips to Hong Kong, Dragon Jade

22   offered to pay for Mr. Cao and Mr. Knox's travel expenses?

23        A.   My understanding is they did pay for Mr. Cao's first

24   trip alone.  And I believe they paid for the trip, second

25   trip with Cao and Knox, although they traveled separately.

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                    147

1    personal.  However, Mr. Knox was the CEO, CPA, handled the

2    financial, day to day.  If he was reimbursed for travel

3    expenses, presumably he would have known that.

4         Q.    When Mr. Cao and Mr. Knox traveled to Hong Kong,

5    how did they pay for their flight?

6         A.    Which trip?

7         Q.    Any one.  Did they put it on a personal card,

8    corporate card?

9         A.    I don't know.  I was told that Dragon Jade paid

10   for them in the first trip.  Cao told Knox that Dragon Jade

11   was bringing him over there.  The second trip, I was told

12   that Dragon Jade paid for it.  I don't know how, but whether

13   they traveled separately, again, Cao was going the day

14   before.  Past that, I don't have any knowledge of it.  To my

15   knowledge, there's no financial records that would indicate

16   otherwise.

17        Q.    Okay.  So Ultroid's position is not only did Dragon

18   Jade threaten to release photos of Mr. Knox -- and let's

19   stick with that one more moment.  Is it your position that

20   those threats were threats to release it if he didn't do

21   something?

22        A.    If he didn't acquiesce to their will, that was his

23   statement to me, as to what he took that to mean, what was

24   his ongoing concern.

25        Q.    So Dragon Jade's statement was if Mr. Knox didn't

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          148

1    acquiesce to their will?

2        A.   He took that -- I didn't say that was their

3    statement, that was what he said he understood that to be

4    mean.

5        Q.   I see.

6        A.   I can only give the general knowledge of what he

7    told me.

8        Q.   So Dr. Lai's alleged threats to release the

9    photographs didn't really have a sort of counterpart, it

10   wasn't, if you don't do something, it was just Mr. Knox's

11   perception?

12       A.   I did not hear of a specific ending.

13       Q.   I just wanted to make sure that I understood what

14   your testimony was.  Thank you.  Did Mr. Knox ever tell

15   anyone else at Ultroid about the cash that was given to Cao?

16       A.   Not to my knowledge.

17       Q.   Do you know if it ever came up at a board meeting?

18       A.   I've seen no records of that.

19       Q.   Did Mr. Knox make any other sort of report to any

20   entity or any individual, other than --

21       A.   At that time?  Not that I know of, at that time.

22   Obviously we know of it now, taking over, but past that, I

23   don't know.

24       Q.   When is the first time that Ultroid heard about this

25   allegation?

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                    166

1   BY MS. D'AMICO:

2      Q.   Were you present for any conversations with

3   Ms. Rose?

4      A.   No, I was not.

5      Q.   And you talked with Mr. Knox though about receiving

6   the funds?

7      A.   Yes.

8      Q.   And he advised you that he did receive the funds

9   which were wired, as far as we know, into Ms. Rose's bank

10  account?

11     A.   Yes.

12     Q.   And he received the funds that were wired, even

13  though it's your testimony that her signature is not -- the

14  signature on those loans with her name on it isn't actually

15  her signature?

16     A.   Yes, that's what he indicated.  Mr. Hendricksen,

17  again, indicated that he was aware that those funds had been

18  transferred at Dr. Lai's request, for Mr. Knox, so that's

19  part of that e-mail chain, so yeah.

20     Q.   Did Dragon Jade threaten Mr. Knox, to try to get him

21  to execute the option agreement?

22         MR. LAWTON:  Objection to form.

23     A.   I guess, can you be more specific on that?

24  BY MS. D'AMICO:

25     Q.   You testified earlier that Dr. Lai, at some point,

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                          167

1    made some threats about releasing photographs.  Didn't tie

2    it to anything, but he made those threats.  And I'm asking if

3    there's any specific threats that Dragon Jade made to get or

4    try to get Knox to sign the option agreement?

5         A.   My understanding from Mr. Knox is that was an

6    ongoing fear of his, and that was how he took all of those

7    threats and that that was of great concern with him in

8    executing the documents and in what he termed, the pressure

9    that was being applied from Dragon Jade for him to do

10   things.

11        Q.   So other than the threats of releasing photos, you

12   said all the threats.

13        A.   I said pressure.

14        Q.   Okay.  Well, what other pressure was there?

15        A.   That's his term.

16        Q.   Okay.  But just the photographs or was there

17   something else that Dragon Jade was doing?

18        A.   All I heard was, all he used with me was that term,

19   you know, pressure, but --

20        Q.   Do you have any?

21        A.   -- specific, other than that particular threat, no,

22   I'm not aware of anything else specific.

23        Q.   Do you know whether Mr. Knox had a financial outcome

24   in the two parties executing the option agreement?

25        A.   I know he's a shareholder.  I know he was getting

Cedric Lewis  30(b)(6), Confidential
December 03, 2018                    168

1   at least those funds.  So from those two standpoints, there

2   was a financial outcome for him if it went through.

3       Q.   As you testified before, his financial position

4   was, maybe he was in trouble at the time?

5       A.   Yeah.  He had been sick for a long time.  His

6   wife had been sick and maybe suicidal.  And that was all

7   the things that Dragon Jade was aware of.  He provided

8   sole support for, I think, six people, wife, children,

9   grandchildren.  Breadwinner.

10      Q.   So entering into the agreement would be a

11  financially beneficial move for him?

12      A.   Yeah.

13      Q.   Just give me a minute to review.

14          MS. D'AMICO:  Can we go off, please?

15          (A recess was taken.)

16  BY MS. D'AMICO:

17      Q.   Were there any other threats of blackmail, aside

18  from the threats concerning the photographs, that you allege

19  Dr. Lai made, meaning in November 2015?

20      A.   I think that's the same question, but as far as I

21  know, no other specifics, other than what you said before.

22  You said threats.

23      Q.   I wanted to use a specific term.

24      A.   I'm sorry.

25      Q.   No, that's great.  At what date did Mr. Knox stop