# EXHIBIT 7

|  |  |
|---|---|
| **From:** | Glenn Henricksen |
| **Sent:** | Thu, 3 Nov 2016 1:05:55 AM US/Eastern |
| **To:** | Michael Knox;Michael Knox |
| **Cc:** | dr.lai;William Fung |
| **Subject:** | Michael Knox |
| **Attachments:** | November 3 Meeting response to Ultroid gh.pdf |

MK-

Please find the attached letter. I am available in your morning (Thursday) for a chat since there is this letter and there are other things that we need to discuss.

Thanks.

**Glenn Henricksen, Jr.**
CIF Consultants & Asia Technology Management
(Cell) 852-9860-0890

He has made everything beautiful in its time. He has also set eternity in the hearts of men; yet they cannot fathom what God has done from beginning to end.
**-Ecclesiastes 3:11-**

**CONFIDENTIAL**

Ultroid0053281
Ultroid0053281

November 3, 2016

To: Michael Knox and interested parties at Ultroid:

We need to report to you where we currently stand on the Ultroid acquisition and the issues that we need to hammer out in order for us to move forward swiftly.

If you have any questions or comments, then let's arrange a call for later this week with you.

1. Acquisition of Ultroid:
   Due to the recent product recall, our funder has decided not to pursue the acquisition of Ultroid.   DGJI's chairman and management continues to believe in the product for the Hong Kong market and is offering $3mm to purchase the Ultroid asset.   However, there remains a severe lack of trust towards Ultroid management due to past behavior.

2. Guarantees:
   Due to above mentioned problems with management's previous violation of best practices by not disclosing relevant and important information to us, we seek to mitigate risks associated with funding the needs of the product prior to the actual acquisition.   In order to secure the investment, the following means are proposed.
      a) A personal guarantee should be provided by Ultroid management to DGJI to mitigate risk of non-performance and contingent liabilities arising from the rehabilitation of the Ultroid asset.   We cannot post any cash until we have these assurances.
      b) This guarantee amount is represented by the $100k needed to complete the remediation by SEI and other expenses such as daily expenses associated with office costs and employees such as Jazz and further work that needs to be completed prior to the product being market ready.
      c) We think that the guarantee needs to be outstanding for both the SEI DHF and Master File remediation as well as to completion of the CE, UL, ISO and other certifications.   We do not want to risk our money until we are assured that we have a product that can be legally sold into the marketplace.   We think that it could take up to 270 days to get all of this completed and in place.
      d) Our Board has required us to protect any further funds dedicated to

**CONFIDENTIAL**

Ultroid0053282

Ultroid0053282

   Ultroid.
   e) We are not sure if security in the 510K asset has any value until after the remediation is totally complete and therefore we do not view a pledge of this as an asset that protects us.

3. DHF and other issues
   We had a conversation with a local consultant on the issue of the DHF, manufacturing records and FDA relationships.   We are still very confused as to how, as we wrote in our October 19th letter to you, the DHF can go missing. Production records that were not maintained would have no consequence on the DHF or the 510K since we are rolling back the product to the original 510K and will be moving the product to a new entity.   The production records are only relevant to the DMR that needs to be maintained after the DHF has been closed out.

   As we understand it, the DHF needs to be maintained as such:

   1. Design plan
   2. User needs
   3. Design inputs
   4. Design outputs
   5. Risk analysis, including hazard identification
   6. Human factors analysis
   7. Design verification, with acceptance criteria
   8. Design validation, with acceptance criteria
   9. Design changes
   10. Software validation----if applicable
   11. Design reviews
   12. Design transfer

   We do not see where any of this can be missing from the original 510K submission as these things were a matter of record back then.   Presumably, the 12 points above were submitted to the FDA to get the 510K.   According to our information, a DHF is closed out upon the issuance of a 510K:   Best practices for "closure" of a DHF is to close it when you receive your 510K clearance letter or PMA approval from the FDA. One should not keep your DHF open for the life of the product. The last three steps of your design transfer process should be as follows:

**CONFIDENTIAL**

**Ultroid0053283**

Ultroid0053283

1. Initiate a Device Master Record (DMR); a DMR Index is best practice and may serve as a Technical File Index as well.
2. Initiate a Post-Market Surveillance (PMS) Plan for the new product or update an existing PMS plan for a product family; this should include an updated risk management plan.
3. Add the 510(k) letter or PMA approval to the DHF.

The previous DMR is of no consequence since the records after the 510K have no meaning to the new owner.

