UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DRAGON JADE INTERNATIONAL,**
**LTD., a British Virgin Islands limited**
**company,**

        **Plaintiff/Counter-Defendant,**

**vs.**

**ULTROID, LLC, et al.,**

        **Defendants/Counter-Plaintiffs.**

_____/

**CASE NO:  8:17-cv-2422-T-27TBM**

**DEFENDANTS/COUNTER-PLAINTIFFS' RESPONSE TO PLAINTIFF/COUNTER-**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

        Defendants/Counter-Plaintiffs, Ultroid, LLC, Ultroid Marketing and Development Corp., and Ultroid Technologies, Inc. (collectively, "Ultroid"), by and through undersigned counsel, hereby respond in opposition to Plaintiff/Counter-Defendant's Motion for Partial Summary Judgment on Ultroid's Counterclaims. In support hereof, Ultroid states as follows:

        The heart of this action is the Option Agreement entered into by Dragon Jade and Michael Knox, on behalf of Ultroid, under disputed circumstances in January of 2017. The challenged Agreement purportedly offers Dragon Jade the right to negotiate the purchase of certain intellectual property owned by Ultroid ("Assets"[1]) associated with Ultroid's innovative product designed to cure hemorrhoids ("Product") for a price as low as $1,000,000.00.[2] Dragon

---

[1] The Assets specifically include the 510(k) premarketing authorization, US Patent No. 81313801, CA Patent No. 2597892, and US Registered Trademark Nos. 3526435 and 1485175.

[2] Dragon Jade has long taken the position that the Agreement grants Dragon Jade the right to purchase the Assets for the set price of $1,000,000, which is a figure substantially below the fair market value of the Assets. Along the same lines, Dragon Jade has represented – both throughout this lawsuit and in the marketplace – that it is the current

Jade has claimed that Ultroid breached the Agreement. Ultroid disputes that claim and brings several Counterclaims challenging the validity and enforceability of the Agreement based on disputed conduct of Dragon Jade and other circumstances surrounding the execution of the Agreement.

By way of the instant Motion, Dragon Jade seeks summary judgment on four of Ultroid's five remaining counterclaims: (a) Counterclaim I for a violation of FDUTPA; (b) Counterclaim V for rescission based on fraud and illegality; (c) Counterclaim VI for fraud in the inducement; and (d) Counterclaim VII for conspiracy.[3] In doing so, Dragon Jade neglects evidence demonstrating that it engaged in bribery, extortion, deceit, and other fraudulent conduct to coerce, manipulate, and mislead Michael Knox, Ultroid's former CEO, into executing the Agreement. Dragon Jade improperly construes evidence in its favor and omits material facts that are unfavorable to its position and supportive of Ultroid's claims.

As discussed in detail below, the record evidence establishes genuine issues of fact with regard to the subject Counterclaims, thereby precluding summary judgment. Accordingly, Dragon Jade's Motion should be denied.

---

owner of the Assets. However, as has been argued by Ultroid, any such interpretation of the Agreement would be in direct violation of Florida Statute § 607.1202, as the Ultroid shareholders have never approved the terms of the proposed sale as suggested by Dragon Jade. The Court recently ruled that shareholder approval was not required for the Option Agreement, due to the Court's interpretation that the Agreement only allows Dragon Jade a limited right to enter into negotiations that, if agreed upon by the parties, would result in  separate Asset Purchase Agreement requiring approval of Ultroid Shareholders. (*See* Doc. 136.) Based upon this Court's ruling, Ultroid has not addressed in this response the issue of shareholder approval, and would instead rely upon the arguments previously made to the Court in that regard.

[3] The Court recently dismissed Counterclaims II, III, and IV, respectively alleging state and federal RICO violations and seeking rescission based on a lack of shareholder approval. (Doc. 136.) Dragon Jade has not challenged Counterclaim VIII – a breach of contract claim pled in the alternative in the event the Agreement is found to be valid and enforceable.

