Dragon Jade International, Ltd.

*vs.*

Ultroid, L.L.C.

Deposition of:

STEVEN LAI

January 09, 2019

Vol 01

# PHIPPS REPORTING

*Raising The Bar...*

1       A.  Yes.

2            Q.  **And at some point in time in 2016, there was**

3   **a purchase price of $84 million that was agreed upon between**

4   **Dragon Jade and Ultroid; is that right?**

5       A.  I did not agree to that.  That was a proposal only,

6   a recommendation.

7            Q.  **A recommendation made by who?**

8       A.  By Michael Cao.

9            Q.  **Did Dragon Jade make an offer to purchase the**

10  **Ultroid companies during 2016?   (Question not interpreted.)**

11           MS. D'AMICO:  I'm going to make an objection here,

12  and, Josh, I believe we're on the same page, but this

13  deposition is limited to two topics and I'll give you

14  a little leeway to go outside of that to set that up, but

15  I want to make sure that we're not wandering into territory

16  that's not appropriate here.

17           MR. WALKER:  Yeah, I appreciate that.  I think

18  you'll see -- you probably already know exactly where I'm

19  going with this.  I'm not going to wander down this road

20  really far at all.  It's just for context.

21           MS. D'AMICO:  Understood.

22           THE INTERPRETER:  Sorry, can you repeat your

23  question?

24  BY MR. WALKER:

25           Q.  **Did Dragon Jade ever make an offer, a monetary**

1    offer, to purchase the Ultroid companies?

2         A.  Yes.

3         Q.  When was that and what was the amount?

4         A.  That was in around April 2016.  We proposed a total

5    amount of US$40 million, and within this 40 million,

6    US$10 million would be cash and US$30 million will be in

7    stocks.

8         Q.  During the time of those negotiations, Michael Cao

9    came to visit you in Hong Kong; is that correct?

10        A.  Yes, in April 2016.

11        Q.  How would you describe your relationship with

12   Michael Cao around that time of April 2016?

13            MS. D'AMICO:  Object to form.

14        A.  Business relationship.

15   BY MR. WALKER:

16        Q.  Okay.  Were you on friendly terms with Mr. Cao?

17        A.  Definitely not.

18        Q.  Why do you say "definitely not"?

19        A.  That is because after we placed order in 2015, they

20   delivered the equipment to us, they actually knew that the

21   equipment was medical or healthcare devices equipment, and

22   they have been warned by FDA of the US about that as well.

23   However, they did not tell us that that was medical

24   equipment.  And then, in January 2016, we were told by

25   hospitals in Hong Kong, in fact the hospitals in Hong Kong

1    Q.   How many times did Michael Knox come to Hong Kong

2    to visit with you?

3    A.   Two times.

4    Q.   When were those times?

5    A.   November 2015 and April 2016.

6    Q.   There has been testimony in this case stating that

7    around the April 2016 trip when Michael Cao came to visit

8    you, that you handed him some cash for some purposes.  Do

9    you recall doing that?

10   A.   Yes.

11   Q.   The testimony, I believe, was that you handed

12   Michael Cao an envelope with cash in it.  Is that also what

13   you recall?

14   A.   Yes.

15   Q.   How much cash did you give to Michael Cao in April

16   2016?

17   A.   I think it should be around US$2,000, but I do not

18   have the exact figure.

19   Q.   Why did you give him that cash?

20   A.   That was to pay for his air ticket for him to fly

21   to Hong Kong.

22   Q.   Where did that cash come from?

23   A.   The company made that conversion into US dollars.

24   Q.   When Michael Cao came to visit you in November

25   2015, did you reimburse his travel expenses then?

1   contact me.

2       Q.  Well, let's address those in turn.  First of all,

3   you say the time is different.  Tell me what you mean by

4   that.

5       A.  First of all, Michael Knox needed money at that

6   time to pay for his rent, and also for some kind of loan

7   maybe or pledge, and he did not have enough money so he

8   wanted to borrow money.  And then the other thing is about

9   the contract that was signed on the 19th of January.  When

10  Michael Knox wanted to borrow money, he did not contact me.

11  He approached Glenn Henricksen in mid-January.

12          So these were actually two separate issues.  One

13  thing is about the CEO having not enough money, wanting to

14  borrow money.  The other thing is about the signing of the

15  contract.  These are two different, separate issues.  So

16  that's why these two things took place at different times.

17      Q.  Okay.  Well, let's talk about the timing first,

18  just to go back to my question.  My question was about

19  Michael Knox asking for money, that he wanted money from

20  Dragon Jade, and that was around the time that the contracts

21  were signed.  I think you had said they were at different

22  times.

23          So let me ask it this way:  When did you first

24  learn that Michael Knox was asking for money to be given to

25  him personally?

1      A.  Around mid-January.

2      **Q.  And that was before the asset purchase agreement**

3   **was signed between the parties; correct?**

4      A.  Yes.

5      **Q.  Now, I understand that Michael Knox made that**

6   **request to Glenn Henricksen; is that right?**

7      A.  Yes.

8      **Q.  Did you ever communicate with Michael Knox about**

9   **his request for money?**

10     A.  No.

11     **Q.  So, in January of 2017, what did Glenn Henricksen**

12   **tell you about Michael Knox's request?**

13     A.  So he told me that he had difficulties in his

14   living, he had no money to spend, and he made ...

15   (Chinese spoken).

16          THE INTERPRETER:  Okay.

17     A.  Michael Knox told Glenn Henricksen that he had

18   difficulties in living and he did not have money to spend,

19   and he made a number of requests to Glenn, but then I did

20   not have all the details of his actual request.  So, through

21   WeChat and telephone calls, he made continuous requests to

22   Glenn.

23   BY MR. WALKER:

24     **Q.  Did you ever communicate directly with Michael Knox**

25   **about his requests for money?**

1        Q.  Well, Dr. Lai, if that was your concern, why then

2    did you agree to give Michael Knox $10,000 at the same time

3    that you were negotiating the asset purchase agreement?

