# In the Matter of:

# MICHAEL KNOX

# SWORN STATEMENT

*January 30, 2018*

ORANGELEGAL

www.OrangeLegal.com
800-275-7991

```
 1        Q.    So Mr. Cao was involved from the very
 2   beginning?
 3        A.    Yes.
 4        Q.    And then in your first individual
 5   involvement with Dragon Jade was in November of 2015?
 6        A.    It was actually just before that when
 7   Mr. Cao visited the -- Hong Kong.  Dragon Jade had
 8   requested a representative of Ultroid go there.  They
 9   flew him out there at their expense.  Their expense
10   being all paid for by Dragon Jade and hotels,
11   entertainment, food, everything.  At that time he -- the
12   agreed upon thing was he was going to demonstrate the
13   product by performing a procedure on -- or overseeing a
14   procedure being performed on the chairman of Dragon
15   Jade.
16        Q.    Who was the chairman of Dragon Jade?
17        A.    I want to say Mr. Low or Law, L-o-w or
18   L-a-w.  I'm not sure.
19        Q.    Following that initial visit Michael Cao
20   took to Hong Kong, did you then go to Hong Kong in the
21   fall of 2015?
22        A.    Yes.  It was November 2015.  They had
23   requested that we come visit to discuss the sale or the
24   potential purchase of the Ultroid Company.
25        Q.    Who did you meet with on that trip?
```

1   A.   Our primary meetings were with Dr. Lai. He
2   is the president and CEO of Dragon Jade.
3   Q.   And that's L-a-i?
4   A.   I believe so.
5   Q.   Did you also meet Glen Hendricksen on that
6   trip?
7   A.   That was the first time I met with Glen.
8   Glen was originally contacted by Michael Cao to
9   represent Ultroid in the potential sale of the company.
10  Q.   What conversations were had with Dr. Lai
11  during that initial visit that you took in November of
12  2015?
13  A.   Primarily to buy the company. They were
14  adamant about acquiring the entire company. They wanted
15  the technology, and in fact, they put a price out there
16  of 80 million. They -- during this meeting, they
17  requested that we get an appraisal to substantiate that
18  price, which we later did.
19  Q.   What did the appraisal come back as?
20  A.   The appraisal came back at 84 million.
21  Q.   So Dr. Lai told you, after they had agreed
22  upon a purchase price of 80 million, to get an appraisal
23  that matched that purchase price?
24  A.   Yes.
25  Q.   Then did you later forward to Dragon Jade

