Michael Goeree - 30(b)(6), Confidential
December 03, 2018

```
 1              UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION

 3                          CASE NO: 8:17-cv-02422-JDW-CPT

 4  DRAGON JADE INTERNATIONAL,
    LTD., a British Virgin
 5  Islands limited company,
         Plaintiff/Counter-Defendant,
 6
    vs.
 7
    ULTROID, LLC, a Nevada corporation;
 8  ULTROID MARKETING DEVELOPMENT CORP.,
    a Florida corporation; ULTROID
 9  TECHNOLOGIES, INC., a Florida
    corporation,
10       Defendants/Counter-Plaintiffs
                                         /
11

12            DEPOSITION OF MICHAEL GOEREE

13       ****  NON ATTORNEYS' EYES PORTIONS  ****

14  Corporate Representative of Defendants/Counter-Plaintiffs,

15  Ultroid Marketing Development Corp., Ultroid LLC and Ultroid

16  Technologies, Inc., pursuant to Fed.R.Civ.P. 30(b)(6)

17              Pages 1 through 127

18           Monday, December 3, 2018

19          From 3:30 p.m. to 7:30 p.m.

20       Dean, Ringers, Morgan & Lawton, P.A.

21          201 East Pine Street, Suite 1200

22              Orlando, Florida  32801

23

24          Stenographically Reported By:

25            Mary Ann Schumacher, FPR
```

U.S. LEGAL SUPPORT
(813) 876-4722

1  come back to them.  Why is it that you got involved with
2  Ultroid, you think you said August 2017?
3       A.   This is the first time I got a phone call about
4  it.
5       Q.   Who called you about?
6       A.   Michael Knox.
7       Q.   What was the substance of that phone call?
8       A.   He asked me if I would come in as CEO of the company
9  and do capitulation management or turn it around.
10      Q.   At the time, what was Michael Knox's position?
11      A.   I believe he was director and secretary.
12      Q.   Was there a CEO or other officer at that time --
13      A.   -- no.
14           MR. LAWTON:  Let her finish her question.  Just
15        pause before you answer, and that'll be a good way for
16             you to do it.
17 BY MS. D'AMICO:
18      Q.   Who else was working at the company with Mr. Knox at
19 that time?
20      A.   Nobody that I know of.
21      Q.   Were there any other directors?
22      A.   No.
23      Q.   And what was the problem that Michael Knox brought
24 to your attention with the business that needed your
25 assistance?

1    A.   It needed new funding sources and the product had to
2  be put back in the market.
3    Q.   When you say product, what are you referring to?
4    A.   Ultroid.
5    Q.   What is Ultroid?
6    A.   The hemorrhoid remediation device.  Not remediation,
7  procedure device.
8    Q.   And at the time when you came into the company's
9  window -- this is August 2017 -- was the Ultroid product or
10 the Ultroid device on the market?
11   A.   No.
12   Q.   To your knowledge, when was the last time that the
13 product was on the market?
14   A.   I think late middle to late 2016.  It was probably
15 middle 2016.
16   Q.   I'm going to mark this Exhibit 5.  Take a look at
17 this.
18   A.   Okay.
19        (Plaintiff's Exhibit 5 was identified.)
20   Q.   Have you seen this before?
21   A.   Never.
22   Q.   Take a moment to look at it and let me know if
23 it's an accurate representation of Ultroid.  And actually,
24 before we go there, let's take a moment.  When I say the
25 word, Ultroid during the course of the deposition, when

1  with Mr. Hendricksen?
2      A.   I did have two.
3      Q.   And you initiated the calls with him or he called
4  you?
5      A.   He initially called me and left the message.
6           MS. D'AMICO:  I'm sorry, let's stop one moment.
7      This is no longer attorney's eyes only.
8           THE DEPONENT:  He initially called me and left a
9      message for me to call him back.
10 BY MS. D'AMICO:
11     Q.   And what did you guys talk about, what was the
12 substance of your discussion?
13     A.   It was more, I thought, just an introduction to say,
14 hey, you know, this is the situation, this is who I am.  I
15 was just trying to, you know, in a business manner, introduce
16 myself.  I didn't quite get the response that I was
17 expecting.  Because he left -- also had called Cedric Lewis
18 and left a message there and spoke to Cedric and was cordial.
19      And Cedric said, Don't worry about it, just give him a
20 call and talk because clearly there's an issue on the table,
21 and you don't have to get to a fistfight the first day.  And
22 so I gave him a call.  And he was very -- how do you say
23 that -- he like, he was very cocky and wanted to stir a
24 fight.
25     Q.   And this was -- just to be clear, this was mid

```
 1   October 2017?
 2        A.   Yeah, probably, just off the top of my head.
 3        Q.   And who did most of the talking on the call, if you
 4   recall?
 5        A.   It was both.
 6        Q.   And during this period of time, was Dragon Jade
 7   still working, pursuant to the option agreement, to remediate
 8   the Ultroid product?
 9        A.   No, we had already terminated.
10        Q.   So was he mad about that or do you know why he was
11   upset?
12        A.   No, he was -- he was -- I mean, I always think
13   there's, you can talk about things, you don't have to get
14   into a fistfight.  He was very cocky about the fact that,
15   you don't understand who you're dealing with, I'm basically
16   far superior intellect than you.
17         He was very insulting, very condescending, very
18   degrading.  And he went on to say, you don't understand,
19   this is a tried and true process, we've done this before,
20   how do you think we get our other patents?  We've used this
21   contract in several locations before, we always win, people
22   have tried to beat us before, and he was laughing at me,
23   ha, ha, ha.  You're an idiot, he says.
24        Q.   He called you an idiot on the call?
25        A.   Yep.
```

