DRAGON JADE INTERNATIONAL

*vs.*

ULTROID

Deposition of:

GLENN HENRICKSEN

September 27, 2018

Vol 01

# PHIPPS REPORTING

*Raising The Bar...*

```
1    that happening?
2              MS. ALTMAN:  Object to the form.
3         A.   So I believe the date of my consultancy
4    started in early December 2015.  Prior to that,
5    Michael Cao and Michael Knox came to Hong Kong, and
6    both Michael Cao and Dr. Lai asked me to attend
7    those meetings.
8    BY MR. WALKER:
9         Q.   What was being discussed during those
10   meetings?
11             MS. ALTMAN:  Object to the form.
12        A.   What was going to be discussed or what was
13   discussed?
14   BY MR. WALKER:
15        Q.   Well, if there's a distinction there, I
16   would like to know it.
17             What was -- to your knowledge, what was
18   supposed to be discussed during those meetings?
19        A.   So, originally, I was under the impression
20   that Ultroid wanted to raise capital, so I attended
21   those meetings in that format.
22        Q.   And then when you attended the meetings,
23   what was actually discussed there?
24        A.   What was actually discussed at that
25   meeting was expansion of Dragon Jade's footprint in
```

1    Asia and distribution of the product.

2         Q.    Did you come to learn that Ultroid and

3    Dragon Jade had a distribution agreement between

4    them which allowed Dragon Jade to distribute

5    Ultroid's product in a specific geographic area?

6         A.    Yes.

7         Q.    Okay.  By the way, what was your skill

8    set, your ability, if any, to raise capital that you

9    believe resulted in you being, you know, introduced

10   to these people for that purpose?

11             MS. ALTMAN:  Object to the form.

12        A.    I have been in those circles for a number

13   of years.

14   BY MR. WALKER:

15        Q.    Okay.  Have you assisted other companies

16   in raising capital before your endeavors here?

17             MS. ALTMAN:  Object to the form.

18        A.    Yes.

19   BY MR. WALKER:

20        Q.    So you're in a conversation now.  You're

21   in a meeting with Steven Lai and Michael Cao and

22   yourself in which conversations are being had about

23   Dragon Jade wanting to expand its footprint; is that

24   right?

25        A.    Correct.

Page 75

1        Q.   Do you recall the scope of the expansion
2   that Dragon Jade wanted?
3        A.   Yes.
4        Q.   What were they trying to do?
5        A.   They were interested in Taiwan, Korea,
6   Japan, and China.
7        Q.   At that time, were you aware of any
8   problems that Ultroid was having with respect to its
9   manufacture of the device?
10       A.   No.
11       Q.   Who else was present during that first
12  meeting that you attended with Michael Cao and
13  Steven Lai?
14       A.   I don't recall.
15       Q.   Had you already met Michael Knox by that
16  point in time?
17       A.   No.  I believe that was the first time I
18  met him.
19       Q.   After that meeting concluded, what was
20  your next interaction with either Ultroid or Dragon
21  Jade, whichever came first?
22            MS. ALTMAN:  Object to the form.
23       A.   I don't recall the things we did after
24  that.
25

Page 83

1       Q.    So what was it generally about your

2   business knowledge that you thought would lend

3   itself towards advising the Dragon Jade company?

4              MS. ALTMAN:   Object to the form.

5       A.    I think you would have to ask them.

6   BY MR. WALKER:

7       Q.    Did you have any conversations with Dragon

8   Jade where you explained to them why you could

9   provide a value service to their company?

10      A.    Yes.

11      Q.    What did you tell them?

12      A.    I told them that I could assist them in

13  handling their dealings with Ultroid.

14      Q.    At some point in time, I understand there

15  was a disagreement between Dragon Jade and Ultroid

16  about some product issues that ultimately led to an

17  arbitration proceeding.   Were you involved with

18  Dragon Jade during that time?

19             MS. ALTMAN:   Object to the form.

20      A.    Yes.

21  BY MR. WALKER:

22      Q.    What is your knowledge of the issues that

23  led to that arbitration proceeding?

