UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DRAGON JADE INTERNATIONAL, LTD.,**

    Plaintiff/Counter-Defendant,

v.                                                             Case No: 8:17-cv-2422-T-27CPT

**ULTROID, LLC, ULTROID
MARKETING DEVELOPMENT CORP.,
and ULTROID TECHNOLOGIES, INC.,**

    Defendants/Counter-Plaintiffs.
_____/

## ORDER

**BEFORE THE COURT** is Plaintiff/Counter-Defendant's "Motion for Partial Summary Judgment on Ultroid's Counterclaims" (Dkt. 176), and Defendants/Counter-Plaintiffs' response (Dkt. 177). Upon consideration, the motion is **GRANTED** *in part* and **DENIED** *in part*.

**I.    BACKGROUND**

Dragon Jade International, Ltd. ("Dragon Jade") brought this action alleging that Ultroid, LLC, Ultroid Marketing Development Corp., and Ultroid Technologies, Inc. (collectively, "Ultroid"), breached two agreements between the parties. *See* (Dkts. 1, 1-1, 1-2). Ultroid counterclaimed, alleging a violation of the Florida Deceptive and Unfair Trade Practices Act (Counterclaim I), violations of the federal and Florida Racketeering Influenced and Corrupt Organization Acts (Counterclaims II and III), rescission of the Option Agreement (Counterclaim IV), rescission of the Option and Security Agreements (Counterclaim V), fraud in the inducement – rescission (Counterclaim VI), conspiracy to defraud (Counterclaim VII), and breach of contract (Counterclaim VIII). (Dkt. 126). Counterclaims II-IV were previously dismissed. (Dkt. 136).

Dragon Jade now moves for summary judgment on four of Ultroid's five remaining counterclaims. (Dkt. 176).

## II. UNDISPUTED MATERIAL FACTS

Dragon Jade is a "life science company" that "is focused on identifying, developing and marketing new technologies including therapeutics, medical devices and nutritional supplements." (Dkt. 12-1 ¶¶ 1, 2). Its principal place of business is Hong Kong, China. (Dkt. 1 at 3, ¶ 7). Ultroid is the manufacturer of a Hemorrhoid Management System (the "Device"), which is comprised of a base unit and single-use probe kit that is intended for non-anesthetic, rapid coagulative homeostatic therapy of internal hemorrhoids.[1] (Dkt. 12-1 ¶¶ 3, 4). Ultroid's principal place of business is Tampa, Florida. (Dkt. 1 at 4, ¶¶ 8-10).

Sometime around June 2015, Dragon Jade's Chief Executive Officer, Dr. Steve Lai, became interested in the Device and requested to meet with Ultroid representatives. (Dkt. 126 ¶ 16; Dkt. 139 ¶ 15; Dkt. 169 at p. 6:8-9). In June 2015, Ultroid's founder, Michael Cao, visited Hong Kong to meet with Dr. Lai. (Dkt. 126 ¶ 16; Dkt. 139 ¶ 16). On June 29, 2015, the parties entered into an International Distribution Agreement whereby they agreed that Dragon Jade would be the exclusive distributor of the Device throughout China. (Dkt. 139 ¶ 19; Dkt. 12-1 ¶ 3). Soon after the agreement was signed, Dragon Jade placed its first order. (Dkt. 12-1 ¶ 6). However, on August 27, 2015, the FDA issued a warning letter to Ultroid regarding deficiencies with its quality management system ("QMS") and internal control structures for the Device.[2] (Dkt. 20-1 ¶ 5; Dkt.

---

[1] The Device was developed in the early 2000s by an electrical engineer and gastroenterologist. (Dkt. 126 ¶ 2). In 2003, the Food and Drug Administration ("FDA") granted the developer a 510(k) premarketing authorization, which approved the Device to be manufactured and placed on the market. (Id. ¶ 3). Once the Device was offered on the open market, Ultroid purchased the Device, including its intellectual property. (Id. ¶ 4).

[2] When Dragon Jade learned of the FDA warning letter is in dispute. *See* (Dkt. 12-1 ¶ 7; Dkt. 176-3 at p.