As you may recall, these were our questions and your responses to us surrounding this issue from the October 19th letter:

1. Regarding Design History File and Device Master Record:
   a. What happened to the original DHF?   Where did it go?   Where is the original DHF copy when submitted the 510K to FDA?   First the original DHF is a work in process and must be maintained.   The last holder of the DHF was Molding Services of Illinois (MSI).   However, MSI received the complete and current DHF, in 2009.   However, MSI failed to maintain the DHF, or keep it in the FDA required format.   Additionally, they scattered the contents of the files between various notes books, and electronics files.   This essentially destroyed.   So, what we have done is go to the beginning and reconstruct the original 510K submission so we can start off on the right foot.
   b. We are confused as to why it does not exist since presumably one was needed to get the original 510K.   Is there a single copy of the DHF in hand (soft copy or hard copy)?   I believe there is a misunderstanding here.   The original 510K submission is only one part of the DHF.   It happens to be the most important part and the first part needed.   Without the original 510k submission, no one can move forward to production.   The next step is to bring the original submission files to a production ready or buildable format.   Currently, there is a both a soft and hard copy of the original 510k submission, which is the beginning of the DHF.   Please note that once the DHF is completed, it will become part of the Design Mater Records (DMR).   DMR will contain all production records for the life of the product plus 2 years.   And a number of other critical items.

**CONFIDENTIAL**

Ultroid0053284

Ultroid0053284

    c. This is an issue since we are not 100% sure if a DHF can be recreated to create a new master file.   Is it legal to recreate the DHF after the fact that ended in the application of the 510K?   Can the software and hardware engineers re-produce the complete DHF and DMR?   No, there are no issues; I have been guaranteed that the DHF can be recreated completely for FDA standards.   Regarding the legal   aspect, let me point this out; as the new owner, you start over fresh with the FDA without any of the baggage from us.

    d. How many revisions are expected to complete the DHF and DMR? The number of revisions, at this time, I do not think anyone could provide an accurate number.   However, Superior Electronics was the designer of the black box version and has experience with the Ultroid Unit, and bringing it from the original 510k submission to a production ready status.   Furthermore they produced a few hundred of them in the past.   It has been a few years, but they are assuring me that they will accomplish the goal within the time they have specified in their proposal.

Obviously, we are very concerned about these issues since it doesn't make sense to us and to our consultant as to why these things happened the way that they did.   And given the misinformation and hiding of relevant information previously, we are duty-bound to make sure that we understand fully what we are getting into here.

Further questions:

1.   Given that the manufacturing entity in Illinois had a contract with you to perform duties as per the requirements and as you have said, that they didn't complete them, then why are you not taking them to court for breach of contract?
2.   We want to see what this contract is and the way that a manufacturing contract is structured so that we understand what we are getting into here.   Please send us a copy for review.
3.   Why did you not sue MSI for breach of contract as their behavior created a loss for the shareholders of Ultroid?
4.   Did you or did you not keep a copy of the original DHF as outlined in the above 12 points?   That would be standard business practice and we think it is incumbent upon the manufacturer and the company to ensure that these records are in good order and maintained.   For over 5 years, Ultroid did not review these records?

**CONFIDENTIAL**

**Ultroid0053285**

Ultroid0053285

5. There are liabilities to the outside consultants and payments made or promised to be made. This includes; Charity, FDA Group and the Hudson Michigan guys. If they did not meet their obligations, then Ultroid has to make claims to them for non-performance. You are listing them as liabilities that need to be paid out of our acquisition funds. The balance of which will go to current shareholders. In our opinion, the lower the liabilities, the more money that shareholders get from the funds we provide. You may think that what you do with the funds is none of our business, but given that Ultroid may be subject to litigation and that we are a creditor to the company and potentially funding the remediation, there is risk to us in the deal being tied up in court at a later date. What actions have you taken against these parties to date?

4. Moving the acquisition forward:
In addition, we need to agree on an acquisition schedule and a total sum/consideration for the acquisition in order to start the necessary Due Diligence. We have retained a lawyer this week and he will represent us in this process, Richard Blaylock of Pillsbury Winthrop Shaw Pittman LLP. Upon agreement, the investment amount shall be put in escrow and will be released only upon satisfactory completion of due diligence by our lawyer. We may also consider the purchase of majority of UMDC's shares at the beginning of the deal to ensure the proper completion of the deal and this could take the form of a share swap.

Regards,

Glenn Henricksen

**CONFIDENTIAL**

Ultroid0053286

Ultroid0053286