## MEMORANDUM OF LAW

I.      **Dragon Jade fails to acknowledge disputed issues of fact and other material evidence.**

Dragon Jade's recitation of facts contravenes the well-settled requirement that the facts be presented and construed against it for purposes of this Motion. Ultroid takes this opportunity to highlight certain disputed facts and present other evidence not cited by Dragon Jade.[4]

The parties' relationship began in June of 2015 when Dragon Jade contracted with Ultroid to be the exclusive distributor of the Product throughout China. (Knox Depo., 80:1–5, 81:21–82:2; Doc. 12-1, pp. 18–32; Doc. 20-1, ¶ 4; Doc. 12-1, p. 1, ¶ 3.)[5] Later that year, Dragon Jade's CEO, Dr. Steve Lai, proposed the idea of Dragon Jade acquiring Ultroid. (Doc. 20-1, ¶ 4; Knox Depo., 79:10–25.) Michael Cao, Ultroid's founder, and Michael Knox, Ultroid's then-CEO, traveled to Hong Kong to meet with Dr. Lai. (Lai Depo., 13:1–5.)[6] Dragon Jade paid for all expenses and provided entertainment to Knox and Cao. (*See* Knox Sworn Statement, 8:4–11; Goeree Depo., 100:1–101:1.)[7] During this visit, Dr. Lai requested that Ultroid obtain an appraisal to substantiate a proposed purchase price of approximately $80,000,000.00 (Knox Depo., 79:10–25; Lai Depo., 9:2–6; Knox Sworn Statement, 9:10–24).

Unfortunately, shortly thereafter, Knox fell critically ill with pneumonia and acute respiratory failure in February 2016, a significant fact that Dragon Jade completely fails to acknowledge. Knox was placed in a medically induced coma for six days, hospitalized for three weeks, and rehabilitated to re-learn how to walk. (Knox Depo., 35:9–36:21; Doc. 20-1, ¶ 6.) Although he was eventually able to return to work, he never resumed his full duties. (Knox

---

[4] For a detailed history of the Ultroid companies and their leadership, Ultroid directs the Court to and incorporates the factual recitation set forth in detail in pages 3 through 5 of Ultroid's Motion for Partial Summary Judgment (Doc. 133).
[5] Cited pages of Michael Knox's deposition testimony are attached at Exhibit 1.
[6] Cited portions of Dr. Steve Lai's deposition testimony are attached at Exhibit 2.
[7] Cited portions of Michael Knox's sworn statement, given on January 30, 2018, are attached at Exhibit 3. Cited portions of Michael Goeree's deposition testimony are attached at Exhibit 4.

Depo., 35:17, 89:3–15; Doc. 20-1, ¶ 6.) He formally resigned from his C-level and managerial positions in July of 2016 and maintained only his officer roles as secretary and treasurer. (Knox Depo., 39:8–24, 47:5–48:1, 89:16–90:3.) While Knox was out of commission, Cao assumed the role of acting CEO and took complete charge of the Ultroid entities. (*Id.* 35:14–15, 36:22–37:3; Doc. 20-1, ¶ 6.)

Leading up to this point, Ultroid had been working to address concerns with its quality management system ("QMS") that had been raised by the FDA in August 2015. (*See* Doc. 20-1, ¶ 5.) Nevertheless, Dragon Jade wanted to expand its footprint through the Asian countries through its ties with Ultroid and the Product. (*See* Henricksen Depo., 73:3–74:6, 74:20–75:6.)[8]

In April 2016, Cao and Knox – despite his ongoing issues and at the insistence of Cao – traveled back to China to further discuss Dragon Jade's purchase of Ultroid. (Knox Depo., 122:18–123:13; Doc. 20-1, ¶ 7.) During that meeting, Dr. Lai reduced his offer to $40,000,000.00, only a quarter of which would be in the form of cash and the remainder of which would be of Dragon Jade stock. (Lai Depo., 9:25–10:7.) Just before then, Cao was handed an envelope of cash by Dr. Lai. (Goeree Depo., 85:11–86:21.) Cao did not seem surprised by the cash or the reduction in the purchase offer. (Knox Sworn Statement, 12:3–13:15.)

A lot went on during the second half of 2016. Under Cao's leadership, Ultroid's QMS remediation was not completed and in September 2016, Ultroid voluntarily recalled the Product and suspended manufacturing so that it could complete its remediation efforts. (Knox Depo., 94:8–95:12; Doc. 20-1, ¶ 8.) The following month, Cao unexpectedly resigned, leaving the still-recovering Knox as the only person acting with any leadership authority as '16 ended and '17 began. (Knox Depo., 98:4–20; Doc. 20-1, ¶ 8.) By this time, Knox was not only suffering from health and physical concerns, but he was also struggling financially. (Knox Sworn Statement,

---

[8] Cited portions of Glenn Henricksen's deposition testimony are attached at Exhibit 5.