4        MS. D'AMICO:  Object to form.

5        A.  During the negotiation of the agreement, I would

6    not give him the money, but after the -- well, because I do

7    not like him.  But after the agreement was signed, Glenn

8    told me that if we did not give him money, if we did not

9    save him, then he would become a beggar, and there was only

10   one person left in his company at that time, so I was

11   actually forced to give him money to rescue him, and at the

12   same time I took pity on him as well.

13   BY MR. WALKER:

14       Q.  Dr. Lai, we have the option agreement that was

15   signed dated January 19, 2017.  Does that match your

16   recollection about when Dragon Jade formally entered into

17   that agreement with the Ultroid companies?

18       A.  I think so.

19       Q.  When did you first give $10,000 to Michael Knox?

20       A.  23rd of January 2017.

21       Q.  So four days after the agreement was signed is when

22   the wire transfer was made to Michael Knox or, as we'll get

23   to, to Michael Knox's sister-in-law; is that right?

24       MS. D'AMICO:  Object to form.

25       A.  The dates mentioned were correct, that is contract

Page 21

1   was signed on the 19th and money was sent to him to rescue

2   him on the 23rd.  But these two matters were not related.

3   However, if he did not -- if he had not signed the contract,

4   I would not have sent him the money, because then he would

5   not be my friend, so I would not have saved him.

6   BY MR. WALKER:

7        **Q.  Let me make sure I understand you correctly,**

8   **Dr. Lai.  Your testimony was that you did not trust Michael**

9   **Knox, you thought he was obnoxious, you thought that he was**

10  **lying to you during the time that you were negotiating the**

11  **purchase option; correct?**

12       A.  I did not like Michael Knox.  I did not like

13  Michael Cao.  I did not like things that the Ultroid company

14  had done in deceiving us.  So I would not and I did not

15  negotiate with him.  The negotiation was handled by Glenn

16  and our lawyer.

17       **Q.  That lawyer was Richard Blaylock?**

18       A.  Yes.

19       **Q.  So those were your feelings before Dragon Jade**

20  **signed the agreement, but yet, within days after the**

21  **agreement being signed, you took pity on Michael Knox,**

22  **according to your testimony, and I think you said that now**

23  **he was your friend now that the agreement was signed.  Was**

24  **that your feeling at the time?**

25       A.  Even after the contract was signed, he still was

Page 22

1   not my friend.  He was just a party, the other party of the

2   agreement, and he is the one to execute the agreement, so

3   without him it's not possible.

4        Q.  Now, it took several days to get the information

5   that you needed to send the $10,000 to Michael Knox; isn't

6   that true?

7        A.  I can't remember because that was not handled by

8   me.

9        Q.  Who handled that part of the transaction?

10       A.  At that time, I asked a clerk to do it.

11       Q.  What was the name of the clerk?

12       A.  Tam Siu Man.

13       Q.  How long had Tam Siu Man been with Dragon Jade as

14   of January 2017?

15       A.  Around 14 to 15 months.

16       Q.  What was her job responsibilities as a clerk for

17   Dragon Jade?

18       A.  She is taking up miscellaneous duties.

19       Q.  Was this mostly a secretarial type of job function?

20       A.  On top of her, there are secretaries.

21       Q.  So she worked underneath some secretaries then; is

22   that right?

23       A.  Yes, you may put it that way.

24       Q.  Would you agree that Tam Siu Man held a very

25   low-level, entry-type position with Dragon Jade?

Page 23

```
 1        A.   I would say she was in a medium level.  In fact she
 2   works very close to me because my electricity, water tariff,
 3   my credit card bills, my daughter's school fees and tuition
 4   fees are all paid through her.  So she's like my family
 5   member, so I would not say whether she is a very junior or
 6   a medium-level person.  I would not put her to a certain
 7   grade.
 8        Q.   Okay.  I'm not trying to denigrate her or be
 9   offensive regarding her position.  I'm just trying to
10   understand what her position was with the company.  You said
11   she was like family.  Was she actually -- is she actually
12   your family member?
13        A.   Definitely not my family member.
14        Q.   To your knowledge, is she related to anyone in the
15   Dragon Jade company?
16        A.   No.
17        Q.   Did she serve as your personal assistant?
18        A.   Part of her responsibilities were described by me
19   just now.  For example, paying my water and electricity
20   bills, credit card bills, and so on.  And then, at the same
21   time, she also assists the secretaries in daily bookkeeping
22   and answering telephone calls.  So she is not really
23   anybody's personal assistant.
24        Q.   Just so I understand -- so she would handle some of
25   your personal finances, paying for your children's school
```

1    expenses, and she would also assist some of the secretaries

2    within Dragon Jade doing functions like bookkeeping and

3    answering the telephones; is that right?

4        A.  Yes.

5        Q.  How long have you known Tam Siu Man?

6        A.  You mean from -- at this point in time, that is the

7    length of --

8        Q.  Yes.

9        A.  I knew her when she joined our company at the end

10   of 2015.

11       Q.  Was that when you first met her?

12       A.  Yes.  Yes.

13       Q.  Is Tam Siu Man still employed by Dragon Jade?

14       A.  No.

15       Q.  When did she leave the company?

16       A.  She resigned in April last year.

17       Q.  Why did she resign?

18       A.  I had asked her.  She had found another job, paying

19   her higher salary, so that's why she left.

20       Q.  When was Michael Knox told that he would be

21   receiving that first wire transfer of $10,000?

22           MS. D'AMICO:  Object to form.

23       A.  I do not know when Michael Knox was told, because

24   it was Glenn who contacted him.  I just gave consent to the

25   sending of money to him on around 22nd/23rd.  But I don't

1    know when Michael Knox was told about this.

2    BY MR. WALKER:

3         Q.   Now, in January 2017, the chief financial officer

4    for Dragon Jade was William Fung; is that correct?