| | | |
|---|---|---|
| 1 | Q. | Did you travel there together? |
| 2 | A. | He arrived one day before I did. |
| 3 | Q. | What was your observations of interactions of Michael Cao and Dr. Lai from Dragon Jade? |
| 5 | A. | Well, actually the interactions seemed to be very friendly. Even the -- in the November trip, but in the -- November of 2015, but during the trip in 2016 in April, they referred to each other as brothers. Very strange. And there was an interaction where Dr. Lai had handed Michael Cao an envelope and he put it in his pocket. |
| 12 | Q. | When did that happen? |
| 13 | A. | During the April 2016 trip. |
| 14 | Q. | So this was during the time that you learned that Dragon Jade had cut their purchase price in half; is that right? |
| 17 | A. | Yes. |
| 18 | Q. | Did Michael Cao seem at all surprised to learn that? |
| 20 | A. | No. |
| 21 | Q. | Did you have any conversations with Michael Cao that the purchase price has gone from 80 million dollars in cash to one of only 10 million in cash and another 30 million in stock? |
| 25 | A. | We had to have a private conversation. |

```
 1  There was -- as he says, they were discussing this
 2  beforehand so -- which told me that he was completely
 3  aware of the decrease in price.  He was not surprised.
 4  Dr. Lai seemed surprised that I was not informed.
 5       Q.    And was part of those discussions that you
 6  saw Dr. Lai slip and envelope to Michael Cao?
 7       A.    Yes, but that was before we started talking
 8  about the price.
 9       Q.    Do you know what was in the envelope?
10       A.    No.  I was not made aware of it.  When I
11  asked, I was never given an answer.
12       Q.    Do you have a suspicion as to what was in
13  there?
14       A.    The envelope was three quarters of an inch
15  to an inch thick.  I suspect it was money.
16       Q.    Okay.  So you come back from Hong Kong with
17  an agreement to sell the company to Dragon Jade for the
18  price of 10 million in cash plus 30 million in Dragon
19  Jade stock; is that right?
20       A.    Yes.
21       Q.    Were you required to have a shareholder vote
22  on that --
23       A.    Yes.
24       Q.    -- of sale?  And did you have a shareholder
25  vote?
```

```
 1      A.    Yes.
 2      Q.    Had you understood that Glen Hendricksen had
 3 the authority to represent Dragon Jade?
 4      A.    That was my understanding, that he had the
 5 authority.
 6      Q.    Okay.  And then Dragon Jade initiated an
 7 arbitration proceeding; is that right?
 8      A.    Yes.
 9      Q.    And then after the initiation of that
10 arbitration proceeding, did you enter into any
11 conversations with Dragon Jade to try to resolve the
12 dispute?
13      A.    Of the arbitration, no.  I was informed by
14 Dragon Jade -- by Glen with Dragon Jade that this was
15 just a ploy to protect themselves if we didn't finish
16 the transaction.
17      Q.    Okay.  The transaction at this point you're
18 referencing is Dragon Jade's desire to purchase the
19 assets of the company?
20      A.    Yes.
21      Q.    Okay.  Would the Ultroid shareholders have
22 to vote before Ultroid could sell or otherwise encumber
23 the Ultroid assets?
24      A.    At that time I was told by a lawyer, but I
25 later found out that was incorrect, I was told that I --
```

1  since we were looking at potential bankruptcy and were
2  essentially insolvent, my responsibilities shift to
3  creditors, but I was inadvertently told or incorrectly
4  told that I did not have to have shareholder vote.
5      Q.   How was your health during that time?
6      A.   I'm still recovering.  To this day I'm still
7  recovering from my ordeal.
8      Q.   In December 2016 and January 2017, were you
9  still having problems related to your earlier
10 hospitalization?
11     A.   Yes.
12     Q.   Okay.  How would you describe your health in
13 that time period?
14     A.   Still weak.  I -- to this day I still cannot
15 run.  I can't even jog more than, you know, 20, 30 feet.
16     Q.   What was your personal financial situation
17 like during that time?
18     A.   Well, not being able to work, going through
19 savings like crazy, I had no more money.  My entire
20 investment was really tied up with Ultroid.
21     Q.   Okay.  Did Dragon Jade do anything to try to
22 influence or pressure you in any way with respect to
23 their desire to enter into a purchase agreement or a
24 security agreement?
25     A.   I was offered a position with Ultroid --

1  excuse me, with Dragon Jade after the transaction would
2  be finalized, but again, after the sale or the
3  transaction was fully done.  They stated that they could
4  not put any of that in writing to me.
5       Q.   So they said that if you signed the
6  agreements, that they would then employ you after the
7  agreement was consummated; is that right?
8       A.   Yes.
9       Q.   And what were the terms of that agreement?
10      A.   The verbal terms were 150,000 a year.  I
11 would serve as an operations and help develop the sales
12 force, train the doctors, everything I was doing before
13 but with the funds to help it expand.
14      Q.   Now, in January 2017 I understand that you
15 signed what we have been calling a purchase agreement in
16 this case.  You're familiar with that document?
17      A.   Yes.
18      Q.   And there's also a security agreement that
19 was signed around the same time by you.  You're familiar
20 with that?
21      A.   Yes.
22      Q.   So was it leading up to your execution of
23 those agreements that Dragon Jade was offering to employ
24 you on the back end?
25      A.   Yes.