1  Q. Understood. If you could just give me a minute,
2  I'd appreciate that. Can you look back at Exhibit -- I think
3  it's 3 and 4, which is your affidavit.
4  A. All right.
5  Q. I'm also going to show you a copy of Exhibit 17.
6  So Exhibit 3 is your affidavit, your original affidavit,
7  and your Exhibit 17 is the September 22, 2017 letter from
8  Mr. Knox to Dr. Lai; do you see that?
9  A. Uh-huh.
10     (Plaintiff Exhibit 17 was identified.)
11  Q. Have you reviewed this letter before?
12  A. So this was sent to -- okay.
13  Q. Have you seen this document before?
14  A. I have not.
15  Q. You have not. And this was filed as an exhibit in
16  this case. It was a Notice of Breach by Michael Knox with a
17  copy to --
18  A. -- to myself and Cedric Lewis.
19  Q. Directing future communication to you two. I don't
20  know that the copy was sent to you. Was a copy sent to you?
21  A. I'm not certain that it was. I didn't see it in
22  that form.
23  Q. The way I read this, just to be clear, for the
24  record, I believe that he is directing that there are some
25  changes to the management structure and that future

```
 1   communications should be to you and Mr. Lewis.  I don't know
 2   whether you received a copy, so I'm just asking if you did.
 3        A.   I think Cedric did, to be honest with you, but I
 4   don't believe that I did.
 5        Q.   Okay.
 6        A.   And he handed me so much paperwork, when I first
 7   took over, that it could still be in that stack somewhere,
 8   just to be fair.
 9        Q.   And do you understand this to be a Notice of
10   Termination of the Exclusive Option and Remediation Agreement
11   by Ultroid?
12        A.   All relationships, period.
13        Q.   Of all relationships?
14        A.   Yeah.
15        Q.   And, in fact, in your affidavit, you mention this
16   letter or, at least say that you approved Michael Knox send
17   such a letter to Dr. Lai?
18        A.   Yeah, we told him to do it.
19        Q.   And if you look at your paragraph 3 of your
20   affidavit, you say that the letter --
21        A.   Affidavit 3?
22        Q.   Correct.  Paragraph 3, it says that the letter
23   inadvertently referenced the completion of phase 2, rather
24   than milestone 2.
25        A.   Yeah.  Again, when the people that drafted the
```

1   against that invoice and saying now it's a loan.  It wasn't a
2   loan, it was a purchase order.
3           MS. D'AMICO:  Okay.  I'm going to move to strike as
4       unresponsive.
5           MR. LAWTON:  I don't think he's finished his answer,
6       but --
7   BY MS. D'AMICO:
8       Q.   Do you want to keep going?
9       A.   My point is, I think there's a lot of conspiracy
10  going on between a lot of parties, Dr. Lai.  Hendricksen.
11  Possibly Michael Knox, that's yet to be seen, I've got a lot
12  of questions for him too.
13          The people that suffered in this were the shareholders.
14  They were lied to.  From start to finish, A to Z, there was
15  not one word of truth told to these people.  Some of them
16  had a good bit of money invested.  And I think they set up
17  the whole situation where they just deliberately drained the
18  company, pushed it down, sucked the money out and then said,
19  Okay, we're going to sell it.
20          It wasn't necessary.  This market is so large and so
21  liquid, there's no reason for this.  Call it bad management,
22  bad judgment.  Not when there's envelopes of cash going back
23  and forth and third and fourth party wires being done with
24  cash.  I mean, you start to think about money laundering,
25  taxes, IRS, you start to think about all kind of problems.