24      A.    That's a pretty broad question.   Can

25  you --

1      Q.    Sure.

2      A.    -- sharpen the pencil a little bit?

3      Q.    And I certainly will so we can get through

4   it, but can you tell me in a general sense what the

5   disagreement was between the parties at that time?

6      A.    In a general sense, Dragon Jade had signed

7   an international distribution agreement with

8   Ultroid.  And Ultroid, through -- had problems.

9   They couldn't deliver product.  They couldn't -- and

10  timing these things is a little bit fuzzy to me.

11  They couldn't deliver product.  They had a recall.

12  They just -- they -- we bought product -- or they

13  bought product from them.

14     Q.    Dragon Jade bought product from Ultroid?

15     A.    Right.  And it was never delivered.

16     Q.    At the time that that dispute arose, had

17  you already been working with Dragon Jade as a

18  consultant for a period of time?

19     A.    Yes.

20     Q.    About how long?

21     A.    The -- my consulting agreement was

22  December 2015.  And I believe that the arbitration

23  was delivered to them in January of 2017.

24     Q.    So you had been working there for a little

25  bit over a year at the time that that issue was

1    been -- you're going to give me the over/under

2    stuff?

3         Q.    Sure.  Approximately.

4         A.    Six months, maybe.

5         Q.    At the time of this agreement, Dragon Jade

6    had been working with the Pillsbury law firm for

7    about six months?

8         A.    Yeah.  I don't recall the exact dates.

9         Q.    And was Mr. Blaylock the attorney that was

10   primarily, as far as you know, primarily involved in

11   drafting this agreement?

12        A.    Yes.

13        Q.    Was Mr. Blaylock your primary point of

14   contact in communicating regarding these issues?

15              MS. ALTMAN:   Object to the form.

16        A.    Regarding what issues?

17   BY MR. WALKER:

18        Q.    The drafting of the agreements that have

19   been signed and made at issue in this case.

20        A.    The -- signed?

21        Q.    I'm sorry.  Let me back up.

22        A.    Okay.

23        Q.    When Dragon Jade decided to retain counsel

24   and when that counsel started drafting the Option

25   Agreement, were you the one that was primarily

Page 137

1  communicating with that counsel for Dragon Jade?

2      A.   You said when we retained counsel.  We had

3  retained counsel probably six months before this,

4  right?  Mr. Blaylock was the primary point person

5  for that whole period of time.

6      Q.   Sure.  And then on the receiving end, on

7  your end, were you the primary point of contact for

8  Dragon Jade in the communications with Mr. Blaylock?

9      A.   Yes.

10      Q.   Was it your understanding that

11  Mr. Blaylock drafted this Exclusive Option and

12  Remediation Agreement?

13      A.   Yes.

14      Q.   Were there any other drafts of this

15  agreement before it was entered into between the

16  parties?

17      A.   I don't recall, but I believe that there

18  were.

19      Q.   Did Ultroid request any changes to this

20  agreement?

21      A.   I don't recall, but there was one -- yes.

22  I believe there was a typographical error in the

23  number of shares, and Ultroid had requested some

24  changes surrounding that.

25      Q.   Do you know if Ultroid had an attorney

DRAGON JADE INTERNATIONAL

*vs.*

ULTROID

Deposition of:

GLENN HENRICKSEN

September 27, 2018

Vol 02

# PHIPPS REPORTING

*Raising The Bar...*

Page 224

1  anything with respect to his request to begin

2  working with Dragon Jade?

3        MS. ALTMAN:  Object to the form.

4     A.   Yes.

5  BY MR. WALKER:

6     Q.   What was he told?

7     A.   Michael Knox had desired to work for the

8  company, and he had expressed that many, many times.

9  And Dr. Lai had said that we would be willing to

10 hire you in the transition as a part-time

11 consultant.

12    Q.   What terms were discussed?

13    A.   Specific terms weren't discussed.

14    Q.   What general compensation terms were

15 discussed?