176-2 at 2-6). As a result, Ultroid spent the remainder of 2015 and early 2016 working to remediate its QMS to satisfy the FDA's concerns. (Dkt. 169-3 at p. 65:1-22).

Around the time the warning letter was issued, Dragon Jade expressed an interest in acquiring Ultroid. (Dkt. 126 ¶ 20; Dkt. 139 ¶ 20). In November 2015, Cao and Michael Knox, Ultroid's then-Chief Executive Officer, traveled to Hong Kong to meet with Dr. Lai. (Dkt. 169-5 at pp. 13:1-5, 13:24-14:1). Following that meeting, Ultroid hired a private company to conduct a valuation report of its worth, and in February 2016, Ultroid was appraised at $84,000,000. (Dkt. 176-4 at 3).

Also in February 2016, and while Ultroid was still working to remediate its QMS, Knox became ill and was placed in a medically induced coma for six days, and hospitalized for three weeks. (Dkt. 176-5 at pp. 35:9-36:1-21; Dkt. 20-1 ¶ 6). While Knox was ill and in recovery, Cao assumed the role of acting CEO and took control of Ultroid. (Id.). Dragon Jade became aware of Knox's health issues. (Dkt. 177-5 at 5). In April 2016, Knox and Cao traveled to China to meet Dr. Lai and discuss Dragon Jade's purchase of Ultroid. (Dkt. 20-1 ¶ 7; Dkt. 169-3 at pp. 122:18-20, 123:10-13). Knox and Cao were handed envelopes of cash to reimburse them for the cost of their flights. (Dkt. 169-5 at p. 14:2-7). During this trip, Dragon Jade offered $40,000,000 to purchase Ultroid. (Dkt. 177-2 at pp. 9:25-10:1-7). According to Dr. Lai, Knox first proposed to work for Dragon Jade during this trip. (Dkt. 169-5 at p. 39:3-9).

In July 2016, the FDA conducted an annual inspection of Ultroid's QMS. (Dkt. 169-6 at p. 65:19-21). According to Knox, "[i]t was not a favorable review," and involved the same issues as

---

293:2-7).

the prior FDA warning. (Dkt. 169-3 at p. 94:8-16). In September 2016, Ultroid issued a voluntary recall of the Device and suspended manufacturing until the FDA's concerns were addressed.[3] (Dkt. 20-1 ¶ 8). As a result of the recall, acquisition negotiations between Ultroid and Dragon Jade ceased and Ultroid proposed instead that Dragon Jade purchase its assets.[4] (Dkt. 176-13 at 3).

Asset purchase negotiations soon began between the parties. (Dkt. 20-1 ¶ 9). In October 2016, Knox emailed Dr. Lai and Dragon Jade's consultant, Glenn Henricksen, to inform them that Cao had resigned from the Board and that Knox "was given formal authority, by the board to finalize the terms for the asset sale to [Dragon Jade], and was instructed to accomplish this as quickly as possible." (Dkt. 176-8 at 2). One month later, Henricksen informed Knox that Dragon Jade was offering $3,000,000 to purchase Ultroid's Device. (Dkt. 12-1 ¶ 24; Dkt. 176-7 at 1-3). That offer was rejected. (Dkt. 12-1 ¶ 24; Dkt. 169-2 at p. 114:12-14). Notwithstanding, in December 2016, the parties resumed asset sale negotiations, and on December 28, 2016, Knox advised Ultroid's Board of Directors that Dragon Jade was still interested in the "Ultroid Brand." (Dkt. 176-13 at 5). After a vote, the Board authorized Knox to "begin formal discussions with [Dragon Jade] for the purpose to sell the assets of [Ultroid]." (Id.).

On January 3, 2017, Dragon Jade initiated an arbitration proceeding against Ultroid. (Dkt. 12-1 ¶ 25). According to Dragon Jade, arbitration was initiated because Ultroid could not deliver the Device in accordance with the parties' International Distribution Agreement. (Dkt. 169-2 at pp. 83:14-20, 84:6-15). Notwithstanding, asset negotiations resumed, and on January 11, 2017,

---

[3] Prior to the recall, Knox resigned from his "C-level and managerial positions" with Ultroid due to family concerns. (Dkt. 176-5 at pp. 88:3-11, 89:16-90:1-3; Dkt. 177 at 4). He remained employed by Ultroid and continued to serve as director, secretary, and treasurer until he was terminated in February 2018. (Id.; Dkt. 176-10).