21:8–20.) Dragon Jade knew of Knox's and Ultroid's vulnerabilities. (*See* Henricksen Depo., 243:23–244:4, 260:10–17; Lai Depo., 17:23–18:22, 37:24–38:2;) In fact, Knox had conveyed his financial vulnerabilities to Henricksen on multiple occasions, advising that he was not being suitably compensated and was struggling to make ends meet for his family. (*See* Henricksen Depo., 243:23–244:4, 260:10–17.)

Additionally, as a result of the recall, Ultroid was unable to fulfill one of Dragon Jade's purchase orders in connection with their distribution agreement. (*Id.* 84:3–15.) Dragon Jade ceased acquisition negotiations and initiated arbitration proceedings against Ultroid. (*Id.* 83:14–84:23; Doc. 12-1, ¶ 25.) Dragon Jade subsequently intertwined itself in Ultroid's remediation efforts and offered to purchase Ultroid's Assets. (Knox Depo., 113:4–9; Doc. 20-1, ¶ 9.)

On January 11, 2017, Dragon Jade's consultant, Glenn Henricksen, presented verbal terms of a proposed Asset sale to Ultroid's only two Board members at the time, one of which was Michael Knox. (Knox Depo., 109:8–15; Doc. 133-7, ¶ 3; Doc. 12-1, p. 63.) The terms included a purchase price of only $1,000,000.00 in cash plus 500,00 shares of Dragon Jade stock. (Doc. 12-1, ¶ 26.) Dragon Jade's purchase option was to be memorialized in the Option Agreement, which would call in part for Dragon Jade to fund some costs and complete certain tasks associated with the remediation of the Device in exchange for an exclusive option to purchase the Assets for potentially as little as $1,000,000.00. (Doc. 20-1, ¶¶ 10, 14, 15; *see also* Doc. 1-1.) Dragon Jade offered this as a solution to the arbitration proceedings. (*See* Lai Depo., 66:19–67:5 (indicating the arbitration stopped after the Agreement was executed); Knox Sworn Statement, 20:6–20.) The Board members approved the verbal terms but requested that they be reduced to writing for approval. (Knox Depo., 109:16–24.) Written terms were subsequently

finalized between Dragon Jade and Knox, but they were never presented to Ultroid's Board or shareholders. (Doc. 133-7, ¶¶ 3, 5.)

Although Henricksen was the primary point of contact for Knox during this time, Dragon Jade fails to mention that Dr. Lai and Attorney Richard Blaylock[9] both dealt heavily with Knox prior to the execution of the Option Agreement. (Knox Depo., 110:17–22; Lai Depo., 22:7–18.) Attorney Blaylock negotiated the terms of the Option Agreement and ultimately drafted the final version of the Agreement. (Knox Depo., 110:17–22; Henricksen Depo., 136:5–137:13.)

Dr. Lai did not like Knox but knew he needed him to obtain the Assets, given that Knox was the only person left with Ultroid that was capable of executing the Agreement.[10] (Lai Depo., 20:1–22:3, 54:19–25, 55:25–56:7.) Therefore, he agreed to assist Knox with his financial struggles, but would only do so once the Option Agreement was executed. (*See id.* 20:1–25.) Additionally, Dr. Lai offered Knox a full-time operations position with Dragon Jade, contingent on the sale of the Assets. (*See* Dragon Jade's Response to Request for Admission No. 16, attached at Exhibit 6; Doc. 20-1, ¶ 16; Henricksen Depo., 224:7–19; Knox Sworn Statement, 21:21–22:13, 22:22–25.) Dragon Jade would not put the offer in writing or finalize the terms of the position until after the Agreement was consummated. (Knox Sworn Statement, 22:3–4; Henricksen Depo., 224:20–225:3.) And on at least one occasion, Dr. Lai threatened to release photographs taken of Knox in compromising situations while in Hong Kong if he did not execute the Agreement. (Knox Sworn Statement, 23:1–6; Goeree Depo., 100:21–101:13.) Dragon Jade did not acknowledge the job offer or threat in its recitation of the facts.