5         A.   Yes.

6         Q.   Is Mr. Fung still the chief financial officer for

7    Dragon Jade?

8         A.   Yes.

9         Q.   Did you have any conversations with Mr. Fung about

10   Michael Knox's request for money in January 2017?

11        A.   Yes.

12        Q.   Tell me about those conversations you had with

13   William Fung.

14        A.   I said to William Fung -- I told him that Michael

15   Knox once again was asking us for money, and then Michael

16   Knox -- and then William Fung said nothing.  He only gave me

17   a facial expression like this, "Huh?", and he did not give

18   any opinion.  The decision was made by me.

19        Q.   Did you instruct William Fung to take any actions

20   with respect to this request?

21             THE WITNESS:  Do you mean January?

22             MR. WALKER:  I did not hear you; can you say that

23   again?

24             THE INTERPRETER:  "Do you mean in January?"

25             MR. WALKER:  Yes, in January 2017.

1    A.  No.

2    BY MR. WALKER:

3        Q.  Did William Fung have any involvement in sending

4    $10,000 in January 2017 to Michael Knox?

5        A.  No.

6        Q.  We have seen, and you may have noted this when you

7    reviewed Mr. Henricksen's testimony, that in fact Michael

8    Knox took the bank information of his sister-in-law, Dale

9    Rose, and sent that to Glenn Henricksen, and Glenn

10   Henricksen sent that information to William Fung.  Were you

11   aware that occurred?

12       A.  I read that later.

13       Q.  Do you deny that William Fung worked with Tam

14   Siu Man in order to send that wire transfer?

15           MS. D'AMICO:  Object to form.  Misstates his

16   testimony.

17       A.  I have to put this in a very precise manner.

18   William Fung should be aware of the situation because a loan

19   agreement had to be signed, so William Fung should be aware

20   of that.  But then for the arrangement of the wire transfer,

21   it was I who asked Tam Siu Man to do it, and this did not go

22   through William Fung.  So I'm not too sure how to

23   differentiate which part is under which person.  So I don't

24   know what really is the meaning of your question.

25   BY MR. WALKER:

1    Q.  Tell me about your conversation with Tam Siu Man

2  where you told her to send money to Michael Knox.

3    A.  Number one, I asked her whether she had US$10,000

4  in her account, and number two, I asked her whether she

5  wanted to earn 5 percent annual interest.

6    Q.  How did you decide that the amount you were going

7  to send to Michael Knox was $10,000?

8    A.  In my mind, every person has a value; even enemies

9  have value.  So, to me, the value of Michael Knox would not

10  be bigger than 10,000.  10,000 is a maximum already.  At

11  that time, he actually wanted to borrow 20,000, but both

12  Glenn and I did not agree to that, so I believe that 10,000

13  was the maximum that could be given to him.

14    Q.  So, once you made that decision, that $10,000 would

15  be given to Michael Knox, you then went to Tam Siu Man and

16  asked her if she had $10,000 in her own account?

17    A.  She was the first person whom I asked whether she

18  wanted to earn 5 percent annual interest.

19    Q.  Did she already have US$10,000 in her account at

20  that time?

21    A.  She certainly had the amount, otherwise she would

22  not have said yes to me.

23    Q.  Did you send any money to Tam Siu Man to put in her

24  account that would allow her to send that money to Michael

25  Knox?

1      A.  Not at that time.

**2      Q.  Did you at some other time reimburse Tam Siu Man**

**3   for any portion of that $10,000?**

4      A.  Around July, because the duration of the agreement

5   was 180 days.

**6      Q.  So around July of 2017?**

7      A.  Yes.

**8      Q.  What agreement are you referencing that had**

**9   a duration of 180 days?**

10      A.  For Tam Siu Man to lend money to Dale Rose.

**11      Q.  This whole time, we've been talking about Michael**

**12   Knox.  You mentioned Dale Rose.  In January 2017, had you**

**13   ever heard the name Dale Rose?**

14      A.  Michael Knox provided this name as a person to sign

15   the loan agreement.  So that's the name he gave, but I did

16   not know who that person was.

**17      Q.  When you decided that you were going to loan money**

**18   to Michael Knox in January 2017, had anyone discussed with**

**19   Michael Knox that this loan would also include a 5 percent**

**20   interest term?**

21      A.  So he must have already read the loan agreement

22   containing that clause, so he would go ahead to borrow the

23   money, if he agreed to the terms.  If he disagreed, then he

24   should have already raised the point, but we had not heard

25   anything from him.

1    Q.  So, when you asked Tam Siu Man if she wanted to

2  make 5 percent interest on a $10,000 loan to Dale Rose, did

3  you know that Michael Knox was going to agree to a 5 percent

4  interest term on that loan?

5    A.  I definitely did not know.  If Michael Knox was not

6  willing to pay that interest, then he could choose not to

7  take up the loan.

8    Q.  We have sent over some documents, there's only five

9  pages, and you should have them in front of you.  I would

10  ask if someone could please assist with us.  I'm going to

11  ask you some questions about those documents.

12         Do you have those in front of you?

13    A.  I've got only three sheets.

14         MR. TUNG:  This looks from here that they're

15  double-sided.

16         THE WITNESS:  Yes, yes, I've got them.

17  BY MR. WALKER:

18    Q.  Okay.  What should be the first page shows

19  a $10,000 wire transfer from Tam Siu Man.  Do you see that

20  page?

21    A.  Are you asking for the date?

22    Q.  I'm just asking if you have in front of you the

23  document that shows the $10,000 wire transfer from Tam

24  Siu Man.

25    A.  Yes, I can see that.

Page 30

1           MS. D'AMICO:  Are you talking about the first
2  document, Josh, just so I can understand, in the pack that
3  you sent over?
4           MR. WALKER:  It would be the first document in the
5  packet that I sent over, yes.
6           MS. D'AMICO:  Okay.
7      A.  Yes, I see that page.
8  BY MR. WALKER:
9      Q.  At the very top, it has information about the
10  sender of that $10,000.  There's an account number that
11  appears to come from Bank of New York City.  Are you
12  familiar with that bank?
13      A.  No.
14      Q.  Okay.
15          Turn with me to the next page, please.
16          We're going to get to this momentarily, but
17  I understand there was a second payment or wire transfer
18  that was made to Michael Knox later on in 2017.  This one
19  shows the amount of $5,375.  Are you looking at that page?
20      A.  Yes.
21      Q.  At the top, it has an account number there as well,
22  and it shows the bank being HSBC Bank USA; do you see that?
23      A.  Yes.
24      Q.  Are you familiar with that bank?
25      A.  This is the largest bank in Hong Kong.  What do you

1   mean whether I'm familiar with this bank?