1      Q.    Did Dragon Jade also threaten you in any way
2   to release embarrassing information or anything along
3   those lines if you didn't sign the agreements?
4      A.    Yes.  They inferred that there was photos of
5   me doing things that were inappropriate and they would
6   get circulated through my family.
7      Q.    Did Dragon Jade also offer to pay you any
8   money personally in order to influence you to sign the
9   agreements?
10     A.    They offered to make me a loan.  They knew
11  my financial situation.
12     Q.    Okay.
13     A.    I requested that they pay me in salary.
14  Either pay the comp -- as a deposit to the company so I
15  could take salary out or something like that, but they
16  changed it and made it into a loan.
17     Q.    Who were you in discussions with in that
18  regard?
19     A.    Glen.
20     Q.    Okay.  Glen Hendricksen?
21     A.    Yes, sir.
22           MR. WALKER:  Okay.  I want to show you some
23           documents that you were kind enough to provide to
24           us.  The first one I will mark as Composite
25           Exhibit 1.

1   Q.   And does that show that a $10,000 wire
2   transfer was initiated?
3   A.   Yes.
4   Q.   To your sister-in-law's account?
5   A.   Yes.
6   Q.   Where was it sent from?
7   A.   Hong Kong.
8   Q.   Does it have the name of the sender?
9   A.   This sender is Ms. Tam Siu Man.
10  Q.   Okay.  And can you turn with me to the next
11  page, please.  And what is reflected on that document?
12  A.   This is a two-page document.  This is a copy
13  of the bank statement showing the arrival of that wire
14  transfer.
15  Q.   And that is to your sister-in-law's account?
16  A.   Yes.
17  Q.   Okay.  Once the money was deposited into
18  your sister-in-law's account, where did it go?
19  A.   It was withdrawn and deposited into my
20  personal account.
21  Q.   How was it withdrawn?
22  A.   My wife went to the bank and withdrew it.  I
23  don't know if she did a check or -- check.
24  Q.   Was your wife a signatory on her sister's
25  account?

```
 1        A.    Yes.  She's a joint holder in that account.
 2        Q.    Okay.  And the amount of the deposit which
 3   was later withdrawn and put in your account was $10,000?
 4        A.    Yes.
 5        Q.    What was the date of that?
 6        A.    The deposit was received on January 25th.
 7   The money was withdrawn on January 26th.
 8        Q.    Just so I understand the time line here.
 9   This was an agreement prior to your execution of the
10   purchase option and the security agreement that you
11   would receive this $10,000 before you signed those other
12   contracts; is that right?
13        A.    This was an offer by them to help me, yes.
14        Q.    And just to put it on a time line, they
15   agreed to do that before you signed the purchase
16   agreement and --
17        A.    They did, yes.
18        Q.    Did you have any conversations with
19   Mr. Hendricksen about the terms of that $10,000 payment?
20        A.    Yes.  About the repayment terms or...
21        Q.    Let's get into that.  So it's at least
22   arguably indicated that it's a loan.  Did you have any
23   conversations about who would repay the loan or when it
24   would be repaid?
25        A.    I would repay the loan out of the closing --
```

| | | |
|---|---|---|
| 1 | Q. | What was the date of that wire? |
| 2 | A. | August 1st. |
| 3 | Q. | What year? |
| 4 | A. | 2017.  Sorry. |
| 5 | Q. | What was the amount that hit your |
| 6 | sister-in-law's account? | |
| 7 | A. | $5,375. |
| 8 | Q. | Okay.  Was that money subsequently |
| 9 | withdrawn? | |
| 10 | A. | Yes, same day. |
| 11 | Q. | By who? |
| 12 | A. | My wife. |
| 13 | Q. | And where was it deposited? |
| 14 | A. | My personal checking account. |
| 15 | Q. | Okay.  So just so we're clear, in January of |
| 16 | 2017 Dragon Jade sent you indirectly a $10,000 payment, | |
| 17 | and then later late July or early August 2017 they sent | |
| 18 | another amount of approximately $5,400; is that right? | |
| 19 | A. | Yes. |
| 20 | Q. | To your knowledge, has anyone ever inquired |
| 21 | about the status of that purported loan? | |
| 22 | A. | No.  No one has requested repayment.  No |
| 23 | demands have been set forth on it. | |
| 24 | Q. | Okay.  I'm done asking you about that. |
| 25 | A. | Do you want to -- |