1    And I hate to say it, but this whole deal smells,
2    doesn't even pass the smell test.  And when their own
3    attorneys are possibly complicit in the whole situation, I
4    believe they're also, maybe not Pillsbury themselves, but
5    surely Blalock, also part of the e-mail negotiation going
6    back and forth, no, say it this way, don't worry, I got it,
7    don't worry, you don't need a shareholder vote.  Of course
8    you need a shareholder vote.  He knew that, everybody knew
9    it.
10        So you put all of this together and it happened in a
11   very short period of time and people getting paid off, it
12   smells bad.  At best, it smells bad.  It really looks
13   horrible.  And that's my position.  So if that answers all
14   that question, that's my answer.
15        Q.    All right.  Are you finished?  I don't want to
16   interrupt.
17        A.    Okay.
18             MS. D'AMICO:  Now I'm going to move to strike as
19        unresponsive.
20             THE DEPONENT:  What does that mean?
21             MR. LAWTON:  It's just legal argument.
22             MS. D'AMICO:  I means that I don't think that your
23        answers were responsive to the question that I asked,
24        which, I'll be honest, I don't even recall what it was
25        at this point.

1    A.    No.  I know Michael Cao took them out of inventory,
2    saying he would take care of the order.  I have no proof
3    that they ever did get to Dragon Jade.
4    Q.    Understood.  So you believe that it was not actually
5    a purchase order?  You don't believe that Dragon Jade
6    actually placed a real purchase order, you believe there was
7    something fishy going on there?
8    A.    No, it was a real purchase order.  I just -- well,
9    I think it was the start of a setup or a reason for
10   everything else to snowball behind it.
11   Q.    Okay.  And you believe that there were lots of
12   envelopes of cash being passed around?
13   A.    I know for a fact.
14   Q.    Okay.  Describe all instances that that happened.
15   A.    When they were over in, just a few weeks prior to
16   the purchase order, they were all in Hong Kong.
17   Q.    Who's there?
18   A.    Michael Cao and Michael Knox, meeting with
19   Hendricksen and Dr. Lai.
20   Q.    Okay.
21   A.    They were all calling, Cao and Lai were calling
22   each other brother, buddy-buddy and hugs and walking, hanging
23   on hands.  I don't know if that's a normal thing to do over
24   there.  Been to China a few times before, never hung on to
25   another man's hand, but that's my personal perspective.  But

```
 1   having said that, Dr. Lai handed Michael Cao an envelope
 2   that was several inches, a couple inches thick, a sealed,
 3   white envelope, and it was suspected that there was cash in
 4   it.
 5        Q.   Suspected by whom?
 6        A.   By Michael Knox.  And that was, Um, why are you
 7   giving this guy cash?  Hendricksen said, That's customary
 8   in China.  Again, I've been to China a couple times, done
 9   business, they didn't hand me envelopes of cash.  So at
10   that point it's speculative, we speculate and assume that
11   it was cash.  Hendricksen had told Knox that it was, it was
12   customary to pay for services, whatever those services are.
13        Q.   Then in Miami, under oath, he confirmed it.
14   Hendricksen confirmed it, yes, it was cash, it was cash
15   that was traded hands.  So then you know, at least unless
16   he's lying under oath, I don't know, but he was handed cash.
17        Three weeks later, you have a purchase order that
18   comes through, where you have more than sufficient inventory
19   to complete the transaction.  The guy that received the cash
20   goes and takes everything out of inventory and says, oh, no,
21   I'll handle this myself personally.  Okay, don't know why.
22        Michael Knox thought, that's odd.  And then he got,
23   of course, sick, he was feeling worse, he resigned.  And when
24   he come back towards the end of the year, going into '17,
25   they all walked up and said, Oh, by the way, that purchase
```

1   Q.   What did Michael Knox tell you?
2   A.   He told me while he was in Hong Kong, they all had a
3   party, it was at, I believe, Dr. Lai's office or restaurant,
4   I'm not sure which, at which point, they were all drunk or
5   drinking, and a whole bunch of girls come in, prostitutes.
6   And then that next day, something was said about a difference
7   in price.  And he said, Well, you do understand we have
8   cameras throughout the whole place and we have pictures of
9   you.
10  Q.   Who said that?
11  A.   Dr. Lai.
12  Q.   To whom?
13  A.   To Michael Knox.
14  Q.   You said that something about a price.  What price
15  are you talking about, the price of the women or --
16  A.   I believe at the time, the price changed from 80
17  million to 40 million.
18  Q.   So you're not talking about the price of the women,
19  you're talking about the price of the company?
20  A.   No.
21  Q.   Okay.  And Dr. Lai -- sorry -- Mr. Knox told you
22  that Dr. Lai told him that there's cameras all over?
23  A.   And they have pictures of him.
24  Q.   And do you know what those pictures are of?
25  A.   According to Michael Knox, he with a woman that's

```
 1   not his wife.
 2        Q.    Has he ever seen the photographs?
 3        A.    No, but they've told him they've got them.
 4        Q.    Who is they?
 5        A.    I believe it was also heard by Glenn Hendricksen.
 6   And I don't know that to be fact, but I understand he was
 7   there, and Dr. Lai said it to Michael Knox.  Sure, in all
 8   fairness, he said it in a joking manner.
 9        Q.    Who did, Dr. Lai did?
10        A.    Dr. Lai did.  But when it's said, it can't be
11   unsaid, it's sort of a --
12        Q.    Did he say that more than once?
13        A.    I don't know.
14        Q.    Do you know if Mr. Knox returned to this restaurant,
15   or office, another time after this incident?
16        A.    I don't believe he did after that date.  And I might
17   have the two trips mixed up, but I don't believe he did after
18   that date.
19        Q.    But he's never seen photographs or video?
20        A.    No.
21        Q.    Or anything.  Okay.  At D, it says, engaging in
22   other deceitful and fraudulent conduct to secure execution of
23   the illegal agreement.
24        A.    Clearly, no shareholder vote, don't worry about
25   it, we know how to do this, would fall into that category.
```