16    A.   The general compensation terms was a

17 monthly -- a monthly payment of $5,000 and some

18 potential to earn additional moneys to be -- in the

19 sales and distribution process.

20    Q.   And at some point in time, you sent

21 Michael Knox a copy of your consultant agreement,

22 correct?

23    A.   That is correct.

24    Q.   Why did you do that?

25    A.   Michael Knox, after the -- after that

Page 225

1    particular meeting, he wanted me to produce a

2    contract.  And so I told him I could not, would not.

3    You can see that in my communications.  And I said I

4    will send you my contract so you can see what it is.

5         Q.   From January 2017 to the present time, has

6    Dragon Jade sent any money to Michael Knox?

7         A.   What is the -- the dates?

8         Q.   January 2017.  Let's call it January 1st,

9    2017, to the present time.

10             MS. ALTMAN:  Object to the form.

11        A.   Dragon Jade has not sent any money to

12   Michael Knox.

13   BY MR. WALKER:

14        Q.   From January 1, 2017, to September 2017,

15   was Michael Knox periodically requesting money from

16   Dragon Jade separate and apart from his

17   presentations or requests to be employed by Dragon

18   Jade?

19             MS. ALTMAN:  Object to the form.

20        A.   Michael Knox periodically told us that he

21   was out of money and requested assistance.

22   BY MR. WALKER:

23        Q.   Did Dragon Jade provide assistance?

24             MS. ALTMAN:  Object to the form.

25        A.   Dragon Jade provided assistance by lending

1    true.  Yes.

2    BY MR. WALKER:

3         Q.    At some point in time, I understand that

4    you had a conversation with William Fung about the

5    fact that Michael Knox was asking for financial

6    assistance; is that right?

7         A.    I don't think I had a conversation with

8    William Fung about that.

9         Q.    Who did you have a conversation with about

10   that?

11        A.    I had a conversation about that with

12   Dr. Lai.

13        Q.    Okay.  And what were you told?  What did

14   Dr. Lai tell you with respect to that issue?

15        A.    Which issue?

16        Q.    The issue of Michael Knox asking for

17   money.

18             MS. ALTMAN:  Object to the form.  And if

19        we could just slow down a little just because

20        it's -- okay.

21        A.    So what do you want to know?

22   BY MR. WALKER:

23        Q.    I believe you just indicated that you told

24   Dr. Lai that Michael Knox was asking for money.  And

25   what did Dr. Lai say to you?

Page 244

1      A.   As I indicated before in previous

2  testimony, Michael Knox would periodically ask for

3  money or tell me that his financial position was not

4  so good, and I would reflect that in to Dr. Lai.

5      Q.   I understand that.  And how would Dr. Lai

6  respond when you would reflect that to him?

7      A.   I can't characterize his responses as any

8  single thing.  Just reflected it and he would say

9  okay.

10     Q.   Did Dr. Lai ever indicate to you that he

11 would agree to give Michael Knox some money?

12          MS. ALTMAN:  Object to the form.

13     A.   At one point, he said that loans could be

14 made to him.

15 BY MR. WALKER:

16     Q.   Did you understand that to be a loan made

17 directly to Michael Knox separate and apart from the

18 loans to Ultroid that we've already discussed?

19     A.   They were not loans to Michael Knox.

20     Q.   Okay.  What -- tell me what your

21 understanding is about the circumstances of Michael

22 Knox receiving money directly or indirectly from

23 Dragon Jade or its representatives.

24     A.   Michael Knox told me to send -- or to have

25 the money sent to Dale Rose.

Page 245

1      Q.    Who's Dale Rose?

2      A.    The person on this -- he sent me an e-mail

3  and said this is the person.

4      Q.    Did you ask who Dale Rose was?

5      A.    I think at a point, he indicated to me

6  that it was his sister -- sister-in-law.  I thought

7  it was his daughter, but it was his sister-in-law.

8      Q.    So Michael Knox is requesting money and

9  has told you that money should be sent to his

10  sister-in-law Dale Rose; is that right?