[4] The assets include the 510(k) premarketing authorization, US Patent Nos. 8131380 and 9179966, CA Patent No. 2597892, and US Registered Trademark Nos. 3526435 and 1485175. (Dkt. 176-15 at 9; Dkt. 177-6 ¶ 3).

Henricksen, on behalf of Dragon Jade, presented verbal terms of a proposed asset sale to Ultroid's Board.[5] (Dkt. 12-1 ¶ 26; Dkt. 176-13 at 7). The terms included a purchase price of $1,000,000 cash plus 500,000 shares of Dragon Jade stock, which had a market value of approximately $1,500,000. (Dkt. 12-1 ¶ 26). The Board found the proposed terms acceptable and asked Dragon Jade to prepare a final document for Ultroid's corporate counsel to review. (Dkt. 176-13 at 7). Dragon Jade's corporate counsel, Richard Blaylock, drafted the Exclusive Option and Remediation Agreement (the "Option Agreement") based on the approved terms and presented the Option Agreement to Ultroid. (Dkt. 169-3 at p. 110:2-11).

According to the Option Agreement, Dragon Jade would agree to stay the arbitration and fund and manage the performance of certain remediation tasks with respect to Ultroid's Device. (Dkt. 176-15 at 2, § 2.9). In exchange, Ultroid would agree to grant Dragon Jade an exclusive option to purchase its assets. (Id. at § 2.1). If Dragon Jade elected to exercise the option to purchase Ultroid's assets, the Option Agreement required the parties to negotiate, in good faith, terms and conditions of an Asset Purchase Agreement.[6] (Id. at §§ 1.1(b), 2.4). The Option Agreement also included certain clauses to protect Dragon Jade's investment in bringing the Device and QMS within FDA's standards. Indeed, in order to protect Dragon Jade's investment, the Option Agreement required Ultroid to grant Dragon Jade a security interest in its assets, by executing a separate security agreement. (Id. at § 4.1). On January 19, 2017, the parties executed the Option

---

[5] At the time, Ultroid's Board of Directors comprised of Knox and one other individual. (Dkt. 176-13 at 7).

[6] Attached as Exhibit B to the Option Agreement is the "Summary of Terms of Asset Purchase Agreement." (Dkt. 176-15 at 10). Previously, this Court determined that shareholder approval was not required for Ultroid to enter into the Option and Security Agreements. (Dkt. 136). In determining that issue, this Court found that the Option Agreement did not constitute a proposed sale of Ultroid's assets, but rather it gave Dragon Jade a security interest in Ultroid's assets and provided Dragon Jade the option to negotiate terms of a "proposed sale", *i.e.* the asset purchase agreement, at a later time. (Id. at 11).

5

Agreement, with Knox executing on behalf of Ultroid, and William Fung, Dragon Jade's chief financial officer, executing on behalf of Dragon Jade. (Dkt. 176-15 at 8). On January 20, 2017, Knox executed the corresponding Security Agreement.[7] (Dkt. 20-1 ¶ 11).

The validity and enforceability of these agreements are contested by the parties. Specifically, Ultroid contends that Dragon Jade "engaged in bribery, extortion, deceit, and other fraudulent conduct to coerce, manipulate, and mislead Michael Knox, Ultroid's former CEO, into executing the [Option] Agreement." (Dkt. 177 at 2). Relevant to these contentions are the following undisputed facts. Prior to the execution of the Option Agreement, around mid-January 2017, Knox informed Dragon Jade that he had serious financial troubles and requested financial assistance. (Dkt. 169-2 at pp. 242:16-25, 243:1, 244:1-4; Dkt. 169-5 at p. 18:2-22). As a result, after the Option Agreement was signed, Dr. Lai used third parties to transfer, in two payments, a total of $15,400 to Knox. The payments were memorialized as loan agreements.[8] (Dkts. 176-20, 176-23). The first transfer occurred on January 23, 2017, whereby Dr. Lai enlisted one of Dragon Jade's clerks, Tam Siu Man, to wire $10,000 from her personal funds to Knox's sister-in-law, Dale Rose. (Dkt. 176-