---

[9] Richard Blaylock is an attorney with the law firm of Pillsbury, Winthrop, Shaw Pittman, LLP, which was the original firm that represented Dragon Jade in connection with this matter. On October 5, 2018, shortly after the deposition of Glenn Henricksen, the K&L Gates law firm substituted as counsel in place of Pillsbury, without explanation. (Doc. 69.)

[10] During his deposition, Dr. Lai likened Michael Knox to his "disgusting driver," whom he could not fire because of his ability to navigate the roads. Dr. Lai placed his driver and Knox in the category of people who are essentially indispensable because their "good points outweigh [their] bad points." (Lai Depo., 52:19–54:25.)

On January 19, 2017, Knox executed the Option Agreement on behalf of Ultroid without the knowledge or approval of the Ultroid shareholders. (*See* Doc. 1-1, p. 2; Doc. 20-1, ⁋ 10; Doc. 133-7, ¶ 3.) Knox also executed a Security Agreement, purportedly granting Dragon Jade an interest in specified collateral as security for Ultroid's reimbursement of costs paid by and due to Dragon Jade under the Option Agreement. (Doc. 1-2; Doc. 20-1, ⁋ 11.)

The contested wire transfers followed.[11] Knox had expressed a need for $20,000. Dr. Lai did not think Knox was worth that, but knew he had to pay him something. (Lai Depo., 20:1–12, 27:6–13.) Dr. Lai orchestrated for Knox to receive an under-the-table payment from a Dragon Jade employee, which was specifically structured in a manner that would avoid scrutiny by the SEC and auditors. (*Id.* 22:4–20, 27:1–18, 34:11–21.) On January 23, 2017, a lower-level employee, Tam Sui Man, wired $10,000.00 – allegedly from her personal finances – to an account in the name of Knox's sister-in-law, Dale Rose. (*Id.* 22:4–20, 34:11–21, 29:18–25, Doc. 133-8, p. 1.)

William Fung, Dragon Jade's CFO, assisted in facilitating the transaction, and Dragon Jade's accounting department prepared a corresponding loan agreement between Tam Sui Man and Dale Rose. (*Id.* 26:13–20, 31:10–18; Henricksen Depo., 247:19–248:1, 252:2–253:5.) Henricksen worked with Knox to obtain account numbers and other information to needed to complete the transaction for the benefit of Knox; Dragon Jade was unaware of who Dale Rose was or whether she even existed. (Lai Depo., 28:11–16, 29:1–7, 32:20–22, 36:1–37:18; *see also* Henricksen Depo., 244:20–249:17.) Knox, whose wife is a co-signor on Dale Rose's account, ultimately retrieved the funds. (Knox Sworn Statement, 27:17–28:7.) Dr. Lai later reimbursed

---

[11] The following facts regarding the January 23 and July 31, 2017 wire transfers are generally derived from and supported by the documents at Doc. 133-1 and the following portions of Dr. Steve Lai's deposition transcript: 20:14–37:23, 43:25–47:20, 48:16–52:18, 56:10–57:12.

Tam Sui Man the $10,000.00, plus interest, from his personal account. (Lai Depo., 27:23–28:5, 44:6–18, 46:14–21.)

When the sale of the Assets did not occur as quickly as anticipated, Dr. Lai orchestrated a second wire transfer to Knox. On July 31, 2017, CFO William Fung wired $5,400.00 from his personal account to the account of Dale Rose. (*Id.* 50:2–4.) Fung also assisted Dragon Jade's accounting department in fabricating another fake loan document between Dale Rose and Tam Sui Man, even though Ms. Man did not provide the money. (*Id.* 49:21–51:20.) Dragon Jade again worked with Knox to sort out the details of the transfer. Dr. Lai later reimbursed Fung from his personal account. (*Id.* 56:10–23.) Knox retrieved the funds on or around August 1, 2017. (Knox Sworn Statement, 33:1–14.)

Both of these transfers were done without any due diligence and designed to evade the eye of the SEC and auditors. (Lai Depo., 34:11–35:20; *see also id.* 47:22–48:6, 57:13–58:7.) Knox believed they were done to influence him to execute the Agreements. (Knox Sworn Statement, 23:7–11.) Dr. Lai testified that he would not have paid Knox had he not executed the Agreement. (*Id.* 22:3–5.)