2       Q.   Are you familiar with that account number?

3       A.   No.

4       Q.   Does Dragon Jade bank with HSBC Bank USA?

5       A.   No.

6       Q.   Also in the packet that I gave you is a document

7   that is a loan agreement dated January 23, 2017.   Please

8   turn to that and let me know once you have it.

9       A.   Yes, got it.

10      Q.   This document shows $10,000 as the loan amount at

11  an interest rate of 5 percent interest for a term of 180

12  days.   Was this the loan agreement that you were discussing

13  earlier?

14      A.   Yes.

15      Q.   Who drafts this document?

16      A.   I believe our accounting document has this kind of

17  template because many people -- many people borrow money

18  from us.

19      Q.   The rate that you put in here of 5 percent

20  interest, is that a standard rate that you include on your

21  templates from your accounting department when Dragon Jade

22  is loaning people money?

23      A.   No.   The name, the numbers, the amounts will be

24  adjusted based on the borrower.

25      Q.   Who came up with the 5 percent rate for this loan?

1   Whose idea was that?

2       A.   I.

3       Q.   How did you come up with that rate?

4       A.   He offered no collateral, so in Hong Kong and China

5   I don't think anybody would be willing to charge such a low

6   interest rate, so no one would be willing to treat him as

7   good as we did.

8            (Chinese spoken).

9       Q.   This also has a term of 180 days, indicating that

10   the loan shall be repaid in full within that time frame.

11   Who came up with that term?

12       A.   I did.

13       Q.   And how did you come up with that term?

14       A.   Because Michael Knox told me that remediation

15   should be completed within 90 days, so in that case our

16   contract could be executed after 90 days.  And then, by

17   then, his company would have money and then he would also

18   have money, so he should be able to repay this loan after 90

19   days.  But then, in order to play safe, I put down 180 days.

20       Q.   This loan agreement contains a social security

21   number of Dale Rose.  Where did that information come from?

22       A.   Michael Knox gave it to us.

23       Q.   Does Dragon Jade routinely loan people money?

24            MS. D'AMICO:  Object to form.

25       A.   No.

1              (Chinese spoken).

2              MR. WALKER:  You told us a moment ago that --

3              THE INTERPRETER:  Sorry, I haven't finished.

4     Sorry.

5       A.   Dragon Jade did not routinely lend money to others,

6     but I did, I am.

7     BY MR. WALKER:

8       **Q.   You told us a moment ago in your testimony that**

9     **Dragon Jade does loan people money from time to time, which**

10    **is why you have this template in your accounting department.**

11    **Is that accurate?**

12             MS. D'AMICO:  Object to form.

13      A.   Well, Dragon Jade did not routinely lend money to

14    others.  Dragon Jade from time to time lends money to other

15    companies and other people, but not on a routine basis.

16    However, I am the person who actually routinely lend money

17    to others, because my friends often ask me to lend money to

18    them because I am a very nice person, so that's why I often

19    get requests from my friends for money.

20    BY MR. WALKER:

21      **Q.   Ultimately, in this case, it was your decision to**

22    **loan money to Michael Knox; correct?**

23      A.   Only I had the right to make this decision.

24      **Q.   That being the case, Dr. Lai, why then, instead of**

25    **you personally loaning the money or Dragon Jade itself**

Page 34

1   loaning the money, why would you go to a clerk at Dragon

2   Jade and ask her to make a loan out of her own personal

3   funds?

4          MS. D'AMICO:  Object to form.

5       A.  I am both a professional as well as a businessman.

6   So, based on my professional instinct, I am of the view that

7   there would be problems if the company or I personally

8   directly sent the money to Michael Knox.  And now this case

9   proved me right, that there really are problems.

10  BY MR. WALKER:

11      Q.  What concerns did you have if in fact it was shown

12  that either you personally or Dragon Jade lent the money to

13  Michael Knox?

14      A.  In doing business, very often we rely on our

15  experience and our feelings.  I do not like Michael Knox, so

16  I'm forced to lend money to him, and I am the CEO of

17  a listed company, so our company is under the regulation of

18  the US SEC, so I don't want any trouble with US SEC rules

19  and regulations.  Besides, there is the independent auditor

20  who would put questions to us if there's problem, because

21  there is annual audit.

22          So that's why, in case when there is conflict of

23  interest, definitely I would decline any request that may

24  lead to conflict of interest.  But I cannot refuse to help

25  Michael Knox.  So that's why I decided to use another

1   person's capacity to send the money.

2        Q.  Can you think of any other time, in your role as

3   the CEO for Dragon Jade, where you had asked a Dragon Jade

4   employee to issue a personal loan such as you did here in

5   this case?

6        A.  Yes, definitely.

7        Q.  On how many occasions?

8        A.  I can't remember.  I think slightly more than

9   a dozen, 10-odd times.

10       Q.  And were those other occasions -- in those other

11  occasions, did you make that request for similar concerns,

12  that you wanted to avoid any issues with SEC oversight or

13  internal audits?

14       A.  No.  This was the only case in -- under that --

15  under those circumstances.

16       Q.  When you decided to make this transaction and to

17  ask Tam Siu Man to do that, did you seek any advice to see

18  if that was permissible?