1  That's very deceitful and very fraudulent.
2      Q.    And you're talking about Dragon Jade's lawyer giving
3  advice to Ultroid?
4      A.    I'm talking about all of them.  Dr. Lai, Dragon
5  Jade.  Hendricksen is also a separate entity, he's his own
6  company.  And then you would have Michael Cao in there,
7  you would have Michael Knox in there, I mean --
8      Q.    So to be clear, is it Ultroid's position that
9  Mr. Cao and Mr. Knox were both caught up in the deceitful and
10 fraudulent conduct that was going on?
11     A.    I definitely think that Michael Cao was.  With
12 regard to Michael Knox, I don't know if he was a
13 co-conspirator or the stickman.  Do you know what a stickman
14 is?
15     Q.    I know what a stickman is.
16     A.    He was the guy left holding the bag.  If you're
17 looking around the room to see who the idiot is, chances are
18 it's you.  Do you know that expression?
19     Q.    I do, sir.
20     A.    I think he was looking around the room.
21     Q.    What is the basis for your statement that Dragon
22 Jade has engaged in similar activity in the past?
23     A.    According to Glenn Hendricksen on the phone, he
24 says, we've done this before, this is a tried and true
25 contract, this is how we get our intellectual properties.

```
 1      A.   I believe it was August 1, 2016 and then was
 2   brought back sometime later.  I believe he completely cut
 3   ties.  I'm not a hundred percent certain of that because I
 4   think you always have conversations and phone calls, but I
 5   believe he completely cut ties then.
 6      Q.   When you say then, what are you referring to?  Are
 7   you referring to August of 2016?
 8      A.   Yes.
 9      Q.   Well, we know he was in place again, negotiating,
10   in late 2016, with respect to the option agreement.
11      A.   That is correct.  I think he was brought back then.
12      Q.   And when did they finally get him to go away?
13      A.   Who?
14      Q.   When did Mr. Knox --
15      A.   -- when did I fire him?
16      Q.   When did Mr. Knox completely leave Ultroid, or cut
17   his ties with Ultroid?
18      A.   I don't know if he did or he didn't.  Like I said,
19   he resigned then.  To me, resignation means you stop.  But
20   that doesn't mean you don't have somebody's telephone number,
21   where they call you and he still has shareholding interest.
22   You know, I just -- I know that during that time, his focus
23   was his wife and his own health, so he was -- he had to stop
24   everything.
25      Q.   Okay.  Well, he came back, at least to negotiate on
```

```
 1  the Dragon Jade deal, right?
 2      A.   Correct.
 3      Q.   And did he continue to work for some time into the
 4  beginning of 2017?
 5      A.   Yes, right on through until February 2018, when I
 6  terminated him.
 7      Q.   Why did you come to terminate Mr. Knox?
 8      A.   Because of all the stuff that I saw, that I told
 9  you, is he a co-conspirator or the fall guy?  I can't take
10  that gamble in the company.  There is other peoples' money,
11  including my own, to, you know, put first.
12      Q.   So you came into the picture in September of 2017
13  and a few months later, Michael Knox left?
14      A.   Correct.  He didn't leave, he was terminated.  I
15  fired him.
16      Q.   Is he consulting at all for Ultroid?
17      A.   No.  Okay, hold on.  Has he given us things like
18  the gentleman for the FDA, correct, yes, but consulting, no.
19      Q.   No formal agreement with Mr. Knox?
20      A.   And very little contact, to be honest.
21      Q.   After Mr. Knox got sick, was he able to continue to
22  work at all or was he completely on leave?
23      A.   He almost died.  He was in -- well, according to
24  his doctor, he was on his death bed.  Three or four people
25  contracted the illness at the same time here in Tampa, and
```