11      A.    That is correct.

12      Q.    Did you ask why the money should be sent

13  to Michael Knox's sister-in-law?

14      A.    That was what he requested.

15      Q.    Did you ask why?

16      A.    He requested to have it sent to his

17  sister-in-law.

18      Q.    That's not answering my question,

19  Mr. Henricksen.  Did you ask him why?  Why,

20  Mr. Knox, are you asking me to send money to your

21  sister-in-law?

22      A.    It was -- you know, the -- the loan that

23  was made was made to his sister-in-law.  That's what

24  he requested.

25      Q.    Did you ask him why?

Page 246

```
 1              MS. ALTMAN:  Do you understand the
 2         question?  He's just asking if you asked him
 3         the reason why.  It's either yes, no, or --
 4         A.   I didn't ask him why.  He sent me an
 5    e-mail saying this is who he wants the money sent
 6    to.
 7    BY MR. WALKER:
 8         Q.   Were you curious about why Michael Knox
 9    would be asking you to send money to his
10    sister-in-law?
11         A.   I'm curious about a lot of things.
12         Q.   Were you curious about that?
13         A.   Not particularly curious.
14         Q.   Do you have any idea who Dale Rose is
15    other than Michael Knox telling you it was his
16    sister-in-law?
17         A.   I have no idea who Dale Rose is.
18         Q.   Have you ever spoken with her?
19         A.   I have never spoken to her.
20         Q.   Have you ever communicated with her in any
21    way?
22         A.   I have never communicated with her in any
23    way.
24         Q.   And I've seen the information.  And it may
25    have been in WeChat or e-mail.  I think it was in
```

Page 247

1   WeChat, where it appeared that you took the name of

2   Dale Rose and the checking or banking information

3   and sent it to William Fung.  Do you recall doing

4   that?

5        A.   Yes.

6        Q.   Were there any conversations between you

7   and William Fung about why you were sending him

8   information for some lady named Dale Rose in Tampa,

9   Florida?

10       A.   The conversations I had was with Dr. Lai.

11       Q.   What conversations did you have with

12  Dr. Lai about that?

13       A.   I told Dr. Lai about Michael Fung --

14  Michael -- Michael Knox's financial situation.  I

15  reflected that in to him.  And Dr. Lai said he'll

16  handle it and decided what course of action to take.

17       Q.   What happened next in that process?

18       A.   I don't know.

19       Q.   Well, you were still involved because at

20  some point when Michael Knox sent you the

21  information of someone named Dale Rose, you somehow

22  knew to forward that to William Fung.  So what -- on

23  what basis were you sending that information to

24  William Fung?

25       A.   He would be the guy that I would send it

1    to that would manage the process.

2         Q.   I want to make sure I understand your

3    testimony, and perhaps I haven't asked all of the

4    questions that I need to.  But from what I've

5    gathered so far, Michael Knox asked for money and

6    you told Dr. Lai that.  Dr. Lai said, "I'll handle

7    it."  Then Michael Knox sent you a message with Dale

8    Rose's name and banking information and you

9    forwarded that to William Fung.  That's what I've

10   gathered so far.

11             Are there any other conversations or

12   communications that you had with anybody about what

13   was going on there?

14             MS. ALTMAN:  Object to the form.  I think

15        mischaracterizes the record.

16             You can answer.

17             THE WITNESS:  Can you read that back?

18             (Requested portion read back.)

19        A.   Well, I had a conversation with Michael

20   Knox.

21   BY MR. WALKER:

22        Q.   Tell me everything that you remember about

23   that.