---

[7] Through the Security Agreement, Ultroid pledged and granted a security interest, including a first priority lien, in:

> all right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising acquired: (i) all Ultroid Assets and any and all claims, rights and interests in any of the Ultroid Assets; (ii) all guaranties and security for any items set forth in (i); (iii) all substitutions and replacements for, additions, accessions, attachments, accessories, and improvements to, and proceeds (including proceedings of any insurance policies, proceeds of proceeds and claims against third parties) of, any and all of the items set forth in (i) and (ii); and (iv) all of Ultroid's books relating to any and all of the items set forth in (i), (ii) or (iii) (collectively, the "Collateral").

(Dkt. 1-2 ¶ 1). Moreover, pursuant to the Security Agreement, Dragon Jade filed several UCC Financing Statements against Ultroid's assets. (Dkt. 1-3 at 2-7).

[8] Whether these transfers were made as "loans" or "under-the-table payments" is disputed. (Dkt. 169-1 at p. 98:16-17).

6

1 at pp. 20:1-20, 22:9-12, 27:1-5, 28:8-10). Later that year, on July 25, Knox emailed Henricksen requesting an additional $10,000 due to "a financial situation which is very uncomfortable for my family and myself." (Dkt. 176-22 at 2). As a result, Dr. Lai facilitated the second transfer to Dale Rose, by asking Dragon Jade's CFO, William Fung, whether he was willing to make a payment out of his own personal funds. (Dkt. 176-1 at pp. 49:10-15; 52:7-10). Fung agreed, and on July 31, 2017, he wired $5,400 from his personal funds to Rose.[9] (Dkt. 169-5 at pp. 49:10-15, 50:2-4). This transfer was also memorialized as a loan between Man and Rose.[10] (Id. at p. 49:17-24; Dkts. 176-20, 176-23). On August 15, 2017, Knox met with Dr. Lai and Henricksen in New York City to discuss Knox working for Dragon Jade.[11] (Dkt. 20-1 ¶ 16; Dkt. 169-2 at p. 223:4-14). During that meeting, Dragon Jade offered Knox a role as a consultant if the asset purchase was completed. (Dkt. 169-2 at p. 224:6-11; Dkt. 177-5 at 5-6).

After the Agreements were executed, remediation of Ultroid's QMS progressed slower than anticipated.[12] And on September 22, 2017, Michael Goeree was appointed as Ultroid's president

---

[9] Dr. Lai testified that he repaid both Man and Fung from his personal funds and that neither Knox nor Rose ever repaid the loans. (Dkt. 176-1 at pp. 44:2-18, 56:21-23).

[10] Ultroid further alleges that Knox was "blackmailed" by Dragon Jade into signing the Option Agreement, contending that "[o]n at least one occasion, Dr. Lai threatened to release photographs taken of Knox in compromising situations while in Hong Kong if he did not execute the Agreement." (Dkt. 177 at 6). In support of this contention, Ultroid cites to the testimony of Michael Goeree, who testified that Knox told him of this threat. *See* (Dkt. 169-1 at pp. 99:21-25, 100:1-25, 101:1-23). Dr. Lai, however, disputes any such threat. (Dkt. 169-5 at p. 16:11-14).

Even if Dragon Jade is correct that Goeree's statements constitute inadmissible hearsay, courts in this Circuit "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3 1283, 1294 (11th. Cir. 2012). In any event, it is unnecessary to rely on this evidence to resolve Dragon Jade's motion.

[11] According to Knox, at the meeting Dragon Jade offered him a position, which he later rejected. (Dkt. 20-1 ¶ 16). Dragon Jade, however, contends that Knox made a presentation to work at Dragon Jade during this meeting and had expressed his desire to work for Dragon Jade numerous times from January 2017 through August 2017. (Dkt. 169-2 at pp. 223:4-14, 224:12-18).