The extent to which Dragon Jade satisfied its obligations under the Option Agreement in the months after it was executed is contested by the parties. So, too, is the reason for the delay in remediation. Nevertheless, by the second half of 2017, Knox learned that Dragon Jade would be unable to make the payments or complete the tasks required of it under the Option Agreement. (Doc. 20-1, ¶¶ 13–17; Knox Depo., 130:5–19, 131:18–133:10.) Thus, Knox sought new leadership to fill the void in management and move Ultroid forward. In September 2017, Michael Goeree was hired as Ultroid's new CEO to manage capitulation, raise funds, and bring the Product back to the market. (Goeree Depo., 23:1–24:7; Doc. 31-1, ⁋ 3.)

Goeree quickly recognized what he considered suspicious circumstances and ambiguities associated with the Option Agreement, prompting him to terminate the relationship between the parties and the employment of Michael Knox. (*Id.* 73:25–74:9, 77:6–77:18, 109:16–110:115; Doc. 1-4.) This action followed.[12] Dragon Jade now seeks summary judgment on the Counterclaims that challenge the validity and enforceability of the Agreements between the parties.

## II.      Dragon Jade's burden at the summary judgment stage.

Federal Rule of Civil Procedure 56(c) provides that judgment for the moving party is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Jeffrey v. Sarasota White Sox*, 64 F.3d 590, 593 (11th Cir. 1995). Assuming Dragon Jade can establish competent evidence in support of its Motion or demonstrate a lack of evidence supporting Ultroid's counterclaims, Ultroid may defeat the Motion by proffering counter-evidence revealing disputed issues of fact. *See Landers v. Milton,* 370 So. 2d 368, 370 (Fla. 1979). All facts and reasonable inferences must be viewed in the light most favorable to the School Board as the nonmoving party. *Hill v. Cundiff*, 797 F.3d 948, 967 (11th Cir. 2015).

## III.     Disputed issues of fact and competing interpretations of the evidence preclude summary judgment on each of the subject Counterclaims.

In the Motion, Dragon Jade paints a picture of an innocent foreign corporation coming to the rescue of a drowning American company and its struggling leader. But, its self-serving

---

[12] Throughout this litigation, Dragon Jade has taken inconsistent positions with respect to its claimed ownership of the Assets versus its right to negotiate a potential purchase of the Assets. In recent filings with the SEC, Dragon Jade has held itself out to be the exclusive owner and provider of a hemorrhoid treatment technology that replicates the technology which is the subject of the Assets. (*See* Affidavit of Attorney Timothy Van Dyke attached at Exhibit 7.)

interpretation of the record and factual omissions fail to account for the competing story of a publicly-traded foreign company's motivation to acquire the innovative, desirable and profitable technology of a privately-owned domestic company and its efforts to ascertain those valuable assets at the lowest possible cost by capitalizing on the vulnerabilities of the American company and its leader. Considered in its totality and construed in the light most favorable to Ultroid, the record evidence paints a very different picture than that depicted by Dragon Jade.

Dragon Jade has had its sights set on Ultroid's Product since 2015, evidenced by its desire to be an exclusive distributor and its CEO's interest in acquiring Ultroid. To this day, Dragon Jade is not only pursuing this litigation in effort to acquire the Assets related to the Product, but it is now replicating the Product's technology for its own use and benefit overseas and to appeal to investors. (*See* Exhibit 7.) It is, therefore, not hard to believe Dragon Jade was actively trying to obtain the Assets over the past few years and would have done whatever it took to get them.

Dragon Jade's first effort to obtain the Product was by way of acquiring Ultroid at a price that Dragon Jade deemed appropriate – around $84,000,000. It later bribed Michael Cao into accepting the lower purchase price of $40,000,000 in cash and Dragon Jade stock. However, following Knox's serious health concerns and Ultroid's recall of the Product, Dragon Jade had the opportunity to leverage their vulnerabilities for its ultimate end goal – to acquire the Assets for a fraction of their worth.