19            MS. D'AMICO:  Object to form.

20       A.  No.

21  BY MR. WALKER:

22       Q.  I haven't got to the next glaring question that we

23  have regarding this, but this whole time we've been talking

24  about Michael Knox requesting the money, you making the

25  decision that he was worth $10,000, and deciding that that

Page 36

1   money would be lent to him by your employee.  Given that,

2   why was this set up to make it look like it was a loan to

3   Dale Rose instead of to Michael Knox?

4            MS. D'AMICO:  Object to form.

5       A.  First of all, I had no trust in Michael Knox.  In

6   front of me, he had no credibility at all, but at that time

7   he was in a very anxious situation.  He needed money

8   desperately.  So I did not have time to do all the due

9   diligence, I did not have time to go through all his bank

10  statements or ask for credit card statements to check, I did

11  not have time to check whether his property really was in

12  his name, and so on and so forth.

13           We wanted to help him, so we had to find

14  a solution.  We had to find a method to help him.  So as

15  long as he can find somebody who is willing to sign the loan

16  agreement, then that will be -- that will suffice.  In that

17  case, we are indirectly getting somebody like a guarantor

18  for the loan.  If Michael Knox could not repay the loan,

19  then he would be putting Dale Rose in trouble.

20           I am a person who focus on problem-solving instead

21  of creating too many problems and troubles.

22  BY MR. WALKER:

23       Q.  Do you have any idea who Dale Rose is?

24       A.  I did not know at that time but I know now.

25  (Chinese spoken) --

1      Q.   What is your current understanding?

2      A.   I only know that Dale Rose is his sister-in-law,

3 but not too clear about the exact relationship by this

4 reference of "sister-in-law."

5      Q.   Did you know anything about Dale Rose's finances at

6 the time that this loan agreement was structured?

7      A.   I do not need to know that.

8      Q.   Did you know if Dale Rose even had a job at the

9 time that this loan agreement was entered into?

10      A.   I don't need to know that.

11      Q.   Did you know if Dale Rose owned any property at the

12 time this agreement was entered into?

13      A.   I don't know.

14      Q.   Do you know --

15      A.   (Chinese spoken).

16      Q.   -- if Dale Rose is even a real person?

17      A.   (In English) Oh, okay.

18         (Via interpreter) No.

19      Q.   Did you conduct any due diligence whatsoever before

20 deciding that this loan agreement would be structured

21 between Tam Siu Man and Dale Rose?

22      A.   I did not have time to do the due diligence,

23 otherwise Michael Knox would have died out of starvation.

24      Q.   Now, you knew in January of 2017 that Michael Knox

25 was in a desperate financial situation; is that right?

1    A.  That was told by him.  It was not my own

2  understanding.

3    **Q.  But certainly even before the option agreement was**

4  **signed between Dragon Jade and Ultroid, Michael Knox had**

5  **been asking Dragon Jade for money for months before that**

6  **time?**

7    MS. D'AMICO:  Object to form.

8    A.  First of all, I had no contact with Michael Knox,

9  so I did not know what his request was or what he said and

10  so on.  He did not have my telephone number.  I also did not

11  have his phone number.

12  BY MR. WALKER:

13    **Q.  My question, Dr. Lai, was whether --**

14    A.  (Chinese spoken).

15    **Q.  -- you were aware, before the option agreement was**

16  **signed in January 2017 --**

17    THE INTERPRETER:  The witness was actually --

18  BY MR. WALKER:

19    **Q.  -- that Michael Knox had been requesting money from**

20  **your company.**

21    THE INTERPRETER:  Excuse me.  Dr. Lai had not

22  finished his answer just now.

23  BY MR. WALKER:

24    **Q.  Please finish.**

25    A.  I did not like Ultroid company either, because

Page 43

1        Q.   And you're aware that in January 2017, that if

2   Dragon Jade wanted to lend money to the Ultroid companies to

3   pay for Michael Knox's salary or expenses, it could have

4   done that directly as a loan from Dragon Jade to the Ultroid

5   companies, instead of from Tam Siu Man to Dale Rose?

6        MS. D'AMICO:   Object to form.

7        A.   At that time, Michael Knox said that if money was

8   sent to his company's account, then it was very possible,

9   very likely, that Michael Cao would take out the money from

10  the account, and as a result Michael Knox would not be able

11  to get the money.   So that's why the whole thing had to go

12  through Dale Rose.

13  BY MR. WALKER:

14       Q.   And this was as of January 2017; is that right?

15       A.   Yes.

16       Q.   But between January 2017 to July 2017, Dragon Jade

17  did in fact lend money directly to Ultroid; correct?

18       A.   Yes, but through a different bank account, and for

19  that bank account only Michael Knox can sign a check.

20       Q.   Do you know when that Ultroid bank account was

21  opened?

22       A.   I think it is between February to early March.

23       Q.   Of 2017?

24       A.   Yes, of course.

25       Q.   Has Michael Knox ever repaid that $10,000 loan?

Page 44

1      A.  It would be excellent if he had repaid it.

2      **Q.  Did he repay the $10,000 loan?**

3      A.  Of course not.

4      **Q.  Did Dale Rose repay the $10,000 loan?**

5      A.  No.

6      **Q.  Was Tam Siu Man reimbursed for the $10,000 that she**

7      **lent to Dale Rose?**

8          MS. D'AMICO:  Object to form.

9      A.  You asked me that question earlier.  Actually, in

10     July, I reimbursed the money to her.

11     BY MR. WALKER:

12     **Q.  Where did the money come from that was used to**

13     **reimburse Tam Siu Man?**

14     A.  From my personal account.

15     **Q.  Did you include any of the interest that was**

16     **supposed to be a part of that loan when you reimbursed Tam**

17     **Siu Man?**

18     A.  I paid her 2.5 percent.

19     **Q.  Why did you reimburse Tam Siu Man?**

20     A.  Because of the 180-day term.

21     **Q.  My question, though, is:  Why did you reimburse**

22     **her?**

23     A.  As I explained earlier, 90 days after the contract,

24     the contract should have been executed, and then Michael

25     Knox should have the money to repay the loan.  However, at

Page 45

1  that time, there was no document at all in his company, so

2  in July it was already 180 days after the signing of the

3  contract.  Still, remediation was not completed.  Because

4  I had asked -- and I had told Tam Siu Man that after 180

5  days, she would get repayment from Dale Rose, but that did

6  not happen.