24             MS. ALTMAN:  Object to the form.

25        A.   He was periodically requesting money.

1    The -- I didn't know what to do, so I forwarded that
2    to Dr. Lai.  Internally, we weren't sure if this
3    was -- it wasn't something I wanted to do, but
4    Dr. Lai said that he'll take care of it.  He'll make
5    a personal loan to whoever it was that Michael Knox
6    deemed appropriate.
7    BY MR. WALKER:
8         Q.   What other conversations were had that
9    you're aware of from the time that Michael Knox
10   asked for money to the time that the payment, the
11   first wire payment, was made to Dale Rose?  Tell me
12   every other conversation that you're aware of
13   regarding that issue.
14        A.   I think --
15             MS. ALTMAN:  Object to the form.
16        A.   I think I communicated quite broadly or
17   succinctly in how this whole process worked.
18   BY MR. WALKER:
19        Q.   Do you recall the specifics of any other
20   conversation that you had with anyone from the time
21   that Michael Knox asked for the money until the time
22   of that first wire payment to Dale Rose?
23        A.   To -- yes.  I said I spoke to Dr. Lai
24   about it.  I spoke to Michael Knox about it.  And
25   those were the two people.

Page 252

```
 1        A.    Yes.
 2        Q.    So Michael Knox approaches you for money.
 3   You go to Dr. Lai who says he'll handle it.  At some
 4   point in this conversation you get Dale Rose's
 5   information and you forward that to William Fung,
 6   correct?
 7        A.    That is correct.
 8        Q.    Did anyone tell you to send that
 9   information to William Fung?
10        A.    No.
11        Q.    The WeChat that I saw doesn't appear to
12   provide very much context in your communication to
13   William Fung.  How did you expect him to understand
14   who Dale Rose was or what this was about?
15        A.    Because Dr. Lai and William Fung sit next
16   to each other.  I don't know what conversations that
17   Dr. Lai and William Fung have.
18        Q.    So when Dr. Lai said, "I'll handle it" --
19   and by "it," it is a wire transfer to Michael Knox's
20   sister-in-law -- it was your assumption that William
21   Fung would understand what was to be done.
22        MS. ALTMAN:  Object to the form.
23        A.    That is correct.
24   BY MR. WALKER:
25        Q.    William Fung at the time was the CFO of
```

Page 253

1   Dragon Jade; is that right?

2        A.   That is correct.

3        Q.   And Dr. Lai was the CEO of Dragon Jade,

4   correct?

5        A.   That is correct.

6        Q.   According to these wire documents, the

7   sender is someone named Ms. Tam -- can you pronounce

8   that for me?

9        A.   Okay.  And let's see here.  Tam Siu Man.

10       Q.   For the benefit of the court reporter,

11  that's T-A-M, S-I-U, M-A-N.

12            Do you know Ms. Tam Siu Man?

13       A.   I have never met her before.

14       Q.   Do you know what relationship, if any,

15  that she has to anyone on the Dragon Jade board of

16  directors?

17            MS. ALTMAN:  Objection to form.

18       A.   I am not aware of any relationship between

19  Tam Siu Man and any board of directors.

20  BY MR. WALKER:

21       Q.   Do you have any idea who Tam Siu Man is?

22            MS. ALTMAN:  Object to the form.

23       A.   Yes.

24  BY MR. WALKER:

25       Q.   What's your understanding?

Page 260

1    your testimony?

2         A.   Yes, because you used the word

3    "appropriate."  I didn't use the word "appropriate,"

4    I believe.  So if I did use the word "appropriate,"

5    then I change my -- it's semantics.

6         Q.   Whether or not this transaction was

7    appropriate or inappropriate, to you, is just

8    semantics.

9              MS. ALTMAN:  Object to the form.

10        A.   I wouldn't have done it.  I handed it off

11   to Dr. Lai.  Dr. Lai felt sorry for Michael Knox.

12   He lent him the money.  Michael Knox had spent a lot

13   of time, you know, complaining about being short of

14   money.  He said he doesn't have money for mortgages,

15   this and that.  Subsequently, we lent money to

16   Ultroid.  At that time, I don't think Ultroid had a

17   clean bank account.

18   BY MR. WALKER:

19        Q.   At what time?

20        A.   At the time that that loan was made.

21        Q.   At the time that the first loan to Dale

22   Rose was made.

23        A.   That is correct.

24        Q.   What do you mean you don't think it had a

25   clean bank account?