[12] Each party submits its reasons why remediation was not completed. According to Ultroid, "Dragon Jade breached the Agreement by failing to engage Underwriters' Laboratories for testing and certification of the [Device] and by failing to timely install a Quality Management System." (Dkt. 177 at 10). Dragon Jade contends that sometime

7

and CEO, and Cedrick Lewis was appointed as its legal advisor. (Dkt. 169-1 at pp. 16:1-9, 17:18-23, 18:11-15). That same day, Knox sent Dragon Jade a letter indicating that leadership had changed and that the letter served as "notice of breach of our agreement and termination of the option effective immediately." (Dkt. 176-31 at 2-3). This action soon followed.

## III. STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). All facts are viewed and all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1998).

The moving party bears the initial burden of showing that there are no genuine disputes of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party demonstrates the

---

after January 23, 2017, it "learned that remediation would not be as simple as Ultroid had represented, but instead would take significantly more time and money." (Dkt. 176 at 7).

8

absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file to designate facts showing a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. A court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, a court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *See id.*

## IV. DISCUSSION

For the reasons below, Dragon Jade's motion for partial summary judgment is granted as to Counterclaim I, and denied as to Counterclaims V-VII.[13]

### i. *FDUTPA (Counterclaim I)*

In Counterclaim I, Ultroid alleges that Dragon Jade violated Fla. Stat. § 501.204, the Florida Deceptive and Unfair Trade Practice Act ("FDUTPA"). (Dkt. 126 at 7-16). Dragon Jade moves for summary judgment on three grounds: 1) "Ultroid cannot establish any deceptive act or unfair practice," 2) "Dragon Jade did not proximately cause Ultroid's damages," and 3) "lost revenues and added expenses are not FDUTPA damages." (Dkt. 176 at 9-15). Summary judgment on Count I is due to be granted because Ultroid has failed to establish actual damages.

The elements of a FDUTPA claim for damages are: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. General Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016) (citation omitted). A deceptive practice is one that is likely to mislead consumers, and an unfair practice is one that "offends established public policy" or is "immoral, unethical,

---

[13] As stated above, Counterclaims II, III, and IV were previously dismissed. *See* (Dkt. 136).

9

oppressive, unscrupulous or substantially injurious to consumers." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (internal citation and quotations omitted). Actual damages are "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Carriuolo*, 823 F.3d at 986 (citation omitted). Actual damages do not include "actual consequential damages", "nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Smith v. 2001 S. Dixie Highway, Inc.*, 872 So. 2d 992, 994 (Fla. 4th DCA 2004) (quoting *Rollins, Inc.*, 951 So. 2d at 873).

In its response, Ultroid contends that "a jury could reasonably conclude that Dragon Jade engaged in immoral, unscrupulous, unethical and illegal conduct, and that said conduct coerced, manipulated and intimidated Knox into executing the Agreements" and that "there is sufficient record evidence to support Ultroid's position that it was damaged by Dragon Jade's fraudulent, deceptive and unfair trade practices." (Dkt. 177 at 14-15). In support of its allegations that "Dragon Jade blackmailed and threatened Knox by threatening to release photographs of him if he did not execute the Agreement," (Id. at 14), Ultroid cites to the deposition of Michael Goeree who testified about Dragon Jade's alleged efforts to "blackmail" Knox when Dr. Lai told Knox that they had taken photographs of him "with a woman that's not his wife." (Dkt. 169-1 at pp. 99:21-101:7). Further, in support of its allegation that "Dragon Jade also extorted [Knox's] financial vulnerabilities," Ultroid relies on the record evidence surrounding the two wire transfers to Knox's sister-in-law, and Dr. Lai's offer of a consultant position to Knox that was contingent on the sale of the Assets. (Dkt. 169-1 at pp. 95:18-96:21, 98:8-22; Dkt. 169-5 at pp. 17:23-18:4, 20:1-21:5, 22:1-3, 34:11-21; 36:5-21, 39:3-9, 49:10-15, 54:22-25, 55:25-56:8; Dkt. 20-1 ¶ 16; Dkt. 177-5 at

5-6). On this record, disputed issues of material fact exist and therefore a reasonably jury could find that Dragon Jade's conduct consisted of deceptive acts or unfair practice that led to Ultroid executing the Agreements.