Dragon Jade offered to assist Ultroid in the requisite remediation efforts in exchange for the right to purchase the Assets for a nominal price, as set forth in the Option Agreement. Dragon Jade leveraged arbitration proceedings against Ultroid, which it agreed to release if Knox executed the Option Agreement. It also capitalized on Knox's financial struggles, bribing him

with a job opportunity and paying him off via an illegal wire transfers masqueraded as a personal loans to a third party in order for him to execute the Agreement. To ensure that Knox carried out the execution of the Agreement, Dragon Jade also threatened to release salacious photographs taken of him while in Hong Kong. Each of these acts were done to secure Knox's execution of the Agreement that purportedly allows for Dragon Jade right to purchase the Assets.

Dragon Jade's coercive, manipulative and deceitful conduct calls into question the validity of the Option Agreement, and the disputed facts and competing interpretations of the evidence in its totality precludes summary judgment. Indeed, from this record, a reasonable jury could find in favor of Ultroid as to each of the following Counterclaims:

## A.   *FDUTPA – Counterclaim I*

A FDUTPA claim has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1325–26 (S.D. Fla. 2014) (citing *Lustig v. Bear Stearns Residential Mortg. Corp.*, 411 F. App'x 224, 225 (11th Cir. 2014)). "A deceptive act is one that is 'likely to mislead' consumers; the pleader need not plead any reliance on the part of the consumer." *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1326 (M.D. Fla. 2007). "An unfair act is 'one that offends established public policy' and is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Saxon Fin. Grp., Inc. v. Rath*, 2012 WL 3278662, *6 (S.D. Fla. Aug. 9, 2012) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). FDUTPA applies to private causes of action arising from single unfair or deceptive acts . . . ." *Id.*

As discussed in detail with supporting evidence herein, in the days and weeks leading up to the execution of the Option Agreement, Dragon Jade blackmailed and threatened Knox by threatening to release photographs of him if he did not execute the Agreement. It also extorted

his financial vulnerabilities, offering him a job contingent on the sale of the Assets and paying him under the table for his execution of the Agreement.

Dragon Jade characterizes the wire transfers as generous personal loans – nothing more than good deeds intended to help a struggling man. However, the circumstances under which they were crafted and carried out suggest otherwise: Dr. Lai was stringing Knox along by providing just enough support to keep him above water, and illegally disguising it as a personal loan to a third party to avoid scrutiny by the SEC and auditors. Dr. Lai did not want anyone to know that Knox was being paid. As for the other acts discussed herein, Dragon Jade writes them off as insignificant or unsupported.

Irrespective of Dragon Jade's characterization of its conduct, when viewing the evidence discussed herein in the light most favorable to Ultroid, a jury could reasonably conclude that Dragon Jade engaged in immoral, unscrupulous, unethical and oppressive conduct, and that said conduct coerced, manipulated and intimidated Knox into executing the Agreements.

Moreover, there is sufficient record evidence to support Ultroid's position that it was damaged in more ways than one by Knox's execution of the Agreements. For example, Ultroid did not end up with the remediated QMS and marketable Product that it expected to have and has had to incur costs associated with having to fund the remediation efforts that it believed would be fulfilled by Dragon Jade.[13] (*See* Doc. 31-1, ⁋ 3.) The Court just held that that these types of damages support "actual damages" for purposes of FDUTPA, recognizing that "diminished value" and "insufficient product value" satisfy the damages aspect of a FDUTPA claim. (*See* Doc. 136, p. 6); *Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 990 (Fla. 5th DCA 2004). Additionally, assuming the Agreement is enforced and results in a sale of the Assets at a price

---

[13] To the extent this theory of damages conflicts with Ultroid's claims for rescission, Ultroid will have the opportunity to elect its remedies down the road. *See Bliss & Laughlin Indus., Inc. v. Malley*, 364 So. 2d 65, 65 (Fla. 4th DCA 1978).

proposed by Dragon Jade, Ultroid would suffer the loss of its Assets for millions of dollars under-value.

Ultimately, the reasonableness and quantification of Ultroid's claimed damages is appropriately determined by the jury. *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1311 (S.D. Fla. 2018) (providing damages are generally an issue of fact for the jury). In light of the disputed issues with regards to each element of the claim, Counterclaim I should be submitted to a jury.