7           And, as I said earlier, I am a person focusing on

8  solving problems.  To me, $10,000 was not a problem at all,

9  and I could not lose credit in front of my subordinate.  So

10  that's why I decided to pay her the money.  And then, after

11  paying the money to Tam Siu Man, I would then check when

12  remediation can be completed and when our company would pay

13  Ultroid and then when Michael Knox would get money from

14  Ultroid to repay the loan.

15      **Q.  Why did you only repay her 2.5 percent interest,**

16  **when the loan agreement would have allowed her to recover**

17  **5 percent interest?**

18      A.  Because, as stated in the loan agreement, the

19  interest rate of 5 percent is 5 percent per annum, that is

20  that's the annual interest rate, but 180 days is only half

21  of a year.

22      **Q.  And did you repay Tam Siu Man out of your own**

23  **personal funds?**

24      A.  Yes, I said that a moment ago already.

25      **Q.  You said that you repaid her in July 2017.  Do you**

1   remember when in July 2017?

2        A.  I can't remember.

3        Q.  Did Tam Siu Man ever complain to you about the fact

4   that she had never been repaid for the $10,000 loan?

5            MS. D'AMICO:  Object to form.

6        A.  No.

7   BY MR. WALKER:

8        Q.  Did she ever mention it to you at all?

9            MS. D'AMICO:  Object to form.

10       A.  No.  She respects me a lot.

11  BY MR. WALKER:

12       Q.  How did you know that she had never been repaid?

13       A.  Because I know that Michael Knox had no money.

14       Q.  Did you ask Tam Siu Man if she had been repaid for

15  that loan?

16       A.  I had not asked.  I did not need to ask.

17       Q.  So, without asking whether she had been repaid by

18  Dale Rose, you just assumed she had not, and took $10,000

19  plus 2.5 percent interest out of your own personal funds and

20  gave that to her in July 2017; is that right?

21       A.  Yes.

22       Q.  Did Dragon Jade ever reimburse you for that

23  $10,000?

24       A.  That is not necessary.

25       Q.  Did Dragon Jade ever reimburse you for that

Page 47

1    $10,000?

2          MS. D'AMICO:  Object to form.

3       A.  No.

4    BY MR. WALKER:

5       Q.  **Why do you feel that would not be necessary?**

6       A.  Because there is the loan agreement still in

7    existence.  If Michael Knox did not make repayment, then he

8    would be sued, and then, when he repays the money back to

9    Tam Siu Man, then Tam Siu Man can repay me and then that's

10   done.

11          So this is all on a personal level.  It does not

12   have to do with Dragon Jade.

13          MR. WALKER:  I'm afraid that the audio cut out

14   there.  Can you repeat the answer, please?

15          THE INTERPRETER:  I said that:  "The loan agreement

16   is still in existence, so even if Michael Knox does not

17   repay the loan, then he can be sued.  And then, after suing

18   him, if he repays the loan, if he repays Tam Siu Man, then

19   Tam Siu Man can repay me, and all this are on a personal

20   level and this has nothing to do with Dragon Jade."

21   BY MR. WALKER:

22      Q.  **Did Dragon Jade keep any type of accounting**

23   **documents demonstrating this loan payment between Tam**

24   **Siu Man and Dale Rose?**

25          MS. D'AMICO:  Object to form.

Page 48

1       A.  Definitely not.

2   BY MR. WALKER:

3       Q.  Was this loan included in any of Dragon Jade's

4   filings with the SEC?

5           MS. D'AMICO:  Object to form.

6       A.  No.

7   BY MR. WALKER:

8       Q.  Is it fair to say that as of July 2017, Tam Siu Man

9   did not feel that she could trust Dale Rose or Michael Knox

10  repaid the loan that was made?

11          MS. D'AMICO:  Object to form.

12      A.  Tam Siu Man did not make that point.  Tam Siu Man

13  has trust in me, not in Michael Knox or Dale Rose.  I am the

14  person facing her every day.

15  BY MR. WALKER:

16      Q.  Now, we've been talking this whole time about the

17  $10,000 payment that was made in January of 2017, but,

18  Dr. Lai, you are aware that there was another payment of

19  $5,400 that was also made, in July of 2017; is that correct?

20      A.  Yes.

21      Q.  And isn't it true that during this time of July

22  2017, you learned from Glenn Henricksen that Michael Knox

23  was still asking for money?

24      A.  Yes.

25      Q.  And you also knew that for several months before

1   July of 2017, that Dragon Jade had been lending money to

2   Ultroid and wiring money from Dragon Jade's account to

3   Ultroid's account?

4       A.  Yes, I know.

5       Q.  And you also knew, in July of 2017, that the

6   $10,000 that was sent to Dale Rose had never been repaid,

7   which caused you to pay that money out of your personal

8   funds?

9       A.  I said I know already, just now.

10      Q.  However, despite all of that, at the very end of

11  July 2017, in fact July 31st, 2017, you facilitated another

12  transaction from Tam Siu Man to Dale Rose, wiring another

13  $5,400, didn't you?

14      MS. D'AMICO:  Object to form.

15      A.  Yes.

16  BY MR. WALKER:

17      Q.  This second loan transaction -- if you look in

18  front of you, there's a loan agreement dated July 31, 2017.

19  Just let me know when you have that in front of you.

20      A.  Yes.

21      Q.  Did Dragon Jade's accounting office also prepare

22  this loan agreement?

23      A.  It was prepared according to the original template

24  with some revised numbers and figures.