As for actual damages, Ultroid contends that the record evidence shows that, as a result of Dragon Jade's conduct, "Ultroid did not end up with the remediated QMS and marketable Product that it expected to have and has had to incur costs associated with having to fund the remediation efforts that it believed would be fulfilled by Dragon Jade" and that Ultroid was "deprived of the significant value of its intellectual property, including the right to sell and transfer that property, due to Dragon Jade's actions." (Dkt. 177 at 15). In support, Ultroid relies on the affidavit of Michael Goeree, who avers that "Ultroid has indeed continued in its own remediation efforts, and it has funded those efforts" and that Ultroid "hired another company to bring the product back to market . . . ." (Dkt. 31-1 ¶ 3).

This evidence, however, fails to establish that Ultroid suffered actual damages as a result of any alleged deceptive act. *See Jones v. TT of Longwood, Inc.*, 2007 WL 2298020, at *7 (M.D. Fla. 2007) ("A plaintiff cannot recover a monetary remedy under the FDUTPA where she fails to establish that she suffered actual damages as a result of the defendant's misrepresentations."). At most, the limited evidence relied on by Ultroid shows that Ultroid decided to take over and fund remediation and hired another company to bring their product back to market. Missing, however, is any evidence establishing "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Carriuolo*, 823 F.3d at 986; *see also Reilly v. Chipotle Mexican Grill, Inc.*, 711 F. App'x 525 (11th Cir. 2017) (affirming the district court's

granting of summary judgment against plaintiff for failing to establish non-speculative losses); *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 181 (Fla. 3d DCA 2010) (affirming summary judgment where plaintiff "failed to present any evidence relating to the proper measure of 'actual damages' in opposition").

Accordingly, because Ultroid cannot establish actual damages, summary judgment on Counterclaim I is due to be granted. *See Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (affirming summary judgment where a plaintiff fails to establish one of the elements of its FDUTPA claim).

### ii. *Fraudulent and Illegal Conduct (Counterclaim V)*

In Counterclaim V, Ultroid seeks rescission of the Option and Security Agreements alleging that "Knox executed the Option and Security Agreements under duress, undue influence, extortion, coercion, bribery, fraudulent circumstances, and other illegal or deceitful conduct by Dragon Jade . . . ." (Dkt. 126 ¶ 177). Dragon Jade moves for summary judgment, contending that Ultroid cannot establish the requisite elements, and alternatively, that rescission is not Ultroid's only remedy at law. (Dkt. 176 at 16-17).

Under Florida law, to prevail on its claim for rescission, Ultroid must prove (1) the relationship of the parties; (2) the making of a contract; (3) the existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission; (4) that the party seeking rescission in fact rescinded the contract and notified the other party of the rescission; (5) if benefits have been received from the contract, an offer to restore these benefits to the party who furnished them, if possible; and (6) that the moving party has no adequate remedy at law. *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965).

Ultroid responds to Dragon Jade's motion contending that the record evidence supports its allegations that Dragon Jade engaged in conduct that constitutes grounds for rescission of the Agreements. Indeed, Ultroid relies on the record evidence to draw the inference that Dragon Jade exploited Knox's "vulnerabilities" when it twice wired him money, offered him a consultant position if the asset sale went through, and told him that certain photographs were taken of him without his knowledge. (Dkt. 169-1 at pp. 95:18-96:21, 98:8-22, 99:21-101:7; Dkt. 169-5 at pp. 17:23-18:4, 20:1-21:5, 22:1-3, 34:11-21; 36:5-21, 39:3-9, 49:10-15, 54:22-25, 55:25-56:8; Dkt. 20-1 ¶ 16; Dkt. 177-5 at 5-6). Viewing the evidence in a light most favorable to Ultroid, Ultroid has demonstrated that genuine issues of material fact exist on this claim.[14] And notwithstanding Dragon Jade's contention that Ultroid has other remedies at law, Florida courts have held the fact "that there is a related cause of action at law does not, alone, preclude maintaining a rescission claim." *Anchor Bank, S.S.B. v. Conrardy*, 763 So. 2d 360, 361 (Fla. 4th DCA 1998); *see also Wynfield Inns v. Edward Leroux Group, Inc.*, 896 F.2d 483, 488 (11th Cir. 1990) (noting that "an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment"). Accordingly, summary judgment on Counterclaim V is denied.