### B. *Rescission of the Agreements Based on Fraud and Illegality – Counterclaim V*

In Counterclaim V, Ultroid seeks rescission of the Agreements on the ground that they sound in fraud and illegality. The counterclaim is predicated on conduct of Dragon Jade and its representatives and other circumstances leading up to and surrounding the execution of the Agreements. A claim for rescission requires proof of: (1) the character or relationship of the parties; (2) the making of the contract; (3) the existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) that the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) lastly, that the moving party has no adequate remedy at law. *Barber v. Am.'s Wholesale Lender*, 542 F. App'x 832, 836 (11th Cir. 2013) (citing *Billian v. Mobil Corp.*, 710 So. 2d 984, 991 (Fla. 4th DCA 1998)).

Dragon Jade's argument rests on the third and sixth elements.[14] Dragon Jade argues that the claim is based on unsupported allegations of financial manipulation, extortion, threats, and concealments, but the Court already rejected that argument in its June 25 Order, finding that Ultroid's allegations of fraudulent and illegal conduct, including financial manipulation, extortion, and blackmail, were pled with sufficient particularity. (Doc. 136, p. 12.) Sections I and III.A, *supra*, discuss the evidentiary basis for those allegations that the Court has already found support this Counterclaim.

Indeed, evidence demonstrates that Dragon Jade orchestrated under-the-table wire transfers with corresponding fraudulent loan agreements and dangled a job opportunity before Knox, which were contingent on the execution of the Agreement and the ultimate sale of the Assets, respectively. Evidence further demonstrates that Dr. Lai provided Knox with sexual and compromising entertainment while he was in Hong Kong during at least the November 2015 trip, and that Dr. Lai and/or his agents took salacious photographs of him in those situations, which Dragon Jade then threatened to release to Knox's family and the public in the months leading up to 2017 if Knox would not execute the Agreements. This of course put Michael Knox's personal and professional life and reputation in jeopardy, leaving him in an even more vulnerable state if he did not execute the Agreements.

Knox was in a vulnerable state in the year leading up to the execution of the Agreements based on his poor health and physical condition since he fell critically ill in February of 2016 and his financial struggles. All the foregoing conduct by Dragon Jade and/or its representatives, which is supported by ample evidence detailed in Section I and discussed herein, constitute

---

[14] As to the remaining elements, there is no dispute as to: the existence of a relationship between the parties; the fact that the Agreements were executed between the parties; that Ultroid notified Dragon Jade of its termination of the Agreement (*see* Doc. 1-4); and, that Ultroid has since requested the amounts that would be owed back to Dragon Jade for expenses it fronted in contemplation of the Option Agreement (*see* Doc. 133-9).

different ways in which Dragon Jade extorted Knox's vulnerabilities and supports a reasonable conclusion that Dragon Jade made financial offers and threats to extort Michael Knox's vulnerabilities and to manipulate and bribe him into executing the Agreements. A reasonable jury could find that this conduct constitutes grounds for rescission of the Agreements.

Dragon Jade further argues that Counterclaim V fails because Ultroid has an adequate remedy at law. In support, Dragon Jade points to Ultroid's other Counterclaims seeking damages. This is a premature inquiry. *See, e.g.*, *Anchor Bank, S.S.B. v. Conrardy*, 763 So. 2d 360, 361 (Fla. 4th DCA 1988) (acknowledging that the trial court held a hearing <u>following the verdict</u> on the rescission claim to determine whether the plaintiff had an adequate remedy at law). For now, the fact that there are related causes of action at law does not preclude the maintenance of a rescission claim. *Id.* If each claim prevails, Ultroid will later be entitled and required to make an election of remedies. *See Bliss & Laughlin Indus., Inc. v. Malley*, 364 So. 2d 65, 65 (Fla. 4th DCA 1978); *see also Deemer v. Hallett v. Pontiac, Inc.*, 288 So. 2d 526, 527–58 (Fla. 3d DCA 1974) (providing that the plaintiff who brought mutually exclusive claims for rescission and for damages was to make an election of remedies). That time has not yet come. Accordingly, this argument fails and the Motion should be denied as to Counterclaim V.

### C. *Fraud in the Inducement – Counterclaim VI*

Counterclaim VI is a claim for fraud in the inducement, which requires: (1) a false statement of material fact; (2) knowledge by the person making the statement that the representation is false; (3) intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party." *Larson v. Correct Craft, Inc.*, 537 F. Supp. 2d 1264, 1267 (M.D. Fla. 2008), *vacated and remanded on other grounds*, 569 F.3d 1319 (Fed. Cir. 2010).