25      Q.  Who prepared that document?

1        A.   William Fung prepared it.

2        Q.   **Where did the money come from for this payment in**

3   **July 2017?**

4        A.   From William Fung's own account.

5        Q.   **Turn with me back to the wire transfer document**

6   **that you looked at earlier, the one that includes "HSBC**

7   **Bank" at the top.**

8        A.   Yes, okay.

9        Q.   **In the middle of that page for this wire transfer**

10  **in July of 2017, under "Originator" it has the name "Mr Fung**

11  **Kwok Wing."  Is that William Fung?**

12       A.   Yes.

13       Q.   **And in that same section, at the bottom, it says,**

14  **"Originator to beneficiary information" -- it says, "From**

15  **Tam Siu Man"; do you see that?**

16       A.   Yes.

17       Q.   **And then the loan agreement that was prepared by**

18  **Dragon Jade shows that this loan came from Tam Siu Man and**

19  **again that it was paid to Dale Rose; is that right?**

20       A.   Yes, you may put it that way.

21       Q.   **Did Tam Siu Man have any involvement with this loan**

22  **in July 2017?**

23       A.   We had notified Tam Siu Man that under her name

24  there would be another loan agreement, but she did not have

25  to contribute money this time.  Because last time, at the

Page 51

1   end of the day, I had to make the reimbursement to her, so

2   this time Tam Siu Man did not have to put in money, so let

3   William Fung handle it.  In fact, the contract -- the

4   agreement states the same person, and so we are making this

5   arrangement so that Michael Knox would not be too desperate.

6          MS. D'AMICO:  I'm sorry, can I ask the court

7   reporter to read that back?  We dropped the video

8   connection, so I couldn't hear what that answer was.  Thank

9   you.

10          THE COURT REPORTER:  Excuse me, I have a sore

11   throat, so I'll do my best.

12                    (Record read.)

13          MS. D'AMICO:  Thank you.

14   BY MR. WALKER:

15     **Q.  Who made the decision to authorize this payment in**

16   **July 2017?**

17     A.  I.  I did.

18     **Q.  Did Tam Siu Man ever sign this loan agreement in**

19   **July 2017?**

20     A.  No.

21     **Q.  What about the earlier loan agreement, in January**

22   **2017?  Did she sign that one?**

23     A.  I believe she had not signed it.

24     **Q.  Why did William Fung make this payment out of his**

25   **own personal funds?**

Page 52

1         A.   Because I'm his boss; he has trust in me.

2    (Chinese spoken).

3         **Q.   Did you direct him to make that payment out of his**

4    **own personal funds?   (Question not interpreted.)**

5         A.   I want to supplement:  Besides, William Fung is

6    very wealthy.

7         **Q.   Did you direct William Fung to make that payment**

8    **out of his own personal funds?**

9         A.   I only asked if he was willing to do that.  I did

10   not direct him to do it.

11        **Q.   Why did you not lend the money out of your own**

12   **personal funds?**

13        A.   In order to arrange a wire transfer, you have to

14   personally go to the bank, and first of all you must have

15   a bank account.  Secondly, you have to queue up to do that.

16   And thirdly, in the past 20 years in which I am a boss or

17   an employer, I have never been to the bank queueing up to

18   arrange this.

19        **Q.   You told me before in your deposition that**

20   **essentially you're a nice guy and people come to you for**

21   **loans every once in a while.  When other people outside of**

22   **Dragon Jade come to you for loans, do you lend them your own**

23   **personal money, or do you turn to your employees and ask**

24   **that those people lend money to your friends instead?**

25             MS. D'AMICO:  Object to form.

Page 53

1    A.  So I classify things in the following way.  If my

2  friends want to borrow money, then I will lend the money to

3  them personally.  If my company's clients want to borrow

4  money, then it will be the company to be the lender.  If the

5  company's employees want money, then the company will be

6  lending them the money.

7  BY MR. WALKER:

8    **Q.  Well, in this situation, none of those apply.**

9  **Michael Knox, from your testimony, is not your friend, nor**

10  **was he an employee of Dragon Jade.  Did you consider him to**

11  **be a client of Dragon Jade?**

12    A.  He is a person whom I really cannot predict or

13  anticipate.  He does not belong to all those three

14  categories.  He's neither my friend, my company's employees,

15  nor our company's clients.  He should be in the fourth

16  category.  So that's why I asked Tam Siu Man to lend him

17  money.

18    **Q.  What would that fourth category be?  How would you**

19  **have classified Michael Knox in July of 2017?**

20    MS. D'AMICO:  Object to form.

21    A.  The fourth category is that when you have no way to

22  reject or decline to giving -- to give help to that person,

23  even though you hate him a lot, you still have to help him.

24  In life, you often encounter a lot of this kind of persons.

25    Let me give you an example.  My driver has been

Page 54

1   serving me for 20 years and he is really a very disgusting

2   person.  My wife always asks me to fire him, but I cannot

3   fire him because I can't find somebody else who is better

4   than him.  He does not need to rely on Google Map to find

5   the right way.

6          So very often people have both strengths and

7   weaknesses, good points and bad points.  So as long as

8   a person's good points outweigh his bad points, then I will

9   still continue to get along with him.  So I think that

10  depends on how you value a person.

11         So the fourth category will be people with --

12  people whose good points outweigh his bad points.

13  BY MR. WALKER:

14     **Q.  If I understand your testimony, you have your own**

15  **personal driver that you've used for 20 years that you feel**

16  **is a disgusting person, but he does a good job so you keep**

17  **him around; is that right?**

18     A.  Yes.

19     **Q.  Is it your testimony that you felt that Michael**

20  **Knox, although you hated him, that in July of 2017, you felt**

21  **that you still needed him around?**

22     A.  The fact is, Michael Knox was the only person left

23  in his company who could execute the contract.  So this is

24  already not a matter of whether I like him or dislike him.

25  I have to help him.  I am forced to help him.

1      Q.  And in fact this was true in January of 2017.  You

2  felt that you had to have Michael Knox around, you had to

3  have a relationship, an ability to use him, because he was

4  the only person on behalf of Ultroid that could enter into

5  the agreements and you needed him in January of 2017;

6  wouldn't you agree with that?

7          MS. D'AMICO:  Object to form.

8      A.  To put it correctly, I do not need him.  It's

9  actually he who needs me.  Even though there might be nobody

10  except him to execute the contract -- well, I can just let

11  it go because anyway we are suing his company.  On the 3rd

12  of January, we started a litigation against his company,

13  asking for compensation of our loss.  So, with hindsight, we

14  should not have helped him.  Actually, we could just claim

15  compensation, instead of spending additional legal costs in

16  the past year.