### iii. *Fraud in the Inducement (Counterclaim VI)*

In Counterclaim VI, Ultroid seeks rescission of the Option and Security Agreements,

---

[14] Dragon Jade does not expound on its contention that "Ultroid cannot establish the requisite elements." Rather, it merely argues that "Counterclaim V is an attempt to reframe the allegations Ultroid made" in Counterclaims I, II and III, and that its "allegations of 'financial manipulation,' 'extortion,' 'threats to release embarrassing pictures,' and 'concealment of legal requirements'" are unsupported. (Dkt. 176 at 16). Further, Dragon Jade includes, "[f]or the same reasons described herein, summary judgment in Dragon Jade's favor is appropriate." (Id.). Notwithstanding its contentions, this Court is not required to "search the record and construct every argument that could have been made based upon the proffered materials." *Restigoache, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 n.5 (11th Cir. 1995) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). In any event, Ultroid includes citations to the record evidence which demonstrate genuine issues for trial.

alleging that Dragon Jade fraudulently induced Knox to execute them. (Dkt. 126 at 25-28). Dragon Jade moves for summary judgment, contending that Ultroid fails to establish "that it was fraudulently induced into executing the Agreements" and that "Ultroid has an adequate remedy at law and has waived its right to rescission." (Dkt. 176 at 17).

The elements of a fraud in the inducement claim are: (1) a false statement of fact, (2) known by the defendant to be false when it was made, (3) made to induce reliance, (4) reliance on the false statement, and (5) resulting damages. *Noack v. Blue Cross & Blue Shield of Florida, Inc.*, 742 So. 2d 433, 434 (Fla. 1st DCA 1999); *Wynfield Inns v. Edward Le Roux Grp., Inc.*, 896 F.2d 483, 490-91 (11th Cir. 1990). In an effort to avoid summary judgment, Ultroid relies on both the affidavit of Michael Knox, in which he avers that Dragon Jade "could not fulfill its non-monetary obligations under the Agreement," that "it did not have sufficient funds or intent to fulfill their obligations under the [Option] Agreement," and Knox's testimony, in which he details the August 2017 meeting in New York City during which Henricksen told him "we don't care if we ever finish it." (Dkt. 20-1 ¶¶ 13-17; Dkt. 169-3 at pp. 130:5-16, 133:16-134:1).

Construing this evidence in a light most favorable to Ultroid, a reasonable inference could be drawn that Ultroid relied on Dragon Jade's representation of its intent to remediate the Device and make payments under the Option Agreement, when in fact, Dragon Jade had no intention of doing so.[15] *See D & M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487 (Fla. 4th DCA 2003) ("As

---

[15] As Dragon Jade correctly notes, at numerous times during his depositions, Knox invoked his Fifth Amendment right against self-incrimination. The general rule is that an adverse inference may be drawn against a party in a civil action when he refuses to testify in response to probative evidence against him. *Baxter v. Palmigiano*, 425 U.S. 308, 317-18 (1976); *United States v. A Single Family Residence and Real Property*, 803 F.2d 625, 629 n.4 (11th Cir. 1986). However, "[t]he negative inference, if any, to be drawn from the assertion of the Fifth Amendment does not substitute for evidence needed to meet the burden of production" required to obtain summary judgment. *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991). "Rather, a party seeking summary judgment must establish independently the elements of [each] claim within the confines of [Rule 56, Federal Rules of Civil Procedure]." *SEC*

a general rule, it is a matter for the jury to determine if an intentional misrepresentation has been made"). Accordingly, a material issue of genuine fact exists as to whether Knox was fraudulently induced into signing the Option and Security Agreements and, therefore, summary judgment on Counterclaim VI is denied.