15

The record contains evidence which supports the conclusion that Dragon Jade, through its representatives, made false statements and misrepresentations to Knox regarding its intentions in entering into the Option Agreement, its ability to perform under the same, and the legal requisites for entering into such an agreement, which Dragon Jade knew to be false and misleading, with the intention of having Knox execute the Option Agreement to set up a sale of the Assets to Dragon Jade. Dragon Jade represented to Knox that it intended to remediate the Product and make payments under the Option Agreement, both of which Knox later learned Dragon Jade could not do. Dragon Jade nonetheless made these representations in order to secure its right to purchase the Assets.

Relying on those representations, Knox did in fact execute the Option Agreement, thereby causing harm and injury to Ultroid. Ultroid has suffered through unanticipated costs incurred in having to complete the remediation on its own, and it will suffer further financial harm should the Assets be purchased at the severely undervalued price suggested by Dragon Jade. This evidence requires that the Counterclaim VI be submitted to the jury.

### D.      *Conspiracy – Counterclaim VII*

Counterclaim VII, which is pled in the alternative to the other counterclaims, is predicated on a conspiracy between Dragon Jade and Michael Knox to defraud the Ultroid shareholders and illegally divest Ultroid of its Assets. (Doc. 126, ¶¶ 194, 199, 201–203.) A conspiracy claim requires: (1) a conspiracy between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in furtherance of the conspiracy; and (4) resulting damage to the plaintiff. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006) (citation omitted).

Ample evidence suggests that Knox, acting outside the scope of his authority, conspired with Dragon Jade and participated in its scheme to strip Ultroid and its shareholders of the Assets. Indeed, Ultroid's corporate representative and current CEO has questioned whether Knox was in fact a victim of Dragon Jade's conduct or himself a bad actor in all of this. (*See* Goeree Depo., 82:9–19, 102:8–13.) Dragon Jade took significant acts in furtherance of that conspiracy by drafting the Option Agreement that potentially allows for the sale of the Assets for as low as $1,000,000.00, paying Knox to reduce the purchase price of the Product and Assets and execute the Option Agreement, fabricating fake loan agreements to avoid the scrutiny of the SEC and auditors, and offering Knox a job once the sale went through.

Under this set of facts, Ultroid has been financially damaged and its shareholders have been wrongfully stripped of their investments, as the company could lose all of its Assets for substantially less than what they are worth. Thus, the Motion should be denied with regard to Counterclaim VII.

## IV.    Conclusion

Dragon Jade's Motion offers a one-sided presentation of the facts which is disputed by competing interpretations and other evidence favorable to Ultroid. Dragon Jade has made a concerted effort to downplay those facts that are unfavorable to its position. Nonetheless, the record contains sufficient evidence that, when construed in the light most favorable to Ultroid, supports a jury verdict in favor of Ultroid and against Dragon Jade as to the subject Counterclaims. As such, summary judgment would be improper and the Motion should be denied.

**WHEREFORE**, Defendants/Counter-Plaintiffs ULTROID, LLC; ULTROID MARKETING DEVELOPMENT CORP.; and ULTROID TECHNOLOGIES, INC. respectfully

request that this Court enter an Order denying Plaintiff's Motion for Partial Summary Judgment on Ultroid's Counterclaims for such other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that on June 27, 2019, the foregoing was electronically served to William J. Simonitsch, Esq. and Javier Roldan Cora, Esq., K & L Gates LLP, Southeast Financial Center, 200 South Biscayne Boulevard, Suite 3900, Miami, FL 33131.

/s/ *Jenna M. Winchester*
WILLIAM E. LAWTON, ESQ.
Florida Bar No. 0163236
JOSHUA B. WALKER, ESQ.
Florida Bar No. 0047614
JENNA M. WINCHESTER, ESQ.
Florida Bar No. 0114280
Dean, Ringers, Morgan & Lawton, P.A.
Post Office Box 2928
Orlando, Florida 32802-2928
Tel: 407-422-4310  Fax: 407-648-0233
WLawton@drml-law.com
JWalker@drml-law.com
JWinchester@drml-law.com
Attorneys for the Ultroid Companies