17  BY MR. WALKER:

18      Q.  Even though you were going to be suing --

19          MR. TUNG:  Josh -- excuse me, Josh, sorry to

20  interject.  The reporter has just said she can only be here

21  for another few minutes.

22          MR. WALKER:  Okay.  We are going to be wrapping up

23  here shortly.

24  BY MR. WALKER:

25      Q.  Even though -- even though you were going to be

Page 56

1   suing the Ultroid company for money, you knew that if Dragon

2   Jade was going to acquire the Ultroid assets, you had to

3   have Michael Knox on board to sign the agreements?

4          MS. D'AMICO:  Object to form.

5      A.   Correct.  So if Michael Knox was no longer there,

6   then Ultroid would have to find another person and appoint

7   another person to sign the necessary agreement.

8   BY MR. WALKER:

9      Q.   A few more questions and then we'll be done here.

10         This loan agreement in July of 2017, where William

11  Fung advanced his own $5,400, was William Fung ever paid

12  back for that?

13     A.   Yes.

14     Q.   By who?

15     A.   By me.

16     Q.   When did you pay William Fung back for that loan?

17     A.   When we started this case about suing Ultroid.  In

18  around October 2017, we filed to sue Ultroid, and at that

19  time I knew William Fung would not be possible to get back

20  5,400, so that's why I decided to pay him back.

21     Q.   Did you pay William Fung out of your own personal

22  funds?

23     A.   Yes.

24     Q.   Did you also pay him the interest that was

25  indicated in the loan document?

Page 57

1      A.   He did not want it because the amount was so

2   little.

3      **Q.   Were you ever reimbursed --**

4      A.   (Chinese spoken).

5           Because --

6      Q.   Sorry, is your answer finished?  (Question not

7   interpreted.)

8      A.   -- I said just now that William Fung is very

9   wealthy.

10     **Q.   Thank you.  Were you ever reimbursed by Dragon Jade**

11  **for that amount?**

12     A.   No.

13     **Q.   Did Dragon Jade keep any documents, any financial**

14  **documents or accounting documents, evidencing this loan in**

15  **July 2017?**

16          MS. D'AMICO:  Object to form.

17     A.   Not in the accounting department's documents, but

18  in William Fung's and also in my email there would be this

19  record.

20  BY MR. WALKER:

21     **Q.   So you would have emails about it but, as far as**

22  **the Dragon Jade accounting department, would there be any**

23  **official Dragon Jade documents reflecting this loan that was**

24  **made in July 2017?**

25          MS. D'AMICO:  Object to form.

Page 58

1      A.   From the auditor's perspective, there was none.

2  BY MR. WALKER:

3      **Q.   Was any part of this loan transaction that was made**

4  **in July 2017 -- was any part of that included in the filings**

5  **that were made with the SEC?**

6           MS. D'AMICO:  Object to form.

7      A.   Definitely not.

8           MR. WALKER:  Give us just a moment, please.  We're

9  almost done here.

10 BY MR. WALKER:

11     **Q.   Did you discuss these loan transactions and the way**

12 **that they were handled with Glenn Henricksen before**

13 **Mr. Henricksen gave his deposition testimony?**

14          MS. D'AMICO:  I'm going to just object and advise

15 the client to make sure that he's not disclosing any

16 communications that occurred in the presence of his lawyers,

17 whether it be our firm or the prior firm, but you're asking

18 about deposition preparation.

19          THE WITNESS:  So the question is about my

20 discussion or conversation with Glenn and not with lawyer,

21 so I can give the answer, right?

22          MS. D'AMICO:  Yes, as long as lawyers were not

23 present at that meeting, sure.

24     A.   (In English) Okay.

25          (Via interpreter) When this case -- when this case

Page 66

1    what you asked about and to your questions about the

2    integration, or relationship rather, between him giving the

3    money and when he signed, and clarifying.  I'll make sure to

4    be more limited so that you understand we're not opening

5    this door.

6             MR. WALKER:  Okay.  We will let you.

7    BY MS. D'AMICO:

8        Q.  Did you ever -- strike that.

9             Dr. Lai, did you or anyone from Dragon Jade ever

10   make payments to Mr. Knox by wire to coerce him into

11   executing the agreement?

12       A.  No.

13       Q.  Mr. Walker asked you earlier about the timing of

14   you giving Mr. Knox money, the $10,000, in relation to the

15   signing of the option agreement.  Do you recall that

16   exchange?

17       A.  I remember and I said to Mr. Walker that these are

18   two separate issues.

19       Q.  Why did you make the decision not to pay Mr. Knox

20   before the agreement was executed?

21       A.  Because at that time I was suing his company, so

22   how could I lend money to him even though he was making

23   request?

24       Q.  And what -- in your opinion, what changed after

25   that agreement was signed?

1          MR. WALKER:  Object to the form.

2     A.  Number one, the arbitration was stopped.  Number

3     two, Michael Knox said he could help us complete the

4     remediation as soon as possible.  So this is as simple as

5     that.

6          MS. D'AMICO:  I have no more questions at this

7     time.

8          MR. WALKER:  No follow-up on our end.

9          Madam Court Reporter, yes, thank you very much, and

10    I am very sorry that you missed the ferry.  We'll be

11    ordering the transcript along with a copy of the DVD,

12    please.

13         MS. D'AMICO:  And same here.  I'd also like to mark

14    this transcript confidential.  And just as a side note,

15    since we have social security numbers on some of the

16    exhibits, let's just be mindful of that.

17         MR. WALKER:  Well, you and I discussed that.  I'm

18    not necessarily opposed to it; I've got to look at it to

19    see.  I don't know if we can mark the entirety of it

20    confidential.  Typically, what we've done is if there are

21    confidential or attorneys' eyes only provisions, we mark

22    that off separately.  But, you know --

23         MS. D'AMICO:  No, actually, at your corporate

24    representatives' deposition, you marked the entire thing

25    confidential, and then there were separate sections that