### iv. Civil Conspiracy (Counterclaim VII)[16]

In Counterclaim VII, Ultroid alleges that Dragon Jade conspired with Knox to defraud Ultroid by "illegally divest[ing] Ultroid of its Assets." (Dkt. 177 at 19). Dragon Jade moves for summary judgment, contending that "Ultroid cannot establish an independent wrong or tort that would be a cause of action if performed by one person," and alternatively, that Ultroid "fails to establish all elements of a civil conspiracy . . . because it cannot establish that two or more parties conspired to defraud it." (Dkt. 176 at 19-20).

To succeed on a claim for civil conspiracy, Ultroid must prove "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to [the] plaintiff as a result of the acts performed pursuant to the conspiracy.'" *Olson v. Johnson*, 961 So. 2d (Fla. 2d DCA 2007) (citing *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006)) (brackets in original). "An actionable [civil] conspiracy requires an actionable underlying tort . . ." or there exists some "peculiar power of coercion possessed by the conspirators by virtue of their combination." *Walters*, 931 So. 2d at 140 (citations and internal quotations omitted).

---

*v. Scherm*, 854 F. Supp. 900, 905 (N.D. Ga. 1993) (citing *Avirgan*, 932 F.2d at 1580). Moreover, whether Knox's averments and testimony are credible is better left for the jury to resolve. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citations omitted) (on summary judgment, the court "draws all justifiable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence").

[16] This counterclaim is pled in the alternative. *See* (Dkt. 126 ¶ 194).

Whether Ultroid can establish an independent wrong or tort is not adequately briefed by the parties. In an effort to show that no genuine issue of material fact exists as to this element of a conspiracy claim, Dragon Jade argues that "Ultroid bases its conspiracy counterclaim on its claim for fraud in the inducement" and that "[f]or all the reasons described above in Parts IV.A, IV.C, Ultroid's conspiracy counterclaim necessarily fails as a matter of law." (Dkt. 176 at 19). However, the practice of incorporating by reference previous arguments has been rejected in this Circuit. *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004) (explaining incorporation by reference "attempts to both bypass the rules governing space limitations and transfer [the] duty to make arguments to the judges of this panel. We now take the opportunity to join the many other Circuits that have rejected the practice . . ., and we hold that [the movant] has waived the arguments it has not properly presented for review."). Moreover, Dragon Jade fails to explain how "Ultroid cannot establish an independent wrong or tort that would be a cause of action if performed by one person." (Dkt. 176 at 19).

In any event, Ultroid's cause of action for civil conspiracy incorporates the allegations in its cause of action for fraud against Dragon Jade and Knox. *See* (Dkt. 126 ¶¶ 198-205). Indeed, Ultroid alleges that the underlying wrongs in this case are the "unfair, deceptive, and/or fraudulent conduct" that led to the execution of the Option and Security Agreements. (Id. at § 203(a)). And as stated above, material issues of disputed fact remain as to those allegations and present a classic issue for the trier of fact. As such, summary judgment on Ultroid's claim for civil conspiracy is due to be denied.

Dragon Jade's second contention that "Ultroid's civil conspiracy claim also fails because it cannot establish that two or more parties conspired to defraud it" (Dkt. 176 at 20), also lacks

16

merit. Indeed, the record evidence relied on by Ultroid demonstrates that material issues of fact exist as to whether Dragon Jade and Knox conspired by engaging in deceptive and/or fraudulent conduct for Ultroid to enter into the Option and Security Agreements. *See* (Dkt. 169-2 at pp. 242:16-25, 243:1, 244:1-4; Dkt. 169-5 at p. 18:2-22; Dkt. 176-13 at 5; Dkt. 176-8 at 2). Accordingly, summary judgment on Counterclaim VII is due to be denied.

## IV. CONCLUSION

Accordingly, Dragon Jade's Motion for Partial Summary Judgment on Ultroid's Counterclaims (Dkt. 176) is **GRANTED *in part* and DENIED *in part***. The Clerk is directed to enter judgment in favor of Dragon Jade and against Ultroid on Counterclaim I. Dragon Jade's motion for summary judgment on Ultroid's Counterclaims V, VI and VII is **DENIED**.

**DONE AND ORDERED** this 29th day of September, 2020.

*/s/ James D. Whittemore*
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record, Unrepresented Parties